# TRANSCRIPT OF THE DEPOSITION OF:

## DR. MARGARET MONTGOMERY-RICHARD
## 02/18/08

---

### PATRICK CARPENTER

### VERSUS

### LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

**VENTURELLA & ASSOCIATES, L.L.C.**
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT A

Case 3:07-cv-00170-JJB-SCR   Document 71-4   05/05/08   Page 2 of 13

PATRICK CARPENTER DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD   REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008   LILLIE R. BURCH, CCR

Q. Were you the person bringing the case or were you the manager being deposed?

A. I was the EEO officer who handled the case.

Q. Oh, okay. We'll get into that when we get into your background.

Just to remind you, the court reporter is taking everything down. Try to answer everything verbally. I would ask that the court reporter make a notation of affirmative nod or negative nod if it can be ascertained; however, I'd ask that you say yes or no if it's appropriate for the answer. Okay?

A. Yes.

Q. If I ask a question that you don't understand, please just let me know and I'll rephrase it. Okay?

A. Okay.

Q. Is there any reason medically or otherwise that you wouldn't be able to testify coherently today?

A. No.

Q. Dr. Montgomery-Richard, what is your highest level of education?

Page 5

A. I have a Ph.D. in higher education administration.

Q. How long did you work for LTC?

A. I worked for Louisiana Technical Colleges System -- I was chancellor for three years. And prior to that I was senior vice president for academic student affairs for a year.

Q. For one year?

A. Yes.

Q. What job did you hold right before that?

A. I was provost of Delgado Community College, City Park Campus, where I managed six campuses, eleven thousand students, and about fifteen hundred faculty and staff.

Q. Okay, and you referenced, when I asked you if you had ever given a deposition before, something about at one time being an EEO officer for Delgado? Was that a position you held before provost?

A. No. Actually, before provost I was dean of work force training and development for the college. Prior to that I

Page 6

served as assistant to two presidents, Dr. Ion Illia and Dr. Jim Collier, for four years each, I think.

Q. And then sometime before that you were in the EEO office?

A. As part of my role under Dr. Collier and Dr. Boyer I was assigned EEO as one of my functions. And I did that for about six years. I was EEO when ADA laws were passed and when Anita Hill and Clarence Thomas --

Q. The beginning of sexual harassment?

A. Yes.

Q. How many years did you work in the Delgado system?

A. Twenty-three years.

Q. So would that be most of your career up to now, the twenty-three years at Delgado and four years at LTC?

A. Yes.

Q. What have you been doing since LTC?

A. Officially I retired from State of Louisiana in September of 2007. And I left

Page 7

June 30, 2006 after the legislature reorganized how the Louisiana Technical Colleges would function. They wanted to eliminate the chancellor's office. I had a lot of time and asked for some leave. And in September, as you all probably know, I had a buy-out of my contract. I had two years left on my contract and I requested that because of the changes in the legislature that my contract had been breached in terms of I was hired to create one college with forty campuses in seven districts. So when I reviewed my contract I was not -- I did not sign up for what we ended up with.

Q. So after a little negotiation they --

A. They resolved my contract.

Q. Did you have to retain legal counsel for that?

A. No.

Q. Are you doing some kind of consulting work now?

A. Yes. I'm partnered with DMM and Associates. We do diversity training, work force, project management, higher ed

Page 8

2 (Pages 5 to 8)

321 North Vermont Street   VENTURELLA & ASSOCIATES, L.L.C.   Telephone: (985) 893-1999
Covington, Louisiana 70433   Board-Certified Court Reporters   Facsimile: (985) 893-6765

PATRICK CARPENTER    DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008    LILLIE R. BURCH, CCR

```
 1    institutions, school districts.
 2         Q.   When you were hired at LTC was it
 3    pursuant to a legislative directive?
 4         A.   No.
 5         Q.   Was it pursuant to trying to
 6    change the direction of LTC, something about
 7    the academics or something like that? Did you
 8    have a mission, or a charge?
 9         A.   Actually, I was hired out of a
10    search process. I applied for the job of
11    chancellor. I was serving as senior vice
12    president of the system and had been assigned
13    to work very closely with the LTC. Began to
14    see the problems and challenges that actually
15    were in place as a result of trying to -- the
16    state was trying to create a two-year post
17    secondary system. They were moving the old
18    vo-tech from under the secondary system into
19    higher ed. The Louisiana Technical College of
20    the old vo-techs had no process in place, no
21    forms. To become one college with all the
22    multiple campuses there was a need to create a
23    system. So part of my responsibility as
24    senior vice president was to assist the what
25    was called then I think assistant vice
                                           Page 9
```

```
 1    chancellors or something of that nature to
 2    actually look at some of the challenges. The
 3    former chancellor of the college had been
 4    released. And once he was released they were
 5    searching for the sixth chancellor of a school
 6    that had been in existence since 1999, had
 7    been created in 1999.
 8         Q.   Do you know if you were the first
 9    African American chancellor?
10         A.   I know I was the first woman.
11    There were lots of interims in between, but
12    officially went through a search of ninety
13    candidates across the country with four levels
14    of interviewing. I will say I know I was the
15    first woman and I'm pretty sure I'm the only
16    African American.
17         Q.   At that level?
18         A.   At that level, yes. But not in
19    the system. There are other African Americans
20    in the system, Louisiana Technical Community
21    College System.
22         Q.   Did you regard the end of your
23    employment, the resignation or retirement
24    which you have just explained, I believe you
25    said it was because of legislative action?
                                          Page 10
```

```
 1         A.   Yes.
 2         Q.   Do you regard that action as
 3    having anything to do with the perception by
 4    the legislature or any other entity, or person
 5    of authority that your performance was in any
 6    way deficient?
 7              BY MR. VINCENT:
 8                   Jim, same standard objections?
 9              BY MR. ARRUEBARRENA:
10                   Yes.
11              BY THE WITNESS:
12                   No. If I got my performance
13    evaluations they were always excellent.
14              MR. ARRUEBARRENA CONTINUES:
15         Q.   So no one conveyed to you that
16    they felt?
17         A.   Poor performance never came up in
18    a conversation.
19         Q.   Who would have been your
20    superior?
21         A.   Walter Bumpus.
22         Q.   Did he ever convey to you that he
23    felt there was something deficient about your
24    performance?
25         A.   No.
                                          Page 11
```

```
 1         Q.   Do you know if Mr. Meaux --
 2         A.   Mr. Meaux was the vice chancellor
 3    -- state your question again.
 4         Q.   Mr. Meaux was a subordinate of
 5    yours?
 6         A.   Yes.
 7         Q.   So he wouldn't have the authority
 8    to judge your performance?
 9         A.   No. But I think in a three sixty
10    environment you should always have people
11    judging your performance. But Mr. Meaux was
12    one of my major resistors. Because Mr. Meaux
13    wanted the job.
14         Q.   You mean the chancellor's job?
15         A.   Yes.
16         Q.   I'm just interested in this
17    legislative action to take out the
18    chancellor's office. Did that change the
19    direction you thought they were trying to
20    take, reverse course and go back to a
21    vocational school?
22         A.   Yes.
23         Q.   What force, political force or
24    whatever it was, caused that change to happen?
25         A.   They had a special joint
                                          Page 12
```

3 (Pages 9 to 12)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433        Board-Certified Court Reporters           Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-4    05/05/08    Page 4 of 13

PATRICK CARPENTER    DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008    LILLIE R. BURCH, CCR

        A.    There was a time when Mr. Meaux made some administrative decisions.  And you have to walk through this in terms of setting up this district model.  We were required to set up a district model.  And we being myself and all of the vice chancellors as they became called under my tenure.  I changed their titles from assistants to vice chancellors and provosts.  Because they felt like the redheaded stepchildren when they had to meet with the other vice chancellors in the district who were part of the system.  When we would make a decision District 2 which was under Mr. Meaux's authority would always, always, always, always, have their plan and our plan.
        They took my computer while I was out, so I don't even know what happened to some of the notes.  Because I did write him about the fact that we had one data system.  And the only system was the SCI system that we used.  We learned that they were doing double data systems.  They were doing double work.  They were doing things that were outside of the directives.

Page 21

        Q.    Let me just kind of --
        A.    But Patrick was in this, so let's keep going, if you don't mind.
        Q.    Well, let me just --
    BY MR. VINCENT:
        No.  If Patrick is involved, let the witness answer the question.
    BY MR. ARRUEBARRENA:
        I know, but I don't want the witness to just go off on an unguided narrative.  In other words, let me ask her some questions --
    BY MR. VINCENT:
        No.  Does it deal with Patrick?
    BY THE WITNESS:
        Well, Patrick got in the mix when he started making all these moves.
    BY MR. ARRUEBARRENA:
        You mean complaints?
    BY THE WITNESS.
        Yes.  When Patrick was complaining, the initial complaint came when -- it seems that people were being moved and things were changing when we were doing the district model.  Because the vice

Page 22

chancellors -- I am not a micromanager under normal circumstances.  When you don't have a system you have to make some very specific directives.  Okay?  So you direct the heads of those units.  In order for us to become a system everybody should be moving in the same direction.  This is how we agreed.  It wasn't as if we didn't talk about it.  We talked things through all the time.  When we made a decision to make some assignments around positions, what positions would be filled based upon the district model that they all had agreed upon.  And the district model was something that I inherited and was intended to help make it work.  The complaints started coming in when I guess Patrick was hired to do one thing or he was one place and then all of a sudden he got moved to another place.  And his duties changed or he was, like, initially -- the style of that campus management was always deal cutting, not necessarily based upon people's level of competence or capacity to do a job.
        Q.    Let me ask you about some certain complaints and you can tell me how all of that

Page 23

interplayed.  Let me show you this.  This is Bates number 29 through 33.  First I want to know if you are aware of this complaint or if you ever saw it or discussed it with anyone.  It's a letter to Wainwright.
        A.    I don't remember anything of this length coming to me.
        Q.    First let me confirm with you.  Would you agree being an ex-EEO person with your knowledge of, you know, the business that the LTC College Systems that a complaint that starts off:  Formal rejection of a corrective action and a formal complaint of harassment as defined by LCTCS policy 2.3.011, based on my race ans my color.
    BY THE COURT:
        By definition that complaint would be a prohibited discrimination complaint?
        A.    Yes, I mean, he says clearly race.
        Q.    What was Mr. Wainwright's responsibility at this point, assuming he got it?  That's an issue.  But assuming he got this complaint, what should be done?

Page 24

6 (Pages 21 to 24)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433        Board-Certified Court Reporters          Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-4    05/05/08    Page 5 of 13

PATRICK CARPENTER    DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008    LILLIE R. BURCH, CCR

### Page 25

1   A.   He should have brought it to his
2   supervisor, who was Mr. Meaux at the time.
3   And Mr. Meaux should have brought it to
4   Margaret or myself.
5   Q.   Okay, let me show you another
6   complaint and see if you can give me your
7   testimony on that. I will mark this MR 1,
8   Bates Number 21, 22, and the last one is Bates
9   Number 5.
10      (Witness viewing document.)
11   A.   Okay.
12   Q.   This letter is addressed to you.
13   It's certified mail number 7004 1350 0000 4274
14   8735. And if you go back to the last page,
15   Leslie Hatfield signed for that on April 8.
16   Do you see that?
17   A.   Yes.
18   Q.   Who is Leslie Hatfield?
19   A.   She was the secretary in HR.
20   Q.   Was she your secretary?
21   A.   No.
22   Q.   She was Margaret's secretary?
23   A.   Yes.
24   Q.   Why would Margaret tell me she
25   wasn't sure what Leslie Hatfield did? Does

### Page 26

1   that make any sense to you?
2   A.   No.
3   Q.   So this complaint even though it
4   was addressed to you was received by Margaret
5   Webb's secretary?
6   A.   Yes.
7   Q.   This is a similar kind of
8   complaint. You don't have to read the whole
9   thing right now. If you feel at any point you
10   need to read the whole exhibit to answer a
11   question, let me know. But just reading the
12   first paragraph would you agree it's a
13   complaint involving prohibited discrimination?
14   A.   Yes. And this was probably when
15   I first asked Margaret to look into this.
16   Q.   Okay, let me just show you
17   something else with regard to that. There are
18   other letters which we will look at. But I
19   show you what I will mark as Exhibit MR 2,
20   Bates 24. April Magee was your secretary,
21   correct?
22   A.   Yes.
23   Q.   And this is an e-mail as you can
24   see on April 13. Would you agree it's
25   probably referring to the first exhibit, M1?

### Page 27

1   A.   It's referring to a complaint,
2   yes.
3   Q.   But looking at M1 and the
4   dates --
5   A.   I don't really remember this, but
6   if April sent this I directed her to send it.
7   Q.   April 13, 2005 to Patrick
8   Carpenter, copied to Margaret Webb.
9   A.   Right.
10   Q.   It says: Mr. Carpenter,
11   Chancellor Richard asked me to let you know
12   that we are in the process of researching your
13   grievance and will notify you in a few weeks.
14   Thank you and please contact our office if you
15   have any questions.
16      Now, just let me let you know
17   that Ms. Webb said as a result of this e-mail
18   and a discussion she had with you you told her
19   Region 2 would do the investigation.
20      BY MR. VINCENT:
21      I object to the form of the
22   question. You can go ahead and answer.
23      MR. ARRUEBARRENA CONTINUES EXAMINATION:
24   Q.   Do you agree with that?
25   A.   No.

### Page 28

1   Q.   Tell me what you remember about
2   this situation.
3   A.   I did tell Margaret to contact
4   Mr. Meaux and to find out what was going on,
5   not to let them direct their own
6   investigation.
7   Q.   So you did tell her to contact --
8   were you asking her to contact Mr. Meaux about
9   Patrick believing that something unfair had
10   happened to him because of race?
11   A.   I didn't specifically state it
12   like that. I asked her to find out what was
13   going on in that district.
14   Q.   Did she tell you her office had
15   received Exhibit 2?
16   A.   I don't know if she told us, but
17   something prompted me to do this. I had to
18   have seen something.
19   Q.   Can you take a close look at
20   Exhibit 2, the letter from April 6 --
21      BY MR. VINCENT:
22      Exhibit 1.
23      EXAMINATION BY MR. ARRUEBARRENA:
24      Exhibit 1, excuse me. The April
25   6, 2005 letter from Patrick to you received by

7 (Pages 25 to 28)

321 North Vermont Street    VENTURELLA & ASSOCIATES, L.L.C.    Telephone: (985) 893-1999
Covington, Louisiana 70433    Board-Certified Court Reporters    Facsimile: (985) 893-6765

PATRICK CARPENTER   DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD   REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008   LILLIE R. BURCH, CCR

```
 1   Ms. Hatfield.  I just need to know if this is
 2   a letter that you saw around that time.
 3        A.    I don't remember honestly if I
 4   saw the letter.  But if I didn't see the
 5   letter, I got a call.  But April would never
 6   send this out without me.
 7        Q.    Going back to Exhibit 2.  We are
 8   in the process of researching your grievance.
 9   Was it your understanding the grievance
10   involved and allegation of prohibited
11   discrimination, race discrimination?
12        A.    There were a lot of allegations.
13        Q.    But I just want to know if you
14   understood that one of the allegations was
15   race discrimination.
16        A.    Yes.
17        Q.    So you expected Margaret Webb to
18   take care of that?
19        A.    Yes.
20        Q.    Did you speak with her about what
21   she did?
22        A.    Yes.
23        Q.    About what she did to take care
24   of it?
25        A.    Well, I spoke with her from this.
                                          Page 29
```

```
 1   But when we got the formal EEO complaint, when
 2   he went to EEO I specially said to Margaret to
 3   get the responses done.
 4        Q.    Was Margaret your subordinate?
 5        A.    Margaret was the director of HR.
 6        Q.    Did you have managerial authority
 7   over her?
 8        A.    She reported to Ben Seigler.  But
 9   because she was our HR person in my office,
10   yes, she was my subordinate.
11        Q.    I mean, you could tell her what
12   to do?
13        A.    Yes.
14        Q.    So April 13, 2005 you told her to
15   go to Mr. Meaux and figure out what was
16   happening?
17        A.    Yes.
18        Q.    Did she convey to you anything
19   about the nature of the complaint her
20   secretary had given her?
21        A.    I don't recall.
22        Q.    Did she call you back at any
23   point around this time period before the EEOC
24   charge?  I'm not trying to mess up your time
25   period.  I know this was a while ago.  The
                                          Page 30
```

```
 1   EEOC charge was filed on July 25.  You see the
 2   date down there where Patrick signed the
 3   charge?
 4        A.    Yes.
 5        Q.    Bates number 803?
 6        A.    Yes.
 7        Q.    So I'm talking about the period
 8   in April or right after April.  Did you get
 9   any feedback from her?
10        A.    I don't recall.
11        Q.    Does that mean it didn't happen
12   or maybe a lot happened in those days and --
13        A.    A lot was happening during those
14   days.  We were in special session.  We were in
15   session.
16        Q.    So you're not saying you didn't
17   get feedback, you're saying right now you're
18   not recalling it?
19        A.    I'm not recalling it.
20        Q.    Let me ask you about another
21   letter.  I want to ask you if you remember
22   getting it.
23        A.    Who signed for it?
24        Q.    I'm going to show you that right
25   now so I can get your comments on it.  I will
                                          Page 31
```

```
 1   mark this one for identification as MR3.  This
 2   is plaintiff's Bates number 16 through 20.
 3   This letter, ma'am, is dated March 9.  Once
 4   again it's to you.  And the last page, you see
 5   the date of the letter is March 9 and then on
 6   March 10?  It went to Leslie Hatfield?
 7        A.    Leslie Hatfield, the same person.
 8        Q.    You don't have any reason to
 9   believe Leslie Hatfield didn't get this,
10   right, looking at these documents?
11        A.    No.  If she signed for it.
12        Q.    Was it her duty?  You said she
13   worked for Margaret Webb.  So you assume she
14   gave it to Margaret Webb?
15        A.    I'm sure she did.
16        Q.    How would you be sure she did?
17        A.    Because Leslie is a person of
18   integrity.  She did.
19        Q.    How do you respond to the fact
20   that Ms. Webb said she never heard of these
21   complaints?
22        BY MR. VINCENT:
23            I object to the form of the
24   question as to characterizing other people's
25   testimony.  But you can answer.
                                          Page 32
```

8 (Pages 29 to 32)

321 North Vermont Street   VENTURELLA & ASSOCIATES, L.L.C.   Telephone: (985) 893-1999
Covington, Louisiana 70433   Board-Certified Court Reporters   Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR   Document 71-4   05/05/08   Page 7 of 13

PATRICK CARPENTER   DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD   REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008   LILLIE R. BURCH, CCR

**Page 33**

BY THE WITNESS:
    That can't be true.
MR. ARRUEBARRENA CONTINUES EXAMINATION:
    Q.   Would you say that that has to be at best inaccurate testimony, at worst a falsehood?
BY MR. VINCENT:
    Continuing objection.
BY THE WITNESS:
    If Leslie received them, Margaret received them. If I sent this, if my secretary sent this in April --
    Q.   You're talking about Exhibit MR2?
    A.   Yes. Then there was a series of something that happened that made me aware. Because anything HR would go to HR. And Leslie was the secretary in HR who was very, very diligent and competent. And I'm certain she gave these to Margaret who in turn evidently told me about them or showed it to me I would say. Because that would be the only way I would know about it. Because our offices were not in the same general vicinity.
    Q.   So even though the letter is addressed to you, because it was signed by HR

**Page 34**

you would have relied on Ms. Webb to get you the letter, convey to you what was in the letter?
    A.   Had to.
    Q.   Your office wouldn't automatically give you a copy of all correspondence from employees that was addressed to you?
    A.   If it came directly to my office they would. But if the mail went to -- if it was an HR issue, whoever sorted the mail, if it was HR they gave it to HR first.
    Q.   I see.
    A.   And then it would come to me.
    Q.   So we know from these documents that we're looking at, especially MR2, that by mid April you were aware of it and you had told Ms. Webb to handle it?
    A.   To investigate it.
    Q.   Now, if I understand your testimony correctly, you don't recall anything else until the EEOC charge?
    A.   Between this MR2 exhibit and the official EEO complaint.
    Q.   So you may have had discussions,

**Page 35**

but you just are not recalling them right now?
    A.   That's right.
    Q.   Now let me go back to the policy of the LTC. And let me read this to you. This was something given to me. I don't know the Bates number on it. But it's entitled policy 6.011. It's called a harassment policy, but Ms. Webb confirmed that this is the policy that was used and is used by the LTC to handle whether it's a harassment complaint or discrimination because of race, age, gender. For anything like that, this is the policy they used to investigate. Do you have any reason to contest that issue?
BY MR. VINCENT:
    I object to the form of the question.
BY THE WITNESS:
    No.
MR. ARRUEBARRENA CONTINUES EXAMINATION:
    Q.   Let me let you look at this so that there is no mistake. Is this the policy under which any prohibited discrimination complaint, whether it involves harassment or any kind of discrimination, would be handled?

**Page 36**

    A.   The only thing that concerns me, I don't remember the date on this original.
    Q.   This was given to me in discovery by the Attorney General's office, the attorneys for LTC and represented as the policy.
    A.   That's true.
    Q.   What I'm first asking you. Would you agree that this policy that I am handing to you, the harassment policy, 6.011, consisting of three pages of listing the policy, then there's a harassment complaint form. And then there's a human resource policy regarding harassment. At the end there's an LCTCS harassment complaint investigation form. Is that what you understood was the official written policy on investigating any type of prohibited discrimination at the LTC?
    A.   I honestly don't ever remember seeing these forms.
    Q.   Talking about the discrimination harassment complaint form?
    A.   I don't ever remember seeing this. I don't remember the HR office from the

9 (Pages 33 to 36)

321 North Vermont Street            VENTURELLA & ASSOCIATES, L.L.C.            Telephone: (985) 893-1999
Covington, Louisiana 70433          Board-Certified Court Reporters            Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR   Document 71-4   05/05/08   Page 8 of 13

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008                LILLIE R. BURCH, CCR

```
 1    LTC giving us the policies like this. They
 2    give you a generic policy.
 3        Q.    You're talking about the first
 4    three pages?
 5        A.    Yes.
 6        BY MR. ARRUEBARRENA:
 7            We're going to mark the document
 8    I just described as MR4.
 9        BY THE WITNESS:
10            I recognize the front of it, but
11    the back of it I don't recognize at all.
12        BY MR. ARRUEBARRENA:
13            When you say the front, you're
14    talking about the first three pages.
15        BY THE WITNESS:
16            The policy itself. But the form,
17    I don't remember seeing the form itself.
18        MR. ARRUEBARRENA CONTINUES EXAMINATION:
19        Q.    In your experience in the EEO
20    office and in other places and at the LTC,
21    even though this is a suggested form, the
22    letters that we're looking at, for instance,
23    MR3 and MR1, are sufficient to initiate a
24    discrimination complaint for an employee,
25    aren't they?
                                           Page 37
```

```
 1        A.    An investigation.
 2        Q.    Yes. You don't have to have some
 3    special form?
 4        A.    For us it triggered a need to
 5    investigate.
 6        Q.    What I'm trying to get at.
 7    Wouldn't even a verbal complaint to a
 8    supervisor be enough to trigger an
 9    investigation?
10        A.    Not for me.
11        Q.    But any written -- let me just
12    ask you this. MR1 and MR3 would be enough to
13    trigger it?
14        A.    Yes.
15        Q.    This particular policy says a
16    couple of things. Some of the things we
17    focused on is complaints of harassment will be
18    investigated promptly. I'm looking at the
19    second page of Exhibit MR4, last paragraph.
20    Complaints of harassment will be investigated
21    promptly and in as an impartial and
22    confidential manner as possible.
23            That was that your understanding,
24    ma'am?
25        A.    Yes.
                                           Page 38
```

```
 1        Q.    I have discovered that the reason
 2    it should be confidential is that, and correct
 3    me if I'm wrong, when people find out, even
 4    though co-employees, if someone is registering
 5    a discrimination complaint sometimes that
 6    creates an adversarial atmosphere among
 7    co-workers, supervisors. Is that one of the
 8    reasons to keep it confidential?
 9        BY MR. VINCENT:
10            I object to the form of the
11    question. You can answer.
12        BY THE WITNESS:
13            Yes.
14        MR. ARRUEBARRENA CONTINUES EXAMINATION:
15        Q.    The next sentence says: A member
16    of Human Resources will conduct the
17    investigation unless otherwise deemed
18    necessary in order to assure an impartial and
19    confidential investigation.
20        A.    Yes.
21        Q.    Wouldn't it be against the policy
22    to have the person who is the subject of the
23    complaint, in other words, the person alleged
24    to be the fox in the hen house, to have that
25    person conduct the investigation? That would
                                           Page 39
```

```
 1    not likely be impartial, would it?
 2        A.    I did not have Ms. Webb direct
 3    Mr. Meaux to investigate himself. I directed
 4    Ms. Webb as HR to investigate the complaint.
 5        Q.    But whether it would be Ms. Webb
 6    or anyone else assigned that job to either Mr.
 7    Meaux or Ms. McDaniel who were the subjects of
 8    the complaint, would that be improper
 9    procedure?
10        A.    Yes, that would be improper.
11        Q.    Would simply the reason be that
12    it would be very difficult for them to be
13    impartial?
14        A.    Yes.
15        Q.    Now I want to direct your
16    attention to your April 6 letter. And all the
17    letters are similar. This paragraph, the
18    first paragraph on Bates 21 on Exhibit MR1,
19    Mr. Carpenter alleges that the grievance
20    involves Ms. Mac Daniel. Do you see that?
21        A.    Yes.
22        Q.    Do you understand that he's
23    complaining that she's among the people who
24    are treating him unfairly because of race?
25        A.    But Ms. Webb was directed to
                                           Page 40
```

10 (Pages 37 to 40)

321 North Vermont Street            VENTURELLA & ASSOCIATES, L.L.C.        Telephone: (985) 893-1999
Covington, Louisiana 70433          Board-Certified Court Reporters        Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR   Document 71-4   05/05/08   Page 9 of 13

PATRICK CARPENTER   DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD   REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008   LILLIE R. BURCH, CCR

### Page 41

1 conduct the investigation. So I'm not
2 understanding right now.
3   Q.  Well, she told us, ma'am -- and
4 counsel can object that I'm characterizing
5 someone else's testimony, and if I am then it
6 simply wouldn't be valuable testimony later --
7 but she did testify under oath last Friday
8 that you told her to have Region 2 do the
9 investigation.
10   A.  Absolutely unequivocally no.
11   Q.  We have already gone over that.
12 That assertion is more than just incorrect,
13 that would have to be an untruthful statement?
14   A.  Absolutely.
15   Q.  Let's go to the EEOC charge. I
16 will mark this for identification as MR5.
17 This is plaintiff's Bates Number 51.
18       First off, did you ever get a
19 copy of this?
20   A.  Yes, I have seen this.
21   Q.  Around the time it came in?
22   A.  Yes.
23   Q.  Can you tell me why it is that
24 they would have given you a copy?
25   A.  Well, I was notified that an

### Page 42

1 official complaint had been filed.
2   Q.  You mean with the EEOC?
3   A.  Yes.
4   Q.  Because these other complaints we
5 were looking at, MR1 and MR3, are official
6 internal LTC complaints, right?
7   A.  Right.
8   Q.  So what you mean by official is
9 an outside agency.
10   A.  He had gone outside the agency.
11   Q.  Who did you speak to about the
12 EEOC charge?
13   A.  Margaret Webb.
14   Q.  Did you convey to her, if you
15 remember -- it was April, four months before
16 that you had sent MR3 or MR1 to her or both.
17   A.  No, they had given these to me.
18 Received these and either shared this with me.
19 Because something triggered this.
20   Q.  Did you ask her: Why has it come
21 to this? Why haven't you done something about
22 the complaint we were working on three months
23 earlier? Do you remember asking her anything
24 about that?
25   A.  My general comment -- and I can't

### Page 43

1 remember -- is now it has come to this and you
2 need to get in there and get these questions
3 answered.
4   Q.  Did you ask her why it wasn't?
5   A.  I told Margaret: You cannot be
6 afraid to do your job. That is what I told
7 her.
8   Q.  When the EEOC charge came in did
9 you have the impression that nothing had been
10 done yet concerning a formal investigation of
11 MR1 or MR3?
12   A.  Right, yes.
13   Q.  Did she admit it?
14   A.  No.
15   Q.  Did you do anything to determine
16 if that was the case, that she hadn't done
17 anything yet? Did you call Mr. Meaux and ask
18 him if Margaret talked to him about complaints
19 in April, May, March?
20   A.  I probably talked to Meaux by
21 this time when this came in.
22   Q.  The EEOC charge?
23   A.  Yes.
24   Q.  What did that conversation
25 consist of?

### Page 44

1   A.  Margaret needed to get over there
2 and provide EEO with all the information that
3 was requested.
4   Q.  At that time if the assertion was
5 made that you told Kay McDaniel in Region 2 to
6 handle the response --
7   A.  I never spoke to Kay McDaniel
8 about this.
9   Q.  Did you instruct Margaret or
10 anyone else in HR to do the response to the
11 EEO charge?
12   A.  I told Margaret to get these
13 answers, to have the EEO get these answers.
14   Q.  To make sure I'm not
15 misunderstanding and your testimony is clear.
16 You didn't instruct her to have Kay McDaniel
17 do it?
18   A.  No, I did not.
19   Q.  By this time did you understand
20 the complaint involved Mr. Meaux and Ms.
21 McDaniel?
22   A.  Yes.
23   Q.  When I say by this point, I mean
24 the EEOC charge. The complaint was clearly
25 against Mr. Meaux and Ms. McDaniel. She's not

11 (Pages 41 to 44)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana  70433       Board-Certified Court Reporters          Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR   Document 71-4   05/05/08   Page 10 of 13

PATRICK CARPENTER   DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD   REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008   LILLIE R. BURCH, CCR

### Page 45

1  listed on the EEOC charge, but she was listed
2  on MR1 and MR3.
3      A.   Well, I knew it was Mr. Meaux at
4  this time. Because I didn't interpret this
5  that he had filed it against anyone else.
6      Q.   Looking at the complaint
7  investigation form, even though you testified
8  you're not familiar seeing the form, please
9  look at it, scan it, and tell me if that was
10 the way the investigation should be done.
11         (Witness viewing document.)
12     A.   Yes, basically.
13     Q.   This appears to me to dovetail
14 with something we discovered about progressive
15 discipline. This is called an admission.
16 This is where we ask questions and ask LTC
17 through their lawyers to admit certain things.
18 This is an uncontested fact in the case. The
19 LTC utilizes progressive discipline and
20 evaluation involving first a verbal warning;
21 then written warnings, including formal
22 meeting with the employee to establish clear
23 performance expectations to correct problems;
24 three, an opportunity for the employee to
25 present his or her case; and, four,

### Page 46

1  termination if the problems remain unresolved
2  after the above steps.
3         Was that your understanding of
4  the basic path of evaluation and progressive
5  discipline at the LTC?
6      BY MR. VINCENT:
7         I object to the form of the
8  question. You can answer.
9      BY THE WITNESS:
10        We never referred to it as
11 progressive discipline.
12     MR. ARRUEBARRENA CONTINUES EXAMINATION:
13     Q.   These steps --
14     A.   That process is usually in civil
15 service, LTC, everywhere state.
16     Q.   I have learned through talking
17 with other witnesses at the LTC that the
18 purpose of this is so that discipline is not
19 just punitive but also in the beginning at
20 least be used to develop the employee. Give
21 them a chance to address the allegation
22 against their performance or conduct and then
23 correct it. Develop them instead of just the
24 road to termination. Wouldn't that be the
25 policy of these steps?

### Page 47

1      A.   Yes.
2      Q.   This particular investigation
3  policy on Exhibit MR4, the last page, entitled
4  Harassment Complaint Investigation Form, has
5  parts in it where -- and this is what Ms. Webb
6  stated in her deposition -- during the
7  investigation allegations of misconduct on the
8  complainant or deficient performance involving
9  the complainant come up, then the complainant
10 would be given the opportunity to address
11 those allegations.
12        Isn't that the policy of the LTC,
13 ma'am?
14     BY MR. VINCENT:
15        I object to the form of the
16 question. You can answer.
17     BY THE WITNESS:
18        Yes.
19     MR. ARRUEBARRENA CONTINUES EXAMINATION:
20     Q.   So it's not only the discipline
21 and evaluation policy even if there is no
22 grievance, but it's also part of the grievance
23 investigation policy?
24     A.   Yes.
25     Q.   Have you ever seen the EEOC

### Page 48

1  response that was given by the LTC?
2      A.   No.
3      Q.   Let me give you an opportunity to
4  take a look at that.
5      BY MR. ARRUEBARRENA:
6         Let the record reflect that I am
7  handing the witness a two hundred twenty page
8  document. It's Bates Numbers 518 to 745. I
9  think it's like two hundred twenty pages.
10     MR. ARRUEBARRENA CONTINUES EXAMINATION:
11     Q.   This was sent to EEOC by Ms.
12 Webb. Ms. McDaniel testified under oath that
13 she personally on her own prepared this
14 document.
15     A.   I have never seen that document.
16     BY MR. VINCENT:
17        I object to the form of the
18 question.
19     MR. ARRUEBARRENA CONTINUES EXAMINATION:
20     Q.   I'm just letting you know that.
21     A.   I have never seen that document.
22     Q.   I guess what I would like you to
23 do is before you look through the whole
24 document, there's about a thirteen-page
25 chronology called the Employment History

12 (Pages 45 to 48)

321 North Vermont Street      VENTURELLA & ASSOCIATES, L.L.C.      Telephone: (985) 893-1999
Covington, Louisiana 70433    Board-Certified Court Reporters       Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-4    05/05/08    Page 11 of 13

PATRICK CARPENTER    DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008    LILLIE R. BURCH, CCR

Page 49

1   Chronology of Patrick Carpenter. I'd ask that
2   you look through this for me. I'd ask you to
3   scan it and let me ask you some questions. Or
4   you can read the whole thing completely.
5      A.   You can start asking your
6   questions. I'm not familiar with this
7   document at all. I have never seen it before.
8      Q.   Go ahead and read it, then.
9   We'll take a couple of moments. That would be
10  Bates Numbers 520 through 532, twelve pages.
11     A.   Now, most of this, I didn't come
12  into the job until July 2003.
13     Q.   I know. But I just need your
14  opinion on it, your testimony on it. I would
15  just ask that you read it.
16        (Witness viewing document.)
17     A.   Okay, I've read it.
18     Q.   Have you ever been seen an EEOC
19  investigation summary?
20     A.   Yes.
21     Q.   Have you ever seen an LTC
22  discrimination grievance investigation
23  summary?
24     A.   Yes. But it wasn't conducted by
25  Ms. Webb.

Page 50

1      Q.   Who conducted it?
2      A.   We hired a lady named Ms. Griffin
3   when I realized we did not have the capacity
4   to adequately respond. Because we had
5   grievances coming in across the state. And
6   when we could not get HR out to the district,
7   I needed to seek some additional help. It
8   became clear that Margaret was not able to
9   handle them. But I did feel she could handle
10  the ones in Baton Rouge. These were in other
11  locales.
12     Q.   I'm assuming because you worked
13  EEO at Delgado for about six years --
14     A.   Yes.
15     Q.   -- you have seen grievance
16  responses. I'm talking now about internal
17  grievances of prohibited discrimination. You
18  have seen investigation summaries whether
19  internal or given to the complainant?
20     A.   Right.
21     Q.   Would you agree that normally if
22  the investigation uncovers deficient
23  performance or misconduct on the part of the
24  claimant that the summary would also at least
25  show the claimant was addressed with the

Page 51

1   claimant, the claimant was advised so-and-so
2   said this, and here is what the claimant says?
3         BY MR. VINCENT:
4         You're talking about with respect
5   to internal investigation or EEOC?
6         MR. ARRUEBARRENA CONTINUES EXAMINATION:
7      Q.   Internal investigation.
8      A.   At Delgado when I had to actually
9   facilitate the process we had a whole formal
10  and informal approach to resolve the issues.
11  When we had the formal, there was more to it
12  than this. They would send us several sheets
13  of questions that we had to respond to related
14  to the case.
15        So this one sheet is not what I'm
16  accustomed to seeing. And in the case of
17  discrimination, it was rarely against a
18  supervisor.
19     Q.   I guess what I'm asking, though,
20  is on the discrimination complaints, the woman
21  that you hired, the consultant or whoever you
22  hired, when she did an investigation if she
23  identified an allegation during the
24  investigation -- I'm assuming you would agree
25  that when the supervisor that is alleged to be

Page 52

1   a racist is asked about the performance of the
2   complainant it's only human nature that they
3   may defend themselves by saying this
4   complainant has deficient performance, he is
5   the deficient performer, he is the misconduct
6   doer.
7      A.   I have not had race specific
8   cases where people blatantly called somebody a
9   racist. You asked me based on my experience.
10  In this case, the behavior of the supervisors
11  -- as an African American woman in a very high
12  level position I was used to white males doing
13  things that probably if I was a more sensitive
14  woman to race issues, aside from gender and
15  race issues, I would have reacted differently.
16  Okay? In this case, how it came to me, there
17  was so much back and forth, my directive to
18  Margaret was to figure out what in the world
19  is going on over there. As I read this
20  chronology, what I would dispute, I don't know
21  the date of the meeting but I know the meeting
22  was before Katrina. Katrina was September 29.
23  And the woman, Mr. Griffin who was doing an
24  investigation for us on a case in the
25  Alexandria area actually was buried on August

13 (Pages 49 to 52)

Case 3:07-cv-00170-JJB-SCR    Document 71-4    05/05/08    Page 12 of 13

PATRICK CARPENTER    DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008    LILLIE R. BURCH, CCR

### Page 53

26. And she was here in New Orleans. I never met her before. She was recommended by the former EEO head for this region. She talked to Margaret regularly and they met. They talked on the phone. I never met her. I have to finish this. I know we talked to them before September 12 as it's stated in here about receiving this --

Q. You're talking about MR5?

A. MR5, that's right. They were aware before we had this meeting they're talking about. I'm not saying they didn't have the meeting, I'm saying they knew there was a formal complaint.

Q. Which page are you looking at?

A. Monday, September 12, 2005.

Q. You're saying you know that before that meeting on September 12, 2005 that Mr. Meaux and Ms. McDaniel knew about the EEOC charge?

A. Yes. We met. I was in a meeting with them.

Q. Where does it say that?

A. Page twelve, the fourth paragraph, Monday, September 12, 2005.

### Page 54

Q. So, in other words, this assertion that it was that date that they discovered the EEOC charge is inaccurate?

A. Yes. Because we got that and I know he knew about that. We notified Mr. Meaux before.

Q. As soon as you got it?

A. Yes, we did. Unless Margaret didn't do what I asked her to do. And I had a conversation with Meaux in my office. Because it was his evaluation time in July. I was doing June and July evaluations. I'm certain all those documents are destroyed. But I know when I got there. Because I had retained the services --

Q. You're talking about MR5?

A. MR5. By that time I had a conversation with Mr. Meaux in my office about what was going on.

Q. What was his response?

A. Well, he probably may have said that Patrick had been a problem.

Q. So he defended himself by saying, which is human nature, "I'm not a racist, he's a problem."

### Page 55

A. He probably didn't use those terms.

Q. But he conveyed that to you?

A. Yes.

Q. And certainly it's human nature, he was named in the charge, wouldn't it be human nature for him to deny he didn't do anything wrong because of race and then say the complainant is the problem? Hasn't that been your experience? Doesn't that happen frequently?

A. When there is a charge, yes.

Q. Shortly after this charge was filed -- do you know Dr. West, then Brunswick?

A. Yes.

Q. She testified under oath last Friday that sometime in August, I don't know if that was during that leadership meeting or not, it was a development meeting with Kay McDaniel, something about a golf course?

A. Each district was allowed to do their own planning. So that may not have been something I was aware of.

Q. And at that time Ms. McDaniel got a phone call about Patrick from someone. And

### Page 56

she stated: His name is not allowed to be mentioned in my house. She stated to Dr. Brunswick, Dr. Brunswick, that he had caused tension in her life.

A. I'm sorry, I'm not understanding.

Q. Dr. West testified, then Brunswick, sometime after July 25, early August 2005, she was with Ms. McDaniel at a meeting. And Ms. McDaniel got a phone call about Patrick. They were like out on a social situation, a golf course. And Ms. McDaniel made two statements. One was that Mr. Carpenter had caused tension in her life. And that his name was not allowed to be spoken in her house. I was just wanting to know if you are aware --

A. I'm not aware of any of that.

Q. Did Mr. Meaux say: I want to have Kay McDaniel handle this so we can get to the bottom of it?

A. No, I don't recall that.

Q. Let me convey something that Ms. McDaniel testified to. In fact, I'll show you her testimony. It's on page 216 of her deposition. This is her sworn testimony: Why

14 (Pages 53 to 56)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433        Board-Certified Court Reporters          Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-4    05/05/08    Page 13 of 13

PATRICK CARPENTER   DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD            REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM   FEBRUARY 18, 2008           LILLIE R. BURCH, CCR

```
 1   did you do the response to the EEOC charge and
 2   not HR?  Because she had testified she had put
 3   together this package that I have shown you.
 4   She said: Dr. Montgomery asked Mr. Meaux to
 5   ask me to do it, so I did it.  I didn't
 6   question it.
 7        A.    Not me.  I didn't ask Mr. Meaux
 8   to handle it, I asked Margaret Webb to handle
 9   this.
10        Q.    So someone is telling an
11   untruthful statement there.  Either Mr. Meaux
12   incorrectly said to her: Chancellor
13   Montgomery wants you to do it.  Which would
14   have been inaccurate for Mr. Meaux to tell her
15   that?
16        A.    That's right.
17        Q.    Or she's lying about that in the
18   deposition, right?
19        A.    Yes.
20        Q.    Would you agree that it was
21   improper for Ms. McDaniel, wasn't she Mr.
22   Meaux's right hand man so-to-speak?
23        A.    Yes.
24        Q.    Especially since we know she was
25   listed also as someone Mr. Carpenter had
                                          Page 57
```

```
 1   alleged had done racially discriminatory
 2   things, that clearly it was improper for her
 3   to provide the response to the EEOC?
 4        A.    Yes.
 5        Q.    Would you agree it's fair to say
 6   that that is not unlike the fox investigating
 7   his attack on the hens?
 8        A.    Yes.
 9        Q.    The question I want to ask you
10   about these documents, Bates Numbers 520
11   through 532, wouldn't you agree this is more
12   as opposed to investigation of discrimination
13   allegation, there is nothing in here about
14   discrimination, is there?
15        A.    No.
16        Q.    Wouldn't this look like a
17   justification for termination?
18        A.    Yes.
19        Q.    So it doesn't look like an
20   investigation?
21        A.    No.
22        Q.    It looks more like a
23   justification for a termination, correct?
24        A.    May I use my own words?
25        Q.    Yes.
                                          Page 58
```

```
 1        A.    This looks like a chronology of
 2   documentation of when you hire somebody and
 3   you have the intent of not keeping them.
 4        Q.    We'll have to show later where
 5   that intent to not keep them started.  That
 6   will be my job.
 7              Let me direct your attention to a
 8   couple of spots.  Do you know Lamoyne
 9   Williams?
10        A.    As an employee on the campus.
11        Q.    Do you know anything about him
12   being considered the golden child, the favored
13   son?
14        A.    I heard that before.
15        Q.    Where did you hear that?
16        A.    From campus folks.
17        Q.    Well, you were pretty high up in
18   management.  No one was higher than you other
19   than the president, right?
20        A.    Right.
21        Q.    So I'm interested under which
22   circumstances someone at your level of
23   management would hear a comment that Lamoyne
24   Williams was Mr. Meaux's fair-haired boy,
25   golden boy, something like that.
                                          Page 59
```

```
 1        A.    Whenever I would go to the
 2   campus.  I would visit the campus at least
 3   once a month.  My base was Baton Rouge.  So
 4   whenever they had anything there.  It had a
 5   nice multi-purpose room.  So every month I
 6   would have like sixty deans and assistant
 7   DEANS come in as we were building this
 8   district model.  So whenever I was out there,
 9   I was not inaccessible, unapproachable.  So
10   people would make comments about what was
11   going on.
12              But as I stated earlier, I could
13   not and did not take all the things I heard as
14   always credible.  Because when you have as
15   many employees as we had you would have people
16   who were not always happy.
17        Q.    Can you remember who --
18        A.    I can't.
19        Q.    Whatever the comment was, golden
20   one, it was a reference that he was being
21   treated differently, allowed to get away with
22   things that other people didn't get away with?
23        A.    Yes.
24        Q.    So it was in the context of
25   unfair favorable treatment?
                                          Page 60
```

15 (Pages 57 to 60)

321 North Vermont Street            VENTURELLA & ASSOCIATES, L.L.C.      Telephone: (985) 893-1999
Covington, Louisiana  70433         Board-Certified Court Reporters       Facsimile: (985) 893-6765