# TRANSCRIPT OF THE DEPOSITION OF:

## MARGARET WEBB
## 02/15/08

---

### PATRICK CARPENTER

### VERSUS

### LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

**VENTURELLA & ASSOCIATES, L.L.C.**
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT H

Case 3:07-cv-00170-JJB-SCR    Document 71-10    05/05/08    Page 2 of 10

| PATRICK CARPENTER | DEPOSITION OF: MARGARET WEBB | REPORTED BY: |
|---|---|---|
| LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL | FEBRUARY 15, 2008 | LILLIE R. BURCH, CCR |

```
 1    Q.   What job did April Magee do?
 2    A.   She was the executive secretary
 3  to Dr. Richard.
 4    Q.   Did you work in the same building
 5  with all of them?
 6    A.   Yes, sir.
 7    Q.   Just down the hall?
 8    A.   No, not down the hall. We were
 9  on the same floor.
10    Q.   Within a short walking distance?
11    A.   Oh, yes, we were all within
12  walking distance, the whole office.
13    Q.   Were you ever involved in
14  investigating race discrimination complaints?
15    A.   Yes.
16    Q.   Tell me first your practice. How
17  is it that you do that? What is it that you
18  do?
19    A.   We actually have a policy and a
20  procedure and we follow the policy and
21  procedure. Part of it is a question guide.
22  And we use this questionnaire and go in and
23  interview everybody involved in the case,
24  whatever case we're looking at. After we do
25  the investigation we have an HR person from
                                        Page 9
```

```
 1  that area as a witness or a co-worker with me
 2  or with whomever. Because I was not the only
 3  one, we had others that would do it. Then we
 4  would go in, review all of our notes,
 5  transcribe everything, make recommendations.
 6    Q.   What kind of recommendations
 7  would you make?
 8    A.   The recommendations would go from
 9  yes, there is validity in the complaint, to
10  no, there is no validity in the complaint. We
11  would go as far as to say if training is
12  needed, if maybe some type of minor
13  disciplinary action was needed. It would go
14  all the way through the disciplinary --
15    Q.   So there would be some kind of
16  appropriate remedial measure, if necessary?
17    A.   If necessary.
18    Q.   And you might even conclude,
19  well, we couldn't corroborate it, so it's
20  closed?
21    A.   Correct.
22    Q.   So closing it as uncorroborated?
23    A.   Correct.
24    Q.   If you close it as uncorroborated
25  do you advise the employee, well, we looked at
                                       Page 10
```

```
 1  it and we couldn't corroborate what you said?
 2    A.   The employee, when I do
 3  investigations the employee gets a letter
 4  outlining the interviews to an extent and the
 5  recommendations that were made to the
 6  appointing authority.
 7    Q.   So they would find out if there
 8  was any support or not?
 9    A.   Oh, yes.
10    Q.   Would you advise the employee if
11  there was going to be any remedial measures or
12  discipline?
13    A.   To an extent.
14    Q.   So, in other words, when you say
15  that, you don't tell them exactly what
16  happened, but maybe --
17    A.   The information would be given to
18  the employee. But as far as the actual
19  reprimand to the other employee, that would be
20  left up to the higher level to give out that
21  information, it would not be me.
22    Q.   Is there ever a situation that
23  you don't investigate a complaint about, say,
24  race discrimination?
25    A.   Repeat.
                                       Page 11
```

```
 1    Q.   Are there ever circumstances or
 2  situations where you receive notice of a
 3  racial discrimination complaint but you don't
 4  investigate it?
 5    A.   If the investigation was not
 6  given to me by the chancellor herself I did
 7  not go in and investigate. It had to be an
 8  assigned investigation. And the only one who
 9  assigned it was the chancellor of the LTC.
10    Q.   How would she assign the
11  investigation to you?
12    A.   Letters would go directly to her.
13  And if she deemed it was necessary to
14  investigate, she would call us in her office,
15  give us the letter, tell us what she wanted us
16  to do. And we would go out either
17  individually or as a team and investigate.
18    Q.   Would she ever ask April to give
19  you the letter?
20    A.   No.
21    Q.   You're saying she would only
22  personally hand it to you?
23    A.   She wouldn't ask April to come
24  over and give me instructions to go on an
25  investigation. I may receive a copy of the
                                       Page 12
```

3 (Pages 9 to 12)

| 321 North Vermont Street | VENTURELLA & ASSOCIATES, L.L.C. | Telephone: (985) 893-1999 |
|---|---|---|
| Covington, Louisiana 70433 | Board-Certified Court Reporters | Facsimile: (985) 893-6765 |

Case 3:07-cv-00170-JJB-SCR   Document 71-10   05/05/08   Page 3 of 10

PATRICK CARPENTER                    DEPOSITION OF: MARGARET WEBB                    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL   FEBRUARY 15, 2008         LILLIE R. BURCH, CCR

letter, but then we would actually meet with her to discuss what was going on.

Q. When you say the letter, you mean a grievance or complaint?

A. I mean any letter. Any letter.

Q. So it doesn't have to be in any special format?

A. No.

Q. Somebody could write a letter with two sentences, I work here, I'm black, and I think I'm being treated unfairly because I'm black, that would be enough to trigger an investigation?

A. That would have been Dr. Richard's decision.

Q. So you're saying the LTC doesn't have an HR policy that if the chancellor decides -- the chancellor, the non-HR person, decides if the investigation should occur?

A. We have a policy. In the policy we have a form. If the individual wants to file a grievance, they follow that procedure.

Q. What about this idea that a person can send a letter?

A. Well, I mean, an individual can

Page 13

send anything they want. That doesn't necessarily warrant that a chancellor would say yes, this is something worthy of sending a team out to investigate.

Q. Is a chancellor an HR expert?

A. I think Dr. Richard had an HR background.

Q. How many chancellors were there when Dr. Richard was a chancellor?

A. That's it. It's an umbrella. The chancellor was over all the LTC campuses and regions.

Q. Before her were there other LTC chancellors?

A. Yes, sir.

Q. Were they HR experts?

BY MR. VINCENT:
 I object to the form of the question.

BY THE WITNESS:
 I have no clue.

MR. ARRUEBARRENA CONTINUES EXAMINATION:

Q. You said you felt Ms. Richard was an HR expert?

A. I did not say she was an HR

Page 14

expert. I said she had HR background.

Q. What is that, to your knowledge?

A. She knows some of the policies and procedures that go along with human resources.

Q. How do you know that?

A. Through discussions with her.

Q. Did she tell you she worked in HR?

A. I don't remember.

Q. It has been confirmed from most of the depositions we've taken that LTC has a policy that even if a complaint isn't filed, if you were to observe discrimination -- let's say you were in an elevator and you heard a manager use the N word toward an African American employee, but the person didn't make a complaint, but you as the HR professional heard it --

A. It would be my obligation to bring it to the chancellor what I heard.

Q. So you're saying, no, I would bring it to the chancellor and let her decide?

A. Yes.

Q. Are you saying that's the policy

Page 15

of the LTC, that the chancellor decides if there's going to be an investigation?

A. If there is a policy that says that?

Q. Yes.

A. No.

Q. So it's not a policy, it's just a practice?

A. It's following the chain of command. And she was at the top of the chain of command no matter what department you worked in.

Q. So if the chancellor doesn't know or doesn't care about HR policy, then there would never be an HR investigation?

A. No.

Q. Well, if a chancellor was unaware that certain things are illegal, say they didn't know, then if the chancellor was unaware, even though HR professionals are made aware of the situation, that would not be entered by the LTC?

A. Well, that's two different things. If a complaint letter comes directly to Human Resources we know about it and we

Page 16

4 (Pages 13 to 16)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433        Board-Certified Court Reporters           Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-10    05/05/08    Page 4 of 10

PATRICK CARPENTER                           DEPOSITION OF: MARGARET WEBB                          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008                      LILLIE R. BURCH, CCR

**Page 25**

1  A.  Yes.
2  Q.  Who?
3  A.  Dr. Richard.
4  Q.  Do you remember if the allegation
5  of deficient performance had to do with her
6  misconduct or not doing things she should do,
7  not performing adequately?
8  A.  I really don't remember.
9  Q.  It says here: All institutions
10 are required to develop a system of recording
11 all formal written complaints. Is that
12 correct?
13 A.  Right.
14 Q.  To be submitted and kept on file
15 in the institution's chancellor's office,
16 correct?
17 A.  Yes.
18 Q.  And the office of the assistant
19 president for the LCTCS, the system's office
20 staff. Is that --
21 A.  I believe it is.
22 Q.  You don't deny that's what it
23 says in the policy?
24 A.  No, I don't.
25 Q.  Do you know if that is something

**Page 26**

1  that -- who does that? Who makes sure it's an
2  LCTCS system office staff? Whose
3  responsibility is that?
4  A.  Back then?
5  Q.  We'll try that first.
6  A.  Could be the secretary, could be
7  the chancellor.
8  Q.  Whose secretary?
9  A.  The chancellor's secretary.
10 Q.  It says: Any student who
11 believes -- it says student, but I'm assuming
12 this applies to employees, too?
13 A.  Students were investigated
14 differently.
15 Q.  Are you saying this policy
16 doesn't apply to employees?
17 A.  Yes, it does apply to employees.
18 Q.  So even that it says here "any
19 student", it applies to employees?
20 A.  Right.
21 Q.  So any student or employee who
22 believes that he or she has suffered from
23 harassment or has knowledge of harassing
24 behavior must report such conduct to the
25 student affairs personnel. He or she may also

**Page 27**

1  submit a complaint to the institution's
2  chancellor.
3      So it's either/or, right?
4  A.  Yes.
5  Q.  Complaints of harassment will be
6  investigated promptly and in as confidential
7  manner as possible. Is that a correct
8  statement?
9  A.  Yes.
10 Q.  When you get e-mails that
11 somebody has issued a grievance do you check
12 in to see what the grievance was about?
13 A.  Yes.
14 Q.  How would you check to see what
15 the grievance is about?
16 A.  Let me back up a tad so you can
17 understand. We were the central office, Human
18 Resources. There are Human Resource staff at
19 every single region.
20 Q.  So what is the significance of
21 that?
22 A.  Sometimes they did the
23 investigations and it did not come to us.
24 Q.  I see. In May or so of 2005 was
25 there an HR staff?

**Page 28**

1  A.  Yes.
2  Q.  Who was that?
3  A.  The Baton Rouge region?
4  Q.  Yes.
5  A.  It was Shawn Schupach,
6  S-C-H-U-P-A-C-H.
7  Q.  You were their boss?
8  A.  I had no supervision over these
9  people.
10 Q.  Why would the chancellor notify
11 you and not Shawn Schupach of a grievance
12 concerning harassment?
13 A.  Because it had come to the office
14 of the chancellor. If it would be lifted to
15 that level, we would be notified.
16 Q.  Then you would be responsible to
17 investigate?
18 A.  Correct.
19 Q.  So now that we have that figured
20 out. When you got notice from the chancellor
21 that she had a grievance what was your
22 procedure? Did you call up and ask what it
23 was about?
24 A.  I could e-mail her back and ask
25 her if she wanted to meet about it.

7 (Pages 25 to 28)

Case 3:07-cv-00170-JJB-SCR   Document 71-10   05/05/08   Page 5 of 10

| PATRICK CARPENTER | DEPOSITION OF: MARGARET WEBB | REPORTED BY: |
| --- | --- | --- |
| LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL | FEBRUARY 15, 2008 | LILLIE R. BURCH, CCR |

```
 1     Q.   And if she said no, you wouldn't
 2  do anything about it?
 3     A.   Well, yes, we would.  I would
 4  still meet with her.  She wouldn't say no.
 5     Q.   Do you know if she has ever
 6  received a written complaint of race
 7  discrimination and decided not to do anything
 8  about it?
 9     A.   No.
10     Q.   So, to your knowledge, she has
11  forwarded all racial discrimination complaints
12  she has received to you?
13     A.   To my knowledge, yes.
14     Q.   Do you know if she forwarded any
15  such complaints involving Patrick Carpenter?
16     A.   No.
17     Q.   You don't?
18     A.   I don't remember getting one.
19     Q.   How do you handle EEOC charges?
20  Are they handled differently than a student or
21  an employee complaint?
22     A.   If an employee goes directly to
23  EEOC, they do the investigation.  We don't.
24     Q.   But don't you do an investigation
25  to provide the EEOC a position paper?
                                        Page 29
```

```
 1  EEOC.
 2     Q.   So you're trying to make a
 3  distinction.  How is it different?  I don't
 4  understand the distinction.
 5     A.   If an employee goes directly to
 6  EEOC to file the complaint, I do not go out
 7  and investigate.
 8     Q.   Who do you send to investigate?
 9     A.   No one.  EEOC will ask us for
10  information and the campus will do the best
11  they can to furnish the information.
12     Q.   When you say investigate -- and I
13  don't know, we might be involved in semantics
14  -- but certainly you wrote this letter here,
15  plaintiff's Bates 518 through 745.  Wasn't it
16  a binder?
17     A.   Yes.
18     Q.   Like a spiral bound binder?
19     A.   Yes.
20     Q.   Who prepared this binder?
21     A.   Baton Rouge campus.
22     Q.   Who prepared it?
23     A.   I would not know who put it
24  together, but I can tell you who gave it to
25  me.
                                        Page 31
```

```
 1     A.   When we do -- most of the time
 2  the employee comes through us or through the
 3  chancellor's office.  So, yeah.
 4     Q.   Let's say an employee just goes
 5  to EEOC.
 6     A.   EEOC would notify us of what was
 7  going on.  Then we would try with the campus
 8  or the region to get the documentation that
 9  was required.
10     Q.   To respond to the charge?
11     A.   Correct.
12     Q.   If you felt the charge was not
13  proper, that it was unjustified, I'm assuming
14  the LTC would advise the EEOC of that, right?
15     A.   (No response.)
16     Q.   Don't you have the right to
17  advise the EEOC --
18     A.   If we did an investigation prior
19  to the person going to EEOC I would have
20  written a letter to EEOC that an investigation
21  had been conducted and these were the
22  findings.  However, employees do go directly
23  to EEOC.  At that point we get a notification
24  in the mail and we work with the campus or the
25  region to get the documentation to submit to
                                        Page 30
```

```
 1     Q.   Who gave it to you?
 2     A.   Wayne Meaux.
 3     Q.   Did you have anything to do with
 4  what's in here?
 5     A.   I wouldn't remember.
 6     Q.   You don't remember a two hundred
 7  page binder that you sent to the EEOC with a
 8  cover letter?
 9     A.   I remember the binder.  Did I put
10  anything in the binder?  I don't remember.
11     Q.   So you may have and just forgot?
12     A.   It's been a while.  I really
13  don't remember.
14     Q.   Some people say, "I don't
15  remember because I know it didn't happen."
16  Then other people say, "I don't remember and
17  it could have happened, just right now I can't
18  remember."  So what I'm asking is did you have
19  any kind of input?  I'm not saying did you put
20  the paper in here.  Were you consulted about
21  what was put in this binder?
22     A.   No.  I was not consulted about
23  what was put in the binder.
24     Q.   Do you know if the legal
25  department was consulted?
                                        Page 32
```

8 (Pages 29 to 32)

321 North Vermont Street       VENTURELLA & ASSOCIATES, L.L.C.       Telephone: (985) 893-1999
Covington, Louisiana 70433     Board-Certified Court Reporters       Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-10    05/05/08    Page 6 of 10

PATRICK CARPENTER                    DEPOSITION OF: MARGARET WEBB                      REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008           LILLIE R. BURCH, CCR

1  Q. Did you look at any documents?
2  A. The only thing I looked at was to
3  get my dates together.
4  Q. What did you look at?
5  A. My computer, payroll documents.
6  Q. How would that help you get dates
7  together?
8  A. I just wanted to make sure where
9  I was during that period of time. Because I
10 had different jobs.
11 Q. So we can look at like your job
12 record?
13 A. Yes. That's all it would show.
14 Q. So in March of 2005 you were
15 what?
16 A. March of '05 I was director of
17 Human Resources for LTC.
18 Q. Would you expect Mr. Meaux to let
19 you know if he became aware that an employee
20 felt that there was a racially discriminatory
21 remark by a manager?
22 A. No.
23 Q. You wouldn't expect him to tell
24 you?
25 A. No.
                                                    Page 41

1  Q. Who would you expect him to tell?
2  A. The chancellor.
3  Q. Would you expect the chancellor
4  to mention it to you?
5  A. If she wanted my opinion or
6  needed me to investigate, yes.
7  Q. Have you seen any written
8  complaints by Mr. Carpenter that predated the
9  EEOC charge?
10 A. No, I don't remember seeing
11 anything like that.
12 Q. Did you speak to the chancellor
13 about any such complaints before the EEOC
14 charge?
15 A. No.
16 Q. Did the chancellor get fired for
17 deficient performance?
18 A. No.
19 Q. Was she asked to leave or was her
20 job simply eliminated?
21 A. Legislative bill.
22 Q. So you wouldn't say her
23 performance was in any way deficient?
24 A. No, sir.
25 Q. Have you ever done any kind of
                                                    Page 42

1  investigation involving Patrick Carpenter
2  concerning an EEOC charge or any verbal
3  complaints or written complaint?
4  A. I don't remember doing anything
5  on Mr. Carpenter.
6  Q. This policy which is distributed
7  to students and employees -- we've figured
8  that out, right?
9  A. Yes, sir.
10 Q. 6.011. It says here: A member of
11 the Human Resources will conduct investigation
12 unless otherwise deemed necessary in order to
13 assure an impartial and confidential
14 investigation.
15       Why is that important? That
16 someone not involved, you know, rather than
17 the accuser investigating that an impartial
18 person do it? Why is that important?
19 A. You get both sides of the issue.
20 Q. That's what I thought. Certainly
21 that is the policy of the LTC, that if there
22 is an issue involving performance that an
23 employee is afforded the opportunity to give
24 both sides, to answer allegations of deficient
25 performance, isn't that the policy of the LTC?
                                                    Page 43

1  A. Yes.
2  Q. I show you admission number
3  eleven. This is what we call something that's
4  not contested in the case. I'm showing you
5  request for admission number eleven, which was
6  admitted by the LTC. Would you read that,
7  ma'am?
8     BY MR. VINCENT:
9        I object to the form of the
10 question.
11 A.
12    MR. ARRUEBARRENA CONTINUES EXAMINATION:
13 Q. Read that into the record.
14 A. Admit or deny that the LTC
15 utilized a progressive discipline policy and
16 evaluation policy which includes steps such
17 as, one, verbal warnings to identify problems;
18 two, written warnings including a formal
19 meeting with the employee to establish clear
20 performance expectations to correct the
21 problems; three, and opportunity for the
22 employee to present his or her case; and four,
23 termination if the problems remain unresolved
24 after the above steps.
25 Q. Do you agree that that applies to
                                                    Page 44

11 (Pages 41 to 44)

321 North Vermont Street        VENTURELLA & ASSOCIATES, L.L.C.        Telephone: (985) 893-1999
Covington, Louisiana 70433      Board-Certified Court Reporters        Facsimile: (985) 893-6765

PATRICK CARPENTER                 DEPOSITION OF: MARGARET WEBB                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008    LILLIE R. BURCH, CCR

```
 1   any allegations, whether the allegations were
 2   raised in response to an EEOC complaint or
 3   grievance or not in relation to an EEOC
 4   complaint, that that's the policy of the LTC?
 5       A.   Yes.
 6       Q.   And the purpose of having an HR
 7   person, an impartial person doing the
 8   investigation, is so that the accused -- it's
 9   so the fox in the henhouse is not the one
10   doing the investigation, so-to-speak. Doesn't
11   that make sense?
12       A.   Yes.
13       Q.   If the person that is being
14   accused controls the investigation, you don't
15   have to be a genius or an HR professional to
16   know they are going to slant it?
17       A.   State your question again.
18       Q.   Isn't it a fact that if the
19   accused conducts the investigation it can't be
20   impartial?
21       A.   That's what it states there.
22       Q.   So that is the purpose of it,
23   right?
24       A.   I would think so.
25       Q.   And isn't it common sense that if
                                         Page 45
```

```
 1   the accused does the investigation they are
 2   going to be biased in their favor? Isn't that
 3   basic HR 101?
 4       A.   I would say yes.
 5       Q.   So it's not following your policy
 6   to not have HR control the investigation;
 7   isn't that correct, ma'am?
 8       A.   They took control of it at that
 9   level, I don't know.
10       Q.   Who else would know?
11       A.   Those ladies.
12       Q.   Who?
13       A.   Margaret Elgin and Shawn
14   Schupach. That's the two HR reps at that
15   region. I would not know if they went in and
16   did the investigation.
17       Q.   We already know that the only
18   person involved in this two hundred twenty
19   something page binder was Ms. McDanie. So
20   that's not in accordance with your policy, is
21   it, ma'am?
22       A.   No, it is not.
23       Q.   Can you tell me why your policy
24   was not followed on Patrick Carpenter's EEOC
25   charge?
                                         Page 46
```

```
 1       A.   No, I can't. I cannot.
 2       Q.   When you got this binder, when
 3   you read it, did you call Ms.
 4   Montgomery-Richard?
 5       A.   I'll be perfectly honest with
 6   you. I don't think I read all of it.
 7       Q.   You didn't care what was in it?
 8       A.   I wouldn't say that. I furnished
 9   EEOC with the information they needed and
10   that's what was furnished to me by the
11   regional director.
12       Q.   You didn't regard it part of your
13   duties to read it, all you did was pass it on?
14       A.   I would say yes.
15       Q.   If a discrimination complaint
16   comes in to somebody, let's say William
17   Wainwright, dean of development, what is he
18   supposed to do if he gets a discrimination
19   complaint?
20       A.   We functioned under the chain of
21   command. So depending on his immediate
22   supervisor he should have gone up the chain of
23   command and reported it.
24       Q.   February 4, 2005, who would have
25   been his supervisor?
                                         Page 47
```

```
 1       A.   I don't remember.
 2       Q.   Have you looked at Plaintiff's
 3   Bates number 29, 232? Wouldn't the first
 4   sentence of this complaint make it a
 5   discrimination complaint? It says: This
 6   letter will serve as the formal rejection of
 7   corrective action. A formal complaint of
 8   harassment as defined by LCTCS policy 3.011
 9   based on my race and color. Wouldn't that
10   alone make this a complaint about prohibited
11   discrimination?
12       A.   Yes.
13       Q.   So if Mr. Wainwright did not
14   forward this to whoever he needed to forward
15   it to, someone in HR, he didn't follow LTC
16   policy, right?
17       A.   If he indeed did not forward it,
18   yes.
19       Q.   Let's look at Bates Number 16
20   through 20. This is a similar complaint.
21   Once again, the opening sentence of the
22   complaint makes it a complaint about
23   prohibited discrimination, doesn't it, ma'am?
24       A.   Yes, sir.
25       Q.   March 9, 2005?
                                         Page 48
```

12 (Pages 45 to 48)

321 North Vermont Street           VENTURELLA & ASSOCIATES, L.L.C.      Telephone: (985) 893-1999
Covington, Louisiana 70433         Board-Certified Court Reporters       Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-10    05/05/08    Page 8 of 10

PATRICK CARPENTER                         DEPOSITION OF: MARGARET WEBB                        REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008                 LILLIE R. BURCH, CCR

**Page 49**

1  A. Yes, sir.
2  Q. This one is directed to
3  Dr. Margaret Montgomery-Richard. Who is
4  Leslie Hatfield?
5  A. Leslie worked in the office with
6  us. Leslie was also one of the executive
7  secretaries. Who she was reporting to at that
8  point, I can't remember.
9  Q. Was she your secretary?
10 A. I had no secretary.
11 Q. So you think she was somebody's
12 secretary, but you're not sure if she was
13 Dr. Montgomery-Richard's secretary?
14 A. I don't remember Leslie Hatfield
15 working directly under Dr. Richard.
16 Q. Do you have reason to believe
17 that the certified mail return receipt on
18 Bates number 20 signed by Leslie Hatfield is
19 not reflective of her receiving this letter
20 dated March 9?
21 A. Oh, no. I can see why Leslie
22 would sign that, yes.
23 Q. Do you have any reason to believe
24 that this receipt isn't a confirmation of
25 Leslie's receipt of the letter I just showed

**Page 50**

1  you on the Bates numbers I just identified?
2  A. No. No reason to believe she did
3  not refer it.
4  Q. Do you remember hearing anything
5  from Leslie about a grievance about race
6  discrimination?
7  A. No.
8  Q. When you look at this thing, you
9  can see that Mr. Carpenter like in the third
10 incomplete paragraph on the first page, this
11 grievance is clearly directed to the following
12 persons: Mr. Meaux, Dr. Kay McDaniel, Mr.
13 William Wainwright. Do you see that?
14 A. Yes, sir.
15 Q. Mr. Carpenter is complaining
16 about race discrimination. He's alleging that
17 those people are involved in it?
18 A. Yes, sir.
19 Q. So it would not be the policy
20 that those people were to handle the
21 investigation, would it?
22 A. No, they would not be part of
23 handling the investigation.
24 Q. This is Bates Number 21 through
25 22. And also Bates number 5, which is once

**Page 51**

1  again the return receipt. This is another
2  letter on April 6. Once again to Dr. Margaret
3  Montgomery-Richard. Do you remember her
4  around April 2006 providing you with any
5  notice that she had received a grievance such
6  as this one?
7  A. No.
8  Q. Do you agree this is a complaint
9  about race discrimination?
10 A. Yes.
11 Q. And it also identifies Mr. Meaux
12 and Kay McDaniel as people that Mr. Carpenter
13 felt were discriminating against him because
14 of racism?
15 A. Yes.
16 Q. Do you agree that Ms. Hatfield on
17 Bates number 5, the last page of the exhibit,
18 received this on 4-8?
19 A. Yeah.
20 Q. Do you remember around that time
21 being advised of the discrimination complaint?
22 A. No.
23 Q. Looking at the two complaints we
24 just looked at, Bates Number 16 through 19,
25 which is the complaint that Dr. Margaret

**Page 52**

1  Montgomery-Richard dated March 9, and Bates
2  Number 21 to 22 which is the complaint dated
3  April 6, 2005, these are complaints that both
4  should have been referred to someone in HR,
5  according to your policy, correct?
6  A. Correct.
7  Q. You're saying they may have been
8  referred, you just didn't know because it
9  could have been one of those other people?
10 A. Correct.
11 Q. What were their names?
12 A. Margaret Elgin, E-L-G-I-N. And
13 Shawn Schupach.
14 Q. I believe I asked the question
15 of your lawyers. Did you help your lawyers in
16 answering interrogatories and request for
17 production of documents? Do you know what
18 that is?
19 A. Yes.
20 Q. Were you one of the people that
21 assisted the Attorney General's office in
22 preparing answers?
23 A. I don't remember doing an
24 interrogatory for this one, for the Patrick
25 Carpenter case.

13 (Pages 49 to 52)

321 North Vermont Street              VENTURELLA & ASSOCIATES, L.L.C.         Telephone: (985) 893-1999
Covington, Louisiana 70433            Board-Certified Court Reporters          Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR    Document 71-10    05/05/08    Page 9 of 10

PATRICK CARPENTER                    DEPOSITION OF: MARGARET WEBB                    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008    LILLIE R. BURCH, CCR

**Page 53**

1  Q. Let me have you take a look at
2  this. Because I really don't understand it.
3  Hold on a second. Interrogatory Number 6:
4  Please state whether plaintiff ever complained
5  about race discrimination based on race and/or
6  retaliation. Do you see that?
7  A. Yes.
8  Q. It says: Please describe the
9  complaint, identify who knows about it.
10  A. Okay.
11  Q. The answer is: On August 15,
12  2005, a letter was written for Dr. Kay
13  McDaniel to Mr. Wayne Meaux requesting that
14  Mr. Carpenter be terminated. Then it says:
15  On September 8, 2005 Wayne Meaux met with
16  Patrick Carpenter to discuss issues and
17  options for his employment.
18       Would you agree so far that
19  doesn't appear to have anything to do with the
20  plaintiff's discrimination complaint?
21  A. Not really.
22  Q. Then it says: On September 12,
23  2005 Vice Chancellor Meaux met with Chancellor
24  Margaret Montgomery-Richard. Dr. Richard
25  informed Mr. Meaux that Mr. Carpenter had

**Page 54**

1  filed a complaint with the EEOC.
2       Do you know anything about that,
3  ma'am?
4  A. Okay.
5  Q. Is that accurate?
6  A. No, I wouldn't know.
7  Q. Were you involved?
8  A. I don't remember being involved.
9  It doesn't mean I wasn't. I just don't
10  remember being involved in it.
11  Q. Are you saying the only thing you
12  remember is that the EEOC called you because
13  they thought you might know how to get a
14  response to a charge? And then you called up
15  and asked for that two hundred twenty-two page
16  binder she made? Is that your only
17  involvement?
18  A. No. Well, let me take that back.
19  It could been my only involvement in the EEOC
20  case, yes.
21  Q. It says here, this is an official
22  answer by LTC: Ms. Margaret Webb, assistant
23  director of Human Resources for LCTCS --
24  A. That's my current position.
25  Q. At the time you were LTC?

**Page 55**

1  A. Correct.
2  Q. -- allegedly received a copy of
3  the complaint. I was a little confused about
4  that. Did you receive a copy of the EEOC
5  complaint? Why would your lawyer say you
6  allegedly received a copy of the complaint?
7  A. Do I have a copy of the
8  compliant?
9  Q. No.
10  A. Did I receive one since I've been
11  at LCTCS.
12  Q. Did you ever receive a copy of
13  the EEOC complaint?
14  A. I know of the EEOC complaint so I
15  probably received a copy of it from EEOC.
16  Q. So you didn't get if from
17  Margaret Montgomery-Richard?
18  A. No.
19  Q. Do you know when you got it from
20  the EEOC?
21  A. That's really difficult.
22  Because -- you know, I could say it was prior
23  to the storm. But then I wouldn't be able to
24  tell you if I'm accurate or inaccurate.
25  Q. But you remember it appeared to

**Page 56**

1  be at the beginning the charge?
2  A. Right. That's what I'm trying to
3  remember. Because he was not the only EEOC
4  complaint. And I'm trying to get my data
5  correct as to which one I'm thinking about.
6  Q. Has anyone else filed a complaint
7  involving Ms. McDaniel?
8  A. No, not that I know of.
9  Q. Or of Mr. Meaux?
10  A. No, not that I can remember.
11  Q. Is that something you would
12  remember?
13  A. I remember some complaints, but
14  it was nothing to do with that region. So it
15  could have been Mr. Carpenter's that I was
16  working on between the Texas and the New
17  Orleans EEOC office.
18  Q. I'm not trying to ask for any
19  privileged communications. I just want to
20  know if you know why your layer would phrase
21  it this way.
22  A. I really don't.
23  Q. It says: It was never provided
24  to Region 2.
25       What does that mean, never

14 (Pages 53 to 56)

321 North Vermont Street                VENTURELLA & ASSOCIATES, L.L.C.                Telephone: (985) 893-1999
Covington, Louisiana 70433               Board-Certified Court Reporters                Facsimile: (985) 893-6765

Case 3:07-cv-00170-JJB-SCR   Document 71-10   05/05/08   Page 10 of 10

PATRICK CARPENTER
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL
DEPOSITION OF: MARGARET WEBB
FEBRUARY 15, 2008
REPORTED BY:
LILLIE R. BURCH, CCR

**Page 57**

1  provided to Region 2?
2  A. For the first time reading it, it
3  says it was never provided. It's saying I
4  never provided the EEOC complaint to Region 2.
5  Q. Does that mean, in other words,
6  it was not provided to Chancellor Richard?
7  A. No, it does not mean that.
8  Q. Does it mean it was not provided
9  to Kay McDaniel?
10 A. It could mean that.
11 Q. But we already know from her
12 testimony that she was provided it and she was
13 the author of this binder.
14 A. That's why I don't understand the
15 statement.
16 Q. So this statement is probably not
17 accurate based on what you sent to the EEOC?
18 A. That's what I would say.
19 Q. I asked here: Please state
20 whether defendant ever conducted an
21 investigation concerning plaintiff's
22 complaint.
23     Now, we've already figured out
24 that the March 9 and April 6 complaints should
25 have resulted in investigations at that time,

**Page 58**

1  right?
2  A. Okay.
3  Q. Somebody dropped the ball, right?
4  A. Yes.
5  Q. Either the chancellor's office or
6  HR, right, if no investigation was done?
7  A. I would agree.
8  Q. It says: Please state whether
9  there was ever an investigation about race
10 discrimination suffered by plaintiff, adverse
11 treatment due to retaliation to support prior
12 complaints about race discrimination. In the
13 answer it says: There was not an
14 investigation regarding the complaint.
15     Do you know if that's true,
16 ma'am?
17 A. If that's what they're saying. I
18 did not do an investigation.
19 Q. Are you aware that failing to do
20 an investigation in and of itself creates
21 liability? Did you know that?
22 BY MR. VINCENT:
23     I object to the form of the
24 question.
25 BY THE WITNESS:

**Page 59**

1  I'm not answering that.
2  BY MR. ARRUEBARRENA:
3  I just want to know if you know
4  that.
5  EXAMINATION BY MR. ARRUEBARRENA:
6  Q. Do you know, as an HR
7  professional, that that in and of itself
8  creates liability?
9  A. Repeat the question.
10 Q. Failing to make a complaint when
11 you have constructive notice of the complaint,
12 constructive notice meaning you can't avoid
13 liability by saying we lost it or didn't send
14 it to the right place --
15 A. Do I know if it's a liability?
16 BY MR. VINCENT:
17 I would object. It calls for a
18 legal conclusion.
19 MR. ARRUEBARRENA CONTINUES EXAMINATION:
20 Q. Are you aware whether or not
21 failing to do an investigation in and of
22 itself creates liability under Title 7?
23 A. Yes.
24 Q. So you are aware, then, that
25 liability was created because we have

**Page 60**

1  determined from your answers and the other
2  answers given to me by the LTC, that no
3  investigation was done on the March 9
4  complaint or the April 6 complaint.
5  BY MR. VINCENT:
6  I object to the form of the
7  question. If you can answer that.
8  BY MR. ARRUEBARRENA:
9  Right?
10 BY MR. VINCENT:
11 If you understand the question
12 you can answer it.
13 BY THE WITNESS:
14 I don't understand. I don't
15 understand the question.
16 MR. ARRUEBARRENA CONTINUES EXAMINATION:
17 Q. It says: We were asked by the
18 chancellor of the LCTCS. Who was the
19 chancellor of the LCTCS?
20 A. It would be chancellor of the
21 LTC.
22 Q. So this is incorrect?
23 A. If they are speaking about the
24 chancellor, that's over the community colleges
25 or the LTC. The president, Dr. Bumfus, was

15 (Pages 57 to 60)

321 North Vermont Street
Covington, Louisiana 70433
VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
Telephone: (985) 893-1999
Facsimile: (985) 893-6765