# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

PATRICK CARPENTER      *     CIVIL ACTION NO. 07-0170

                                  *

VERSUS                     *     JUDGE BRADY

                                  *

THE BOARD OF SUPERVISORS OF THE    *     MAGISTRATE RIEDLINGER

LOUISIANA COMMUNITY AND            *

TECHNICAL COLLEGE SYSTEM,         *

LOUISIANA BOARD OF REGENTS        *

AND LOUISIANA TECHNICAL COLLEGE    *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

      **NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Patrick Carpenter ("Mr. Carpenter"), who files this Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## INITIAL STATEMENT

    "When a party moves for summary judgment, ... '[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.'" *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 (5th Cir.2000) (citing *Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir.1993)).   The moving party must address why  evidence on material matters adverse to its position does not create an issue of material fact, because  "before the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial." *Id.* (internal

quotations and citations omitted). The LTC has utterly failed to meet its summary judgment burden because the LTC has failed to address why compelling evidence adverse to its position does not create issues of material fact.  Additionally the relatively few factual assertions made by the LTC are based solely on conclusory allegations.[1]  Plaintiff respectfully asserts that these failings are so glaring that the motion itself at best is a waste of judicial resources and at worse should arguably be considered frivolous under the Federal Rules of Civil Procedure.  Nonetheless, out of an abundance of caution, Plaintiff submits this opposition memorandum.

## MATERIAL FACTS

Plaintiff, Mr. Carpenter, worked for the Louisiana Technical College (the "LTC") for approximately four (4) years until his retaliatory termination on or about January 2, 2007.[2]  Prior to complaining about racial discrimination and racial harassment, Plaintiff was never disciplined for deficient performance or misconduct.[3]

It is uncontested that Dr. Margaret Montgomery-Richard ("Dr. Montgomery-Richard") was the Chancellor of the LTC during Plaintiff's employment until she left due to a Legislative initiated re-organization in June 2006.[4]  Wayne Meaux ("Mr. Meaux") was the Vice-Chancellor and Dr. Montgomery-Richard's subordinate.  Dr. Kay McDaniel ("Dr. McDaniel") reported to Mr. Meaux and was the Associate Dean/Campus Administrator for LTC - BR Tech Campus.  Margaret Webb

---

[1]  Neither the LTC's Memorandum in Support of Motion for Summary Judgment nor its Statement of Uncontested Material Facts state what evidence applies to its suggestions that this Honorable Court should dismiss any claims.

[2]  Exhibit "D" Declaration of Patrick Carpenter.

[3]  Exhibit "D" Declaration of Patrick Carpenter.

[4]  Exhibit "A" Montgomery-Richard 7-8.

("Ms. Webb") was the director of HR for the LTC.[5]

**Plaintiff's Protected Activity – Complaints about race discrimination:**

As explained more fully below, Plaintiff complained verbally regarding race discrimination in April 2004. He complained in writing to the LTC on: February 4, 2005; March 9, 2005 and April 6, 2005. On July 25, 2005 Plaintiff filed a Charge of Discrimination alleging race discrimination and retaliation.

Plaintiff first complained about race discrimination in April of 2004.[6] At that time, he verbally complained to Dr. Kay McDaniel ("Defendant-McDaniel"), Dean/Campus Administrator for LTC - BR Tech Campus, that he was being treated unfairly and not supported properly because of his race, African-American.[7] On February 4, 2005, Plaintiff complained in writing[8] to William S. Wainwright, the LTC Dean of Workforce Development, that he was being treated unfairly due to "racial harassment" toward him that had been evident and remained evident.[9]

The LTC failed to provide any response to Plaintiff concerning these complaints.[10] Thus, on

---

[5] Exhibit "A" Montgomery-Richard 30-31.

[6] Exhibit "D" Declaration of Patrick Carpenter ; Exhibit "B" Carpenter 120-22.

[7] Exhibit "D" Declaration of Patrick Carpenter ; Exhibit "B" Carpenter 120-22.

[8] Exhibit "C" February 4, 2005 race discrimination complaint including that Michael Gassen had made racially offensive comments.

[9] Exhibit "B" Carpenter 279. Predictably William Wainwright denied receiving a written complaint but did admit that Plaintiff complained about comments made by Mike Gassen ("Mr. Gassen") about music. (Exhibit "G" Wainwright 11-12). Wainwright did not deny that Plaintiff complained that Mr. Gassen had made a racially offensive comment about the music Plaintiff liked – he just claimed loss of memory on that point. (Exhibit "G" Wainwright 12-13).

[10] Exhibit "D" Declaration of Patrick Carpenter

March 9, 2005 Plaintiff complained again to Dr. Montgomery-Richard about race discrimination, retaliation and the LTC's failure to respond to his prior complaints.[11]  That this  complaint was received by the LTC is incontrovertible as Dr. Montgomery-Richard admitted that the complaint was received by Leslie Hatfield the secretary to Ms. Webb, the Director of HR.[12]  Dr. Montgomery-Richard confirmed that – although this complaint was addressed to her it actually was received in the HR department by Ms. Webb's secretary.[13]  Interestingly, Ms. Webb claimed to have no knowledge as to who Leslie Hatfield reported to or worked for while also claiming to have no knowledge of the March 9, 2005 complaint.[14]

Once again, receiving no response from the LTC, it was necessary for Plaintiff to complain by certified mail about race discrimination to Dr. Montgomery-Richard on April 6, 2005.[15]  As before, this letter was received by Leslie Hatfield.[16]  This time Dr. Montgomery-Richard had her secretary email Plaintiff that the LTC was researching his grievance and that he would be notified with a response in a few weeks.[17]  Dr. Montgomery-Richard understood the complaint involved race discrimination and she spoke to Ms. Webb about taking care of the complaint.[18]  In spite of this

---

[11]  Exhibit "F" March 9, 2005 Certified Letter to Dr. Montgomery-Richard from Plaintiff.

[12]  Exhibit "A" Dr. Montgomery-Richard 25.

[13]  Exhibit "A" Dr. Montgomery-Richard 25-26 and 32-33.

[14]  Exhibit "H" Webb 48-50.

[15]  Exhibit "I" April 6, 2005 Certified Letter to Dr. Montgomery-Richard from Plaintiff.

[16]  Exhibit "A" Dr. Montgomery-Richard 25-26.

[17]  Exhibit "J" April 14, 2005 Email from April Magee (Dr. Montgomery-Richard's secretary) to Plaintiff with a copy to Ms. Webb.

[18]  Exhibit "A" Dr. Montgomery-Richard 29-30.

directive to Ms. Webb, the LTC once again failed to respond to Plaintiff's race discrimination complaints. Indeed, Ms. Webb admitted that she failed to conduct an investigation,[19] and, once again, she claimed no knowledge of Dr. Montgomery-Richard telling her to take care of Plaintiff's race discrimination complaint.[20] Therefore, Plaintiff was left with no alternative but to complain to the EEOC by filing a Charge of Discrimination on July 25, 2005.[21]

**The LTC's complaint/grievance and progressive discipline policy:**

A complaint or grievance does not have to be in any special format – it could be just a letter.[22] The LTCCS Harassment Complaint Investigation form, Policy 6.011 (produced by the LTC) defines some aspects as to how a complaint/grievance is to be handled.[23] The first thing that should be done is to interview the complainant.[24] And, HR should conduct the investigation to ensure an impartial investigation.[25] Even Ms. Webb – who had trouble remembering Plaintiff's complaints received by her secretary (or even that her secretary was her secretary) and conversations with Dr. Montgomery-Richard about Plaintiff's complaints – had to admit the obvious that it is "HR 101" that "if the accused does the investigation they are going to be biased in their favor."[26]

---

[19] Exhibit "H" Webb 57-58.

[20] Exhibit "H" Webb 29.

[21] Exhibit "K" EEOC Charge of Discrimination signed by Plaintiff on July 25, 2005; see also, Exhibit "B" Carpenter 284.

[22] Exhibit "L" LTC grievance policy 6.011; and, Exhibit "H" Webb 12-13.

[23] Exhibit "L" LTC grievance policy 6.011.

[24] Exhibit "L" LTC grievance policy 6.011; see also, Exhibit "M" Dr. McDaniel 232.

[25] Exhibit "L" LTC grievance policy 6.011; see also, Exhibit "H" Webb 45-46.

[26] Exhibit "H" Webb 45-46.

The LTC has admitted (in Request for Admissions No. 11) the following progressive discipline policy:

"...the LTC utilizes (sic) a progressive discipline policy and evaluation policy which includes steps such as, one, verbal warnings to identify problems; two, written warnings including a formal meeting with the employee to establish clear performance expectations to correct the problems; three, and opportunity for the employee to present his or her case; and four, termination if the problems remain unresolved after the above steps."[27]  Ms. Webb acknowledged that this is the LTC's discipline/evaluation policy whether the allegation of deficient performance or misconduct arises during the normal course of work or in during an investigation of an internal grievance or even an EEOC Charge investigation.[28]  Dr. Montgomery-Richard also confirmed that the referenced LTC progressive discipline evaluation policy applies to allegations of deficient performance or misconduct that arise from any source.[29]

**The LTC's response to Plaintiff's race discrimination complaints and his EEOC charge was in violation of its policies:**

Plaintiff's complaints involving race discrimination included that Mr. Meaux and Dr. McDaniel had taken adverse actions against him due to the prohibited motivation of race discrimination and/or retaliation.[30]   Although the Chancellor, Dr. Montgomery-Richard, had

---

[27] Exhibit "H" Webb 44; see also, Exhibit "N" Request for Admission No. 11.

[28] Exhibit "H" Webb 44-45..

[29] Exhibit "A" Dr. Montgomery-Richard 46-47.

[30] See Exhibits "C", "F", "I" Plaintiff's internal written grievances, and "K" Plaintiff's first EEOC Charge of Discrimination.

personally asked Ms. Webb to investigate Plaintiff's internal complaint and his EEOC charge,[31] and

that was the policy of the LTC (to have such investigations conducted by HR – not the accused), Dr.

McDaniel admits that because of Plaintiff's EEOC Charge Mr. Meaux asked her to put together

"information" on Plaintiff's employment.[32]  Dr. McDaniel felt that  Plaintiff's filing of the Charge

of Discrimination indicated a lack of concern on his part as to the impact it would have on the LTC.[33]

She also admitted that she believed that Plaintiff's filing of his EEOC Charge showed a lack of team

building on Plaintiff's part.[34]  On or about August 15, 2005, unbeknownst to Plaintiff, Dr. McDaniel

recommended his termination in writing.[35]  Dr. Joycelyn D. West ("Dr. West"), the District Dean of

Student Affairs,[36] testified that – in August 2005[37] – Dr. McDaniel told her that Plaintiff had caused

so much tension in her life that his name was not allowed to be spoken in her house.[38]  Dr. McDaniel

claimed she was not allowed to terminate Plaintiff in August 2005 because he had filed an EEOC

Charge.[39]  Dr. McDaniel admitted that she prepared "information" on Plaintiff (the response to the

---

[31]  Exhibit "A" Dr. Montgomery-Richard 29-30.

[32]  Exhibit "M" Dr. McDaniel 32-33.

[33]  Exhibit "M" Dr. McDaniel 243-44.

[34]  Exhibit "M" Dr. McDaniel 244.

[35]  Exhibit "O" Dr. McDaniel letter dated August 15, 2005 to terminate Plaintiff.

[36]  Exhibit "P" Dr. West 6.

[37]  Exhibit "P" Dr. West 24.

[38]  Exhibit "P" Dr. West 17.

[39]  Exhibit "M" Dr. McDaniel 128-29.

EEOC) in September 2005[40] and claimed that "Dr. Montgomery asked Mr. Meaux to ask me to do it, so I did it."[41]

Meanwhile, after Dr. McDaniel's attempt to get Plaintiff terminated on August 15, 2005, Mr. Meaux met with Plaintiff on or about September 9, 2005.[42]  Mr. Meaux admitted in this meeting he gave Plaintiff three options: (1) resign; (2) be terminated; or, (3) accept a relocation to the LTC's Jackson's campus about 50 miles from Baton Rouge.[43]  That did not work so Dr. McDaniel prepared her binder on Plaintiff.

Dr. Montgomery-Richard confirmed that having the accused (Dr. McDaniel) conduct the investigation into Plaintiff's discrimination complaints violated LTC's policies and was improper.[44] As to Dr. McDaniel's contention that Dr. Montgomery-Richard asked Mr. Meaux to ask her to do the investigation, Dr. Montgomery-Richard confirmed that either Mr. Meaux improperly asked her to investigate Plaintiff and herself, or she was being untruthful about Mr. Meaux asking her to investigate herself.[45]  In any event, as referenced already, Dr. Montgomery-Richard admitted that the "investigation" was not unlike the fox investigating his attack on the hens.[46]

Dr. McDaniel's binder of "information" on Plaintiff contained two hundred twenty (220)

---

[40]  Exhibit "M" Dr. McDaniel 32-33.

[41]  Exhibit "M" Dr. McDaniel 215-16.

[42]  Exhibit "T" Meaux 286-87.

[43]  Exhibit "T" Meaux 286-87.

[44]  Exhibit "A" Dr. Montgomery-Richard 40-41.

[45]  Exhibit "A" Dr. Montgomery-Richard 57-58.

[46]  Exhibit "A" Dr. Montgomery-Richard 57-58.

pages.[47]  Dr. Montgomery-Richard reviewed the binder in her deposition[48] and confirmed that the binder did not look anything like a discrimination investigation.  She confirmed that it looked more like a justification for termination – "like a chronology of documentation of when you hire somebody you have the intent of not keeping them."[49]  Further, Ms. Webb, the HR Director, also admitted that Dr. McDaniel preparing the binder on Plaintiff was not in accordance with LTC policy.[50]

The EEOC issued a dismissal and right-to-sue notice in April of 2006,[51] but the Charge was re-opened.[52]  However, Dr. McDaniel thought the EEOC Charge was over 90 days after April of 2006 – she was told the matter was resolved.[53]  She did not know the EEOC Charge had been re-opened by the EEOC.[54]  Prior to January 2007 (when Plaintiff was terminated) Mr. Meaux retired and Dr. McDaniel began to report to Jim Henderson ("Mr. Henderson"), Senior Vice President of the LTC.[55]  Before Christmas 2006 Dr. McDaniel brought the binder she prepared on Plaintiff to Mr. Henderson.[56]  This was the first time she had brought the binder to Mr. Henderson and she still

---

[47]  Exhibit "A" Dr. Montgomery-Richard 47-48.

[48]  Dr. Montgomery had not seen the "binder" prior to her deposition.

[49]  Exhibit "A" Dr. Montgomery-Richard 58-59.

[50]  Exhibit "H" Webb 46-47.

[51]  Exhibit "Q" Dismissal and Notice of Suit Rights April 2006.

[52]  Exhibit "R" Re-opening of EEOC Charge.

[53]  Exhibit "M" Dr. McDaniel 134-135.

[54]  Exhibit "M" Dr. McDaniel 134-135.

[55]  Exhibit "M" Dr. McDaniel 95 and 130-31.

[56]  Exhibit "M" Dr. McDaniel 132-33.

thought Plaintiff's EEOC issue was dismissed.[57]  She told Mr. Henderson that the binder was her

work in response to Plaintiff's EEOC Charge.[58]  In thirty minutes, she had convinced Mr. Henderson

to terminate Plaintiff's employment with the LTC.[59]  Mr. Henderson's office wrote a letter

terminating Plaintiff effective January 2, 2007.[60]  Mr. Henderson had no personal knowledge of

Plaintiff's situation other than what Dr. McDaniel told him.[61]

**Dr. McDaniel's peppering of Plaintiff's personnel file – the binder – was in violation of LTC**

**policies**:

On July 25, 2005, Plaintiff filed his first Charge of Discrimination with the EEOC alleging

adverse treatment at the LTC due to race discrimination.[62]  The LTC and the individual defendants

failed to provide a response to Plaintiff regarding this Charge of Discrimination.[63]  At this point, the

LTC and Defendant-McDaniel and Defendant-Meaux embarked upon a shameless and concerted

secret effort to unfairly justify Plaintiff's termination.[64]   It was the intent of the LTC and the

individual defendants to hide these criticisms to unfairly paper Plaintiff's personnel file with

---

[57] Exhibit "M" Dr. McDaniel 133-35.

[58] Exhibit "M" Dr. McDaniel 134.

[59] Exhibit "M" Dr. McDaniel 135-137.

[60] Exhibit "S" Henderson termination letter.

[61] Exhibit "M" Dr. McDaniel 266.

[62] Exhibit "D" Declaration of Patrick Carpenter.

[63] Exhibit "D" Declaration of Patrick Carpenter.

[64] Exhibit "D" Declaration of Patrick Carpenter.

negative entries to justify his eventual termination.[65]

Mr. Meaux was Dr. McDaniel's mentor and supervisor.[66]  Just after Plaintiff filed his first EEOC Charge in July 2005 – on or about August 15, 2005 – Dr. McDaniel brought a termination recommendation to Mr. Meaux.  Mr. Meaux admitted that this action was against the LTC progressive discipline policy, which requires reasonable notice to employees in this situation.[67]  He could offer no explanation as to why Dr. McDaniel would suddenly attempt to terminate Plaintiff in mid-August 2005.[68]  Written progressive discipline should have been conducted with Plaintiff prior to seeking his termination.[69]

Dr. McDaniel finished her binder on Plaintiff by September 28, 2005.  Meaux reviewed Plaintiff's personnel file and the "binder" and found no indication of deficient performance alleged against Plaintiff after September 28, 2005.[70]

The record shows that Mr. Bravel from the outside  electrical apprenticeship program sent a letter to Dr. McDaniel critical of Plaintiff dated September 28, 2005.  Mr. Meaux admitted Dr. McDaniel's failure to even mention the subject matter of the letter to Plaintiff was deficient performance on her part.[71]

---

[65]  Exhibit "D" Declaration of Patrick Carpenter.

[66]  Exhibit "M" Dr. McDaniel 94-95.

[67]  Exhibit "T" Meaux 284-85.

[68]  Exhibit "T" Meaux 284-85.

[69]  Exhibit "T" Meaux 108-109

[70]  Exhibit "T" Meaux 309-10.

[71]  Exhibit "T" Meaux 301-302.

Buffy Brinkley (an administrative employee in Student Finance) was asked to submit a written complaint about Plaintiff. Indeed, Plaintiff was not given an opportunity to respond to any of the individual complaints that were placed in the "binder."[72]  Mr. Meaux confirmed that Dr. McDaniel's failure to review all of the individual complaints against Plaintiff -- which were solicited and included in the binder – was deficient performance on her part.[73]  Amazingly, he still evaluated Dr. McDaniel as an outstanding employee.[74]

## LAW AND ARGUMENT

**Standard of Review:**  Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett, LLC* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp., LLC* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *see also LLCBaton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp., LLC* 289 F.3d 373, 375 (5th Cir.2002).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp.,* 477 U.S. at 322-23; *Hart v. Hairston,* 343 F.3d 762, 764 (5th Cir.2003). An issue is material if its

---

[72]  Exhibit "M" Dr. McDaniel 251-252

[73]  Exhibit "T" Meaux 299-318.

[74]  Exhibit "T" Meaux 125-26.

resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 412 (5th Cir.2003). However, factual controversies are resolved in favor of the nonmovant when both parties have submitted evidence of contradictory facts or the nonmovant has submitted un-rebutted evidence in support of her claim. See, e.g., *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir.1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 282 (5th Cir.2001) (quoting *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Brenoettsky,* 158 F.3d at 911); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District,* 308 F.3d 451, 458 (5th Cir.2002).

"In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the

nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. at least to the extent that that evidence comes from disinterested witnesses.'" <u>Mota v. University of Texas Houston Health Science Center</u>, 261 F.3d 512 (5th Cir. 08/09/2001), citing <u>Reeves v. Sanderson Plumbing Products, Inc</u>., 530 U.S. 133, 151 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529 (2d ed. 1995)); see also id. at 150 (noting that the standard governing motions for judgment as a matter of law mirrors the summary judgment standard of review). Id. at 2110.

Judgment as a Matter of Law should not be granted unless "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." Flowers v. S. Reg'l Physician Serv., Inc. , 247 F.3d 229, 235 (5th Cir. 2001) (quotations and citations omitted). The panel must "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves , 530 U.S. at 151; see also FED. R. CIV. P. 50(a)(1).  Palasota v. Haggar Clothing Co., 342 F.3d 569 (5th Cir. 09/03/2003)

### A.    Evidence of "prior bad acts" of Meaux and Dr. McDaniel should be considered by this Court in this motion summary judgment.

This Court should give credence to all evidence favoring Carpenter at the summary judgment stage, including prior bad acts of Meaux and Dr. McDaniel. All evidence should be considered in the light most favorable to the nonmoving party, Carpenter. Defendants suggest that the evidence of "prior bad acts" is unrelated to Carpenter's claims of discrimination and should not be considered by this Court.  However, Carpenter has evidence that the same managers who discriminated against him, Meaux and McDaniel, also discriminated against other African Americans.  For example, Dr. Cyprian testified that she, as an African American, experienced race discrimination by Meaux when she applied for a transfer to the Florida Parishes campus.

-14-

Although white individuals like Delano Klein and Mark Zean were transferred upon request, Dr.

Cyprian had to meet with Meaux three or four times to get her transfer.[75]  Dr. McDaniel

recognized everyone on the graduation stage at the Baton Rouge campus except Dr. Cyprian, who

was the only African American on the stage.[76]  This evidence is relevant because it is prior bad

acts of discrimination by Meaux and Dr. McDaniel, who also discriminated against Carpenter.

This evidence is probative of Meaux and Dr. McDaniel's intent to discriminate and is probative to

the issue of whether the anti-discrimination policy of the employer was effective.

This evidence of "prior bad acts" of discrimination or retaliation against other employees

is not to be confused with observations of Dr. Cyprian of discrimination or retaliation against

Carpenter himself. For example, Dr. Cyprian testified that she observed that after Carpenter's

complaints of discrimination, Pat Walton, who had no chain of command relationship with

Carpenter, would constantly email him about his procedures used in the verification of students.

She observed that no one would ask the same thing of Marlon Morrison, who also did financial

aid at the Baton Rouge campus.[77]

The Defendants suggest that this Court should find the testimony of former LTC

employees, in which it was stated that Meaux and Dr. McDaniel frequently used race as a

determining factor in making employment decisions, as inadmissible.  However, this argument is

not ripe for determination in a motion for summary judgment.  This issue should be presented to

---

[75]Exhibit "U" Cyprian 18-19.

[76]Exhibit "U" Cyprian 23-24..

[77]Exhibit "U" Cyprian 32.

the Court in a Motion In Limine.

Defendants attempt to support their contention that the testimony of former LTC employees is inadmissible by setting forth several recent decisions regarding these "mini-me" trials.  In both *Krunosky v. Genesis Group Restaurants, LLC*, 2007 WL 3310648, *1 (S.D. Ala. Nov. 6, 2007) and *Lewis v. Department of Transportation*, 187 Fed.  Appx. 961 (11th Cir. 2006) the respective Courts excluded similar testimony from the trial record; however, the Defendants in *Krunosky* and *Lewis* requested an exclusion of evidence in a Motion In Limine.

Further, the Defendants cited *Goldsmith v. Bagby Elevator Co.,Inc.,* 513 F.3d 1261 (2008) as holding there was "no abuse of discretion in the exclusion of non-plaintiff grievances against supervisor."  However, the Court in *Goldsmith* held that the district court did not abuse its discretion in admitting evidence of workplace discrimination against employees other than plaintiff.  *Id.* at 1261.  The Court in *Goldsmith* further explains that the district court admitted the evidence for the wrong reason; nonetheless, the testimony of discrimination against employees other than plaintiff was otherwise admissible to support Goldsmith's claim of a hostile work environment and to rebut the defenses of [Defendant].  *Id.* at 1285.  *Goldsmith* states that "me too" evidence is admissible "as relevant to plaintiff's employee's claim of hostile work environment, to rebut the employer's good faith defense by showing that its anti-discrimination policy was not effective, and as probative of intent of the common decision maker involved in termination of plaintiff..." *Id.* at 1261.

Dr. McDaniel admitted that Carpenter was not interviewed in compliance with LTC policy

6.011 regarding harassment.[78]  Ms. Webb also admitted that she does not remember doing any type of investigation involving Carpenter concerning an EEOC charge or any verbal or written complaints.[79]  Webb further states that the investigation is important so that both sides of the story can be heard.[80]  It is clear that the LTC did not follow its own anti-discrimination policy when dealing with Carpenter's complaints of racial discrimination; no investigation was made into those complaints and Carpenter was not allowed to tell his side of the story, thereby making the LTC's anti-discrimination policy ineffective.  Therefore, the testimony of former LTC employees as to the racial attitudes of McDaniel and Meaux should be admissible to provide Plaintiff the opportunity to rebut Defendants' good faith defense.

Defendants argue that if this testimony is found to be admissible the result would be a series of mini-trials relating to other employees' grievances.  *McWhorter v. City of Birmingham*, 906 F.2d 674, 679 (11th Cir. 1990).  The Defendant's in *Goldsmith* advanced a similar argument regarding "mini-trials" and "me-too" evidence; however, the Court in *Goldsmith* found that the "me-too" evidence was admissible as relevant to Plaintiff's claim of a hostile work environment. 513 F.3d at 1286.  The Court in *Goldsmith* explained that, "in some cases, this testimony goes directly to the issue of racial harassment on the job." *Id.* (citing *Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991).  Dr. Alecia Cyprian's ("Dr. Cyprian") testimony is that Dr. McDaniel had a condescending demeanor towards African Americans, in comparison with her

---

[78]  Exhibit "M" Dr. McDaniel 53.

[79]  Exhibit "H" Webb 42-43.

[80]  Exhibit "H" Webb 43.

demeanor towards Caucasians.[81]  Further, Dr. Cyprian noted that "the bottom line was you either

fell in line or you were put on that list.  And when you get to [Dr. McDaniel's] list that is not a

good list."[82]  Dr. Cyprian also stated that between the time she was employed at LTC Baton Rouge

Campus up to the time she left, "people of color, especially African Americans, were either being

forced to resign or were going to be fired."[83]

    As to Meaux, Dr. Cyprian testified that he was one of "the good ole boys," and the reason

that many qualified individuals were overlooked for positions at the LTC Baton Rouge Campus

was due to the "good ole boy politics in the state of Louisiana."[84]  The Court in *Goldsmith* held

that testimony of former employees similar to the testimony of Dr. Cyprian supported Plaintiff's

claim that Defendants permitted a " severe and pervasive atmosphere of racial discrimination on

its premises."  *Id.* at 1286.

    Furthermore, testimony of former employees is probative of the intent of the common

decision-maker involved in the retaliatory action.  Dr. Cyprian's testimony[85] is probative to show

that both Dr. McDaniel and Meaux, the common decision-makers, held racially discriminatory

───────────────

[81]  Exhibit "U" Cyprian 21-23.

[82]  Exhibit "U" Cyprian 22.

[83]  Exhibit "U" Cyprian 20.

[84]  Exhibit "U" Cyprian 20-21.

[85]  Exhibit "U" Cyprian 22-23.  When asked in her deposition, "what about Kay
McDaniel, do you feel she has done anything adverse to African Americans that was
racially motivated?," Dr. Cyprian responded, " So the bottom line was you either fell in
line or you were put on that list.  And when you get to Kay's list that's not a good list.
Because Wayne valued Kay because Kay was the type of leader that whatever Wayne told
Kay to do that he thought was in the best interest of the Baton Rouge campus, then that's
what happened."

attitudes toward employees of color, more specifically African American employees.    In

*Goldsmith,* the Court found that the "me too" evidence was admissible, under Rule 404(b), to

prove the intent of Defendant was to discriminate and retaliate. *Id.* at 1286. (citing Fed.R.Evid.

404(b); *Phillips v. Smalley Maint. Servs., Inc.*, 711 F.2d 1524, 1532 (11th Cir. 1983)).  Similar to

the facts in *Goldsmith*, Plaintiff and Dr. Cyprian were discriminated against by the same

supervisors, Dr. McDaniel and Meaux, so the experiences of Dr. Cyprian are probative of Dr.

McDaniel's and Meaux's intent to discriminate.  *Id.*

> **B.    The record contains sufficient summary judgment evidence to support
> Plaintiff's retaliation claim under Title VII.**

        The Fifth Circuit has held that the "allocation of the burden of proof in Title VII retaliation

cases depends on the nature of the plaintiff's evidence supporting the causation element." *Id.* If the

plaintiff provides circumstantial evidence to establish causation, the tripartite burden-shifting

framework of *McDonnell Douglas* applies. See *id.* (citing *Portis v. First Nat'l Bank, 34 F.3d 325,*

*328 (5th Cir. 1994)).* As noted above, this framework requires the plaintiff to carry the initial

burden of establishing a *prima facie* case of retaliation by demonstrating that: (1) he engaged in

activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal link

existed between the adverse employment action and the protected activity. *See Fierros v. Texas*

*Dep't of Health, 274 F.3d 187, 191 (5th Cir. 2001).*

        This *prima facie* showing then raises "an inference of a retaliatory motive that the

employer can rebut by producing evidence of a legitimate, non-retaliatory reason for the adverse

action." *Id.* (citing *Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001)).* If the employer

produces this evidence, "then the plaintiff has the burden of proving that the Title VII protected

activity 'was a 'but for' cause of the adverse employment decision.'" *Id.* (citing *Long v. Eastfield College, 88 F.3d 300, 305 n. 4*).

On the other hand, the *McDonnell Douglas* framework does not apply if the plaintiff produces direct evidence that "the employer's motivation for the adverse action was at least in part retaliatory." *Id.* (citing *Moore v. United States Dep't of Agric., 55 F.3d 991, 995 (5th Cir. 1995)).* If the plaintiff provides direct evidence of retaliatory animus to the Court, the plaintiff may follow a less circuitous path than that of *McDonnell-Douglas* because "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." *Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993).*

The Fifth Circuit has defined "direct evidence" as "evidence which, 'if believed, proves the fact [in question] without inference or presumption." *Fabela v. Socorro Indep. School Dist., 329 F.3d 409, 415 (5th Cir. 2003)* (quoting *Portis, 34 F.3d at 328-29*). In a Title VII suit, "direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action." *Id.* (emphasis in original).

Here, there could be no dispute as to whether "an adverse employment action occurred" as Plaintiff was terminated.  The only issues as to retaliation due to race discrimination complaints will be "protected activity" and the "causal link" evidence.

    **1.**    **This record shows issues of material fact exist as to protected activity.**

Once again, the record shows that Plaintiff first complained about race discrimination in

April of 2004.[86]  At that time, he verbally complained to Dr. McDaniel that he was being treated

unfairly and not supported properly because of his race, African-American.[87]   On February 4,

2005, Plaintiff complained in writing[88] to Mr. Wainwright that he was being treated unfairly due

to "racial harassment" toward him  that had been evident and remained evident.[89]

     The LTC failed to provide any response to Plaintiff concerning any of these complaints.[90]

Thus, on March 9, 2005 Plaintiff complained again to Dr. Montgomery-Richard about race

discrimination, retaliation and the LTC's failure to respond to his prior complaints.[91]   That this

complaint was received by the LTC is incontrovertible as Dr. Montgomery-Richard admitted that

the complaint was received by Leslie Hatfield.[92]

     Once again, receiving no response from the LTC, it was necessary for Plaintiff to complain

by certified mail about race discrimination to Dr. Montgomery-Richard on April 6, 2005.[93]   As

---

[86] Exhibit "D" Declaration of Patrick Carpenter ; Exhibit "B" Carpenter 120-22.

[87] Exhibit "D" Declaration of Patrick Carpenter ; Exhibit "B" Carpenter 120-22.

[88]  Exhibit "C" February 4, 2005 race discrimination complaint including that Michael Gassen had made racially offensive comments.

[89] Exhibit "B" Carpenter 279.  Predictably William Wainwright denied receiving a written complaint but did admit that Plaintiff complained about comments made by Mike Gassen ("Mr. Gassen") about music.  (Exhibit "G" Wainwright 11-12).  Wainwright did not deny that Plaintiff complained that Mr. Gassen had made a racially offensive comment about the music Plaintiff liked – he just claimed loss of memory on that point.  (Exhibit "G" Wainwright 12-13).

[90] Exhibit "D" Declaration of Patrick Carpenter.

[91]  Exhibit "F" March 9, 2005 Certified Letter to Dr. Montgomery-Richard from Plaintiff.

[92]  Exhibit "A" Dr. Montgomery-Richard 25.

[93]  Exhibit "I" April 6, 2005 Certified Letter to Dr. Montgomery-Richard from Plaintiff.

before, this letter was received by Leslie Hatfield.[94]  This time Dr. Montgomery-Richard had her

secretary email Plaintiff that the LTC was researching his grievance and that he would be notified

with a response in a few weeks.[95]  Dr. Montgomery-Richard understood the complaint involved

race discrimination and she spoke to Ms. Webb about taking care of the complaint.[96]  In spite of

this directive to Ms. Webb, the LTC once again failed to respond to Plaintiff's race discrimination

complaints.  Indeed, Ms. Webb admitted that she failed to conduct an investigation,[97] and, once

again, she claimed no knowledge of Dr. Montgomery-Richard telling her to take care of Plaintiff's

race discrimination complaint.[98] Therefore, Plaintiff was left with no alternative but to complain

to the EEOC by filing a Charge of Discrimination on July 25, 2005.[99]

Plaintiff shows that these complaints up to and including the filing of the EEOC charge are

clearly protected activity under Title VII.  At the very least, Plaintiff respectfully contends that –

taking all inferences in favor of Plaintiff – this evidence shows material issues of fact exist as to

Plaintiff's protected activity involving his race discrimination complaints.

Defendant makes the bewildering contention that Plaintiff can not show protected activity.

(See LTC Memorandum pp.15-17).  The LTC just ignores compelling evidence showing

---

[94]  Exhibit "A" Dr. Montgomery-Richard 25-26.

[95]  Exhibit "J" April 14, 2005 Email from April Magee (Dr. Montgomery-Richard's secretary) to Plaintiff with a copy to Ms. Webb.

[96]  Exhibit "A" Dr. Montgomery-Richard 29-30.

[97]  Exhibit "H" Webb 57-58.

[98]  Exhibit "H" Webb 29.

[99]  Exhibit "K" EEOC Charge of Discrimination signed by Plaintiff on July 25, 2005; see also, Exhibit "B" Carpenter 284.

protected activity.[100]  For example, the LTC has not even attempted to address the fact that

Plaintiff complained about race discrimination on numerous occasions before he was demoted.

Plaintiff has testified that:

a)    On April 15, 2004 Plaintiff complained to Dr. McDaniel regarding race
      discrimination on the job after an issue with Michael Gassen;[101]

b)    On February 4, 2005 Plaintiff also complained to William Wainwright in writing
      that he was being subjected to racism on the job;[102]

c)    On March 10, 2005 Plaintiff complained in writing to Chancellor Montgomery-
      Richard that he was being subjected to race discrimination;[103]

d)    Also on March 10, 2005, Plaintiff filed a formal written grievance concerning
      racial harassment and racial discrimination;[104]

e)    Plaintiff complained on April 6, 2005 in writing to Chancellor Montgomery-
      Richard that his previous complaints of race discrimination were not being
      properly addressed;[105]

---

[100]  This Honorable Court is reminded that the moving party must address why evidence
on material matters  adverse to its position does not create an issue of material fact, because
"before the non-moving party is required to produce evidence in opposition to the motion, the
moving party must first satisfy its obligation of demonstrating that there are no factual issues
warranting trial." *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 (5th Cir.2000)
(citing *Ashe v. Corley,* 992 F.2d 540, 543 (5th  Cir.1993))(internal quotations and citations
omitted). LTC has failed to met its summary judgment burden.

[101]  Exhibit "B" Carpenter 121.

[102]  Exhibit "B" Carpenter 122.

[103]  Exhibit "B" Carpenter 138.

[104]  Exhibit "D" Declaration of Patrick Carpenter

[105]  Exhibit "D" Declaration of Patrick Carpenter

-23-

f)    Plaintiff, fed up with the lack of adequate response to and investigation into his complaints of race discrimination, filed a Charge of Discrimination with the EEOC on July 25, 2005;[106]

LTC incorrectly contends that Plaintiff's complaints were not based upon the reasonable belief that he was complaining about acts prohibited by law.  Plaintiff respectfully contends that it is obvious that an employee would reasonably conclude that racial harassment and discrimination were prohibited by federal and state law.

**2.    LTC decided to terminate Carpenter's employment five days after the EEOC served Carpenter's EEOC Charge of Discrimination on LTC, creating an inference of retaliatory animus and evidence of a causal link between the protected activity and the adverse action.**

The Defendants claim that the lapse of time between the filing of Plaintiff's EEOC complaint and his termination precludes a finding of an inference of retaliatory discharge. Defendants claim that the Charge of Discrimination was filed on July 25, 2005 and that because Plaintiff's eventual termination was some eighteen months later on January 2, 2007, there is no inference of retaliatory motive.  Defendants have cited numerous instances in case law which state that a mere three and four months is too long of a time period to support an inference of retaliatory motive. *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).  Defendants have also cited cases which state that termination within weeks after the protected activity is sufficient to create an inference of retaliatory animus.  *ABF Feight Sys., Inc. v. National Labor Relations Board*, 114 S.Ct. 835, 837 (1994); *O'Bryan v. KTIV Television*, 64 F.3d 118, 1194 (8th Cir. 1995).

However, on August 15, 2005, five days after the Notice of Charge of Discrimination was

---

[106]  Exhibit "D" Declaration of Patrick Carpenter

served on LTC,[107] Dr. McDaniel placed Carpenter on annual leave, which eventually lasted 30 days, and she gave him a low annual performance evaluation that covered only four months.[108] Also at the August 15 meeting Dr. McDaniel told Carpenter that he could no longer return to the campus, and that Meaux or his office would notify Plaintiff of his return.[109]

Also on August 15, 2005, Dr. McDaniel recommended to Meaux that Carpenter be terminated.[110] Dr. Montgomery-Richard admitted that LTC got the EEOC charge prior to Hurricane Katrina (August 29, 2005) and that when they received the charge Meaux and Dr. McDaniel were informed of the charge.[111]

While waiting for that call from Meaux as to when he could return to his job Hurricane Katrina struck the Southeastern part of Louisiana.[112]  Plaintiff received a call from Meaux in September[113] and attended a meeting with Meaux on September 12, 2005, where Meaux explained to Plaintiff that Plaintiff had three options: relocation, resignation, or termination.[114]  Plaintiff's

---

[107]Exhibit "W" Notice of Charge of Discrimination and Case Log sheet

[108]Exhibit "X" Performance Evaluation dated 8/15/05

[109] Exhibit "B" Carpenter 286. Also Dr. McDaniel wrote a letter on 8/15/05 describing this meeting in slightly different terms, which letter Carpenter did not receive until 10/13/05. Exhibit "V"

[110]Exhibit "O" Dr. McDaniel letter dated August 15, 2005 to terminate Plaintiff; see also, Exhibit "V" Letter to Carpenter from Dr. McDaniel stating that he was going to be put on annual leave.

[111]Exhibit "A" Dr. Montgomery-Richard 51-55.

[112] Exhibit "B" Carpenter 287.

[113] Exhibit "B" Carpenter 287.

[114] Exhibit "B" Carpenter 287-288

response to Meaux was that he did not wish to relocate to Jackson nor did he wish to resign.[115] Contrary to Meaux's threat of termination, he did not terminate Plaintiff at this time.[116]

Meaux accepted Dr. McDaniel's recommendation to terminate Plaintiff.[117]  Dr. McDaniel was told shortly after writing this letter by Chancellor Montgomery-Richard that Plaintiff had to be returned to his position because of Plaintiff's EEOC Charge.[118] Chancellor Montgomery-Richard told McDaniel that Plaintiff was to remain employed until his EEOC Charge had been settled.[119]  It is clear that the retaliatory motive to terminate Plaintiff was present five days after the EEOC Charge of Discrimination was served on LTC.

Plaintiff received a dismissal from the EEOC in April 2006.[120]  Shortly thereafter, Plaintiff discovered that the EEOC dismissed his Charge without receiving an answer from the LTC.[121] Subsequently, Plaintiff wrote a letter to Senator Mary Landrieu in which he requested and was granted a reversal of the EEOC dismissal.[122]  In June 2006, the EEOC sent a letter to the LTC demanding a response to Plaintiff's EEOC Charge.[123]  Defendants finally answered Plaintiff's

---

[115]  Exhibit "B" Carpenter 288.

[116]  Exhibit "B" Carpenter 289.

[117]  Exhibit "M" McDaniel 128.

[118]  Exhibit "M" McDaniel 129.

[119]  Exhibit "M" McDaniel 129.

[120]  Exhibit "B" Carpenter 293.

[121]  Exhibit "B" Carpenter 293.

[122]  Exhibit "B" Carpenter 293.

[123]  Exhibit "B" Carpenter 293.

EEOC Charge on December 11, 2006.[124]  Plaintiff was ultimately terminated from the LTC on

January 2, 2007.[125]  Plaintiff's termination came just three weeks after Defendants' submitted their

answer to his Charge of Discrimination to the EEOC.

     Defendant's attempted to terminate[126] Plaintiff five days after the EEOC Charge of

Discrimination was served on LTC. Plaintiff was ultimately terminated mere weeks after

Defendants' finally answered his Charge of Discrimination.[127]  The timing between the serving of

the discrimination charge on LTC and McDaniel's recommendation that Plaintiff's be terminated

supports an inference that LTC had a retaliatory animus that ultimately lead to Carpenter's

termination.

     There is evidence of a causal connection between Plaintiff's complaints of racial

discrimination, his subsequent EEOC Charge of Discrimination and his termination.  Again, on

this point, LTC just ignores strong evidence – including direct evidence of retaliatory intent –

showing the causal link.  First, McDaniel could not categorically deny that Plaintiff did not

complain to her that he felt racially discriminated against by Gassen.[128] Plaintiff's EEOC Charge

was filed on July 25, 2005 and the LTC was notified a few days later about the Charge.[129]  Dr.

McDaniel testified that she recommended, and Meaux approved, Plaintiff's termination only a

---

[124] See Statement of Uncontested Facts.

[125]  Exhibit "B" Carpenter 159.

[126]  Exhibit "O" Dr. McDaniel letter dated August 15, 2005 to terminate Plaintiff.

[127]  Exhibit "B" Carpenter 159.

[128]  Exhibit "M" McDaniel 163-165.

[129]  Exhibit "D" Declaration of Patrick Carpenter

few weeks after the filing of the Charge, but was told she could not terminate Plaintiff until the EEOC matter was settled.[130]  As the termination decision maker, this is the most important complaint as to retaliation causation.  The Fifth Circuit has held that the Court must focus on the final decisionmaker to determine whether the "adverse employment action was taken as a result of retaliation." *Ackel v. Nat'l Communications, Inc., 339 F.3d 376, 385 (5th Cir. 2003)* (quoting *Gee v. Principi, 289 F.3d 342, 346 (5th Cir. 2002))*.

Here, McDaniel testified very pejoratively that she recommended Plaintiff's termination on August 15, 2005.[131]  McDaniel's contempt for Plaintiff's Charge is obvious because she wanted Plaintiff terminated but "Margaret Richard asked us to put him back in his position....Because he filed this EEOC.  And she told us to put him back in the position until it was settled."[132]   Plaintiff respectfully submits that – absent a Perry Mason admission like "I fired him because she complained about discrimination and filed an EEOC Charge of Discrimination" – it doesn't get any better than this in the world of direct evidence of retaliatory animus.

Finally, as to the causal link, this record shows suspicious timing of adverse treatment.  Of course, it is hornbook law that in a retaliation case suspicious timing evidence is always important summary judgment evidence. Courts have found that "close timing between an employee's protected activity and an adverse action against [him] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Evans v. City of Houston, 246 F.3d 344, 354 (5th*

---

[130]  Exhibit "M" McDaniel 128-129.

[131]  Exhibit "M" McDaniel 128.

[132]  Exhibit "M" McDaniel 129.

*Cir. 2001)*(quoting *Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997))*. The Fifth Circuit has noted that courts have found a time lapse of "four months" sufficient to raise an inference of causation. *See id.* Here, Plaintiff filed his EEOC Charge of Discrimination on July 25, 2005.[133] And, McDaniel wrote a letter recommending Plaintiff's termination on August 15, 2005, within weeks of the filing of his Charge.

It is also important that LTC took retaliatory action against Plaintiff prior to his termination, and immediately after his EEOC Charge was filed. An employer's attempt  to discredit the complainant by papering his personnel file with negative evaluations has been found to contribute to the causal link prong of retaliation claims. See, e.g., *Kim v. Nash Finch Co.., 123 F.3d 1046, 1066 (8th Cir. 1997).* And, of course, recently, in *Burlington N. & Santa Fe Ry. Co. v. White,* --- U.S. ----, 126 S.Ct. 2405, --- L.Ed.2d ---- (2006), the Supreme Court clarified the degree of material adversity an employer action must cause before a plaintiff may bring a Title VII retaliation claim. The Court concluded that a retaliation plaintiff meets her burden when she shows that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (quotation marks and citation omitted). The Court further emphasized that "context matters" and things seemingly as trivial as a schedule change or a supervisor declining to invite an employee to lunch may qualify as material adverse employee actions under the right circumstances. *Id.* at 2415-16. Here, immediately after Plaintiff's EEOC Charge was filed, McDaniel was instructed by Meaux to prepare a binder of Plaintiff's work history[134], which included complaints of former co-workers and students that

---

[133]  Exhibit "D" Declaration of Patrick Carpenter

[134]  Exhibit "M" McDaniel 52.

Plaintiff was not given the opportunity to read.[135] It is very astounding that the person whom the allegations of race discrimination were alleged would be allowed to put forth evidence to the EEOC of Plaintiff's work history.  It is only obvious that McDaniel would be biased in her own favor and would not do an adequate investigation into the EEOC Charge.  This evidence, combined with the suspicious timing of McDaniel's recommendation of Plaintiff's termination after filing his EEOC Charge constitutes sufficient evidence for a reasonable jury to conclude that LTC took retaliatory action against Plaintiff, which retaliation culminated in Plaintiff termination.

    This record contains sufficient evidence to present Plaintiff's retaliation claims under federal and state law.

### C.    This record shows issues of material fact exist as to whether Carpenter has sufficient evidence to establish a prima facie case of discrimination.

    To establish a prima facie case of discriminatory discharge under Title VII, plaintiffs must show that they (1) are members of a protected class, (2) were qualified for the position, (3) were subject to an adverse employment action, and (4) were replaced by someone outside the protected class, or, in the case of disparate treatment, show that other similarly situated employees were treated more favorably.[136] *See, e..g, Bryan v. McKinsey & Co.,* 375 F.3d 358, 360 (5th Cir.2004) (addressing discharge-based § 1981 claims).  Plaintiff alleges that his disparate treatment in being demoted and terminated was motivated by race discrimination.

---

[135]  Exhibit "M" McDaniel 209-210.

[136]  Exhibit "P" Dr. West 26-27, testimony of Dr. Jocelyn West explaining that Candice Guidry (a white female) was being trained at "Financial Aid Boot Camp," without Dr. West's knowledge, to take Plaintiff's position in the Financial Aid Department despite the fact that Guidry only possessed a high school diploma and was unqualified and inexperienced.  West further testified that Guidry is now working in Plaintiff's position.

Speaking only in terms of Plaintiff's qualifications, Dr. McDaniel confirmed that she was on the interview committee that hired Plaintiff.[137]  Meaux confirmed that he too was on the interview committee that ultimately made the decision to hire Plaintiff.[138]  Defendant is now claiming that Plaintiff was unqualified for all positions he held at LTC; yet it was determined at the time of the interview and ultimate hiring of Plaintiff that he was in fact qualified for the position of Student Services Director III.   Plaintiff was "shuffled through the LTC system" and was demoted in September of 2005 to the position of Financial Aid Officer, mere months after the filing of his EEOC Charge of Discrimination.  The testimony of former employees of the LTC, which Plaintiff argues is indeed admissible, supports Plaintiff's contention that the LTC was a racially hostile work environment due to the racist attitudes of Dr. McDaniel and Meaux. Furthermore, Dr. West confirmed that Candice Guidry, a white female, was being prepared to (and ultimately did) take over Plaintiff's position in the Financial Aid Office.[139]

**D.      Plaintiff is not claiming that the negative job performance evaluations he received are actionable.**

The negative job performance evaluations received by Plaintiff following his complaints and EEOC Charge of Discrimination, in and of itself, are not part of Plaintiff's claim.  Plaintiff is claiming that the evaluations are evidence of race discrimination and retaliation. As evidence of discrimination they help to prove that the demotion and retaliation were illegal acts.

**F.      Plaintiff need not revisit the Title VII ruling of since that issue has already**

---

[137]  Exhibit "M" McDaniel 64.

[138]  Exhibit "T" Meaux 128.

[139]  Exhibit "P" West 26-27.

**been reconsidered by this Court.**

Plaintiff agrees with the Court's decision on this issue. Plaintiff incorporates by reference

all of his arguments from the motion for reconsideration into this memorandum as if stated herein.


Respectfully submitted,

**VICTOR R. FARRUGIA**


/s/ Victor R. Farrugia
Victor R. Farrugia (#19324)T.A.
1010 Common Street, Suite 3000
New Orleans, Louisiana 70112
Telephone (504) 525-2520
Facsimile (504) 581-7083

And


James L. Arruebarrena (#22235)
1010 Common Street, Suite 3000
New Orleans, Louisiana 70112
Telephone (504) 525-2520
Facsimile (504) 581-7083


**Attorneys for Patrick Carpenter**

**C E R T I F I C A T E**

I hereby certify that a copy of the above and foregoing has been served upon all parties herein by using the CM/ECF system and by depositing same in the United States Mail, properly addressed, and postage prepaid, on this 5th day of May, 2008 to any non-CM/ECF participants.

_____
VICTOR R. FARRUGIA