# TRANSCRIPT OF THE DEPOSITION OF:

## DR. MARGARET MONTGOMERY-RICHARD
## 02/18/08

---

## PATRICK CARPENTER

## VERSUS

## LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT

A

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008                LILLIE R. BURCH, CCR

| | |
|---|---|
| 1     Q.    Were you the person bringing the<br>2  case or were you the manager being deposed?<br>3     A.    I was the EEO officer who handled<br>4  the case.<br>5     Q.    Oh, okay.  We'll get into that<br>6  when we get into your background.<br>7          Just to remind you, the court<br>8  reporter is taking everything down.  Try to<br>9  answer everything verbally.  I would ask that<br>10  the court reporter make a notation of<br>11  affirmative nod or negative nod if it can be<br>12  ascertained; however, I'd ask that you say yes<br>13  or no if it's appropriate for the answer.<br>14  Okay?<br>15     A.    Yes.<br>16     Q.    If I ask a question that you<br>17  don't understand, please just let me know and<br>18  I'll rephrase it.  Okay?<br>19     A.    Okay.<br>20     Q.    Is there any reason medically or<br>21  otherwise that you wouldn't be able to testify<br>22  coherently today?<br>23     A.    No.<br>24     Q.    Dr. Montgomery-Richard, what is<br>25  your highest level of education?<br>                                  Page 5 | 1  served as assistant to two presidents, Dr. Ion<br>2  Illia and Dr. Jim Collier, for four years<br>3  each, I think.<br>4     Q.    And then sometime before that you<br>5  were in the EEO office?<br>6     A.    As part of my role under<br>7  Dr. Collier and Dr. Boyer I was assigned EEO<br>8  as one of my functions.  And I did that for<br>9  about six years.  I was EEO when ADA laws were<br>10  passed and when Anita Hill and Clarence<br>11  Thomas --<br>12     Q.    The beginning of sexual<br>13  harassment?<br>14     A.    Yes.<br>15     Q.    How many years did you work in<br>16  the Delgado system?<br>17     A.    Twenty-three years.<br>18     Q.    So would that be most of your<br>19  career up to now, the twenty-three years at<br>20  Delgado and four years at LTC?<br>21     A.    Yes.<br>22     Q.    What have you been doing since<br>23  LTC?<br>24     A.    Officially I retired from State<br>25  of Louisiana in September of 2007.  And I left<br>                                  Page 7 |
| 1     A.    I have a Ph.D. in higher<br>2  education administration.<br>3     Q.    How long did you work for LTC?<br>4     A.    I worked for Louisiana Technical<br>5  Colleges System -- I was chancellor for three<br>6  years.  And prior to that I was senior vice<br>7  president for academic student affairs for a<br>8  year.<br>9     Q.    For one year?<br>10     A.    Yes.<br>11     Q.    What job did you hold right<br>12  before that?<br>13     A.    I was provost of Delgado<br>14  Community College, City Park Campus, where I<br>15  managed six campuses, eleven thousand<br>16  students, and about fifteen hundred faculty<br>17  and staff.<br>18     Q.    Okay, and you referenced, when I<br>19  asked you if you had ever given a deposition<br>20  before, something about at one time being an<br>21  EEO officer for Delgado?  Was that a position<br>22  you held before provost?<br>23     A.    No.  Actually, before provost I<br>24  was dean of work force training and<br>25  development for the college.  Prior to that I<br>                                  Page 6 | 1  June 30, 2006 after the legislature<br>2  reorganized how the Louisiana Technical<br>3  Colleges would function.  They wanted to<br>4  eliminate the chancellor's office.  I had a<br>5  lot of time and asked for some leave.  And in<br>6  September, as you all probably know, I had a<br>7  buy-out of my contract.  I had two years left<br>8  on my contract and I requested that because of<br>9  the changes in the legislature that my<br>10  contract had been breached in terms of I was<br>11  hired to create one college with forty<br>12  campuses in seven districts.  So when I<br>13  reviewed my contract I was not -- I did not<br>14  sign up for what we ended up with.<br>15     Q.    So after a little negotiation<br>16  they --<br>17     A.    They resolved my contract.<br>18     Q.    Did you have to retain legal<br>19  counsel for that?<br>20     A.    No.<br>21     Q.    Are you doing some kind of<br>22  consulting work now?<br>23     A.    Yes.  I'm partnered with DMM and<br>24  Associates.  We do diversity training, work<br>25  force, project management, higher ed<br>                                  Page 8 |

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana  70433          Board-Certified Court Reporters          Facsimile: (985) 893-6765

1  institutions, school districts.
2      Q.    When you were hired at LTC was it
3  pursuant to a legislative directive?
4      A.    No.
5      Q.    Was it pursuant to trying to
6  change the direction of LTC, something about
7  the academics or something like that?  Did you
8  have a mission, or a charge?
9      A.    Actually, I was hired out of a
10  search process.  I applied for the job of
11  chancellor.  I was serving as senior vice
12  president of the system and had been assigned
13  to work very closely with the LTC.  Began to
14  see the problems and challenges that actually
15  were in place as a result of trying to -- the
16  state was trying to create a two-year post
17  secondary system.  They were moving the old
18  vo-tech from under the secondary system into
19  higher ed.  The Louisiana Technical College of
20  the old vo-techs had no process in place, no
21  forms.  To become one college with all the
22  multiple campuses there was a need to create a
23  system.  So part of my responsibility as
24  senior vice president was to assist the what
25  was called then I think assistant vice

Page 9

1      A.    Yes.
2      Q.    Do you regard that action as
3  having anything to do with the perception by
4  the legislature or any other entity, or person
5  of authority that your performance was in any
6  way deficient?
7      BY MR. VINCENT:
8          Jim, same standard objections?
9      BY MR. ARRUEBARRENA:
10          Yes.
11      BY THE WITNESS:
12          No.  If I got my performance
13  evaluations they were always excellent.
14      MR. ARRUEBARRENA CONTINUES:
15      Q.    So no one conveyed to you that
16  they felt?
17      A.    Poor performance never came up in
18  a conversation.
19      Q.    Who would have been your
20  superior?
21      A.    Walter Bumpus.
22      Q.    Did he ever convey to you that he
23  felt there was something deficient about your
24  performance?
25      A.    No.

Page 11

1  chancellors or something of that nature to
2  actually look at some of the challenges.  The
3  former chancellor of the college had been
4  released.  And once he was released they were
5  searching for the sixth chancellor of a school
6  that had been in existence since 1999, had
7  been created in 1999.
8      Q.    Do you know if you were the first
9  African American chancellor?
10      A.    I know I was the first woman.
11  There were lots of interims in between, but
12  officially went through a search of ninety
13  candidates across the country with four levels
14  of interviewing.  I will say I know I was the
15  first woman and I'm pretty sure I'm the only
16  African American.
17      Q.    At that level?
18      A.    At that level, yes.  But not in
19  the system.  There are other African Americans
20  in the system, Louisiana Technical Community
21  College System.
22      Q.    Did you regard the end of your
23  employment, the resignation or retirement
24  which you have just explained, I believe you
25  said it was because of legislative action?

Page 10

1      Q.    Do you know if Mr. Meaux --
2      A.    Mr. Meaux was the vice chancellor
3  — state your question again.
4      Q.    Mr. Meaux was a subordinate of
5  yours?
6      A.    Yes.
7      Q.    So he wouldn't have the authority
8  to judge your performance?
9      A.    No.  But I think in a three sixty
10  environment you should always have people
11  judging your performance.  But Mr. Meaux was
12  one of my major resistors.  Because Mr. Meaux
13  wanted the job.
14      Q.    You mean the chancellor's job?
15      A.    Yes.
16      Q.    I'm just interested in this
17  legislative action to take out the
18  chancellor's office.  Did that change the
19  direction you thought they were trying to
20  take, reverse course and go back to a
21  vocational school?
22      A.    Yes.
23      Q.    What force, political force or
24  whatever it was, caused that change to happen?
25      A.    They had a special joint

Page 12

3  (Pages 9 to 12)

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008                LILLIE R. BURCH, CCR

1    A.    There was a time when Mr. Meaux
2  made some administrative decisions.  And you
3  have to walk through this in terms of setting
4  up this district model.  We were required to
5  set up a district model.  And we being vice
6  and all of the vice chancellors as they became
7  called under my tenure.  I changed their
8  titles from assistants to vice chancellors and
9  provosts.  Because they felt like the
10  redheaded stepchildren when they had to meet
11  with the other vice chancellors in the
12  district who were part of the system.  When we
13  would make a decision District 2 which was
14  under Mr. Meaux's authority would always,
15  always, always, always, have their plan and
16  our plan.
17        They took my computer while I was
18  out, so I don't even know what happened to
19  some of the notes.  Because I did write him
20  about the fact that we had one data system.
21  And the only system was the SCI system that we
22  used.  We learned that they were doing double
23  data systems.  They were doing double work.
24  They were doing things that were outside of
25  the directives.

<div align="right">Page 21</div>

1  chancellors -- I am not a micromanager under
2  normal circumstances.  When you don't have a
3  system you have to make some very specific
4  directives.  Okay?  So you direct the heads of
5  those units.  In order for us to become a
6  system everybody should be moving in the same
7  direction.  This is how we agreed.  It wasn't
8  as if we didn't talk about it.  We talked
9  things through all the time.  When we made a
10  decision to make some assignments around
11  positions, what positions would be filled
12  based upon the district model that they all
13  had agreed upon.  And the district model was
14  something that I inherited and was intended to
15  help make it work.  The complaints started
16  coming in when I guess Patrick was hired to do
17  one thing or he was one place and then all of
18  a sudden he got moved to another place.  And
19  his duties changed or he was, like,
20  initially -- the style of that campus
21  management was always deal cutting, not
22  necessarily based upon people's level of
23  competence or capacity to do a job.
24        Q.    Let me ask you about some certain
25  complaints and you can tell me how all of that

<div align="right">Page 23</div>

1        Q.    Let me just kind of --
2        A.    But Patrick was in this, so let's
3  keep going, if you don't mind.
4        Q.    Well, let me just --
5  BY MR. VINCENT:
6        No.  If Patrick is involved, let
7  the witness answer the question.
8  BY MR. ARRUEBARRENA:
9        I know, but I don't want the
10  witness to just go off on an unguided
11  narrative.  In other words, let me ask her
12  some questions --
13  BY MR. VINCENT:
14        No.  Does it deal with Patrick?
15  BY THE WITNESS:
16        Well, Patrick got in the mix when
17  he started making all these moves.
18  BY MR. ARRUEBARRENA:
19        You mean complaints?
20  BY THE WITNESS:
21        Yes.  When Patrick was
22  complaining, the initial complaint came when
23  -- it seems that people were being moved and
24  things were changing when we were doing the
25  district model.  Because the vice

<div align="right">Page 22</div>

1  interplayed.  Let me show you this.  This is
2  Bates number 29 through 33.  First I want to
3  know if you are aware of this complaint or if
4  you ever saw it or discussed it with anyone.
5  It's a letter to Wainwright.
6        A.    I don't remember anything of this
7  length coming to me.
8        Q.    First let me confirm with you.
9  Would you agree being an ex-EEO person with
10  your knowledge of, you know, the business that
11  the LTC College Systems that a complaint that
12  starts off:  Formal rejection of a corrective
13  action and a formal complaint of harassment as
14  defined by LCTCS policy 2.3.011, based on my
15  race ans my color.
16  BY THE COURT:
17        By definition that complaint
18  would be a prohibited discrimination
19  complaint?
20        A.    Yes, I mean, he says clearly
21  race.
22        Q.    What was Mr. Wainwright's
23  responsibility at this point, assuming he got
24  it?  That's an issue.  But assuming he got
25  this complaint, what should be done?

<div align="right">Page 24</div>

<div align="right">6  (Pages 21 to 24)</div>

**Page 25**

1      A.    He should have brought it to his
2  supervisor, who was Mr. Meaux at the time.
3  And Mr. Meaux should have brought it to
4  Margaret or myself.
5      Q.    Okay, let me show you another
6  complaint and see if you can give me your
7  testimony on that.  I will mark this MR 1,
8  Bates Number 21, 22, and the last one is Bates
9  Number 5.
10         (Witness viewing document.)
11     A.    Okay.
12     Q.    This letter is addressed to you.
13  It's certified mail number 7004 1350 0000 4274
14  8735.  And if you go back to the last page,
15  Leslie Hatfield signed for that on April 8.
16  Do you see that?
17     A.    Yes.
18     Q.    Who is Leslie Hatfield?
19     A.    She was the secretary in HR.
20     Q.    Was she your secretary?
21     A.    No.
22     Q.    She was Margaret's secretary?
23     A.    Yes.
24     Q.    Why would Margaret tell me she
25  wasn't sure what Leslie Hatfield did?  Does

**Page 27**

1      A.    It's referring to a complaint,
2  yes.
3      Q.    But looking at M1 and the
4  dates --
5      A.    I don't really remember this, but
6  if April sent this I directed her to send it.
7      Q.    April 13, 2005 to Patrick
8  Carpenter, copied to Margaret Webb.
9      A.    Right.
10     Q.    It says: Mr. Carpenter,
11  Chancellor Richard asked me to let you know
12  that we are in the process of researching your
13  grievance and will notify you in a few weeks.
14  Thank you and please contact our office if you
15  have any questions.
16         Now, just let me let you know
17  that Ms. Webb said as a result of this e-mail
18  and a discussion she had with you you told her
19  Region 2 would do the investigation.
20     BY MR. VINCENT:
21         I object to the form of the
22  question.  You can go ahead and answer.
23     MR. ARRUEBARRENA CONTINUES EXAMINATION:
24     Q.    Do you agree with that?
25     A.    No.

**Page 26**

1  that make any sense to you?
2      A.    No.
3      Q.    So this complaint even though it
4  was addressed to you was received by Margaret
5  Webb's secretary?
6      A.    Yes.
7      Q.    This is a similar kind of
8  complaint.  You don't have to read the whole
9  thing right now.  If you feel at any point you
10  need to read the whole exhibit to answer a
11  question, let me know.  But just reading the
12  first paragraph would you agree it's a
13  complaint involving prohibited discrimination?
14     A.    Yes.  And this was probably when
15  I first asked Margaret to look into this.
16     Q.    Okay, let me just show you
17  something else with regard to that.  There are
18  other letters which we will look at.  But I
19  show you what I will mark as Exhibit MR 2,
20  Bates 24.  April Magee was your secretary,
21  correct?
22     A.    Yes.
23     Q.    And this is an e-mail as you can
24  see on April 13.  Would you agree it's
25  probably referring to the first exhibit, M1?

**Page 28**

1      Q.    Tell me what you remember about
2  this situation.
3      A.    I did tell Margaret to contact
4  Mr. Meaux and to find out what was going on,
5  not to let them direct their own
6  investigation.
7      Q.    So you did tell her to contact --
8  were you asking her to contact Mr. Meaux about
9  Patrick believing that something unfair had
10  happened to him because of race?
11     A.    I didn't specifically state it
12  like that.  I asked her to find out what was
13  going on in that district.
14     Q.    Did she tell you her office had
15  received Exhibit 2?
16     A.    I don't know if she told us, but
17  something prompted me to do this.  I had to
18  have seen something.
19     Q.    Can you take a close look at
20  Exhibit 2, the letter from April 6 --
21     BY MR. VINCENT:
22         Exhibit 1.
23     EXAMINATION BY MR. ARRUEBARRENA:
24         Exhibit 1, excuse me.  The April
25  6, 2005 letter from Patrick to you received by

7  (Pages 25 to 28)

**Page 29**

1    Ms. Hatfield.  I just need to know if this is
2   a letter that you saw around that time.
3        A.    I don't remember honestly if I
4   saw the letter.  But if I didn't see the
5   letter, I got a call.  But April would never
6   send this out without me.
7        Q.    Going back to Exhibit 2.  We are
8   in the process of researching your grievance.
9   Was it your understanding the grievance
10  involved and allegation of prohibited
11  discrimination, race discrimination?
12       A.    There were a lot of allegations.
13       Q.    But I just want to know if you
14  understood that one of the allegations was
15  race discrimination.
16       A.    Yes.
17       Q.    So you expected Margaret Webb to
18  take care of that?
19       A.    Yes.
20       Q.    Did you speak with her about what
21  she did?
22       A.    Yes.
23       Q.    About what she did to take care
24  of it?
25       A.    Well, I spoke with her from this.

**Page 30**

1   But when we got the formal EEO complaint, when
2   he went to EEO I specially said to Margaret to
3   get the responses done.
4        Q.    Was Margaret your subordinate?
5        A.    Margaret was the director of HR.
6        Q.    Did you have managerial authority
7   over her?
8        A.    She reported to Ben Seigler.  But
9   because she was our HR person in my office,
10  yes, she was my subordinate.
11       Q.    I mean, you could tell her what
12  to do?
13       A.    Yes.
14       Q.    So April 13, 2005 you told her to
15  go to Mr. Meaux and figure out what was
16  happening?
17       A.    Yes.
18       Q.    Did she convey to you anything
19  about the nature of the complaint her
20  secretary had given her?
21       A.    I don't recall.
22       Q.    Did she call you back at any
23  point around this time period before the EEOC
24  charge?  I'm not trying to mess up your time
25  period.  I know this was a while ago.  The

**Page 31**

1   EEOC charge was filed on July 25.  You see the
2   date down there where Patrick signed the
3   charge?
4        A.    Yes.
5        Q.    Bates number 803?
6        A.    Yes.
7        Q.    So I'm talking about the period
8   in April or right after April.  Did you get
9   any feedback from her?
10       A.    I don't recall.
11       Q.    Does that mean it didn't happen
12  or maybe a lot happened in those days and --
13       A.    A lot was happening during those
14  days.  We were in special session.  We were in
15  session.
16       Q.    So you're not saying you didn't
17  get feedback, you're saying right now you're
18  not recalling it?
19       A.    I'm not recalling it.
20       Q.    Let me ask you about another
21  letter.  I want to ask you if you remember
22  getting it.
23       A.    Who signed for it?
24       Q.    I'm going to show you that right
25  now so I can get your comments on it.  I will

**Page 32**

1   mark this one for identification as MR3.  This
2   is plaintiff's Bates number 16 through 20.
3   This letter, ma'am, is dated March 9.  Once
4   again it's to you.  And the last page, you see
5   the date of the letter is March 9 and then on
6   March 10?  It went to Leslie Hatfield?
7        A.    Leslie Hatfield, the same person.
8        Q.    You don't have any reason to
9   believe Leslie Hatfield didn't get this,
10  right, looking at these documents?
11       A.    No.  If she signed for it.
12       Q.    Was it her duty?  You said she
13  worked for Margaret Webb.  So you assume she
14  gave it to Margaret Webb?
15       A.    I'm sure she did.
16       Q.    How would you be sure she did?
17       A.    Because Leslie is a person of
18  integrity.  She did.
19       Q.    How do you respond to the fact
20  that Ms. Webb said she never heard of these
21  complaints?
22  BY MR. VINCENT:
23       I object to the form of the
24  question as to characterizing other people's
25  testimony.  But you can answer.

321 North Vermont Street
Covington, Louisiana  70433

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

Telephone: (985) 893-1999
Facsimile: (985) 893-6765

**Page 33**

1    BY THE WITNESS:
2         That can't be true.
3    MR. ARRUEBARRENA CONTINUES EXAMINATION:
4    Q.    Would you say that that has to be
5    at best inaccurate testimony, at worst a
6    falsehood?
7    BY MR. VINCENT:
8         Continuing objection.
9    BY THE WITNESS:
10        If Leslie received them, Margaret
11   received them.  If I sent this, if my
12   secretary sent this in April --
13   Q.    You're talking about Exhibit MR2?
14   A.    Yes.  Then there was a series of
15   something that happened that made me aware.
16   Because anything HR would go to HR.  And
17   Leslie was the secretary in HR who was very,
18   very diligent and competent.  And I'm certain
19   she gave these to Margaret who in turn
20   evidently told me about them or showed it to
21   me I would say.  Because that would be the
22   only way I would know about it.  Because our
23   offices were not in the same general vicinity.
24   Q.    So even though the letter is
25   addressed to you, because it was signed by HR

**Page 34**

1    you would have relied on Ms. Webb to get you
2    the letter, convey to you what was in the
3    letter?
4    A.    Had to.
5    Q.    Your office wouldn't
6    automatically give you a copy of all
7    correspondence from employees that was
8    addressed to you?
9    A.    If it came directly to my office
10   they would.  But if the mail went to -- if it
11   was an HR issue, whoever sorted the mail, if
12   it was HR they gave it to HR first.
13   Q.    I see.
14   A.    And then it would come to me.
15   Q.    So we know from these documents
16   that we're looking at, especially MR2, that by
17   mid April you were aware of it and you had
18   told Ms. Webb to handle it?
19   A.    To investigate it.
20   Q.    Now, if I understand your
21   testimony correctly, you don't recall anything
22   else until the EEOC charge?
23   A.    Between this MR2 exhibit and the
24   official EEO complaint.
25   Q.    So you may have had discussions,

**Page 35**

1    but you just are not recalling them right now?
2    A.    That's right.
3    Q.    Now let me go back to the policy
4    of the LTC.  And let me read this to you.
5    This was something given to me.  I don't know
6    the Bates number on it.  But it's entitled
7    policy 6.011.  It's called a harassment
8    policy, but Ms. Webb confirmed that this is
9    the policy that was used and is used by the
10   LTC to handle whether it's a harassment
11   complaint or discrimination because of race,
12   age, gender.  For anything like that, this is
13   the policy they used to investigate.  Do you
14   have any reason to contest that issue?
15   BY MR. VINCENT:
16        I object to the form of the
17   question.
18   BY THE WITNESS:
19        No.
20   MR. ARRUEBARRENA CONTINUES EXAMINATION:
21   Q.    Let me let you look at this so
22   that there is no mistake.  Is this the policy
23   under which any prohibited discrimination
24   complaint, whether it involves harassment or
25   any kind of discrimination, would be handled?

**Page 36**

1    A.    The only thing that concerns me,
2    I don't remember the date on this original.
3    Q.    This was given to me in discovery
4    by the Attorney General's office, the
5    attorneys for LTC and represented as the
6    policy.
7    A.    That's true.
8    Q.    What I'm first asking you.  Would
9    you agree that this policy that I am handing
10   to you, the harassment policy, 6.011,
11   consisting of three pages of listing the
12   policy, then there's a harassment complaint
13   form.  And then there's a human resource
14   policy regarding harassment.  At the end
15   there's an LCTCS harassment complaint
16   investigation form.  Is that what you
17   understood was the official written policy on
18   investigating any type of prohibited
19   discrimination at the LTC?
20   A.    I honestly don't ever remember
21   seeing these forms.
22   Q.    Talking about the discrimination
23   harassment complaint form?
24   A.    I don't ever remember seeing
25   this.  I don't remember the HR office from the

321 North Vermont Street
Covington, Louisiana  70433

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

Telephone: (985) 893-1999
Facsimile: (985) 893-6765

1  LTC giving us the policies like this.  They
2  give you a generic policy.
3       Q.    You're talking about the first
4  three pages?
5       A.    Yes.
6       BY MR. ARRUEBARRENA:
7            We're going to mark the document
8  I just described as MR4.
9       BY THE WITNESS:
10           I recognize the front of it, but
11  the back of it I don't recognize at all.
12      BY MR. ARRUEBARRENA:
13           When you say the front, you're
14  talking about the first three pages.
15      BY THE WITNESS:
16           The policy itself.  But the form,
17  I don't remember seeing the form itself.
18      MR. ARRUEBARRENA CONTINUES EXAMINATION:
19      Q.    In your experience in the EEO
20  office and in other places and at the LTC,
21  even though this is a suggested form, the
22  letters that we're looking at, for instance,
23  MR3 and MR1, are sufficient to initiate a
24  discrimination complaint for an employee,
25  aren't they?

Page 37

1       Q.    I have discovered that the reason
2  it should be confidential is that, and correct
3  me if I'm wrong, when people find out, even
4  though co-employees, if someone is registering
5  a discrimination complaint sometimes that
6  creates an adversarial atmosphere among
7  co-workers, supervisors.  Is that one of the
8  reasons to keep it confidential?
9       BY MR. VINCENT:
10           I object to the form of the
11  question.  You can answer.
12      BY THE WITNESS:
13           Yes.
14      MR. ARRUEBARRENA CONTINUES EXAMINATION:
15      Q.    The next sentence says:  A member
16  of Human Resources will conduct the
17  investigation unless otherwise deemed
18  necessary in order to assure an impartial and
19  confidential investigation.
20      A.    Yes.
21      Q.    Wouldn't it be against the policy
22  to have the person who is the subject of the
23  complaint, in other words, the person alleged
24  to be the fox in the hen house, to have that
25  person conduct the investigation?  That would

Page 39

1       A.    An investigation.
2       Q.    Yes.  You don't have to have some
3  special form?
4       A.    For us it triggered a need to
5  investigate.
6       Q.    What I'm trying to get at.
7  Wouldn't even a verbal complaint to a
8  supervisor be enough to trigger an
9  investigation?
10      A.    Not for me.
11      Q.    But any written -- let me just
12  ask you this.  MR1 and MR3 would be enough to
13  trigger it?
14      A.    Yes.
15      Q.    This particular policy says a
16  couple of things.  Some of the things we
17  focused on is complaints of harassment will be
18  investigated promptly.  I'm looking at the
19  second page of Exhibit MR4, last paragraph.
20  Complaints of harassment will be investigated
21  promptly and in as an impartial and
22  confidential manner as possible.
23           That was that your understanding,
24  ma'am?
25      A.    Yes.

Page 38

1  not likely be impartial, would it?
2       A.    I did not have Ms. Webb direct
3  Mr. Meaux to investigate himself.  I directed
4  Ms. Webb as HR to investigate the complaint.
5       Q.    But whether it would be Ms. Webb
6  or anyone else assigned that job to either Mr.
7  Meaux or Ms. McDaniel who were the subjects of
8  the complaint, would that be improper
9  procedure?
10      A.    Yes, that would be improper.
11      Q.    Would simply the reason be that
12  it would be very difficult for them to be
13  impartial?
14      A.    Yes.
15      Q.    Now I want to direct your
16  attention to your April 6 letter.  And all the
17  letters are similar.  This paragraph, the
18  first paragraph on Bates 21 on Exhibit MR1,
19  Mr. Carpenter alleges that the grievance
20  involves Ms. Mac Daniel.  Do you see that?
21      A.    Yes.
22      Q.    Do you understand that he's
23  complaining that she's among the people who
24  are treating him unfairly because of race?
25      A.    But Ms. Webb was directed to

Page 40

10  (Pages 37 to 40)

1  conduct the investigation. So I'm not
2  understanding right now.
3       Q.    Well, she told us, ma'am -- and
4  counsel can object that I'm characterizing
5  someone else's testimony, and if I am then it
6  simply wouldn't be valuable testimony later --
7  but she did testify under oath last Friday
8  that you told her to have Region 2 do the
9  investigation.
10      A.    Absolutely unequivocally no.
11      Q.    We have already gone over that.
12 That assertion is more than just incorrect,
13 that would have to be an untruthful statement?
14      A.    Absolutely.
15      Q.    Let's go to the EEOC charge. I
16 will mark this for identification as MR5.
17 This is plaintiff's Bates Number 51.
18            First off, did you ever get a
19 copy of this?
20      A.    Yes, I have seen this.
21      Q.    Around the time it came in?
22      A.    Yes.
23      Q.    Can you tell me why it is that
24 they would have given you a copy?
25      A.    Well, I was notified that an

Page 41

1  remember -- is now it has come to this and you
2  need to get in there and get these questions
3  answered.
4       Q.    Did you ask her why it wasn't?
5       A.    I told Margaret:  You cannot be
6  afraid to do your job.  That is what I told
7  her.
8       Q.    When the EEOC charge came in did
9  you have the impression that nothing had been
10 done yet concerning a formal investigation of
11 MR1 or MR3?
12      A.    Right, yes.
13      Q.    Did she admit it?
14      A.    No.
15      Q.    Did you do anything to determine
16 if that was the case, that she hadn't done
17 anything yet?  Did you call Mr. Meaux and ask
18 him if Margaret talked to him about complaints
19 in April, May, March?
20      A.    I probably talked to Meaux by
21 this time when this came in.
22      Q.    The EEOC charge?
23      A.    Yes.
24      Q.    What did that conversation
25 consist of?

Page 43

1  official complaint had been filed.
2       Q.    You mean with the EEOC?
3       A.    Yes.
4       Q.    Because these other complaints we
5  were looking at, MR1 and MR3, are official
6  internal LTC complaints, right?
7       A.    Right.
8       Q.    So what you mean by official is
9  an outside agency.
10      A.    He had gone outside the agency.
11      Q.    Who did you speak to about the
12 EEOC charge?
13      A.    Margaret Webb.
14      Q.    Did you convey to her, if you
15 remember -- it was April, four months before
16 that you had sent MR3 or MR1 to her or both.
17      A.    No, they had given these to me.
18 Received these and either shared this with me.
19 Because something triggered this.
20      Q.    Did you ask her:  Why has it come
21 to this?  Why haven't you done something about
22 the complaint we were working on three months
23 earlier?  Do you remember asking her anything
24 about that?
25      A.    My general comment -- and I can't

Page 42

1       A.    Margaret needed to get over there
2  and provide EEO with all the information that
3  was requested.
4       Q.    At that time if the assertion was
5  made that you told Kay McDaniel in Region 2 to
6  handle the response --
7       A.    I never spoke to Kay McDaniel
8  about this.
9       Q.    Did you instruct Margaret or
10 anyone else in HR to do the response to the
11 EEO charge?
12      A.    I told Margaret to get these
13 answers, to have the EEO get these answers.
14      Q.    To make sure I'm not
15 misunderstanding and your testimony is clear.
16 You didn't instruct her to have Kay McDaniel
17 do it?
18      A.    No, I did not.
19      Q.    By this time did you understand
20 the complaint involved Mr. Meaux and Ms.
21 McDaniel?
22      A.    Yes.
23      Q.    When I say by this point, I mean
24 the EEOC charge.  The complaint was clearly
25 against Mr. Meaux and Ms. McDaniel.  She's not

Page 44

321 North Vermont Street
Covington, Louisiana 70433

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

Telephone: (985) 893-1999
Facsimile: (985) 893-6765

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM     FEBRUARY 18, 2008                        LILLIE R. BURCH, CCR

| | |
|---|---|
| 1  listed on the EEOC charge, but she was listed | 1     A.    Yes. |
| 2  on MR1 and MR3. | 2     Q.    This particular investigation |
| 3     A.    Well, I knew it was Mr. Meaux at | 3  policy on Exhibit MR4, the last page, entitled |
| 4  this time.  Because I didn't interpret this | 4  Harassment Complaint Investigation Form, has |
| 5  that he had filed it against anyone else. | 5  parts in it where -- and this is what Ms. Webb |
| 6     Q.    Looking at the complaint | 6  stated in her deposition -- during the |
| 7  investigation form, even though you testified | 7  investigation allegations of misconduct on the |
| 8  you're not familiar seeing the form, please | 8  complainant or deficient performance involving |
| 9  look at it, scan it, and tell me if that was | 9  the complainant come up, then the complainant |
| 10  the way the investigation should be done. | 10  would be given the opportunity to address |
| 11     (Witness viewing document.) | 11  those allegations. |
| 12     A.    Yes, basically. | 12     Isn't that the policy of the LTC, |
| 13     Q.    This appears to me to dovetail | 13  ma'am? |
| 14  with something we discovered about progressive | 14     BY MR. VINCENT: |
| 15  discipline.  This is called an admission. | 15     I object to the form of the |
| 16  This is where we ask questions and ask LTC | 16  question.  You can answer. |
| 17  through their lawyers to admit certain things. | 17     BY THE WITNESS: |
| 18  This is an uncontested fact in the case.  The | 18     Yes. |
| 19  LTC utilizes progressive discipline and | 19     MR. ARRUEBARRENA CONTINUES EXAMINATION: |
| 20  evaluation involving first a verbal warning; | 20     Q.    So it's not only the discipline |
| 21  then written warnings, including formal | 21  and evaluation policy even if there is no |
| 22  meeting with the employee to establish clear | 22  grievance, but it's also part of the grievance |
| 23  performance expectations to correct problems; | 23  investigation policy? |
| 24  three, an opportunity for the employee to | 24     A.    Yes. |
| 25  present his or her case; and, four, | 25     Q.    Have you ever seen the EEOC |
| Page 45 | Page 47 |

| | |
|---|---|
| 1  termination if the problems remain unresolved | 1  response that was given by the LTC? |
| 2  after the above steps. | 2     A.    No. |
| 3     Was that your understanding of | 3     Q.    Let me give you an opportunity to |
| 4  the basic path of evaluation and progressive | 4  take a look at that. |
| 5  discipline at the LTC? | 5     BY MR. ARRUEBARRENA: |
| 6     BY MR. VINCENT: | 6     Let the record reflect that I am |
| 7     I object to the form of the | 7  handing the witness a hundred twenty page |
| 8  question.  You can answer. | 8  document.  It's Bates Numbers 518 to 745.  I |
| 9     BY THE WITNESS: | 9  think it's like two hundred twenty pages. |
| 10     We never referred to it as | 10     MR. ARRUEBARRENA CONTINUES EXAMINATION: |
| 11  progressive discipline. | 11     Q.    This was sent to EEOC by Ms. |
| 12     MR. ARRUEBARRENA CONTINUES EXAMINATION: | 12  Webb.  Ms. McDaniel testified under oath that |
| 13     Q.    These steps -- | 13  she personally on her own prepared this |
| 14     A.    That process is usually in civil | 14  document. |
| 15  service, LTC, everywhere state. | 15     A.    I have never seen that document. |
| 16     Q.    I have learned through talking | 16     BY MR. VINCENT: |
| 17  with other witnesses at the LTC that the | 17     I object to the form of the |
| 18  purpose of this is so that discipline is not | 18  question. |
| 19  just punitive but also in the beginning at | 19     MR. ARRUEBARRENA CONTINUES EXAMINATION: |
| 20  least be used to develop the employee.  Give | 20     Q.    I'm just letting you know that. |
| 21  them a chance to address the allegation | 21     A.    I have never seen that document. |
| 22  against their performance or conduct and then | 22     Q.    I guess what I would like you to |
| 23  correct it.  Develop them instead of just the | 23  do is before you look through the whole |
| 24  road to termination.  Wouldn't that be the | 24  document, there's about a thirteen-page |
| 25  policy of these steps? | 25  chronology called the Employment History |
| Page 46 | Page 48 |

12  (Pages 45 to 48)

1  Chronology of Patrick Carpenter. I'd ask that
2  you look through this for me. I'd ask you to
3  scan it and let me ask you some questions. Or
4  you can read the whole thing completely.
5      A.    You can start asking your
6  questions. I'm not familiar with this
7  document at all. I have never seen it before.
8      Q.    Go ahead and read it, then.
9  We'll take a couple of moments. That would be
10  Bates Numbers 520 through 532, twelve pages.
11      A.    Now, most of this, I didn't come
12  into the job until July 2003.
13      Q.    I know. But I just need your
14  opinion on it, your testimony on it. I would
15  just ask that you read it.
16          (Witness viewing document.)
17      A.    Okay, I've read it.
18      Q.    Have you ever been seen an EEOC
19  investigation summary?
20      A.    Yes.
21      Q.    Have you ever seen an LTC
22  discrimination grievance investigation
23  summary?
24      A.    Yes. But it wasn't conducted by
25  Ms. Webb.

Page 49

1      Q.    Who conducted it?
2      A.    We hired a lady named Ms. Griffin
3  when I realized we did not have the capacity
4  to adequately respond. Because we had
5  grievances coming in across the state. And
6  when we could not get HR out to the district,
7  I needed to seek some additional help. It
8  became clear that Margaret was not able to
9  handle them. But I did feel she could handle
10  the ones in Baton Rouge. These were in other
11  locales.
12      Q.    I'm assuming because you worked
13  EEO at Delgado for about six years --
14      A.    Yes.
15      Q.    -- you have seen grievance
16  responses. I'm talking now about internal
17  grievances of prohibited discrimination. You
18  have seen investigation summaries whether
19  internal or given to the complainant?
20      A.    Right.
21      Q.    Would you agree that normally if
22  the investigation uncovers deficient
23  performance or misconduct on the part of the
24  claimant that the summary would also at least
25  show the claimant was addressed with the

Page 50

1  claimant, the claimant was advised so-and-so
2  said this, and here is what the claimant says?
3      BY MR. VINCENT:
4          You're talking about with respect
5  to internal investigation or EEOC?
6      MR. ARRUEBARRENA CONTINUES EXAMINATION:
7      Q.    Internal investigation.
8      A.    At Delgado when I had to actually
9  facilitate the process we had a whole formal
10  and informal approach to resolve the issues.
11  When we had the formal, there was more to it
12  than this. They would send us several sheets
13  of questions that we had to respond to related
14  to the case.
15          So this one sheet is not what I'm
16  accustomed to seeing. And in the case of
17  discrimination, it was rarely against a
18  supervisor.
19      Q.    I guess what I'm asking, though,
20  is on the discrimination complaints, the woman
21  that you hired, the consultant or whoever you
22  hired, when she did an investigation if she
23  identified an allegation during the
24  investigation -- I'm assuming you would agree
25  that when the supervisor that is alleged to be

Page 51

1  a racist is asked about the performance of the
2  complainant it's only human nature that they
3  may defend themselves by saying this
4  complainant has deficient performance, he is
5  the deficient performer, he is the misconduct
6  doer.
7      A.    I have not had race specific
8  cases where people blatantly called somebody a
9  racist. You asked me based on my experience.
10  In this case, the behavior of the supervisors
11  -- as an African American woman in a very high
12  level position I was used to white males doing
13  things that probably if I was a more sensitive
14  woman to race issues, aside from gender and
15  race issues, I would have reacted differently.
16  Okay? In this case, how it came to me, there
17  was so much back and forth, my directive to
18  Margaret was to figure out what in the world
19  is going on over there. As I read this
20  chronology, what I would dispute, I don't know
21  the date of the meeting but I know the meeting
22  was before Katrina. Katrina was September 29.
23  And the woman, Mr. Griffin who was doing an
24  investigation for us on a case in the
25  Alexandria area actually was buried on August

Page 52

13  (Pages 49 to 52)

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008                LILLIE R. BURCH, CCR

1   26. And she was here in New Orleans. I never
2   met her before. She was recommended by the
3   former EEO head for this region. She talked
4   to Margaret regularly and they met. They
5   talked on the phone. I never met her. I have
6   to finish this. I know we talked to them
7   before September 12 as it's stated in here
8   about receiving this --
9       Q.    You're talking about MR5?
10      A.    MR5, that's right. They were
11  aware before we had this meeting they're
12  talking about. I'm not saying they didn't
13  have the meeting, I'm saying they knew there
14  was a formal complaint.
15      Q.    Which page are you looking at?
16      A.    Monday, September 12, 2005.
17      Q.    You're saying you know that
18  before that meeting on September 12, 2005 that
19  Mr. Meaux and Ms. McDaniel knew about the EEOC
20  charge?
21      A.    Yes. We met. I was in a meeting
22  with them.
23      Q.    Where does it say that?
24      A.    Page twelve, the fourth
25  paragraph, Monday, September 12, 2005.
                                            Page 53

1       A.    He probably didn't use those
2   terms.
3       Q.    But he conveyed that to you?
4       A.    Yes.
5       Q.    And certainly it's human nature,
6   he was named in the charge, wouldn't it be
7   human nature for him to deny he didn't do
8   anything wrong because of race and then say
9   the complainant is the problem? Hasn't that
10  been your experience? Doesn't that happen
11  frequently?
12      A.    When there is a charge, yes.
13      Q.    Shortly after this charge was
14  filed -- do you know Dr. West, then Brunswick?
15      A.    Yes.
16      Q.    She testified under oath last
17  Friday that sometime in August, I don't know
18  if that was during that leadership meeting or
19  not, it was a development meeting with Kay
20  McDaniel, something about a golf course?
21      A.    Each district was allowed to do
22  their own planning. So that may not have been
23  something I was aware of.
24      Q.    And at that time Ms. McDaniel got
25  a phone call about Patrick from someone. And
                                            Page 55

1       Q.    So, in other words, this
2   assertion that it was that date that they
3   discovered the EEOC charge is inaccurate?
4       A.    Yes. Because we got that and I
5   know he knew about that. We notified Mr.
6   Meaux before.
7       Q.    As soon as you got it?
8       A.    Yes, we did. Unless Margaret
9   didn't do what I asked her to do. And I had a
10  conversation with Meaux in my office. Because
11  it was his evaluation time in July. I was
12  doing June and July evaluations. I'm certain
13  all those documents are destroyed. But I know
14  when I got there. Because I had retained the
15  services --
16      Q.    You're talking about MR5?
17      A.    MR5. By that time I had a
18  conversation with Mr. Meaux in my office about
19  what was going on.
20      Q.    What was his response?
21      A.    Well, he probably may have said
22  that Patrick had been a problem.
23      Q.    So he defended himself by saying,
24  which is human nature, "I'm not a racist, he's
25  a problem."
                                            Page 54

1   she stated: His name is not allowed to be
2   mentioned in my house. She stated to
3   Dr. Brunswick, Dr. Brunswick, that he had
4   caused tension in her life.
5       A.    I'm sorry, I'm not understanding.
6       Q.    Dr. West testified, then
7   Brunswick, sometime after July 25, early
8   August 2005, she was with Ms. McDaniel at a
9   meeting. And Ms. McDaniel got a phone call
10  about Patrick. They were like out on a social
11  situation, a golf course. And Ms. McDaniel
12  made two statements. One was that Mr.
13  Carpenter had caused tension in her life. And
14  that his name was not allowed to be spoken in
15  her house. I was just wanting to know if you
16  are aware --
17      A.    I'm not aware of any of that.
18      Q.    Did Mr. Meaux say: I want to
19  have Kay McDaniel handle this so we can get to
20  the bottom of it?
21      A.    No, I don't recall that.
22      Q.    Let me convey something that Ms.
23  McDaniel testified to. In fact, I'll show you
24  her testimony. It's on page 216 of her
25  deposition. This is her sworn testimony: Why
                                            Page 56

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.       Telephone: (985) 893-1999
Covington, Louisiana 70433        Board-Certified Court Reporters       Facsimile: (985) 893-6765

PATRICK CARPENTER  DEPOSITION OF: DR. MARGARET MONTGOMERY-RICHARD        REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    FEBRUARY 18, 2008        LILLIE R. BURCH, CCR

---

1    did you do the response to the EEOC charge and
2    not HR?  Because she had testified she had put
3    together this package that I have shown you.
4    She said: Dr. Montgomery asked Mr. Meaux to
5    ask me to do it, so I did it.  I didn't
6    question it.
7        A.    Not me.  I didn't ask Mr. Meaux
8    to handle it, I asked Margaret Webb to handle
9    this.
10       Q.    So someone is telling an
11   untruthful statement there.  Either Mr. Meaux
12   incorrectly said to her:  Chancellor
13   Montgomery wants you to do it.  Which would
14   have been inaccurate for Mr. Meaux to tell her
15   that?
16       A.    That's right.
17       Q.    Or she's lying about that in the
18   deposition, right?
19       A.    Yes.
20       Q.    Would you agree that it was
21   improper for Ms. McDaniel, wasn't she Mr.
22   Meaux's right hand man so-to-speak?
23       A.    Yes.
24       Q.    Especially since we know she was
25   listed also as someone Mr. Carpenter had

Page 57

---

1        A.    This looks like a chronology of
2    documentation of when you hire somebody and
3    you have the intent of not keeping them.
4        Q.    We'll have to show later where
5    that intent to not keep them started.  That
6    will be my job.
7            Let me direct your attention to a
8    couple of spots.  Do you know Lamoyne
9    Williams?
10       A.    As an employee on the campus.
11       Q.    Do you know anything about him
12   being considered the golden child, the favored
13   son?
14       A.    I heard that before.
15       Q.    Where did you hear that?
16       A.    From campus folks.
17       Q.    Well, you were pretty high up in
18   management.  No one was higher than you other
19   than the president, right?
20       A.    Right.
21       Q.    So I'm interested under which
22   circumstances someone at your level of
23   management would hear a comment that Lamoyne
24   Williams was Mr. Meaux's fair-haired boy,
25   golden boy, something like that.

Page 59

---

1    alleged had done racially discriminatory
2    things, that clearly it was improper for her
3    to provide the response to the EEOC?
4        A.    Yes.
5        Q.    Would you agree it's fair to say
6    that that is not unlike the fox investigating
7    his attack on the hens?
8        A.    Yes.
9        Q.    The question I want to ask you
10   about these documents, Bates Numbers 520
11   through 532, wouldn't you agree this is more
12   as opposed to investigation of discrimination
13   allegation, there is nothing in here about
14   discrimination, is there?
15       A.    No.
16       Q.    Wouldn't this look like a
17   justification for termination?
18       A.    Yes.
19       Q.    So it doesn't look like an
20   investigation?
21       A.    No.
22       Q.    It looks more like a
23   justification for a termination, correct?
24       A.    May I use my own words?
25       Q.    Yes.

Page 58

---

1        A.    Whenever I would go to the
2    campus.  I would visit the campus at least
3    once a month.  My base was Baton Rouge.  So
4    whenever they had anything there.  It had a
5    nice multi-purpose room.  So every month I
6    would have like sixty deans and assistant
7    DEANS come in as we were building this
8    district model.  So whenever I was out there,
9    I was not inaccessible, unapproachable.  So
10   people would make comments about what was
11   going on.
12           But as I stated earlier, I could
13   not and did not take all the things I heard as
14   always credible.  Because when you have as
15   many employees as we had you would have people
16   who were not always happy.
17       Q.    Can you remember who --
18       A.    I can't.
19       Q.    Whatever the comment was, golden
20   one, it was a reference that he was being
21   treated differently, allowed to get away with
22   things that other people didn't get away with?
23       A.    Yes.
24       Q.    So it was in the context of
25   unfair favorable treatment?

Page 60

---

15  (Pages 57 to 60)

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

STATE OF LOUISIANA

PATRICK CARPENTER       \*CIVIL ACTION
      \*   NO. 07-0170-JJB-SCR
versus       \*
      \*MAGISTRATE RIEDLINGER
THE BOARD OF SUPERVISORS\*
OF THE LOUISIANA       \*JUDGE BRADY
COMMUNITY AND TECHNICAL   \*
COLLEGE SYSTEM, ET AL.   \*
      \*
\* \* \* \* \* \* \* \* \* \* \* \*


Deposition of **PATRICK WAYNE CARPENTER,**

taken at the offices of the Louisiana

Department of Justice, 1885 North Third

Street, Baton Rouge, Louisiana 70408, on

Wednesday, **DECEMBER 19, 2007,** commencing at or

about 9:30 a.m.




REPORTED BY:
     Belen B. Cross, CCR
     Certified Court Reporter
     Certificate No. 24031

PATRICK WAYNE CARPENTER          C&I Basic™                          DECEMBER 19, 2007

Page 117

1  that I like to listen to.
2      And I asked him what did he mean
3  because I always listen to jazz in my office
4  whereas he listens to country and western.
5  And once that happened, yes, it upset me. I
6  even went to Dr. McDaniel about this and she
7  was outraged that he made that type of
8  statement to me.
9      Q.  Well, and I'm going to refer back to
10 Exhibit No. 9. Did you submit a written
11 grievance in response to Mr. Gassen's --
12     A.  No. This was verbal. This was
13 verbal.
14     Q.  I understand your exchange between Mr.
15 Gassen was verbal. Was your exchange between
16 Dr. McDaniel verbal?
17     A.  Yes.
18     Q.  Why didn't you submit a grievance in
19 writing?
20     A.  I just didn't.
21     Q.  Okay. You just didn't? It wasn't
22 important to you?
23     A.  Well, I went in the next day to her
24 and I spoke of it.
25     Q.  Why didn't you think if you could take

Page 118

1  time to go speak to her, what couldn't you
2  take time to put it in writing?
3      A.  Because I just decided to go and speak
4  to her about what happened.
5      Q.  Okay. So you didn't want to put it in
6  writing?
7      A.  No. It's not that.
8      Q.  Were you satisfied with Dr. McDaniel's
9  response?
10     A.  Yes.
11     Q.  Okay.
12     MR. ARRUEBARRENA:
13        Why don't you ask him what the
14        response was? You don't want to know?
15        You're not curious?
16 BY MS. JOHNSON:
17     Q.  Okay. We're going to refer to Exhibit
18 No. 44 right now.
19     MS. JOHNSON:
20        Have you seen this, Jim?
21     MR. ARRUEBARRENA:
22        Uh-huh.
23 BY MS. JOHNSON:
24     Q.  Okay. Exhibit No. 44 are the
25 plaintiff's responses to defendant's first set

Page 119

1  of interrogatories. Mr. Carpenter, I'm going
2  to ask you questions from defendant's
3  interrogatory No. 7 and your response to it,
4  okay. Would you please read interrogatory
5  No.7 into the record?
6      MR. ARRUEBARRENA:
7        You what him to read this
8        response?
9      MR. VINCENT:
10        No. The interrogatory, Jim.
11     MS. JOHNSON:
12        Read the question, the
13        interrogatory, please.
14     MR. VINCENT:
15        Into the record is what I heard
16        her say.
17     MR. ARRUEBARRENA:
18        They want you to read this
19        sentence (indicating).
20 BY MS. JOHNSON:
21     Q.  Just read the question, please.
22     MR. ARRUEBARRENA:
23        They want you to read it out loud.
24     THE WITNESS:
25        Oh, okay. I'm sorry.

Page 120

1  BY MS. JOHNSON:
2      Q.  That's okay. That's okay.
3      A.  (As read) "Please state in your own
4  words, with as much detail as possible, how
5  the incident happened giving the time of day,
6  date, and place of the incident."
7      Q.  All right. Now, in response to
8  interrogatory No. 7, you know, it's a pretty
9  lengthy response but I'm just going to hone in
10 on what we previously discussed a few minutes
11 ago in regards to your conversation with Dr.
12 McDaniel. Okay. What date in April did you
13 allegedly complain about the discrimination to
14 Dr. McDaniel?
15     MR. ARRUEBARRENA:
16        Okay. First, I want to object and
17        the objection is in the response, that
18        --
19     MS. JOHNSON:
20        It says in April of 2004. I don't
21        have the date.
22     MR. ARRUEBARRENA:
23        -- that asking for, in an
24        interrogatory response, for as much
25        detail as possible is unduly

PATRICK WAYNE CARPENTER                C&I Basic™                          DECEMBER 19, 2007

Page 121

1  burdensome in a response to discovery
2  and that the proper method of getting
3  all details about something would be a
4  deposition which is what we're doing
5  now.  So subject to that response, you
6  can answer the question.
7     MR. VINCENT:
8        He doesn't remember what the
9     question is.
10    MS. JOHNSON:
11       I don't either.
12    MR. VINCENT:
13       Ma'am, could you read the question
14    back?
15    MS. JOHNSON:
16       I remember.
17 BY MS. JOHNSON:
18    Q.  What date in April did you allegedly
19 complain about discrimination to Dr. McDaniel?
20    A.  I know it was in April, ma'am, but I
21 don't have the exact date.
22    Q.  Okay.  Can you give me an approximate
23 date?
24    A.  I would say anywhere between the 5th
25 and the 15th, somewhere in there.

Page 122

1     Q.  Okay.  And did you ever advise Mr.
2  William Wainwright about alleged
3  discrimination in writing?
4     A.  I did.
5     Q.  Okay.  Do you have the letter?
6     A.  Do I have a personal copy of it?
7     Q.  Right.
8     A.  Yes, I do.
9     Q.  Okay.
10    MR. ARRUEBARRENA:
11       We've given it to you.
12    MS. JOHNSON:
13       Okay.
14    MR. ARRUEBARRENA:
15       I can give you the Bates No. if
16    you like.
17 BY MS. JOHNSON:
18    Q.  Okay.  Now we're referring to Exhibit
19 9a, Mr. Carpenter.
20    MS. JOHNSON:
21       I need this back (indicating).
22    You can get rid of that.  Nine is
23    gone.
24    MR. ARRUEBARRENA:
25       Now it's 9a.

Page 123

1  BY MS. JOHNSON:
2     Q.  Mr. Carpenter, have you ever seen
3  Exhibit 9a before which is the harassment
4  policy?
5     A.  Yes, I have.
6     Q.  When is the first date you saw this?
7     A.  I actually learned it on the web site
8  after giving the letter to Mr. William
9  Wainwright.
10    Q.  Okay.  And, again, you said it's
11 available on the web site?
12    A.  Yes, it is.
13    Q.  So just like the harassment policy,
14 the grievance policy is available on the web
15 site.  Would you agree that the equal
16 opportunity --
17    A.  Yes.
18    Q.  -- policy is on the web site?
19    A.  Yes.
20    Q.  And you could have had access to it if
21 you wanted to?  You could have clicked it and
22 read it yourself?
23    A.  Right.
24    Q.  Even though you say you've never seen
25 it?

Page 124

1     MR. ARRUEBARRENA:
2        I don't think he said he never saw
3     it.
4  BY MS. JOHNSON:
5     Q.  Did you say you never saw it?
6     MR. ARRUEBARRENA:
7        I don't believe he testified to
8     that.  No.  You asked him if he asked
9     about it.
10 BY MS. JOHNSON:
11    Q.  When is the first time you saw this
12 policy?
13    A.  It was on the web site.
14    Q.  You saw it on the web site, too?
15    A.  Yes.
16    Q.  Oh, okay.  I didn't get that
17 testimony.
18    MR. ARRUEBARRENA:
19       No, no.  You asked him when did
20    you ever ask about it.  He didn't have
21    to ask.  He went on the web site.
22 BY MS. JOHNSON:
23    Q.  Oh, okay.  That's good.  When did you
24 go to the web site and see this?
25    A.  I saw it.

1 MR. ARRUEBARRENA:
2    Yes. I like this exhibit.
3 MS. JOHNSON:
4    Jim, have you seen this before?
5 MR. ARRUEBARRENA:
6    It's one of my favorite exhibits.
7 I like this one a lot.
8 MS. JOHNSON:
9    Are you going to tell us why?
10 MR. ARRUEBARRENA:
11    It's not my favorite exhibit.
12 MS. JOHNSON:
13    Do you want to tell us why now?
14 MR. ARRUEBARRENA:
15    No, no. No.
16 MS. JOHNSON:
17    Or you want to tell us in about
18 five minutes?
19 MR. ARRUEBARRENA:
20    I just thought you might be
21 interested. It's not my most favorite
22 exhibit but it is one of my favorites.
23 BY MS. JOHNSON:
24    Q. Oh, well, you've seen this, Mr.
25 Carpenter. You wrote this, right?

1    A. Right.
2    Q. What's the date on this letter?
3    A. The date on this letter is March 9,
4 2005.
5    Q. Who was your immediate supervisor at
6 the LTC in March 2005?
7    A. William Wainwright, Kay McDaniel.
8    Q. Okay. Oh, I'm sorry. Go ahead.
9    A. William Wainwright, Kay McDaniel.
10    Q. Okay. Who is Dr. Montgomery-Richard?
11    A. The chancellor.
12    Q. And is this letter addressed to her,
13 Dr. Montgomery-Richard?
14    A. Yes, it is.
15    Q. Okay. And which policy numbers do you
16 cite in the first paragraph of this
17 typewritten grievance?
18    A. Policy No. 2.3.015.
19    Q. Okay. So what else?
20    A. And policy No. 2.3.011.
21    Q. Okay. So in the letter do you
22 complain about being forced to change
23 positions?
24    A. Yes.
25    Q. Okay. Were you really forced to

1 change positions? Couldn't you have resigned?
2    A. I could have.
3    Q. Well, why didn't you?
4    A. I had a family to feed, so I didn't
5 resign.
6    Q. You couldn't go out and try to find
7 another job to feed your family?
8    A. Yes, I could have.
9    Q. Did you try?
10    A. No.
11    Q. Why?
12    A. Because I didn't.
13 MR. ARRUEBARRENA:
14    Hold on one second.
15 MR. VINCENT:
16    I would object that counselor is
17 whispering in his client's ear while
18 there is a question on the table.
19 MS. JOHNSON:
20    Yes. Telling him how to answer.
21 MR. VINCENT:
22    The whispering has been occurring
23 for about 10 seconds. We'd object.
24 MR. ARRUEBARRENA:
25    I can talk to my client if there

1 is no question pending. Go ahead.
2 MR. VINCENT:
3    There is a question pending.
4 MS. JOHNSON:
5    There is a question on the table.
6 MR. ARRUEBARRENA:
7    There was no question pending.
8 MS. JOHNSON:
9    Yes. There is, Jim.
10 MR. ARRUEBARRENA:
11    There was no question pending.
12 MR. VINCENT:
13    Absolutely.
14 MS. JOHNSON:
15    There is a question pending.
16 MR. ARRUEBARRENA:
17    No. I disagree.
18 MR. VINCENT:
19    Jim, if this continues, I've been
20 extremely --
21 MR. ARRUEBARRENA:
22    No. There's no question pending.
23 MS. JOHNSON:
24    We may have to read --
25 MR. ARRUEBARRENA:

Page 157

1      MR. ARRUEBARRENA:
2          Let her finish asking her
3      question.
4   BY MS. JOHNSON:
5      Q. Would you expect her to recognize your
6   job performance?  As you say, she didn't do it
7   but did you have that expectation?
8      A. Well, she was my immediate supervisor.
9      Q. But you're also testified that
10  Wainwright was your supervisor at one time and
11  Meaux was also your supervisor.
12     A. Right.
13     Q. And Gassen was your supervisor.
14     A. Right.
15     Q. Right.  So at what point during your
16  employment there did she fail to recognize
17  your job performance?  At what point did she
18  disappoint or not meet your expectations in
19  failing to recognize your job performance?
20     A. Disappoint me?  No.
21     Q. You said she failed to recognize your
22  job performance.
23     A. Yes.  That's what I said.
24     Q. When?  When did you expect her to do
25  it?

Page 158

1      MR. ARRUEBARRENA:
2          Okay.  Go ahead and if you can
3      answer it, answer it.
4      THE WITNESS:
5          On several occasions when
6      actually, you know, things were
7      running smoothly in student services.
8      The specifics, I don't have for you
9      right now.
10  BY MS. JOHNSON:
11     Q. In student services in 2005?
12     A. I'm sorry.  Actually in corporate and
13  continuing education.
14     Q. And who was your direct supervisor
15  then?
16     A. Both of them.
17     Q. Who did you work with on a day-to-day
18  basis?
19     A. Actually, I worked with her a lot more
20  than I did William Wainwright because he was
21  off of the campus a lot.
22     Q. Okay.  But you expected to be
23  recognized by Dr. McDaniel.  Did William
24  Wainwright recognize you?
25     A. Yes.

Page 159

1      Q. Okay.  But you did you get some type
2   of --
3      A. Yes.
4      Q. And so you consider not recognizing
5   your job performance harassment?
6      MR. ARRUEBARRENA:
7          Objection.  Legal conclusion.  Go
8      ahead and answer it if you can.
9      THE WITNESS:
10         Yes.
11  BY MS. JOHNSON:
12     Q. Okay.  What other forms of harassment
13  did you experience?
14     MR. ARRUEBARRENA:
15         I need to -- really need to order
16     my food.
17     MS. JOHNSON:
18         Okay.  Let's go.  We're going off
19     the record, Belen.
20  (Whereupon, there was a break taken at or
21  about 12:32 p.m. to 1:07 p.m.)
22     MS. JOHNSON:
23         And we'll just note for the record
24     that we took a break.
25     MR. ARRUEBARRENA:

Page 160

1          Yes.  I've asked you to put the
2      time, you know, beginning and ending
3      of testimony.
4      (Court reporter confirms.)
5      MS. JOHNSON:
6          And right now we're waiting on the
7      lunch to be delivered.
8      MR. ARRUEBARRENA:
9          Right.  We're at March of 2006.
10     We're doing fine.  No.  '05.
11  BY MS. JOHNSON:
12     Q. Okay.  Mr. Carpenter, I'm going to ask
13  you questions from page two of that same
14  letter that you wrote on March 5, 2005.
15     A. Okay.
16     Q. In paragraph five on page two, will
17  you please read it out loud, paragraph five,
18  number five on page two?
19     A. (As read) "I was under the -- 1 was
20  under Michael Gassen's supervision until
21  approximately September '04 and was reassigned
22  due to racial harassment that I reported to
23  Dr. McDaniel that was not handled per
24  LTC/LTCTS policy."
25     Q. Okay.  Did you submit a grievance to

PATRICK WAYNE CARPENTER          C&I Basic™          DECEMBER 19, 2007

Page 277

1  Q. So what was it about this document,
2  Bates No. 648, Plaintiff's 648 and 649, that
3  you felt constituted retaliation?
4  A. It all stems back to April 2004 when I
5  complained to Dr. McDaniel about --
6  Q. But why did you feel the write-up
7  itself was retaliatory?
8  MR. VINCENT:
9  Note for the record that the
10  lawyer is pointing to the testimony --
11  MS. JOHNSON:
12  He's pointing to it.
13  MR. ARRUEBARRENA:
14  I'm not pointing to it.
15  MS. JOHNSON:
16  Yes, you are.
17  MR. VINCENT:
18  -- and to parts of the record.
19  MR. ARRUEBARRENA:
20  I'm not doing that.
21  MS. JOHNSON:
22  You are, too. You went just like
23  that (demonstrating). I just saw you.
24  MR. ARRUEBARRENA:
25  I didn't do it.

Page 278

1  BY MR. ARRUEBARRENA:
2  Q. Go ahead. Why did you think this was
3  retaliatory?
4  MS. JOHNSON:
5  He's reading the letter now.
6  THE WITNESS:
7  Because of the situation with the
8  apprenticeship program.
9  BY MR. ARRUEBARRENA:
10  Q. Okay. Did you feel that this letter
11  was overly harsh?
12  A. Yes.
13  Q. Is that what you thought was
14  retaliatory about it?
15  A. Yes.
16  MS. JOHNSON:
17  You're putting words in his mouth,
18  too.
19  BY MR. ARRUEBARRENA:
20  Q. All right. Now I'm referring you to
21  Bates 29, plaintiff's Bates 29, through 33.
22  Was this a complaint concerning race
23  discrimination?
24  A. It was a rejection letter to the
25  corrective actions that was given to me by

Page 279

1  William Wainwright.
2  Q. Did you allege that you were being
3  treated unfairly because of race in the Bates
4  numbered document that I referred?
5  A. Yes.
6  Q. Okay. What's the date of it?
7  A. February 4, 2005.
8  Q. Who was it addressed to?
9  A. William Wainwright, Dean of Workforce
10  Development.
11  Q. Now I refer you to the last Bates
12  number, No. 33. It says copy to whom?
13  A. Dr. Kay McDaniel, Wayne Meaux, and
14  Margaret Elgin.
15  Q. Did you send this letter certified
16  mail?
17  A. No, I did not.
18  Q. How did you get this letter to the
19  individuals, Mr. Wainwright who it was
20  addressed to and Mr. McDaniel -- Ms. McDaniel,
21  Mr. Meaux, and Ms. Elgin?
22  A. Actually, it was placed in their boxes
23  at the school.
24  Q. Did you do that personally?
25  A. Yes.

Page 280

1  Q. When you say "in their boxes," what do
2  you mean?
3  A. Their mailboxes.
4  Q. Okay. Now I want to refer you to a
5  letter which was referred to in your earlier
6  testimony, plaintiff's Bates No. 116 through
7  20. And this letter is dated March 9, 2005
8  and this one is to Dr. Margaret Montgomery-
9  Richard, the chancellor?
10  A. Right.
11  Q. Okay. Did you mean for this to be a
12  race discrimination complaint?
13  A. Yes.
14  Q. Did you mean for this to be a
15  complaint about retaliation?
16  A. Yes.
17  Q. Okay. Now, did you send this
18  certified mail?
19  A. Yes, I did.
20  Q. Okay. Does plaintiff's Bates No. 20
21  show the certified mail receipt?
22  A. Yes.
23  Q. Now I'm going to refer you to an
24  evaluation which we referred to in the other
25  deposition and I'm referring to -- it is

PATRICK WAYNE CARPENTER          C&I Basic™          DECEMBER 19, 2007

Page 281

1  plaintiff's Bates 60 through -- I missed a
2  Bates number there but it's probably 65 --
3  plaintiff's Bates 60 through 65. Do you
4  remember receiving this evaluation?
5      A. Yes.
6      Q. It was an evaluation by Mr.
7  Wainwright?
8      A. Yes.
9      Q. Do you remember testifying that you
10 had been given an overall rating of two on
11 this evaluation?
12     A. Yes.
13     Q. In spite of the date, when did you
14 receive it?
15     A. On the 16th.
16     Q. And how did you receive it?
17     A. It was left in my seat at my station.
18     Q. Was it reviewed with you by Mr.
19 Wainwright?
20     A. No.
21     Q. Did anyone speak to you about it?
22     A. No.
23     Q. Okay. Now, April -- I'm looking at
24 Bates No. 21 through 22 and Bates No. 5 but
25 first 21 through 22. That's a two-page letter

Page 282

1  dated April 16, 2005 to Dr. Margaret
2  Montgomery-Richard, the chancellor. Do you
3  remember that?
4      A. Uh-huh. Right.
5      Q. Did you intend for this complaint to
6  be asking for when your March 9th complaint
7  would be responded to?
8      A. It was just another letter that was
9  sent because I hadn't heard anything from my
10 first letter.
11     Q. Okay. And did you regard this as a
12 race discrimination claim?
13     A. Yes.
14     Q. Did you regard this as a complaint
15 about retaliation?
16     A. Yes.
17     Q. And looking at Bates No. 5, did you
18 receive this return receipt from the post
19 office that it was received by Chancellor
20 Montgomery-Richard's office?
21     A. Yes.
22     Q. Okay. And then referring to Bates No.
23 24 which is the e-mail from April Magee, who
24 is the executive secretary to the chancellor,
25 do you remember receiving that?

Page 283

1      A. Yes.
2      Q. Now I'm referring to the -- which was
3  produced to me by the defendant, it's called
4  "Human Resource Policy Regarding Harassment."
5  There's no policy number on it. It seems to
6  be part of -- it may be part of policy 6.011
7  and it appears at the top of it it says "LCTCS
8  Harassment Complaint Investigation Form."
9      A. Correct.
10     Q. Do you see that?
11     A. Yes.
12     Q. Had you looked that up on the
13 Internet?
14     A. Yes.
15     Q. What's the first step?
16     A. Interview the complainant.
17     Q. Okay. That would be you, right?
18     A. Correct.
19     Q. We just talked about the complaints
20 you had been making?
21     A. Right.
22     Q. Okay. Now, when you got this e-mail
23 from April Magee, were you waiting within a
24 couple of weeks to get an interview?
25     A. Yes.

Page 284

1      Q. Okay. Did it happen?
2      A. No.
3      Q. Okay. Now, what did you do in July?
4      A. Filed an EEOC charge.
5      Q. But you had contacted the EEOC in May,
6  correct?
7      A. Correct.
8      Q. But you didn't file the charge until
9  July?
10     A. Correct.
11     Q. Do you remember the date?
12     A. July 25th.
13     Q. Okay. What did the EEOC tell you when
14 you signed the charge? What did they say they
15 were going to do with it?
16     A. They were going to notify the LTC
17 within seven to ten business days.
18     Q. Did they indicate they were going to
19 mail your charge to them?
20     A. Right.
21     Q. To the LTC?
22     A. Right.
23     Q. Did you give them the LTC's address?
24     A. I did.
25     Q. Which address did you give them?

PATRICK WAYNE CARPENTER                C&I Basic™                    DECEMBER 19, 2007

Page 285

1 A. On the charge it was 3250 North
2 Acadian Thruway East.
3 Q. Who works there?
4 A. Wayne Meaux, Kay McDaniel.
5 Q. Okay. Now, Mr. Meaux -- Ms. McDaniel
6 gave you an evaluation after that period on
7 the 18th -- on August 15th, 2005, correct?
8 A. Correct.
9 Q. I'll refer you to plaintiff's Bates
10 No. 717 through 727. Do you see that?
11 A. Yes.
12 Q. I'm looking at the Bates No. 727. Ms.
13 McDaniel gave you that on 8/15?
14 A. Correct.
15 Q. What was her primary complaint when
16 she spoke to you in giving you a low -- first
17 off, she gave you a low rating, correct?
18 A. Correct.
19 Q. What was it? I'm looking at Bates
20 724.
21 A. Along with William Wainwright and her
22 it came out to be a 1.92.
23 Q. Okay. So you talked about that in the
24 other deposition?
25 A. Correct.

Page 286

1 Q. Did you agree that you deserved such a
2 low rating?
3 A. I didn't agree with that.
4 Q. Did you assign any motivation to this?
5 Why do you think you got such a low rating
6 after being given high ratings when you were
7 just new, when you were just starting?
8 A. Actually, because of my complaint.
9 Q. You mean in retaliation for your
10 complaints?
11 A. Yes.
12 Q. Okay. Now, when you met with Ms.
13 McDaniel, she told you you were going to be
14 put on the annual leave, correct?
15 A. Correct.
16 Q. She also told you something else,
17 didn't she?
18 A. That I could no longer return to the
19 campus.
20 Q. And under what condition did she tell
21 you you could return to the campus
22 notwithstanding any leave or period of leave
23 she was putting you on?
24 A. That I be notified by Mr. Wayne Meaux
25 or his office upon his return.

Page 287

1 Q. So she told you not to come back until
2 we call you?
3 A. Right.
4 Q. Don't call us; we'll call you, right?
5 A. Right.
6 Q. Okay. And were you called?
7 A. No.
8 Q. Well, you were eventually called?
9 A. Yes.
10 Q. Well, what happened right after that?
11 We don't know, right?
12 A. Right.
13 Q. What happened while you were waiting
14 to get called?
15 A. Hurricane Katrina hit.
16 Q. Okay. So when did you get the call?
17 A. In September.
18 Q. Okay. And did you respond?
19 A. Yes.
20 Q. And did you come talk to Mr. Meaux?
21 A. Yes, I did.
22 Q. And what were the main points he
23 wanted to make to you? I know that you
24 recorded that conversation, correct?
25 A. Correct.

Page 288

1 Q. And what were the main points he made
2 to you?
3 A. That I had three options.
4 Q. What was that?
5 A. Either I could be relocated, I could
6 resign, or I could be terminated.
7 Q. And did you feel that that was in
8 response -- well, what did you think was the
9 motivation for him making those comments?
10 A. Because of my complaint that I filed
11 with the EEOC.
12 Q. And any other complaints?
13 A. Retaliation for that.
14 Q. Okay. Now, you were shown this
15 (indicating). It was Exhibit 28 to the
16 deposition.
17 A. Right.
18 Q. Now, after Mr. Meaux gave you that
19 choice, what did you do? Did you call him
20 back and give him your decision?
21 A. I did.
22 Q. What was that?
23 A. That I told him that I would not
24 relocate to the Jackson campus nor would I
25 resign.

PATRICK WAYNE CARPENTER　　　C&I Basic™　　　DECEMBER 19, 2007

Page 289

1　Q. Okay. So he gave you three options?
2　A. Right.
3　Q. Quit?
4　A. Yes.
5　Q. What was the other?
6　A. Relocate.
7　Q. Relocate.
8　A. Or we terminate you.
9　Q. Or we terminate you.
10　A. Right.
11　Q. And when you called him and said I
12　don't take any of those, he didn't terminate
13　you, did he?
14　A. No, he did not.
15　Q. Okay. Do you have any idea why he
16　didn't?
17　A. I guess because of my complaint to
18　EEOC.
19　Q. Okay. Now, after that did things cool
20　down a little bit? I mean, did you -- well,
21　let me ask you this: Up to that point, let's
22　say, when Mr. Meaux gave you the quit, resign,
23　or go 50 miles away, okay, up to that point
24　did you feel under siege?
25　A. It felt pretty much like, you know,

Page 290

1　things were kind of easing up off of me some.
2　Q. In other words, you weren't getting as
3　many bad evaluations and stuff like that?
4　A. Right.
5　Q. Okay. Now, you did have to take a
6　leave, though?
7　A. Yes.
8　Q. Counsel showed you this Exhibit 28 to
9　the deposition (indicating)?
10　A. Right.
11　Q. And I think we figured out the leave
12　was probably from the middle of April to about
13　the middle of June, correct?
14　A. Correct.
15　Q. And what were your feelings at this
16　time? Well, first of all, what was it as far
17　as you know that caused the anxiety,
18　depression, and insomnia that caused this
19　leave?
20　A. The treatment that I was receiving at
21　the LTC.
22　Q. What treatment?
23　A. The unfair, unjust treatment,
24　retaliation because I had filed by claim at
25　the LTC. I couldn't do anything correct.

Page 291

1　Q. So you felt there were unfair
2　criticisms of your work performance?
3　A. Yes.
4　Q. Now, other than the general terms
5　"anxiety, depression, and insomnia," how would
6　you characterize how you felt while you were
7　still working there during this period up
8　until, you know, the leave and during the
9　leave?
10　A. I was still under a watchful eye.
11　Still somewhat disturbed a little bit but
12　still performing --
13　Q. Describe what you mean by "disturbed."
14　A. Always being watched. Always had
15　negative -- some people always had negative
16　things to say.
17　Q. Tell me how you felt.
18　A. Somewhat upset, I mean, depressed and
19　anxious and anxiety and all those things which
20　just happened to me.
21　Q. Did you feel humiliated?
22　A. Yes.
23　Q. Anything else?
24　A. Embarrassed.
25　Q. How often did you feel like that,

Page 292

1　humiliated and embarrassed?
2　A. Quite some, quite some.
3　Q. Now, did anything happen in June which
4　was sort of reminiscent of the days before the
5　EEOC complaint?
6　A. In 2005 you mean?
7　Q. 2006.
8　A. 2006? In June of 2006, I'm trying to
9　remember.
10　Q. Well, let me show you a document. It
11　was Exhibit 29 to the deposition (indicating).
12　This was another "needs improvement"
13　evaluation from Ms. McDaniel, correct?
14　A. Correct.
15　Q. Exhibit 29 to your deposition today,
16　correct?
17　A. Right.
18　Q. You already testified that you refused
19　to sign it?
20　A. Correct.
21　Q. When you were shown this, what was
22　going on with the EEOC?
23　A. Actually, they had already sent me my
24　right to sue from the first charge that I
25　submitted and then I got a notice after going

Page 293

1  to my senator, Mary Landrieu, because of the
2  fact I felt that they hadn't questioned the
3  LTC. the EEOC office revoked my first right to
4  sue and reopened my case.
5      Q. Did you understand the EEOC was asking
6  the LTC demanding a response to your EEOC
7  charge --
8      A. Yes.
9      Q. -- at that time?
10     A. Yes.
11     Q. Okay. Now, when counsel showed you
12 the first dismissal of suit and notice of suit
13 rights, it was one of the exhibits in the
14 case, it was dated in April of 2006?
15     A. Correct.
16     Q. Did you find out that the EEOC gave
17 you that notice without even getting a
18 response from the LTC?
19     A. Yes, I did.
20     Q. Is that why you sent a letter to Mary
21 Landrieu?
22     A. Yes.
23     Q. Okay. And is that why you understood
24 they reversed it?
25     A. Yes.

Page 294

1      Q. Okay. And is that why you understood
2  in April -- I mean, in June of 2006 they were
3  demanding that the LTC answer your charge?
4      A. Yes.
5      Q. Okay.
6      MR. ARRUEBARRENA:
7          That's all I have for now. I
8      might have some follow-ups.
9      MS. JOHNSON:
10         Jim, can I get that little
11     certification back so I can put it
12     back in Belen's stack?
13     MR. ARRUEBARRENA:
14         Yes. This thing (indicating),
15     yes.
16     MS. JOHNSON:
17         Thank you.
18     MR. ARRUEBARRENA:
19         Go ahead and answer Mr. Vincent's
20     questions.
21     E X A M I N A T I O N
22 BY MR. VINCENT:
23     Q. Mr. Carpenter, are you now complaining
24 that there is in your personnel file
25 complaints concerning your performance, that

Page 295

1  are unfavorable, that were made by persons --
2  let's say made by students and other employees
3  other than the top people, say, other than Dr.
4  Davidson and Mr. Meaux?
5      A. I wasn't even aware of those
6  complaints, sir.
7      Q. And so today you're still not aware of
8  any complaints made by anybody other than
9  Meaux or Davidson, is that correct, in your
10 personnel file?
11     MR. ARRUEBARRENA:
12         If you're asking him if he was
13     shown at the time, is that what you
14     want to know, Counsel?
15     MR. VINCENT:
16         No. I'm saying that as of today.
17     MR. ARRUEBARRENA:
18         No, no. As of today, what you've
19     shown him.
20     MR. VINCENT:
21         I'm asking him the question.
22 BY MR. VINCENT:
23     Q. As of today, are you aware that there
24 are letters or complaints in your file that
25 are made by people other than Meaux and

Page 296

1  Davidson?
2      A. As of today, yes.
3      Q. When's the first time you became aware
4  of these complaints about your performance?
5      A. By other people or --
6      Q. At any time. Whether God told you --
7      MR. ARRUEBARRENA:
8          Counsel, ask a question that's not
9      argumentative.
10     MR. VINCENT:
11         No, no. He's --
12     MR. ARRUEBARRENA:
13         Whether God told him?
14     MR. VINCENT:
15         Yes.
16 BY MR. VINCENT:
17     Q. About whether God told you or whether
18 a frog told you or whether it was written in
19 the sky, from any source.
20     MR. ARRUEBARRENA:
21         If you understand the question,
22     you can go ahead or you can ask him to
23     rephrase it in a more professional
24     manner.
25     THE WITNESS:

February 4, 2005


Mr. Patrick Carpenter, Director of Corporate and Continuing Education
LTC BR Tech Campus

Mr. William Wainwright, Dean of Workforce Development
Louisiana Technical College Greater Capital Area

Mr. Wainwright:

This letter will serve as a *formal rejection of a "Corrective Action" and a formal complaint of Harassment as defined in the LCTCS Policy # II.3.011 based on my race and my color*. The "corrective action" letter stated that I failed to communicate with Ms. Fran Castile regarding the Apprenticeship Training Program at the Florida Parish Campus. The statement is not accurate. Communication with Ms. Fran Castile was done during the Fall Semester once the job description was obtained in the month of November, Year 2004 and to this current date.

Ms. Shawn Shubach, contacted me by email requesting that I speak with Ms. Fran Castile. Ms. Fran Castile had reportedly called Ms. Shubach with questions regarding pay for the Apprenticeship Training Program due to time sheets she had just received from the Apprenticeship Directors dated during the LTC observed Christmas Holiday Period. These days were also noted as non-instructional days. Ms. Fran Castile was contacted by telephone at the request of Ms. Shubach. She asked the question "Are Apprenticeship Instructors to be paid over the Christmas Break?" My response was, "If they are set up in the system as adjunct instructors, they are not to be paid over the holidays." This response was solely based upon common knowledge pertaining to adjunct instructors. Ms. Fran Castile agreed to the statement that I made regarding payment of adjunct instructors. So, at the conclusion of the telephone conversation with Ms. Castile I thought the situation was resolved. There was no communication by Ms. Castile to negate that these instructors were not set up in the system as adjuncts. If communication was expressed to me that the Apprenticeship Instructors were set up in the system in positions other than as adjunct positions, It would have prompted me to further investigate the situation. Again, this was not the case, thus the situation was thought to be resolved.

The first communication I received regarding nonpayment of the Florida Parish Campus' Apprenticeship Instructors was on January 24, 2005 by you, Mr. Wainwright, via a telephone conversation. At the time of the conversation I was out sick for the day. You reported that you were notified by an email correspondence from Sharon Hornsby, the Campus Dean for the Florida Parish Campus, regarding the aforementioned. You stated, "There are some issues regarding the Apprenticeship Pay." You also stated, "I need you to report to work on tomorrow."

EXHIBIT
C

PENGAD 800-631-6889

Carpenter v. LTC
Bates No. 000029

2

Upon my return to work, we met face to face in your office and began discussing the Florida Parish Campus Apprenticeship situation. During the discussion, Dr. Kay McDaniel walked into your office and you excused yourself from our meeting to discuss something with her. Before she left, you invited her to sit in on, as stated by you "The debriefing of the Apprenticeship situation." During the meeting with you, Dr. Kay McDaniel and I in attendance, you stated, "You are Mr. Apprenticeship and you are ultimately responsible for the apprenticeship programs." Ms. Shawn Shubach was also in the area working and her input was needed. The only response that was stated by Ms. Shubach was, "He said that they were not to be paid." I replied, "I said if they were set up as adjunct instructors they were not to be paid." Dr. Kay McDaniel then stated "She would have never questioned time sheets pertaining to apprentices because she had knowledge of their training schedules in the past." I made no response. You made no response. I asked to speak to you alone. Dr. Kay McDaniel left, however, Ms. Shubach remained in the area hearing the total discussion. I stated, "I am just trying to only help but it seems that I am to blame for everything that happens." You stated again, "You are ultimately responsible for the apprenticeship programs." I did not debate with that statement at the time due to the lack of privacy. I also asked, "How do I have the final word to tell a campus who is paid or not when the campus has a Dean overseeing the day to day operations and budgets." No response was given. There was no communication of a meeting of "corrective action" that would be documented at a later date for me to sign. Therefore, the meeting was just a "debriefing".

The above is my formal statement regarding the situation that prompted me to receive a letter of "corrective action". Again, I reject this letter of "corrective action" due to the following:

1. I was asked to come back to LTC-BR by Mr. Wayne Meaux after being temporally relocated without any documented reason to LTC-Westside Campus. The return was made on January 4, 2004.
2. I was asked by Mr. Meaux to "Run Continuing Education" upon my return with Micheal Gassen being my immediate supervisor.
3. Micheal Gassen included Safety Coordinator duties with the position.
4. I was under Micheal Gassen's supervision until approximately September of 2004 and was reassigned due to racial harassment that was not handled per policy.
5. I then was reassigned to Mr. Wainwright with the focus being mainly on Continuing & Corporate Education.
6. I did not receive a written job description for Continuing & Corporate Education until mid to late November 2004.
7. I was not given all the information regarding the already existing Continuing & Corporate Education's procedures and had to learn and is still learning a lot by trial and error. People with helpful information are very territorial and will not always release what is needed for a smooth transition. I did not and have not to this day received thorough formal training regarding the aforementioned.

Carpenter v. LTC
Bates No. 000030

8. I am left out of the communication loop regarding Continuing & Corporate Education. Contact is made to department heads without regard of my position. Decisions are made without my input. I am then contacted when problems arise that I am accused of causing.

I will not be the "scape-goat" for problems that are created and nurtured without regard for my position. I have obtained the title of Director of Continuing and Corporate Education but am not fully allowed to handle the department. So many people from administration within the LTC system and abroad are allowed to engage in the procedures of the department.

I am also deeply concerned with the treatment that I have and am currently receiving from you, Dr. Kay McDaniel, and other administrators. I will elaborate more in detail once this matter is investigated as per the policy. I have been patient with the acts of harassment believing things would change and have taken much for the welfare of my family. The acts of harassment are very detrimental to me. These civilly wrongful acts have been and are still affecting my total health. I am concerned that my job performance will be affected by this if nothing is done. However, I am now convinced that the racial harassment will not stop until I file, in writing, a formal complaint. I have verbally discussed my concerns in the past but no change has followed. I don't feel comfortable in my workplace environment and the treatment will no longer be tolerated. The acts of physical, verbal, visual racial harassment towards me have been evident and remain evident as follows:

*Understand the use of the descriptive terms "white" and "black" is mainly to show the racial harassment pattern.*

1. I have been constantly targeted verbally as the "cause of problems" for anything that I am associated with when it involves all whites in managerial/administrative positions.
2. I have been rushed to complete policies and procedures for the Department of Corporative and Continuing Education (Apprenticeship programs and Industry Training). The Department has been operated for many years by whites that should have already had the policies and procedures in place but was not held responsible to do so.
3. I have been expected to **always function at a level of excellence with no mistakes** in positions here at LTC –BR where whites that were in the same positions before were allowed to function as they wished. Whites in the same positions were allowed to use trial and error that was not formally counted against their job performance but was expressed as making them "a team player".
4. I have been the target of racial comments by Micheal Gassen, who is white, which was discussed with Dr. Kay McDaniel (white), which led to my reassignment to Mr. Wainwright in the Fall 2004 semester.

4

5. I have been reassigned up to three times at LTC-BR for no documented reasons by whites in administration.
6. I am the only black person in "administration" and am left out of many professional opportunities in regards to the general operations at LTC-BR.
7. I am constantly "disciplined" (called into meetings with other administrative staff and verbally tried, accused, and punished based on hear-say) in any way one sees fit and not by the LCTCS Discipline- For All Employees Policy #II.3.014.
8. I am the only person in administration that received "Directives" to which I am held accountable. The directives were received on November 2, 2004 at the time that preceded my receipt of any Job Description for the position of Director of Corporate and Continuing Education.
9. After having a work schedule that was set since my return to LTC-BR in Jan. 2004, a new schedule was assigned to me on November 2, 2004 in an effort to "ensure campus safety and proper supervision of evening classes" without any previous communication. I am not responsible for nor did I agree to act as a security guard regarding campus safety. It was given to me along with the "Directives" after a meeting with Dr. Kay McDaniel and Mr. Wainwright (white) where I disagreed with something Dr. McDaniel stated. The change in the schedule was not considerate of any of my neither professional work habits nor personal situations.
10. I am not included in meetings that involve all of the white administrative staff and I don't feel comfortable attempting to interrupt them if I am need of direction. The discomfort comes from being ignored or not even acknowledged that I was trying to get someone's attention in the past.
11. I have attempted to communicate issues with some white administrative staff that I needed assistance with handling, regarding this position, but was ignored.
12. I have been verbally ridiculed by Dr. Kay McDaniel in regards to typographical errors made with correspondence while other white department heads are allowed to send numerous letters with typos out into the industry.
13. I am expected to perform all duties listed on the job description without a secretary. The white person that held this position previous to Michel Gassen had a secretary.
14. Disciplinary terms and processes are being utilized in an attempt to "Handle me" that are not per the LTC/LCTCS Polices. It is because I am black.

5

Again, this letter will serve as a *formal rejection of the "Corrective Action" and a formal complaint of Harassment as defined in the LCTCS Policy # II.3.011 based on my race and my color*.   I am following the above mentioned policy to present this complaint. I am aware of my rights as a U.S. citizen, aware of the LTC/ LCTCS policies and will exercise them to the fullest.  I am not, by any means, making any threats but am exercising my rights by voicing my concerns. However, future incidences will not be tolerated.  I am also notifying all that are considered to be my immediate supervisors of my willingness at this point to utilize the LTC/LCTCS chain- of- command and/ or policies first to resolve these matters.

Sincerely,

*Patrick Carpenter*

Mr. Patrick Carpenter, Director of Corporate and Continuing Education
LTC BR Tech Campus

cc.  Dr. Kay McDaniel, Dean
Louisiana Technical College Greater Capital Area

cc: W. Wayne Meaux, Vice Chancellor/Provost
Louisiana Technical College Greater Capital Area

cc: Margaret Elgin, Human Resource Director
Louisiana Technical College Greater Capital Area

Carpenter v. LTC
Bates No. 000033

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK CARPENTER | * | CIVIL ACTION NO. 07-0170 |
| | * | |
| VERSUS | * | JUDGE BRADY |
| | * | |
| THE BOARD OF SUPERVISORS OF THE | * | MAGISTRATE RIEDLINGER |
| LOUISIANA COMMUNITY AND | * | |
| TECHNICAL COLLEGE SYSTEM, | * | |
| LOUISIANA BOARD OF REGENTS | * | |
| AND LOUISIANA TECHNICAL COLLEGE | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF PATRICK CARPENTER

I, Patrick Carpenter, make the following declaration in lieu of an affidavit, as permitted by Section 1746 of Title 28 of the United States Code. I am aware that this declaration will be filed with the United States District Court of the Middle District of Louisiana, and that it is the legal equivalent of a statement under oath.

1.  I am a citizen of the State of Louisiana, and of the United States, and reside within the confines of the Middle District.

2.  I worked for The Louisiana Technical College ("the LTC") for approximately four (4) years from 2002 until his retaliatory termination on or about January 2, 2007.

3.  Prior to complaining about racial discrimination and racial harassment at the LTC, I was never disciplined for deficient performance or misconduct.

4.  My employment at the LTC began in December of 2002 when I was appointed as Director of Student Admissions (Student Services Officer III).



EXHIBIT

D

PENGAD 800-631-6989

5.    In April of 2004, I verbally complained to Dr. Kay McDaniel ("Dr. McDaniel"), the Associate Dean/Campus Administrator for LTC - BR Tech Campus, that I was being treated unfairly and not supported properly because of my race, African-American.

6.    In January of 2004, I was assigned the position of Coordinator of Corporate/Continuing Education and Safety Apprenticeship Training.

7.    On February 1, 2005, I received a memo from Dr. McDaniel and William S. Wainwright ("Mr. Wainwright"), the Dean of Workforce Development for LTC, Greater Capitol area, alleging that there was a problem with apprenticeship trainers not receiving compensation in a timely manner during the Christmas Holidays of 2004.

8.    This memo was discriminatory or retaliatory because I had not been trained and had not been advised that apprenticeship trainers were working over the Christmas Holidays.

9.    The next day, I was given my job description, for the first time, finally advising me of my duties and expectations.

10.    On February 4, 2005, I wrote Mr. Wainwright in response to the February 1, 2005 letter concerning the apprenticeship training program.

11.    In that letter, I complained that I was being treated unfairly due to "racial harassment" toward me that had been evident and remained evident.

12.    I provided specific examples of unfair treatment due to my race in this communication.

13.    The LTC failed to properly investigate my race discrimination complaint. There was no response and no investigation.

14.    Because there was no response to my previous racial discrimination complaint, on March 10, 2005, I complained in writing via certified mail (with return receipt) to Dr. Margaret

2

Montgomery-Richard, Chancellor, LTC, that my previous complaints of racial discrimination and racial harassment had not been addressed by the LTC.

15. As to my March 10, 2005 formal written grievance concerning racial discrimination and racial harassment, once again, the LTC conducted no investigation and provided no response.

16. After the LTC received the above referenced formal written grievance, an unfairly negative and unfairly low annual evaluation was placed on my desk. The evaluation was signed by Mr. Wainwright, the Dean of Workforce Development, but no one at LTC ever presented or reviewed the evaluation with me.

17. In the above referenced unfairly negative evaluation, Mr. Wainwright rated my performance in each category as mostly 2 out of 5 (with 5 being the best rating and 1 being the poorest rating).

18. This evaluation was part of a concerted effort to paper my personnel file with unfairly negative and retaliatory entries to either unfairly justify my termination or to force my involuntary resignation.

19. I complained again in writing on April 6, 2005, to Dr. Montgomery-Richard that my prior complaints of race discrimination had not been addressed.

20. Once again, there was no investigation and no response by anyone at the LTC.

21. This time, the only response from Dr. Montgomery-Richard came from Dr. Montgomery-Richard's Assistant, April McGee ("Ms. McGee") that the Chancellor asked her to let me know that "we are in the process of researching [my] grievance and will notify [me] within a few weeks."

22. In spite of this "response" there was no investigation and no further reply to me.

3

23. The next retaliatory action was to demote me to the position of Financial Aid Officer which resulted in significant financial losses.

24. This demotion was not justified in any manner. This demotion was retaliatory and for the purpose of papering my personal file with negative personnel events to either unfairly justify my termination or to force my involuntary resignation in retaliation for my race discrimination complaints.

25. Because the LTC refused to properly investigate and failed to provide a reasonable response to my race discrimination complaints as referenced above, I filed a charge of discrimination with the EEOC on July 25, 2005.

26. In response to this charge, the LTC suspended me supposedly for two days but which suspension ultimately lasted for thirty (30) days.

27. I was not advised that I could return to work until W. Wayne Meaux's ("Mr. Meaux") secretary called me to tell me that I could return to work.

28. I ultimately was able to return to work in the Financial Aid office on approximately September 13, 2005.

29. In approximately July of 2006, there was a reorganization at LTC and I began reporting to Lynn Hitchcock ("Ms. Hitchcock").

30. Once again, on December 15, 2006, Mr. McDaniel made an unfair allegation in a letter that I purportedly failed to use vans when attending a financial aid conference in Lake Charles, Louisiana.

31. The allegations in the December 15, 2006 letter are either blatantly untrue or grossly unfair and were in retaliation for my prior complaints as part of a concerted effort to paper my

4

personnel file with negative personnel issues to either unfairly justify my termination or to force my involuntary resignation.

32.     I received a letter dated January 2, 2007 from Jim Henderson, ("Mr. Henderson"), Senior Vice President of Work Force Training Development for LTC system stating that "it had been determined in the best interest of the LTC system to terminate [my] employment effective January 2, 2007."


I declare under penalty of perjury that the foregoing is true and correct. Executed on the __5__ day of May, 2008.


PATRICK CARPENTER

March 9, 2005


Mr. Patrick Carpenter
9621 East Graham Avenue
Baton Rouge, Louisiana 70814


Dr. Margaret Montgomery-Richard, Chancellor
Louisiana Technical College
150 3rd Street
Baton Rouge, LA  70801


Dear Dr. Margaret Montgomery- Richard:

This letter will serve first as a *formal grievance as defined in the LCTCS Policy # II.3.015 and second as a formal complaint of Harassment as defined in the LCTCS Policy # II.3.011 based on my race and my color.*

I have been an employee of LTC-BR since December 4, 2002.  During the time of my employment, I have been forced to change positions four times by Mr. Wayne Meaux. I have been under the supervision of at least five different people and have not received any justification for the many moves.  I am currently in financial aid. The last position held before this fourth move was in administration.  I was the only black male in administration and was treated differently regards to my race but the indifferent treatment started prior to the last administrative position.

Per the request of Mr. Meaux, I am currently in financial aid, as quoted by Mr. Meaux "assisting Mr. Lemoyne Williams, due to budget cuts, with a projected decrease in my salary as of April 25, 2005". Mr Meaux also stated, "The salaries for positions within the student service hierarchy are capped", thus attempting to defend my salary decrease by $9800.00.  Again, I have not received anything in writing regarding any of the moves and am convinced that I am being harassed based on my race.  I have voiced some concerns about the treatment I have received in the past to Mr. Meaux, Dr. Kay McDaniel, Mr. William Wainwright, Mike Gassen, Dr. Brunswick, and Alicia Cyprian-Andrews

Providing the brief history above, I am directing this grievance to you, Dr. Margaret Montgomery-Richard, due to this grievance involving my supervisors ( LTC-BR administrative chain- of –command).  The grievance is clearly directed to the following persons: Mr. Meaux, Dr. Kay McDaniel, and Mr. William Wainwright.  Based on the treatment that I have received from them, I don't feel comfortable discussing any more of my concerns with any of the aforementioned.  I was given a "corrective action" letter by Mr. Wainwright and Dr. Kay McDaniel based on hear-say with the last administrative position.  I have been the victim of constant harassment and indifferent treatment since about two months within my employment with the LTC system.  I have attempted to make the best out of these situations for the welfare of my family.  I can no longer allow the treatment to continue.

EXHIBIT

F

PENGAD 800-631-6989

Carpenter v. LTC

Please review the following time-line of my employment:

1. I have been an employee of LTC-BR since December 4, 2002, hired as the Director of Student Services. The beginning salary I began with was one that was left open by a retiree, Virginia Watts. The beginning salary was $56, 900.
2. I was asked to come back to LTC-BR by Mr. Wayne Meaux after being temporally relocated without any documented reason to LTC-Westside Campus. I was told by Mr. Meaux that I needed to be an intern under Dr. Brunswick. I had verbally disagreed with some of the practices of Dr. Kay McDaniel prior to my move. I was asked to return to LTC-BR by Mr. Meaux, and returned on January 4, 2004.
3. I was asked by Mr. Meaux to "Run Continuing Education" upon my return. Micheal Gassen was my immediate supervisor.
4. Micheal Gassen included Safety Coordinator duties with the position.
5. I was under Micheal Gassen's supervision until approximately September of 2004 and was reassigned due to racial harassment that I reported to Dr. Kay McDaniel that was not handled per LTC/LCTCS policy.
6. I then was reassigned to Mr. Wainwright with the focus being mainly on Corporate & Continuing Education
7. I did not receive a written job description for Corporate & Continuing Education until mid to late November 2004.
8. I was not given all the information regarding the already existing Corporate & Continuing Education's procedures and had to learn by trial and error. People with helpful information were very territorial and would not always release what was needed for a smooth transition. I did not and have not to this day received thorough formal training regarding the aforementioned.
9. I was left out of the communication loop regarding Corporate & Continuing Education. Contact was made to department heads without regard of my position. Decisions were made without my input. I was contacted when problems arose that I was accused of causing.
10. I was a successful participant of the first inaugural class of the Leadership Development Academy of LTC.

Dr. Margaret Montgomery- Richard, I will not continue to be the "scape-goat" for problems that are created and nurtured without regard for my position. I had obtained the title of Director of Corporate & Continuing Education but was not fully allowed to handle the department. So many people from administration within the LTC system and abroad were allowed to engage in the procedures of the department regardless of the position I held.

If asked, I am willing to elaborate more in detail once this matter is investigated as per the policy. Again, due to my religious beliefs, I have been patient with the acts of indifferent treatment and harassment believing things would change and have taken much for the welfare of my family. I have also been very fearful of losing my job based on the constant relocations. These acts are very detrimental to me. These civilly wrongful acts

Carpenter v. LTC

have been and are still affecting my total health. I am concerned that my job performance will be affected by this if nothing is done.

However, I am now convinced that the indifferent treatment and racial harassment will not stop until I file, in writing, a formal complaint. I am also convinced that the next move for me will be out of the door based on the previous treatment. I have verbally discussed some of my concerns in the past but no changes have pursued. I don't feel comfortable in my workplace environment and the treatment will no longer be tolerated. The acts of verbal, visual, and racial harassment towards me have been evident and remain evident as follows:

*Understand the use of the descriptive terms "white" and "black" is mainly to show the racial harassment pattern.*

1. I have been constantly targeted verbally as the "cause of problems" for anything that I am associated with when it involves all whites in managerial/administrative positions.
2. I have been rushed to complete policies and procedures for the Department of Corporative and Continuing Education (Apprenticeship programs and Industry Training). The Department has been operated for many years by whites that should have already had the policies and procedures in place but was not held responsible to do so.
3. I have been expected to **always function at a level of excellence with no room for trial and error** in positions here at LTC –BR where whites that were in the same positions before were allowed to function as they wished. Whites in the same positions were allowed to use trial and error that was not formally counted against their job performance but was expressed as making them "a team player".
4. I have been the target of racial comments by Micheal Gassen, who is white, which was discussed with Dr. Kay McDaniel (white), which led to my reassignment to Mr. Wainwright in the Fall 2004 semester.
5. I have been reassigned up to four times at LTC-BR for no documented reasons by Mr. Meaux, who is white in administration.
6. I was the only black person in "administration" and was left out of many professional opportunities in regards to the general operations at LTC-BR.
7. I am constantly "disciplined" (called into meetings with other administrative staff and verbally tried, accused, and punished based on hear-say) in any way one sees fit and not by the LCTCS Discipline- For All Employees Policy #II.3.014.
8. I was not given all the information regarding the already existing Corporate & Continuing Education procedures and had to learn by trial and error. People with helpful information were very territorial and would not easily release what was needed for a smooth transition. I did not and have not to this day received thorough formal training regarding the aforementioned.
9. I was left out of the communication loop regarding Corporate & Continuing Education . Contact was made to department heads without regard of my position. Decisions were made without my input. I was contacted when problems arose that I was accused of causing.

10. I was the only person in administration that received "Directives" to which I was held accountable. The directives were received on November 2, 2004 at the time that preceded my receipt of any Job Description for the position of Director of Corporate and Continuing Education.

11. After having a work schedule that was set since my return to LTC-BR in Jan. 2004, a new schedule was assigned to me on November 2, 2004 in an effort to "ensure campus safety and proper supervision of evening classes" without any previous communication. I am not responsible for nor did I agree to act as a security guard regarding campus safety. It was given to me along with the "Directives" after a meeting with Dr. Kay McDaniel and Mr. Wainwright (white) where I disagreed with something Dr. McDaniel stated. The change in the schedule was not considerate of my professional work habits nor personal situations.

12. I wasn't included in meetings that involved all of the white administrative staff and I didn't feel comfortable attempting to interrupt them if I needed direction. The discomfort came from being ignored or not even being acknowledged that I was trying to get someone's attention in the past.

13. I have attempted to communicate issues with some white administrative staff that I needed assistance with handling, regarding this position, but was ignored.

14. I have been verbally ridiculed by Dr. Kay McDaniel in regards to typographical errors made with correspondence while other white department heads are allowed to send numerous letters with typos out into the industry.

15. Once it was received, I was expected to perform all duties listed on the Corporate and Continuing Education Job Description without a secretary. The white person that held this position previous to Michel Gassen had a secretary.

16. Disciplinary terms and processes are being utilized in an attempt to "Handle me" that are not per the LTC/LCTCS Polices. It is because I am black.

Again, this letter will serve first as a *formal grievance as defined in the LCTCS Policy # II.3.015 and second as a formal complaint of Harassment as defined in the LCTCS Policy # II.3.011 based on my race and my color.*

I am following the above mentioned policies to present this complaint. I am aware of my rights as a U.S. citizen, aware of the LTC/ LCTCS policies and will exercise them to the fullest. I am not, by any means, making any threats but am exercising my rights by voicing my concerns. However, future incidences will not be tolerated. I am also notifying all that are considered to be my immediate supervisors of my willingness at this point to utilize the LTC/LCTCS chain- of- command and/ or policies, first, to resolve these matters.

Sincerely,

*Mr. Patrick Carpenter*

Mr. Patrick Carpenter





Carpenter v. LTC

# TRANSCRIPT OF THE DEPOSITION OF:

## WILLIAM WAINWRIGHT
## 12/20/07

---

## PATRICK CARPENTER

## VERSUS

## THE BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND TECHNICAL COLLEGE STYSTEM, ET AL

---

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT
G

PATRICK CARPENTER                    DEPOSITION OF: WILLIAM WAINWRIGHT                    REPORTED BY:
VS. LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

Page 10

1    A.    A February letter.
2    Q.    Which also mentioned that thing
3    about the apprentice?
4    A.    Yes.
5    Q.    We figured out from other
6    testimony and from looking at this binder, we
7    figured out it was prepared by Dr. McDaniel,
8    that it appears that -- and correct me if I'm
9    wrong -- that Mr. Carpenter worked under you
10   from about 7 of '04 to 2 of '05?
11   A.    Yes.
12   Q.    When he first came to work for
13   you, before that he was reporting to Mr.
14   Gassen, right?
15   A.    Before coming to me?
16   Q.    Yes.
17   A.    Yes.
18   Q.    But he had the same job, the same
19   desk and everything, just at that time you
20   took over his management?
21   A.    Yes.
22   Q.    What was Mr. Gassen's title at
23   that time?
24   A.    I can't remember.
25   Q.    Was it the same as yours?

Page 11

1    A.    No.
2    Q.    At that time what was your title?
3    A.    Dean of work force development.
4    Q.    Was he higher, lower, or equal to
5    you, Mr. Gassen?
6    A.    He was facilities. And I don't
7    know what that means. I know facilities was a
8    part of what he did, but I don't know where
9    that fell on the organizational chart.
10   Q.    So he may have been a little
11   higher or a little lower than you in terms of
12   management level?
13   A.    I guess.
14   Q.    By the way, July of '04, had you
15   heard that you were getting Mr. Carpenter
16   because of a disagreement between he and Mr.
17   Gassen about music being played, a complaint
18   about that?
19   A.    About music being played?
20   Q.    Yeah, Mr. Carter listening to
21   modern jazz and Mr. Gassen mentioning he
22   didn't like that, and there was a discussion
23   between them and a complaint about that?
24   A.    I believe Mr. Carpenter mentioned
25   something about that to me.

Page 12

1    Q.    To you?
2    A.    Yeah.
3    Q.    Okay, what did he say?
4    A.    Pretty much what you just said.
5    Q.    Did he convey to you that it was
6    racially offensive?
7    A.    No.
8    Q.    He didn't convey that to you?
9    A.    No.
10   Q.    Are you sure he didn't or are you
11   saying he could have, but you don't remember?
12   A.    I can't remember.
13   Q.    So if he said he did convey to
14   you that he thought Mr. Gassen had made a
15   racially offensive statement would you defer
16   to his memory?
17   A.    I can't recall the detail of
18   that.
19   Q.    So you're not saying for sure he
20   didn't say that?
21   A.    I don't know.
22   Q.    Sometimes people when they say
23   they don't remember, sometimes they know they
24   can't remember or sometimes it could have
25   happened but they just don't remember. Is

Page 13

1    that the category? It could have happened,
2    but you don't remember?
3    A.    I don't remember.
4    Q.    So he could have said that to
5    you?
6    A.    I don't remember.
7    Q.    Is that something you would
8    remember if someone conveyed to you, made a
9    statement to me that I felt was offensive
10   because of race or felt offense because I'm a
11   woman, is that something you would remember?
12   A.    I would think I would.
13   Q.    But you're not sure?
14   A.    Right.
15   Q.    Do you understand that because of
16   whatever happened between Mr. Carpenter and
17   Mr. Gassen concerning what he told you about,
18   is that why you understood you were taking
19   over for Mr. Gassen?
20   A.    No.
21   Q.    What did you understand?
22   A.    I needed help and I was getting
23   help.
24   Q.    So you asked for Mr. Carpenter?
25   A.    No, I asked for help from my

4 (Pages 10 to 13)

321 North Vermont Street                    VENTURELLA & ASSOCIATES                    Telephone: (985) 893-1999
Covington, Louisiana 70433                    Board-Certified Court Reporters                    Facsimile: (985) 893-6765

b37bee30-f793-450f-8d81-76196cd7d818

PATRICK CARPENTER                    DEPOSITION OF:  WILLIAM WAINWRIGHT                    REPORTED BY:
VS. LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

Page 14

1  boss.
2       Q.    Who is your boss?
3       A.    **Wayne Meaux.**
4       Q.    And in response to this request
5  he said, "I'm going to let Patrick Carpenter
6  help you"?
7       A.    **Yes.**
8       Q.    Had you heard anything good or
9  bad about Mr. Carpenter before that?
10      A.    **No.**
11      Q.    So you really had heard nothing?
12      A.    **No.**
13      Q.    Did Mr. Carpenter convey to you
14  how he thought it was going for him at LTC
15  when he came to work for you?
16      A.    **No.**
17      Q.    Did he say he had any trouble or
18  any criticisms or anything?
19      A.    **No.**
20      Q.    Did he indicate to you he had
21  been evaluated by Ms. Andrews or Ms. Brunswick
22  or Mr. Gassen?
23      A.    **Yes.**
24      Q.    Had you seen those evaluations?
25      A.    **No.**

Page 15

1       Q.    So he told you he got "meets
2  expectations" from them?
3       A.    **Yes. That's part of the**
4  **transition over.**
5       Q.    And that's something you were
6  interested in because you were his supervisor?
7       A.    **Yes.**
8       Q.    Were you supervising anyone other
9  than him at that time?
10      A.    **No.**
11      Q.    If you know, what was the
12  function he was doing under Mr. Gassen?
13      A.    **I believe continuing ed.**
14      Q.    What was the function that he was
15  going to do for you in July of '04?
16      A.    **I understood it as continuing ed,**
17  **pretty much his same roles.  Let me think.**
18  **Continuing ed, safety, apprenticeship, I**
19  **believe that fell under continuing ed.**
20      Q.    And as far as you know, that was
21  what he was doing already for Mr. Gassen?
22      A.    **Yes.**
23      Q.    Did you encounter feeling that
24  Mr. Carpenter had made any mistakes or had any
25  problems while he worked for you?

Page 16

1       A.    **Repeat the question.**
2       Q.    Do you feel he made any mistakes
3  when he worked for you?
4       A.    **That he should be criticized for?**
5       Q.    Yes.
6       A.    **No.**
7       Q.    Would you expect it?
8       A.    **At first, yes.**
9       Q.    What was that?
10      A.    **Early on communication,**
11  **breakdowns in communication.**
12      Q.    Give me your top example of that.
13      A.    **Apprenticeship.**
14      Q.    You mean the issue of the pay?
15      A.    **Uh-huh (indicating**
16  **affirmatively).**
17      Q.    So that would be the most serious
18  thing that happened during your tenure, that
19  pay issue?  There's been a lot of testimony
20  about it already.
21      A.    **That's one.**
22      Q.    Is it the most serious thing?
23      A.    **I have not ranked them.**
24      Q.    Was there something else you
25  would say was a problem?

Page 17

1       A.    **No.**
2       Q.    So the only problem that you know
3  of while he worked for you was that issue with
4  paying the apprentices during the holiday
5  period of 2004?
6       A.    **Performance issues.  There was a**
7  **challenge of performance issues.**
8       Q.    Do you differentiate that
9  between --
10      A.    **It goes beyond apprenticeship.**
11      Q.    Isn't what happened with the
12  apprenticeship program a performance issue?
13      A.    **One.**
14      Q.    Do you have something else you
15  feel he did wrong?
16      A.    **There was a request to complete a**
17  **workforce training manual.  It was not**
18  **completed.**
19      Q.    And that request came from you?
20      A.    **Uh-huh (indicating**
21  **affirmatively).  I believe you have a letter**
22  **that indicates the performance challenges**
23  **dated November.  That's what I'm speaking**
24  **about.**
25      Q.    I'm going to give you the binder.

5 (Pages 14 to 17)

321 North Vermont Street          VENTURELLA & ASSOCIATES          Telephone: (985) 893-1999
Covington, Louisiana  70433       Board-Certified Court Reporters    Facsimile: (985) 893-6765

b37bee30-f793-450f-8d81-76196cd7d818

# TRANSCRIPT OF THE DEPOSITION OF:

## MARGARET WEBB
## 02/15/08

---

## PATRICK CARPENTER

## VERSUS

## LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT
H

PATRICK CARPENTER                DEPOSITION OF: MARGARET WEBB                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL        FEBRUARY 15, 2008                                LILLIE R. BURCH, CCR

Page 9

```
 1       Q.     What job did April Magee do?
 2       A.     She was the executive secretary
 3  to Dr. Richard.
 4       Q.     Did you work in the same building
 5  with all of them?
 6       A.     Yes, sir.
 7       Q.     Just down the hall?
 8       A.     No, not down the hall.  We were
 9  on the same floor.
10       Q.     Within a short walking distance?
11       A.     Oh, yes, we were all within
12  walking distance, the whole office.
13       Q.     Were you ever involved in
14  investigating race discrimination complaints?
15       A.     Yes.
16       Q.     Tell me first your practice.  How
17  is it that you do that?  What is it that you
18  do?
19       A.     We actually have a policy and a
20  procedure and we follow the policy and
21  procedure.  Part of it is a question guide.
22  And we use this questionnaire and go in and
23  interview everybody involved in the case,
24  whatever case we're looking at.  After we do
25  the investigation we have an HR person from
```

Page 11

```
 1  it and we couldn't corroborate what you said?
 2       A.     The employee, when I do
 3  investigations the employee gets a letter
 4  outlining the interviews to an extent and the
 5  recommendations that were made to the
 6  appointing authority.
 7       Q.     So they would find out if there
 8  was any support or not?
 9       A.     Oh, yes.
10       Q.     Would you advise the employee if
11  there is going to be any remedial measures or
12  discipline?
13       A.     To an extent.
14       Q.     So, in other words, when you say
15  that, you don't tell them exactly what
16  happened, but maybe --
17       A.     The information would be given to
18  the employee.  But as far as the actual
19  reprimand to the other employee, that would be
20  left up to the higher level to give out that
21  information, it would not be me.
22       Q.     Is there ever a situation that
23  you don't investigate a complaint about, say,
24  race discrimination?
25       A.     Repeat.
```

Page 10

```
 1  that area as a witness or a co-worker with me
 2  or with whomever.  Because I was not the only
 3  one, we had others that would do it.  Then we
 4  would go in, review all of our notes,
 5  transcribe everything, make recommendations.
 6       Q.     What kind of recommendations
 7  would you make?
 8       A.     The recommendations would go from
 9  yes, there is validity in the complaint, to
10  no, there is no validity in the complaint.  We
11  would go as far as to say if training is
12  needed, if maybe some type of minor
13  disciplinary action was needed.  It would go
14  all the way through the disciplinary --
15       Q.     So there would be some kind of
16  appropriate remedial measure, if necessary?
17       A.     If necessary.
18       Q.     And you might even conclude,
19  well, we couldn't corroborate it, so it's
20  closed?
21       A.     Correct.
22       Q.     So closing it as uncorroborated?
23       A.     Correct.
24       Q.     If you close it as uncorroborated
25  do you advise the employee, well, we looked at
```

Page 12

```
 1       Q.     Are there ever circumstances or
 2  situations where you receive notice of a
 3  racial discrimination complaint but you don't
 4  investigate it?
 5       A.     If the investigation was not
 6  given to me by the chancellor herself I did
 7  not go in and investigate.  It had to be an
 8  assigned investigation.  And the only one who
 9  assigned it was the chancellor of the LTC.
10       Q.     How would she assign the
11  investigation to you?
12       A.     Letters would go directly to her.
13  And if she deemed it was necessary to
14  investigate, she would call us in her office,
15  give us the letter, tell us what she wanted us
16  to do.  And we would go out either
17  individually or as a team and investigate.
18       Q.     Would she ever ask April to give
19  you the letter?
20       A.     No.
21       Q.     You're saying she would only
22  personally hand it to you?
23       A.     She wouldn't ask April to come
24  over and give me instructions to go on an
25  investigation.  I may receive a copy of the
```

3  (Pages 9 to 12)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433          Board-Certified Court Reporters          Facsimile: (985) 893-6765

1    letter, but then we would actually meet with
2    her to discuss what was going on.
3        Q.    When you say the letter, you mean
4    a grievance or complaint?
5        A.    I mean any letter.  Any letter.
6        Q.    So it doesn't have to be in any
7    special format?
8        A.    No.
9        Q.    Somebody could write a letter
10   with two sentences, I work here, I'm black,
11   and I think I'm being treated unfairly because
12   I'm black, that would be enough to trigger an
13   investigation?
14       A.    That would have been
15   Dr. Richard's decision.
16       Q.    So you're saying the LTC doesn't
17   have an HR policy that if the chancellor
18   decides -- the chancellor, the non-HR person,
19   decides if the investigation should occur?
20       A.    We have a policy.  In the policy
21   we have a form.  If the individual wants to
22   file a grievance, they follow that procedure.
23       Q.    What about this idea that a
24   person can send a letter?
25       A.    Well, I mean, an individual can
                                        Page 13

1    expert.  I said she had HR background.
2        Q.    What is that, to your knowledge?
3        A.    She knows some of the policies
4    and procedures that go along with human
5    resources.
6        Q.    How do you know that?
7        A.    Through discussions with her.
8        Q.    Did she tell you she worked in
9    HR?
10       A.    I don't remember.
11       Q.    It has been confirmed from most
12   of the depositions we've taken that LTC has a
13   policy that even if a complaint isn't filed,
14   if you were to observe discrimination -- let's
15   say you were in an elevator and you heard a
16   manager use the N word toward an African
17   American employee, but the person didn't make
18   a complaint, but you as the HR professional
19   heard it --
20       A.    It would be my obligation to
21   bring it to the chancellor what I heard.
22       Q.    So you're saying, no, I would
23   bring it to the chancellor and let her decide?
24       A.    Yes.
25       Q.    Are you saying that's the policy
                                        Page 15

1    send anything they want.  That doesn't
2    necessarily warrant that a chancellor would
3    say yes, this is something worthy of sending a
4    team out to investigate.
5        Q.    Is a chancellor an HR expert?
6        A.    I think Dr. Richard had an HR
7    background.
8        Q.    How many chancellors were there
9    when Dr. Richard was a chancellor?
10       A.    That's it.  It's an umbrella.
11   The chancellor was over all the LTC campuses
12   and regions.
13       Q.    Before her were there other LTC
14   chancellors?
15       A.    Yes, sir.
16       Q.    Were they HR experts?
17   BY MR. VINCENT:
18       I object to the form of the
19   question.
20   BY THE WITNESS:
21       I have no clue.
22   MR. ARRUEBARRENA CONTINUES EXAMINATION:
23       Q.    You said you felt Ms. Richard was
24   an HR expert?
25       A.    I did not say she was an HR
                                        Page 14

1    of the LTC, that the chancellor decides if
2    there's going to be an investigation?
3        A.    If there is a policy that says
4    that?
5        Q.    Yes.
6        A.    No.
7        Q.    So it's not a policy, it's just a
8    practice?
9        A.    It's following the chain of
10   command.  And she was at the top of the chain
11   of command no matter what department you
12   worked in.
13       Q.    So if the chancellor doesn't know
14   or doesn't care about HR policy, then there
15   would never be an HR investigation?
16       A.    No.
17       Q.    Well, if a chancellor was unaware
18   that certain things are illegal, say they
19   didn't know, then if the chancellor was
20   unaware, even though HR professionals are made
21   aware of the situation, that would not be
22   entered by the LTC?
23       A.    Well, that's two different
24   things.  If a complaint letter comes directly
25   to Human Resources we know about it and we
                                        Page 16

                          4  (Pages 13 to 16)

1    A.    Yes.
2    Q.    Who?
3    A.    Dr. Richard.
4    Q.    Do you remember if the allegation
5  of deficient performance had to do with her
6  misconduct or not doing things she should do,
7  not performing adequately?
8    A.    I really don't remember.
9    Q.    It says here: All institutions
10 are required to develop a system of recording
11 all formal written complaints. Is that
12 correct?
13   A.    Right.
14   Q.    To be submitted and kept on file
15 in the institution's chancellor's office,
16 correct?
17   A.    Yes.
18   Q.    And the office of the assistant
19 president for the LCTCS, the system's office
20 staff. Is that --
21   A.    I believe it is.
22   Q.    You don't deny that's what it
23 says in the policy?
24   A.    No, I don't.
25   Q.    Do you know if that is something

Page 25

1  submit a complaint to the institution's
2  chancellor.
3    So it's either/or, right?
4    A.    Yes.
5    Q.    Complaints of harassment will be
6  investigated promptly and in as confidential
7  manner as possible. Is that a correct
8  statement?
9    A.    Yes.
10   Q.    When you get e-mails that
11 somebody has issued a grievance do you check
12 in to see whether the grievance was about?
13   A.    Yes.
14   Q.    How would you check to see what
15 the grievance is about?
16   A.    Let me back up a tad so you can
17 understand. We were the central office, Human
18 Resources. There are Human Resource staff at
19 every single region.
20   Q.    So what is the significance of
21 that?
22   A.    Sometimes they did the
23 investigations and it did not come to us.
24   Q.    I see. In May or so of 2005 was
25 there an HR staff?

Page 27

1  that -- who does that? Who makes sure it's an
2  LCTCS system office staff? Whose
3  responsibility is that?
4    A.    Back then?
5    Q.    We'll try that first.
6    A.    Could be the secretary, could be
7  the chancellor.
8    Q.    Whose secretary?
9    A.    The chancellor's secretary.
10   Q.    It says: Any student who
11 believes -- it says student, but I'm assuming
12 this applies to employees, too?
13   A.    Students were investigated
14 differently.
15   Q.    Are you saying this policy
16 doesn't apply to employees?
17   A.    Yes, it does apply to employees.
18   Q.    So even that it says here "any
19 student", it applies to employees?
20   A.    Right.
21   Q.    So any student or employee who
22 believes that he or she has suffered from
23 harassment or has knowledge of harassing
24 behavior must report such conduct to the
25 student affairs personnel. He or she may also

Page 26

1    A.    Yes.
2    Q.    Who was that?
3    A.    The Baton Rouge region?
4    Q.    Yes.
5    A.    It was Shawn Schupach,
6  S-C-H-U-P-A-C-H.
7    Q.    You were their boss?
8    A.    I had no supervision over these
9  people.
10   Q.    Why would the chancellor notify
11 you and not Shawn Schupach of a grievance
12 concerning harassment?
13   A.    Because it had come to the office
14 of the chancellor. If it would be lifted to
15 that level, we would be notified.
16   Q.    Then you would be responsible to
17 investigate?
18   A.    Correct.
19   Q.    So now that we have that figured
20 out. When you got notice from the chancellor
21 that she had a grievance what was your
22 procedure? Did you call up and ask what it
23 was about?
24   A.    I could e-mail her back and ask
25 her if she wanted to meet about it.

Page 28

7 (Pages 25 to 28)

PATRICK CARPENTER                DEPOSITION OF: MARGARET WEBB                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL        FEBRUARY 15, 2008                LILLIE R. BURCH, CCR

---

1     Q.    And if she said no, you wouldn't
2  do anything about it?
3     A.    Well, yes, we would.  I would
4  still meet with her.  She wouldn't say no.
5     Q.    Do you know if she has ever
6  received a written complaint of race
7  discrimination and decided not to do anything
8  about it?
9     A.    No.
10     Q.    So, to your knowledge, she has
11  forwarded all racial discrimination complaints
12  she has received to you?
13     A.    To my knowledge, yes.
14     Q.    Do you know if she forwarded any
15  such complaints involving Patrick Carpenter?
16     A.    No.
17     Q.    You don't?
18     A.    I don't remember getting one.
19     Q.    How do you handle EEOC charges?
20  Are they handled differently than a student or
21  an employee complaint?
22     A.    If an employee goes directly to
23  EEOC, they do the investigation.  We don't.
24     Q.    But don't you do an investigation
25  to provide the EEOC a position paper?

Page 29

---

1  EEOC.
2     Q.    So you're trying to make a
3  distinction.  How is it different?  I don't
4  understand the distinction.
5     A.    If an employee goes directly to
6  EEOC to file the complaint, I do not go out
7  and investigate.
8     Q.    Who do you send to investigate?
9     A.    No one.  EEOC will ask us for
10  information and the campus will do the best
11  they can to furnish the information.
12     Q.    When you say investigate -- and I
13  don't know, we might be involved in semantics
14  -- but certainly you wrote this letter here,
15  plaintiff's Bates 518 through 745.  Wasn't it
16  a binder?
17     A.    Yes.
18     Q.    Like a spiral bound binder?
19     A.    Yes.
20     Q.    Who prepared this binder?
21     A.    Baton Rouge campus.
22     Q.    Who prepared it?
23     A.    I would not know who put it
24  together, but I can tell you who gave it to
25  me.

Page 31

---

1     A.    When we do -- most of the time
2  the employee comes through us or through the
3  chancellor's office.  So, yeah.
4     Q.    Let's say an employee just goes
5  to EEOC.
6     A.    EEOC would notify us of what was
7  going on.  Then we would try with the campus
8  or the region to get the documentation that
9  was required.
10     Q.    To respond to the charge?
11     A.    Correct.
12     Q.    If you felt the charge was not
13  proper, that it was unjustified, I'm assuming
14  the LTC would advise the EEOC of that, right?
15     A.    (No response.)
16     Q.    Don't you have the right to
17  advise the EEOC --
18     A.    If we did an investigation prior
19  to the person going to EEOC I would have
20  written a letter to EEOC that an investigation
21  had been conducted and these were the
22  findings.  However, employees do go directly
23  to EEOC.  At that point we get a notification
24  in the mail and we work with the campus or the
25  region to get the documentation to submit to

Page 30

---

1     Q.    Who gave it to you?
2     A.    Wayne Meaux.
3     Q.    Did you have anything to do with
4  what's in here?
5     A.    I wouldn't remember.
6     Q.    You don't remember a two hundred
7  page binder that you sent to the EEOC with a
8  cover letter?
9     A.    I remember the binder.  Did I put
10  anything in the binder?  I don't remember.
11     Q.    So you may have and just forgot?
12     A.    It's been a while.  I really
13  don't remember.
14     Q.    Some people say, "I don't
15  remember because I know it didn't happen."
16  Then other people say, "I don't remember and
17  it could have happened, just right now I can't
18  remember."  So what I'm asking is did you have
19  any kind of input?  I'm not saying did you put
20  the paper in here.  Were you consulted about
21  what was put in this binder?
22     A.    No.  I was not consulted about
23  what was put in the binder.
24     Q.    Do you know if the legal
25  department was consulted?

Page 32

---

8  (Pages 29 to 32)

---

1    Q.    Did you look at any documents?
2    A.    The only thing I looked at was to
3 get my dates together.
4    Q.    What did you look at?
5    A.    My computer, payroll documents.
6    Q.    How would that help you get dates
7 together?
8    A.    I just wanted to make sure where
9 I was during that period of time. Because I
10 had different jobs.
11    Q.    So we can lock at like your job
12 record?
13    A.    Yes. That's all it would show.
14    Q.    So in March of 2005 you were
15 what?
16    A.    March of '05 I was director of
17 Human Resources for LTC.
18    Q.    Would you expect Mr. Meaux to let
19 you know if he became aware that an employee
20 felt that there was a racially discriminatory
21 remark by a manager?
22    A.    No.
23    Q.    You wouldn't expect him to tell
24 you?
25    A.    No.

Page 41

1    Q.    Who would you expect him to tell?
2    A.    The chancellor.
3    Q.    Would you expect the chancellor
4 to mention it to you?
5    A.    If she wanted my opinion or
6 needed me to investigate, yes.
7    Q.    Have you seen any written
8 complaints by Mr. Carpenter that predated the
9 EEOC charge?
10    A.    No, I don't remember seeing
11 anything like that.
12    Q.    Did you speak to the chancellor
13 about any such complaints before the EEOC
14 charge?
15    A.    No.
16    Q.    Did the chancellor get fired for
17 deficient performance?
18    A.    No.
19    Q.    Was she asked to leave or was her
20 job simply eliminated?
21    A.    Legislative bill.
22    Q.    So you wouldn't say her
23 performance was in any way deficient?
24    A.    No, sir.
25    Q.    Have you ever done any kind of

Page 42

1 investigation involving Patrick Carpenter
2 concerning an EEOC charge or any verbal
3 complaints or written complaint?
4    A.    I don't remember doing anything
5 on Mr. Carpenter.
6    Q.    This policy which is distributed
7 to students and employees -- we've figured
8 that out, right?
9    A.    Yes, sir.
10    Q.    6.011. It says here: A member of
11 the Human Resources will conduct investigation
12 unless otherwise deemed necessary in order to
13 assure an impartial and confidential
14 investigation.
15        Why is that important? That
16 someone not involved, you know, rather than
17 the accuser investigating that an impartial
18 person do it? Why is that important?
19    A.    You get both sides of the issue.
20    Q.    That's what I thought. Certainly
21 that is the policy of the LTC, that if there
22 is an issue involving performance that an
23 employee is afforded the opportunity to give
24 both sides, to answer allegations of deficient
25 performance, isn't that the policy of the LTC?

Page 43

1    A.    Yes.
2    Q.    I show you admission number
3 eleven. This is what we call something that's
4 not contested in the case. I'm showing you
5 request for admission number eleven, which was
6 admitted by the LTC. Would you read that,
7 ma'am?
8        BY MR. VINCENT:
9        I object to the form of the
10 question.
11    A.
12        MR. ARRUEBARRENA CONTINUES EXAMINATION:
13    Q.    Read that into the record.
14    A.    Admit or deny that the LTC
15 utilized a progressive discipline policy and
16 evaluation policy which includes steps such
17 as, one, verbal warnings to identify problems;
18 two, written warnings including a formal
19 meeting with the employee to establish clear
20 performance expectations to correct the
21 problems; three, and opportunity for the
22 employee to present his or her case; and four,
23 termination if the problems remain unresolved
24 after the above steps.
25    Q.    Do you agree that that applies to

Page 44

11  (Pages 41 to 44)

1  any allegations, whether the allegations were
2  raised in response to an EEOC complaint or
3  grievance or not in relation to an EEOC
4  complaint, that that's the policy of the LTC?
5      A.    Yes.
6      Q.    And the purpose of having an HR
7  person, an impartial person doing the
8  investigation, is so that the accused -- it's
9  so the fox in the henhouse is not the one
10 doing the investigation, so-to-speak.  Doesn't
11 that make sense?
12     A.    Yes.
13     Q.    If the person that is being
14 accused controls the investigation, you don't
15 have to be a genius or an HR professional to
16 know they are going to slant it?
17     A.    State your question again.
18     Q.    Isn't it a fact that if the
19 accused conducts the investigation it can't be
20 impartial?
21     A.    That's what it states there.
22     Q.    So that is the purpose of it,
23 right?
24     A.    I would think so.
25     Q.    And isn't it common sense that if
                                        Page 45

1  the accused does the investigation they are
2  going to be biased in their favor?  Isn't that
3  basic HR 101?
4      A.    I would say yes.
5      Q.    So it's not following your policy
6  to not have HR control the investigation;
7  isn't that correct, ma'am?
8      A.    They took control of it at that
9  level, I don't know.
10     Q.    Who else would know?
11     A.    Those ladies.
12     Q.    Who?
13     A.    Margaret Elgin and Shawn
14 Schupach.  That's the two HR reps at that
15 region.  I would not know if they went in and
16 did the investigation.
17     Q.    We already know that the only
18 person involved in this two hundred twenty
19 something page binder was Ms. McDanie.  So
20 that's not in accordance with your policy, is
21 it, ma'am?
22     A.    No, it is not.
23     Q.    Can you tell me why your policy
24 was not followed on Patrick Carpenter's EEOC
25 charge?
                                        Page 46

1      A.    No, I can't.  I cannot.
2      Q.    When you got this binder, when
3  you read it, did you call Ms.
4  Montgomery-Richard?
5      A.    I'll be perfectly honest with
6  you.  I don't think I read all of it.
7      Q.    You didn't care what was in it?
8      A.    I wouldn't say that.  I furnished
9  EEOC with the information they needed and
10 that's what was furnished to me by the
11 regional director.
12     Q.    You didn't regard it part of your
13 duties to read it, all you did was pass it on?
14     A.    I would say yes.
15     Q.    If a discrimination complaint
16 comes in to somebody, let's say William
17 Wainwright, dean of development, what is he
18 supposed to do if he gets a discrimination
19 complaint?
20     A.    We functioned under the chain of
21 command.  So depending on his immediate
22 supervisor he should have gone up the chain of
23 command and reported it.
24     Q.    February 4, 2005, who would have
25 been his supervisor?
                                        Page 47

1      A.    I don't remember.
2      Q.    Have you looked at Plaintiff's
3  Bates number 29, 232?  Wouldn't the first
4  sentence of this complaint make it a
5  discrimination complaint?  It says:  This
6  letter will serve as the formal rejection of
7  corrective action.  A formal complaint of
8  harassment as defined by LCTCS policy 3.011
9  based on my race and color.  Wouldn't that
10 alone make this a complaint about prohibited
11 discrimination?
12     A.    Yes.
13     Q.    So if Mr. Wainwright did not
14 forward this to whoever he needed to forward
15 it to, someone in HR, he didn't follow LTC
16 policy, right?
17     A.    If he indeed did not forward it,
18 yes.
19     Q.    Let's look at Bates Number 16
20 through 20.  This is a similar complaint.
21 Once again, the opening sentence of the
22 complaint makes it a complaint about
23 prohibited discrimination, doesn't it, ma'am?
24     A.    Yes, sir.
25     Q.    March 9, 2005?
                                        Page 48

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433          Board-Certified Court Reporters          Facsimile: (985) 893-6765

1     A.   Yes, sir.
2     Q.   This one is directed to
3  Dr. Margaret Montgomery-Richard.  Who is
4  Leslie Hatfield?
5     A.   Leslie worked in the office with
6  us.  Leslie was also one of the executive
7  secretaries.  Who she was reporting to at that
8  point, I can't remember.
9     Q.   Was she your secretary?
10    A.   I had no secretary.
11    Q.   So you think she was somebody's
12 secretary, but you're not sure if she was
13 Dr. Montgomery-Richard's secretary?
14    A.   I don't remember Leslie Hatfield
15 working directly under Dr. Richard.
16    Q.   Do you have reason to believe
17 that the certified mail return receipt on
18 Bates number 20 signed by Leslie Hatfield is
19 not reflective of her receiving this letter
20 dated March 9?
21    A.   Oh, no.  I can see why Leslie
22 would sign that, yes.
23    Q.   Do you have any reason to believe
24 that this receipt isn't a confirmation of
25 Leslie's receipt of the letter I just showed
                                      Page 49

1  you on the Bates numbers I just identified?
2     A.   No.  No reason to believe she did
3  not refer it.
4     Q.   Do you remember hearing anything
5  from Leslie about a grievance about race
6  discrimination?
7     A.   No.
8     Q.   When you look at this thing, you
9  can see that Mr. Carpenter like in the third
10 incomplete paragraph on the first page, this
11 grievance is clearly directed to the following
12 persons: Mr. Meaux, Dr. Kay McDaniel, Mr.
13 William Wainwright.  Do you see that?
14    A.   Yes, sir.
15    Q.   Mr. Carpenter is complaining
16 about race discrimination.  He's alleging that
17 those people are involved in it?
18    A.   Yes, sir.
19    Q.   So it would not be the policy
20 that those people were to handle the
21 investigation, would it?
22    A.   No, they would not be part of
23 handling the investigation.
24    Q.   This is Bates Number 21 through
25 22.  And also Bates number 5, which is once
                                      Page 50

1  again the return receipt.  This is another
2  letter on April 6.  Once again to Dr. Margaret
3  Montgomery-Richard.  Do you remember her
4  around April 2006 providing you with any
5  notice that she had received a grievance such
6  as this one?
7     A.   No.
8     Q.   Do you agree this is a complaint
9  about race discrimination?
10    A.   Yes.
11    Q.   And it also identifies Mr. Meaux
12 and Kay McDaniel as people that Mr. Carpenter
13 felt were discriminating against him because
14 of racism?
15    A.   Yes.
16    Q.   Do you agree that Ms. Hatfield on
17 Bates number 5, the last page of the exhibit,
18 received this on 4-8?
19    A.   Yeah.
20    Q.   Do you remember around that time
21 being advised of the discrimination complaint?
22    A.   No.
23    Q.   Looking at the two complaints we
24 just looked at, Bates Number 16 through 19,
25 which is the complaint that Dr. Margaret
                                      Page 51

1  Montgomery-Richard dated March 9, and Bates
2  Number 21 to 22 which is the complaint dated
3  April 6, 2005, these are complaints that both
4  should have been referred to someone in HR,
5  according to your policy, correct?
6     A.   Correct.
7     Q.   You're saying they may have been
8  referred, you just didn't know because it
9  could have been one of those other people?
10    A.   Correct.
11    Q.   What were their names?
12    A.   Margaret Elgin, E-L-G-I-N.  And
13 Shawn Schupach.
14    Q.   I believe I asked the question
15 of your lawyers.  Did you help your lawyers in
16 answering interrogatories and request for
17 production of documents?  Do you know what
18 that is?
19    A.   Yes.
20    Q.   Were you one of the people that
21 assisted the Attorney General's office in
22 preparing answers?
23    A.   I don't remember doing an
24 interrogatory for this one, for the Patrick
25 Carpenter case.
                                      Page 52

13  (Pages 49 to 52)

1     Q.     Let me have you take a look at
2   this. Because I really don't understand it.
3   Hold on a second.   Interrogatory Number 6:
4   Please state whether plaintiff ever complained
5   about race discrimination based on race and/or
6   retaliation.  Do you see that?
7     A.     Yes.
8     Q.     It says:  Please describe the
9   complaint, identify who knows about it.
10     A.     Okay.
11     Q.     The answer is: On August 15,
12   2005, a letter was written for Dr. Kay
13   McDaniel to Mr. Wayne Meaux requesting that
14   Mr. Carpenter be terminated.  It then says:
15   On September 8, 2005 Wayne Meaux met with
16   Patrick Carpenter to discuss issues and
17   options for his employment.
18             Would you agree so far that
19   doesn't appear to have anything to do with the
20   plaintiff's discrimination complaint?
21     A.     Not really.
22     Q.     Then it says:  On September 12,
23   2005 Vice Chancellor Meaux met with Chancellor
24   Margaret Montgomery-Richard.  Dr. Richard
25   informed Mr. Meaux that Mr. Carpenter had
                                    Page 53

1   filed a complaint with the EEOC.
2             Do you know anything about that,
3   ma'am?
4     A.     Okay.
5     Q.     Is that accurate?
6     A.     No, I wouldn't know.
7     Q.     Were you involved?
8     A.     I don't remember being involved.
9   It doesn't mean I wasn't.  I just don't
10   remember being involved in it.
11     Q.     Are you saying the only thing you
12   remember is that the EEOC called you because
13   they thought you might know how to get a
14   response to a charge?  And then you called up
15   and asked for that two hundred twenty-two page
16   binder she made?  Is that your only
17   involvement?
18     A.     No.  Well, let me take that back.
19   It could been my only involvement in the EEOC
20   case, yes.
21     Q.     It says here, this is an official
22   answer by LTC: Ms. Margaret Webb, assistant
23   director of Human Resources for LCTCS --
24     A.     That's my current position.
25     Q.     At the time you were LTC?
                                    Page 54

1     A.     Correct.
2     Q.     -- allegedly received a copy of
3   the complaint.  I was a little confused about
4   that.  Did you receive a copy of the EEOC
5   complaint?  Why would your lawyer say you
6   allegedly received a copy of the complaint?
7     A.     Do I have a copy of the
8   compliant?
9     Q.     No.
10     A.     Did I receive one since I've been
11   at LCTCS.
12     Q.     Did you ever receive a copy of
13   the EEOC complaint?
14     A.     I know of the EEOC complaint so I
15   probably received a copy of it from EEOC.
16     Q.     So you didn't get if from
17   Margaret Montgomery-Richard?
18     A.     No.
19     Q.     Do you know when you got it from
20   the EEOC?
21     A.     That's really difficult.
22   Because -- you know, I could say it was prior
23   to the storm.  But then I wouldn't be able to
24   tell you if I'm accurate or inaccurate.
25     Q.     But you remember it appeared to
                                    Page 55

1   be at the beginning the charge?
2     A.     Right.  That's what I'm trying to
3   remember.  Because he was not the only EEOC
4   complaint.  And I'm trying to get my data
5   correct as to which one I'm thinking about.
6     Q.     Has anyone else filed a complaint
7   involving Ms. McDaniel?
8     A.     No, not that I know of.
9     Q.     Or of Mr. Meaux?
10     A.     No, not that I can remember.
11     Q.     Is that something you would
12   remember?
13     A.     I remember some complaints, but
14   it was nothing to do with that region.  So it
15   could have been Mr. Carpenter's that I was
16   working on between the Texas and the New
17   Orleans EEOC office.
18     Q.     I'm not trying to ask for any
19   privileged communications.  I just want to
20   know if you know why your layer would phrase
21   it this way.
22     A.     I really don't.
23     Q.     It says:  It was never provided
24   to Region 2.
25             What does that mean, never
                                    Page 56

                              14  (Pages 53 to 56)

1   provided to Region 2?
2       A.    For the first time reading it, it
3   says it was never provided.  It's saying I
4   never provided the EEOC complaint to Region 2.
5       Q.    Does that mean, in other words,
6   it was not provided to Chancellor Richard?
7       A.    No, it does not mean that.
8       Q.    Does it mean it was not provided
9   to Kay McDaniel?
10      A.    It could mean that.
11      Q.    But we already know from her
12  testimony that she was provided it and she was
13  the author of this binder.
14      A.    That's why I don't understand the
15  statement.
16      Q.    So this statement is probably not
17  accurate based on what you sent to the EEOC?
18      A.    That's what I would say.
19      Q.    I asked here: Please state
20  whether defendant ever conducted an
21  investigation concerning plaintiff's
22  complaint.
23          Now, we've already figured out
24  that the March 9 and April 6 complaints should
25  have resulted in investigations at that time,

Page 57

1   right?
2       A.    Okay.
3       Q.    Somebody dropped the ball, right?
4       A.    Yes.
5       Q.    Either the chancellor's office or
6   HR, right, if no investigation was done?
7       A.    I would agree.
8       Q.    It says:  Please state whether
9   there was ever an investigation about race
10  discrimination suffered by plaintiff, adverse
11  treatment due to retaliation to support prior
12  complaints about race discrimination.  In the
13  answer it says:  There was not an
14  investigation regarding the complaint.
15          Do you know if that's true,
16  ma'am?
17      A.    If that's what they're saying.  I
18  did not do an investigation.
19      Q.    Are you aware that failing to do
20  an investigation in and of itself creates
21  liability?  Did you know that?
22      BY MR. VINCENT:
23          I object to the form of the
24  question.
25      BY THE WITNESS:

Page 58

1           I'm not answering that.
2       BY MR. ARRUEBARRENA:
3           I just want to know if you know
4   that.
5       EXAMINATION BY MR. ARRUEBARRENA:
6       Q.    Do you know, as an HR
7   professional, that that in and of itself
8   creates liability?
9       A.    Repeat the question.
10      Q.    Failing to make a complaint when
11  you have constructive notice of the complaint,
12  constructive notice meaning you can't avoid
13  liability by saying we lost it or didn't send
14  it to the right place --
15      A.    Do I know if it's a liability?
16      BY MR. VINCENT:
17          I would object.  It calls for a
18  legal conclusion.
19      MR. ARRUEBARRENA CONTINUES EXAMINATION:
20      Q.    Are you aware whether or not
21  failing to do an investigation in and of
22  itself creates liability under Title 7?
23      A.    Yes.
24      Q.    So you are aware, then, that
25  liability was created because we have

Page 59

1   determined from your answers and the other
2   answers given to me by the LTC, that no
3   investigation was done on the March 9
4   complaint or the April 6 complaint.
5       BY MR. VINCENT:
6           I object to the form of the
7   question.  If you can answer that.
8       BY MR. ARRUEBARRENA:
9           Right?
10      BY MR. VINCENT:
11          If you understand the question
12  you can answer it.
13      BY THE WITNESS:
14          I don't understand.  I don't
15  understand the question.
16      MR. ARRUEBARRENA CONTINUES EXAMINATION:
17      Q.    It says:  We were asked by the
18  chancellor of the LCTCS.  Who was the
19  chancellor of the LCTCS?
20      A.    It would be chancellor of the
21  LTC.
22      Q.    So this is incorrect?
23      A.    If they are speaking about the
24  chancellor, that's over the community colleges
25  or the LTC.  The president, Dr. Bumfus, was

Page 60

15  (Pages 57 to 60)

321 North Vermont Street
Covington, Louisiana 70433

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

Telephone: (985) 893-1999
Facsimile: (985) 893-6765

**PATRICK CARPENTER**
9621 EAST GRAHAM AVENUE
BATON ROUGE, LA 70814

Telephone: 225-929-7665

Facsimile: 225-248-9611

April 6, 2005

Dr. Margaret Montgomery-Richard, Chancellor
Louisiana Technical College
150 3rd Street
Baton Rouge, LA 70801

**CERTIFIED MAIL # 7004 1350 0000 4274 8735**

Dear Dr. Margaret Montgomery- Richard:

On March 9, 2005 a certified mail letter was mailed to you to serve first as a *formal grievance as defined in the LCTCS Policy # II.3.015 and second as a formal complaint of Harassment as defined in the LCTCS Policy # II.3.011 based on my race and my color*. I have not received a response from you or anyone regarding the letter and am sending a second letter. This second letter is a much summarized version of the first letter and I will be willing to elaborate and supply a copy of the first letter once these matters are addressed.

As the first letter stated, I am scheduled to receive a $9800 dollar salary reduction as of "April 25, 2005" as per Mr. Meaux. The salary reduction will greatly impact my family. I have been forced to change positions four times by Mr. Meaux in order to keep my job during my employment with LTC-BR Campus as of December 4, 2002. The moves and the anticipated salary reduction as per Mr. Meaux have not been adequately justified.

I am being harassed based on my race and my color. I have been forced to comply with the treatment during my employment with LTC-BR Tech Campus. I am currently in financial aid "assisting Mr. Lemoyne Williams". I have voiced some concerns about the treatment I have received in the past to Mr. Meaux, Dr. Kay McDaniel, Mr. William Wainwright, Mike Gassen, Dr. Brunswick, and Alicia Cyprian-Andrews.

Providing the summarized information above, I am directing this grievance to you, Dr. Margaret Montgomery-Richard, due to this grievance involving my supervisors (LTC-BR administrative chain-of-command). The grievance is clearly directed to the following persons: Mr. Meaux, Dr. Kay McDaniel, and Mr. William Wainwright. Based on the treatment that I have received from them, I don't feel comfortable discussing any more of my concerns with any of the aforementioned. I have been the victim of constant harassment and indifferent treatment for a long time. I have attempted to make the best out of these situations for the welfare of my family and my religious beliefs. I have also

**EXHIBIT**
PENGAD 800-631-6989

Carpenter v. LTC

**PATRICK CARPENTER**
9621 EAST GRAHAM AVENUE
BATON ROUGE, LA 70814

Telephone: 225-929-7665

Facsimile: 225-248-9611

As stated in the first letter, I can no longer allow the treatment to continue. These acts are very detrimental to me. These civilly wrongful acts have been and are still affecting my total health. I am concerned that my job performance will be affected by this if nothing is done. I am seeking your help in these matters. I am now convinced that the indifferent treatment and racial harassment will not stop until I file, in writing, a formal complaint. I am also convinced that the next move for me will be out of the door based on the previous treatment. I have verbally discussed some of my concerns in the past but no changes have pursued.

Again, as stated in the first letter, I don't feel comfortable in my workplace environment and the treatment will no longer be tolerated. Again, I am following the aforementioned policies to present this complaint. I am aware of my rights as a U.S. citizen, aware of the LTC/LCTCS policies and will exercise them to the fullest. I am not, by any means, making any threats but am exercising my rights by voicing my concerns. However, future incidences will not be tolerated. I am also notifying all that are considered to be my supervisors of my willingness at this point to utilize the LTC/LCTCS chain-of-command and/or policies, first, to resolve these matters.

Sincerely,

*Mr. Patrick Carpenter*

Mr. Patrick Carpenter

**DER: COMPLETE THIS SECTION**

mplete items 1, 2, and 3. Also complete
n 4 if Restricted Delivery is desired.
nt your name and address on the reverse
that we can return the card to you.
ch this card to the back of the mailpiece,
front if space permits.

Article Addressed to:

USIANA TECHNICAL
LLEGE
50 3rd Street
ton Rouge, LA
m: Chancellor, LTC 70801

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Leslie Hatfield_    ☐ Agent
                       ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery
                                4-22-5

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

Article Number
Transfer from service label)   7004 1350 0000 4274 8735

Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

---

**NDER: COMPLETE THIS SECTION**

Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
Print your name and address on the reverse
so that we can return the card to you.
Attach this card to the back of the mailpiece,
or on the front if space permits.

Article Addressed to:

USIANA Technical College
50 3rd St
Baton Rouge, LA
70801

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Leslie Hatfield_    ☐ Agent
                       ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery
                                4-22-5

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

Article Number
(Transfer from service label)   7003 1010 0005 5154 2677

Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1540

**Patrick Carpenter**

**From:** April Magee [april.magee@theltc.net]
**Sent:** Wednesday, April 13, 2005 10:59 AM
**To:** Patrick Carpenter
**Cc:** Margaret Webb
**Subject:** Grievance

Mr. Carpenter, Chancellor Richard asked me to let you know that we are in the process of researching your grievance and will notify you within a few weeks.

Thank you, and please contact our office if you have any questions.

*April Magee*
Executive Secretary to the Chancellor
Louisiana Technical College
150 Third St Ste 200
Baton Rouge LA 70801-1303
(225) 219-9532
(225) 219-0304 (fax)
(225) 202-6342 (cell)
april.magee@theltc.net



Carpenter v. LTC

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 270-2005-00410 |

| Louisiana Commission On Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Patrick W. Carpenter | (225) 929-7665 | 02-15-1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 9621 East Graham Avenue, Baton Rouge, LA 70814 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| LOUISIANA TECHNICAL COLLEGE | 500 or More | (225) 359-9204 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3250 North Acadian Thruway East, Baton Rouge, LA 70805 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 02-28-2005 | 02-28-2005 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by LOUISIANA TECHNICAL COLLEGE on December 4, 2002 as the Director of Student Services. On February 28, 2005, I was demoted from my position of Director of Student Services to that of Financial Aid Officer.

On February 28, 2005, I was advised by Wayne Meaux (White) Vice Chancellor/Provost of the Baton Rouge, LA Campus that I was being "reassigned" to my new position because of budget cuts.

I believe I was discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that, I was the only Black Administrator in my former Department. William Wainwright (White) Administrator/Dean of Workforce Development, was not subjected to a demotion as was I due to budget cut backs. My pay was reduced from $56,900 to $47,010.

**EXHIBIT**

**K**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X 7/25/05  X Patrick W. Carpenter<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Carpenter v. LTC
Bates No. 000803

# LOUISIANA COMMUNITY & TECHNICAL COLLEGE SYSTEM
## Policy # 6.011

Title: Harassment Policy

| | |
|---|---|
| Authority: Board Action | Original Adoption: 06/13/01 |
| | Effective Date: 06/13/01 |
| | Last Revision: Initial |

Harassment, including sexual harassment, is prohibited by the Equal Employment Opportunity Commission, the Office for Civil Rights and state regulations *(R.S. 23:301, 312, 332)*, and therefore, it is the policy of LCTCS that unlawful harassment of employees and students is prohibited.

**Harassment** is physical, verbal and visual conduct that creates an intimidating, offensive, or hostile environment, which interferes with work performance. This includes harassment because of race, sex, sexual orientation, religious creed, color, national origin, ancestry, disability or medical condition, age, or any other basis protected by federal, state or local law, ordinance or regulation.

**Sexual Harassment** is defined by the Equal Employment Opportunity Commission as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature... when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose and effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile or offensive working environment.

*LCTCS applies this definition to the areas of academic advancement, academic standing or academic performance.*

Workplace harassment infringes on employees' right to a comfortable work environment, and it is a form of misconduct that undermines the integrity of the employment relationship. No employee – male or female – should be subjected to unsolicited and unwelcome overtures or conduct, either verbally, visually, physically or electronically transmitted. Although this list is not all-inclusive, examples of conduct that is prohibited includes:

- *Taking any personnel action on the basis of an employee's submission to or refusal of sexual overtures*
- *Unwelcome or unwanted conversations*



EXHIBIT

L

- *Unwelcome or unwanted touching*
- *Continued or repeated verbal abuse of a sexual nature*
- *Explicit or degrading verbal comments, suggestions, or slurs about another individual or his/her appearance*
- *Offensive comments regarding sexual or private matters*
- *Display of sexually suggestive pictures, objects*
- *Offensive jokes*
- *Verbal abuse, comments, names or slurs that in any way relate to an individual's race, color, sex, sexual orientation, age, religion, national origin or disability*
- *Any other offensive or abusive physical, visual or verbal conduct*

This policy applies to all members of the LCTCS Board of Supervisors, unclassified employees, students, supervisors, managers, faculty, vendors, and all other individuals doing business with LCTCS. It is the policy of LCTCS that no member of the LCTCS community may harass another. This includes harassment of an employee by another employee, of a student by an employee, of an employee by a student, of a student by another student. Additionally, under appropriate circumstances, LCTCS may take action to protect its employees and students from harassment, on LCTCS property or at LCTCS-sponsored events, by individuals who are not students or employees of LCTCS.

A complaint of harassment should be presented as promptly as possible after the alleged harassment occurs. Any employee who believes he/she is the subject of harassment or who has knowledge of harassing behavior must report such conduct to their direct supervisor, and the institution's human resource department. All institutions are required to develop a system of recording all formal written complaints to be submitted and kept on file in the institution Chancellor's office and in the office of the system president for the LCTCS system office staff. Any student who believes he/she is the subject of harassment or who has knowledge of harassing behavior must report such conduct to student affairs personnel. He/she also may submit a complaint to the institution's Chancellor. No student or employee is required to report or make a complaint of harassment to the person who is allegedly engaging in the problematic conduct. In the event that an individual feels uncomfortable making a complaint at the institution level, such complaint may be made at the system level with the LCTCS Director of Human Resources (225-219-8700), Louisiana Community and Technical College System, 822 Neosho Avenue, Baton Rouge, Louisiana 70802. Each campus is required to provide to employees and students a copy of this policy and post a poster with contact list identifying individual names, titles, physical location and telephone number where complaints may be filed.

Complaints of harassment will be investigated promptly and in as impartial and confidential a manner as possible. A member of human resources will conduct investigations, unless otherwise deemed necessary, in order to assure an impartial and confidential investigation. LCTCS will not tolerate any type of discipline or retaliation, direct or indirect, against any employee or other person who, in good faith, files a complaint of or responds to questions in regard to having witnessed

prohibited harassment. False charges are treated as serious offenses and may result in disciplinary and/or civil action.

Any employee or member of management who is found, after appropriate investigation, to have engaged in harassing conduct is subject to appropriate disciplinary action up to and including termination of employment and/or student standing per the institution's policies in place governing students.

## Discrimination/Harassment Complaint Form

Name of Complainant: _____ Date form completed: _____

Department/Institution: _____

Home Phone: _____ Business Phone: _____

1. Charge of discrimination based on:

   ( ) Race/Color                          ( ) Sex

   ( ) Sexual Orientation                  ( ) Religious Creed

   ( ) National Origin/Ancestry            ( ) Disability or Medical Condition

   ( ) Age                                 ( ) Other _____

2. Statement of Discrimination/Harassment, please provide the following information (use an attached sheet if necessary):

   1) Date(s), time(s), and location(s) of the incident/incidences that took place


   2) Description of each incident: e.g., was any physical contact made?, what was said and/or done?, etc.

   3) Name(s) of anyone present during each incident


   4) Anyone with whom you've discussed the incident/incidences

Comments:

Complainant Signature: _____    Date : _____
Complaint Recipient Signature: _____    Date: _____

Poster
Louisiana Community and Technical College System

## HUMAN RESOURCES POLICY REGARDING HARASSMENT

Harassment, including sexual harassment, is prohibited by the Equal Employment Opportunity Commission, the Office for Civil Rights and state regulations. Therefore, it is the policy of LCTCS that unlawful harassment of employees and students is prohibited.

**Harassment** is physical, verbal and visual conduct that creates an intimidating, offensive, or hostile environment, which interferes with work performance. This includes harassment because of race, sex, sexual orientation, religious creed, color, national origin, ancestry, disability or medical condition, age, or any other basis protected by federal, state or local law, ordinance or regulation.

**Sexual Harassment** is defined as:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature...when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose and effect of unreasonably interfering with an individual's work performance or creating an intimidating , hostile or offensive working environment.

LCTCS applies this definition to the areas of academic advancement, academic standing or academic performance.

No student or employee is required to report or make a complaint of harassment to the person who is allegedly engaging in the problematic conduct. Complaints should be presented as promptly as possible after the alleged harassment occurs through the following avenues for this institution.

Employee: Your direct supervisor and Human Resources contact at: _____

_____

Student: Student affairs personnel at: _____

Chancellor _____

LCTCS Director of Human Resources (225-219-8700), Louisiana Community & Technical College System, 822 Neosho Avenue, Baton Rouge, LA  70802

# LCTCS HARASSMENT COMPLAINT INVESTIGATION FORM

## Investigator: _____        Date:

_____

Complainant: _____ Location/Dept: _____

- Take the complaint seriously and inform Director of Human Resources
- Make arrangements to conduct investigation immediately – don't delay. **Assure that the complainant is comfortable with the person(s) assigned to conduct the investigation.**
- Determine appropriate person to conduct the investigation.
- Have a witness during the investigation.
- Document the facts each step of the investigation beginning with initial complaint.
- Maintain the confidentiality of the investigation – limit to those involved and those with a need to know.

1. **Interview the complainant:** Explore the allegations thoroughly
➢ Who was the alleged harasser?

➢ What is your relationship with the accused (i.e, subordinate, co-worker, personal friend)?

➢ What exactly happened/nature of the harassment (comments, touching)?

➢ When and where did the incident(s) occur? Be specific: dates & times.

➢ Was the incident limited to one instance or was it continuing in nature? Explain.

➢ How did you react to the incident(s)?

➢ What did you tell the alleged harasser?

➢ Can any witnesses be identified (I may need to speak to them)?

➢ Is there any other evidence of the incident occurring?

➢ Are you aware of any other employees that may have experienced the same or similar...?

➢ Why the delay in reporting the incident (if not immediate)?

➢ Are you aware of the system's harassment policy (provide a copy)

➢ Was there a specific reason for the harassment, i.e. intimidation, retaliation, or attraction?

➢ How were you and your work affected by this?

➢ Did you discuss the incident with anyone else?

➢ What is your desired result?

➢ Offer Employee Assistance Program assistance at this time, if appropriate.

# TRANSCRIPT OF THE DEPOSITION OF:

# DR. KAY MCDANIEL
## 12/20/07

## PATRICK CARPENTER

## VERSUS

## LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT
M

PENGAD 800-631-6989

1    Q.    What kind of policies?
2    A.    Some HR policies.
3    Q.    Okay, so you reviewed the binder,
4  the Patrick Carpenter binder, would that be an
5  appropriate term?
6    A.    Yes.
7    Q.    And HR documents. What kind of
8  documents, involving what HR issues?
9    A.    Policies such as hiring and
10 terminating.
11   Q.    Anything else?
12   A.    I think that's all.
13   Q.    What about like complaining,
14 grievances, stuff like that?
15   A.    Oh, I have read those.
16   Q.    What about EEOC, or EEO,
17 prohibited discrimination complaints, anything
18 like that?
19   A.    I've read those, yes.
20   Q.    Any other documents you've read
21 to prepare for the deposition?
22   A.    No.
23   Q.    Did you listen to a tape?
24   A.    No.
25   Q.    Were you given a transcript of a
                                        Page 29

1  tape?
2    A.    Not that I know of.
3    Q.    Did anybody tell you there was a
4  tape of a conversation you had with Patrick?
5    A.    No.
6    Q.    Okay, so you mentioned in the
7  fall of 2003 you had a meeting with Chancellor
8  Montgomery-Richards. Is that the only time
9  you have ever spoken to her?
10   A.    I've talked to her before, but
11 that was the only time I had a formal meeting
12 with her.
13   Q.    What did you talk to her about?
14 What would be the occasion other than saying
15 hello in the hall or something? For instance,
16 where was her office?
17   A.    On Third Street.
18   Q.    Where were you working?
19   A.    Baton Rouge campus on North
20 Acadian.
21   Q.    So two different buildings?
22   A.    Yes.
23   Q.    How far apart are they?
24   A.    Maybe five miles.
25   Q.    Did you have occasion to speak to
                                        Page 30

1  her on the phone occasionally?
2    A.    No, I don't think I ever talked
3  to her on the phone.
4    Q.    You never talked to her on the
5  phone?
6    A.    I don't think so.
7    Q.    Did you ever send her an e-mail?
8    A.    Possibly.
9    Q.    What would you send her an e-mail
10 about?
11   A.    I have no specific memory. She
12 may have asked for information. Like I said,
13 she typically went through the vice
14 chancellor, who was my boss, and I responded
15 to him.
16   Q.    Did you ever get an e-mail from
17 him saying Ms. Montgomery-Richard has asked me
18 to provide some information, would you please
19 get it for me? Something like that?
20   A.    I have no memory of that.
21   Q.    Do you think it's likely that
22 such an e-mail, you know, that occasionally --
23 Mr. Meaux you're talking about, right?
24   A.    Yes.
25   Q.    Would have conveyed to his boss,
                                        Page 31

1  the chancellor, right?
2    A.    That's right.
3    Q.    Asked for information and maybe
4  he sought that from you? Do you think that
5  ever occurred?
6    A.    I don't think it was an e-mail.
7  Our offices were next door to each other.
8    Q.    Oh, so he may have just walked
9  over?
10   A.    Right.
11   Q.    Do you remember him verbally
12 saying Chancellor Montgomery-Richard has asked
13 for something, can you please get it together?
14   A.    He did ask me to get information
15 together on Patrick's employment.
16   Q.    Who asked you, Mr. Meaux?
17   A.    Yes.
18   Q.    When did he ask you that?
19   A.    Probably September 2005.
20   Q.    Did he tell you why he wanted you
21 to get together information on Patrick's
22 employment?
23   A.    He said there had been a suit
24 filed.
25   Q.    Who told him there was a suit
                                        Page 32

8  (Pages 29 to 32)

1   filed?
2       A.    He said Dr. Richard told him.
3       Q.    What did he tell you? I need to
4   know everything you remember about that
5   conversation.
6       A.    He told me to put together
7   information on Patrick's work history at LTC.
8       Q.    Did he tell you what the suit
9   involved?
10      A.    No. I never saw a copy of it.
11      Q.    Did he say it was an injury, like
12  Patrick alleged that he fell down or something
13  and got hurt?
14      A.    No. He said it was an EEOC.
15      Q.    So he told you it involved an
16  EEOC?
17      A.    Yes.
18      Q.    You understand an EEOC would
19  involve prohibited discrimination?
20      A.    I understand.
21      Q.    Were you aware that Patrick had
22  alleged prohibited discrimination?
23      A.    Not until that day.
24      Q.    Until that day?
25      A.    Right.

Page 33

1       Q.    What kind of discrimination did
2   you have the impression that he alleged?
3       A.    I believe I was told racial.
4       Q.    Did you have the impression that
5   he alleged something called retaliation?
6       A.    I don't remember that.
7       Q.    Did you have an impression that
8   he alleged that it was due to racial
9   discrimination that he had been demoted?
10      A.    No, I was not told that.
11      Q.    You were not told that?
12      A.    No, I was not told that.
13      Q.    Now, it is against the LTC policy
14  to racially discriminate, right?
15      A.    Yes.
16      Q.    Do you know what retaliation is?
17      A.    Yes.
18      Q.    Go ahead and tell me what you
19  understand retaliation is.
20      A.    Retaliation is when you do
21  something to get back at somebody for
22  something they did.
23      Q.    Right. And do you know that it's
24  illegal under federal law that if someone
25  complains about prohibited discrimination,

Page 34

1   like race discrimination, that it would be
2   illegal to have reprisals against that person
3   because of that complaint? Are you aware of
4   that?
5       A.    Yes.
6       Q.    And that is against the policy of
7   LTC, correct?
8       A.    Yes, it is.
9       Q.    Can you imagine that anyone
10  wouldn't know that in management at LTC, if
11  you know?
12      A.    I would assume everybody knows
13  that.
14      I mean, you have been to HR
15  classes and most people have gone through
16  those classes, right?
17      A.    Most people in administration,
18  yes.
19      Q.    Would you think Mr. Wainwright
20  would know that?
21      A.    Yes.
22      Q.    Have you been in a class with him
23  where that was discussed?
24      A.    No. But he was in a former LDI
25  class.

Page 35

1       Q.    So you can say you know he knows
2   that?
3       A.    He's a regional director like I
4   am.
5       Q.    What about Ms. Brunswick, would
6   she know it?
7       A.    I can't answer that.
8       Q.    What about Mr. Gassen, would he
9   know it?
10      A.    Mike Gassen?
11      Q.    Yes. Would he know it?
12      A.    I can't speak to that, either.
13      Q.    Do you think the chancellor would
14  know it, Ms. Montgomery-Richard?
15      A.    I really can't speak to her
16  knowledge.
17      Q.    She sent you to the HR classes
18  where some of those classes you learned about
19  these things, right?
20      A.    She sent me to LDI.
21      Q.    Which included HR classes?
22      A.    Which it did. She did not
23  attend, but she sent me.
24      Q.    Now, you're aware that at the LTC
25  if you were in an elevator and you heard

Page 36

9  (Pages 33 to 36)

1   A.   No. But it was just one
2  complaint of sexual harassment.
3   Q.   Let me refer you to LCTCS
4  harassment complaint investigation form. Do
5  you see that?
6   A.   Yes.
7   Q.   Are you familiar with this?
8   A.   Yes, I've seen it.
9   Q.   It says the first step is to
10  interview the complainant?
11   A.   Yes, I see that.
12   Q.   And then it talks about asking
13  all these questions about what happened, all
14  of that. All of these are questions that are
15  supposed to be said to the complainant; is
16  that right?
17   A.   That's what it looks like.
18   Q.   "What is your relationship to the
19  accused? What exactly happened? When and
20  where did the incident occur? So everything
21  in there are questions that should be asked of
22  the complainant, correct?
23   A.   Yes.
24   Q.   The binder you identified as
25  Plaintiff's Bates 518 to 745 --

Page 49

1  BY MR. VINCENT:
2   What Bates number?
3  BY MR. ARRUEBARRENA:
4   518 to 745.
5  MR. ARRUEBARRENA CONTINUES EXAMINATION:
6   Q.   Can you show me in here anything
7  indicating that Mr. Carpenter --
8  BY MS. JOHNSON:
9   I'm going to object. You failed
10  to lay a foundation that she even saw the
11  grievance form that he submitted in the first
12  place. She hasn't testified to that today.
13  BY MR. ARRUEBARRENA:
14   Counsel, let's go ahead and have
15  the 37.1 conference. I'm going to ask that
16  you limit your objections to the form of the
17  question.
18  BY MS. JOHNSON:
19   You can ask all you want to. I
20  understand.
21  BY MR. ARRUEBARRENA:
22   Let me finish, then you can say
23  what you need to say.
24  BY MS. JOHNSON:
25   Sure.

Page 50

1  BY MR. ARRUEBARRENA:
2   I'm going to ask that you limit
3  your objections to the form of the question.
4  And that would be vagueness, something like
5  that, compound question. And that all other
6  speaking objections be withheld. And if you
7  can't agree with that -- I would like you to
8  mark this part of the deposition so we can
9  call Magistrate Riedlinger and have him read
10  Rule 26 to you. Okay?
11  BY MS. JOHNSON:
12   I'm going to object. You failed
13  to lay foundation.
14  MR. ARRUEBARRENA CONTINUES EXAMINATION:
15   Q.   Ma'am, referring you again to the
16  document you said you read before the
17  deposition which we identified as the Patrick
18  Carpenter binder. Which, if I understood you
19  correctly, ma'am, you put together?
20   A.   I did.
21   Q.   So you called everybody --
22   A.   No, I did not, I didn't call
23  people.
24   Q.   How did you put the statements in
25  here?

Page 51

1   A.   Many were just given to me.
2   Q.   When?
3   A.   Like evaluations were in his
4  file.
5   Q.   Okay, evaluations. And
6  statements were given to you?
7   A.   Yes.
8   Q.   After you were told by Mr. Meaux
9  in September to do this binder was it just a
10  coincidence that those statements came in?
11   A.   Many had been given to me
12  previous to that. There were many complaints
13  previous to that.
14   Q.   Ma'am, can you show me in here
15  where it says anything about interviewing Mr.
16  Carpenter? Please look through it and let me
17  know.
18   A.   Interviewing for what?
19   Q.   We're just looking, ma'am, at
20  policy 6.011. We're looking at the LCTCS
21  harassment complaint investigation form. It
22  talks about interviewing the complainant. Can
23  you tell me where in that document it
24  indicates any documents where the complainant,
25  Mr. Carpenter, was interviewed?

Page 52

13  (Pages 49 to 52)

| | |
|---|---|
| 1  BY MR. VINCENT: | 1    A.    No, I don't. |
| 2      I'm going to object to the form | 2    Q.    That's an uncontested fact in our |
| 3  of the question in that the question | 3  case. I refer you to -- |
| 4  presupposes that this document was compiled in | 4    BY MR. VINCENT: |
| 5  accordance with the form that counsel is | 5      I object to the form of the |
| 6  referring to. | 6  question. |
| 7    BY MR. ARRUEBARRENA: | 7    MR. ARRUEBARRENA CONTINUES EXAMINATION: |
| 8      Ma'am, please answer the | 8    Q.    I refer you to what is called |
| 9  question. Would you please look at this | 9  defendant's answers to plaintiff's first |
| 10  document and tell me where there was any | 10  request for admissions. It's included in |
| 11  indication that he was interviewed. | 11  exhibit W2, admission number eleven. |
| 12    BY THE WITNESS: | 12      So I'm showing you that, ma'am. |
| 13      He was not interviewed. | 13  That's what I've just read to you. That is |
| 14    MR. ARRUEBARRENA CONTINUES EXAMINATION: | 14  the policy and it's admitted. So it's an |
| 15    Q.    So he was not interviewed, right? | 15  uncontested fact in our case. |
| 16    A.    Because he did not file a | 16    BY MR. VINCENT: |
| 17  complaint. | 17      I object to the form of the |
| 18    Q.    He was not interviewed, right? | 18  question. |
| 19    A.    He was not interviewed. | 19    BY MR. ARRUEBARRENA: |
| 20    Q.    You are aware that the LTC has a | 20      I didn't ask the question yet. I |
| 21  progressive discipline policy, aren't you, | 21  just made a statement. Are you objecting to |
| 22  ma'am? | 22  my statement? |
| 23    A.    Yes. | 23    BY MR. VINCENT: |
| 24    Q.    You are aware of that? | 24      Ask your question. |
| 25    A.    Yes. | 25    BY MR. ARRUEBARRENA: |
| Page 53 | Page 55 |

| | |
|---|---|
| 1    Q.    The progressive discipline policy | 1      You agree, sir, that it is an |
| 2  calls for verbal warnings maybe as a first | 2  uncontested fact, don't you? |
| 3  step? | 3    BY MR. VINCENT: |
| 4    A.    Right. | 4      I absolutely disagree. |
| 5    Q.    Then after that there could be a | 5    BY MR. ARRUEBARRENA: |
| 6  written warning, including maybe a meeting, a | 6      You agree that admission to |
| 7  formal meeting with the employee to establish | 7  number eleven is an uncontested fact? |
| 8  a clear performance expectation to correct the | 8    BY MR. VINCENT: |
| 9  problem? | 9      Correct. That's not what it is. |
| 10    A.    That's correct. | 10    BY MR. ARRUEBARRENA: |
| 11    Q.    Then there would be an | 11      Okay, we'll deal with that later |
| 12  opportunity for the employee to present his or | 12  with the court. |
| 13  her case? | 13      It does say admitted, doesn't it, |
| 14    A.    That's correct. | 14  sir? Is that the word "admitted" right there |
| 15    Q.    And then termination if the | 15  on the answer to request for admission number |
| 16  problems remain unresolved after the above | 16  eleven? Does it say "admitted"? |
| 17  steps? | 17    BY MR. VINCENT: |
| 18    A.    That's correct. | 18      Counsel, I'm not going to read to |
| 19    Q.    That is the policy of LTC? | 19  you today. |
| 20    A.    That's correct. | 20    EXAMINATION BY MR. ARRUEBARRENA: |
| 21    Q.    Do you know if it's in a written | 21    Q.    Ma'am, would you please read from |
| 22  policy somewhere? | 22  the exhibit W2, answer to request for |
| 23    A.    I'm sure it is. I don't know the | 23  admission number eleven? Would you read it |
| 24  number. | 24  for me, please? What is that word? |
| 25    Q.    You don't know the number? | 25    A.    The next word is "admitted". |
| Page 54 | Page 56 |

1  administration.
2      Q.    That would be 2000 to 2008?
3      A.    Yes.
4      Q.    What about before that when you
5  worked at LTC, were you aware of that?
6      A.    I have no knowledge. I was in
7  the classroom.
8      Q.    So you know about two EEO
9  complaints?
10     A.    That's correct.
11     Q.    One involving Mark Vignes and one
12 involving Patrick Carpenter; is that right?
13     A.    I heard there was one on Patrick
14 Carpenter, I didn't see it.
15     Q.    Right. But those are the only
16 ones you know about?
17     A.    Right.
18     Q.    You had never heard about any
19 others?
20     A.    Not in my region.
21     Q.    Had you heard about it in other
22 regions?
23     A.    No.
24     Q.    Was Margaret Webb involved in the
25 Patrick Carpenter binder for Region 2 which
Page 61

1  you have identified?
2      A.    She's the one I submitted it to.
3  When I was asked to pull together his history
4  she's the one I submitted it to.
5      Q.    Would Margaret Webb have any
6  personal knowledge of any of the two hundred
7  twenty something pages we have identified in
8  Bates number 518 to 745, the binder for
9  Patrick Carpenter? Would she have any
10 personal knowledge of what is in there?
11     A.    That's difficult for me to speak
12 to her knowledge. I submitted the binder to
13 her. I don't know if she read it. I don't
14 know.
15     Q.    Do you know if, for instance, any
16 alleged complaints went to her?
17     A.    The EEOC complaint may have gone
18 went to her.
19     Q.    No, no. I'm talking about any
20 complaints alleged in the binder, the thing
21 you put together.
22     A.    No, I'm not aware of anything
23 going to her.
24     Q.    Do you know if she had any
25 personal observation of Mr. Carpenter doing
Page 62

1  his work, any of his jobs, if you know?
2      A.    Not that I know of.
3      Q.    Did she work in a different
4  building?
5      A.    Yes.
6      Q.    So would it be unlikely she would
7  say, "I personally observed Patrick Carpenter
8  doing something good or bad"?
9      A.    I think it would be unlikely.
10     Q.    So she just took what you put
11 together. You started putting that together
12 in September of '05, right?
13     A.    I put it together with the people
14 who had supervised him, yes.
15     Q.    You said September of '05. Do
16 you remember what date it was?
17     A.    No.
18     Q.    Could I say end of September of
19 '05?
20     A.    I really don't have a date. I
21 know it was after Katrina, but I don't know a
22 specific date.
23     Q.    Okay, we'll get back to this.
24          All right, now, when Mr.
25 Carpenter was hired did Mr. Meaux give you any
Page 63

1  instructions about what his job was?
2      A.    He was hired as the director of
3  student services.
4      Q.    Did you speak to Mr. Meaux about
5  it?
6      A.    I'm sorry?
7      Q.    Did you speak to Mr. Meaux about
8  the fact that that position was going to be
9  filled by Mr. Carpenter?
10     A.    We went through the interview
11 process.
12     Q.    You interviewed him?
13     A.    I was on the interview committee.
14     Q.    Ma'am, there were some problems,
15 right, in that area?
16     A.    Of the interview?
17     Q.    No, in the area that he was being
18 hired to become involved in?
19          BY MR. VINCENT:
20          I object to the form of the
21 question.
22          MR. ARRUEBARRENA CONTINUES EXAMINATION:
23     Q.    Can you tell me if there were
24 some problems?
25     A.    Are you asking me if there are
Page 64

16  (Pages 61 to 64)

PATRICK CARPENTER                DEPOSITION OF: DR. KAY MCDANIEL                REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

| | |
|---|---|
| 1  problems in student services?<br>2      Q.    Not now, I'm talking about in<br>3  2002.  Were there any problems in October of<br>4  2002?<br>5      A.    They needed an administrator, but<br>6  I don't know of any specific problems.<br>7      Q.    So everything was going<br>8  perfectly?<br>9      A.    They didn't have a leader in the<br>10  department so they did need some leadership.<br>11      Q.    Did you see the letter that Mr.<br>12  Meaux sent to Dr. Jimmy Clark, acting<br>13  chancellor, on October 11, 2002?<br>14      A.    I don't know if I did or not.<br>15      Q.    By the way, who is Dr. Jimmy<br>16  Clark, acting chancellor?  Was Ms. Montgomery<br>17  Richard out sick or something at that time?<br>18      A.    He was before her.<br>19      Q.    Oh, okay.<br>20  BY MR. ARRUEBARRENA:<br>21          We will make this W3.  It's a<br>22  letter dated October 11, 2002 to Dr. Jimmy<br>23  Clarke from Mr. Meaux.<br>24      MR. ARRUEBARRENA CONTINUES EXAMINATION:<br>25      Q.    Ma'am, please review it.  The<br><div align="right">Page 65</div> | 1  would not have given you this letter?<br>2      A.    There would have been no reason<br>3  to.  I was on the interview committee.  This<br>4  is just a letter to recommend Mr. Carpenter as<br>5  director of student services.  But it does not<br>6  indicate there were any problems.  It's just a<br>7  letter recommending a hire.<br>8      Q.    Right.  And, in fact, it seems to<br>9  be complimentary, wouldn't you agree?<br>10      A.    It's a letter of hire, yes.<br>11      Q.    It says here in the second<br>12  paragraph:  Mr. Carpenter brings to this<br>13  position many years of experience in the<br>14  registrar's office at student services at<br>15  Southern University.<br>16          Is that something that you as<br>17  part of the hiring committee have come to<br>18  understand?<br>19      A.    Based on his resume', yes.<br>20      Q.    Oh, you didn't participate in any<br>21  interviews with him?<br>22      A.    Yes, I did.<br>23      Q.    So did you come to understand<br>24  that through interviews also?<br>25      A.    I suppose.<br><div align="right">Page 67</div> |
| 1      first question I have is:  Have you ever seen<br>2  this letter?<br>3      A.    Well, this is just a letter<br>4  recommending to hire somebody.<br>5      Q.    Have you seen the letter?<br>6      A.    I'm not sure if I have or not.<br>7      Q.    Is that a letter that would have<br>8  likely come to you in 2002 in your position?<br>9      A.    No, it would not have come to me.<br>10  It went to the acting chancellor.<br>11      Q.    At that time you were the<br>12  senior -- were you campus dean or were you<br>13  senior assistant?<br>14      A.    That was before I was campus<br>15  dean.<br>16      Q.    Who was the dean?<br>17      A.    Mr. Meaux would have had a dual<br>18  responsibility.<br>19      Q.    So you were assistant dean at the<br>20  Baton Rouge campus, right?<br>21      A.    Yes.<br>22      Q.    So you worked for Mr. Meaux at<br>23  this date?<br>24      A.    Yes.<br>25      Q.    And are you saying Mr. Meaux<br><div align="right">Page 66</div> | 1      Q.    You suppose, okay.  Are you --<br>2      A.    Yes.<br>3      Q.    So is that a true statement?<br>4      A.    He had worked for many years for<br>5  Southern, that's a true statement.<br>6      Q.    Is there anything in there that's<br>7  not true?<br>8      A.    He had worked for Southern for<br>9  many years, yes.<br>10      Q.    No, is there anything in the<br>11  sentence that I just read that is not true, as<br>12  far as you know?<br>13      A.    Which sentence?<br>14      Q.    Mr. Carpenter brings to this<br>15  position many years of experience in the<br>16  registrar's office and student services at<br>17  Southern University.  Is there anything untrue<br>18  in that?<br>19      A.    That's true.  He just was not in<br>20  the position of director there.<br>21      Q.    But, once again, there is nothing<br>22  that you know of today that is untrue about<br>23  that statement; is that true?<br>24      A.    That's true.  That's a true<br>25  statement.<br><div align="right">Page 68</div> |

<div align="right">17  (Pages 65 to 68)</div>

1    A.    It's not my job to watch what
2  they are doing on the computer. She did her
3  job. And we met all the deadlines on our
4  reports.
5    Q.    When Patrick came in did you meet
6  with him? You were aware of that paragraph,
7  that sentence: Mr. Carpenter will be
8  directing, developing, and reorganizing the BR
9  Tech student service department. That's the
10 department we just talked about?
11   A.    That's correct.
12   Q.    You were aware of that?
13   A.    Yes.
14   Q.    Did you speak to him about how
15 that would be done when he came?
16   A.    I was on the interview committee.
17 I think Mr. Meaux worked with him on that.
18   Q.    Did he report to Mr. Meaux or
19 you?
20   A.    Well, early on I was the
21 assistant director, when he first came. I
22 think I did supervise him, yes.
23   Q.    So when he first came you were
24 his direct line supervisor?
25   A.    He rarely went to me. He went to
                                        Page 93

1    Q.    So you feel that Mr. Meaux
2  regarded himself as Patrick's mentor?
3    A.    Yes.
4    Q.    So it would not be improper for
5  someone to go to their mentor?
6    A.    No, it would not.
7    Q.    It's not improper to go to your
8  mentor, is it?
9    A.    No, sir.
10   Q.    You have a mentor, don't you?
11   A.    Yes.
12   Q.    Who is your mentor?
13   A.    It was Mr. Meaux before he
14 retired. But now it's Jim Henderson. He's my
15 immediate supervisor.
16   Q.    But has your mentor always been
17 your immediate supervisor?
18   A.    Since I've been in leadership,
19 yes.
20   Q.    In this case Mr. Carpenter's
21 mentor was your boss?
22   A.    Right.
23   Q.    You were okay with that?
24   A.    I was okay with it.
25   Q.    So he was doing what he was
                                        Page 95

1  Mr. Meaux.
2    Q.    I'm asking on the organizational
3  chart.
4    A.    Yes.
5    Q.    But he had a dotted line to Mr.
6  Meaux?
7    A.    No. But he went to Mr. Meaux.
8    Q.    Are you saying he circumvented
9  you?
10   A.    Often.
11   Q.    Did Mr. Meaux tell you Patrick
12 came to me and I want him to come to you? Did
13 he tell you that?
14   A.    I don't recall that.
15   Q.    If Mr. Meaux felt that that kind
16 of activity was improper, wouldn't you expect
17 him to mention that to you?
18   A.    He was kind of a player coach.
19 So he would have spoken to --
20   Q.    You said he was a player coach?
21   A.    Yes. He felt like he was a
22 mentor coach. So he would have tried to help
23 Patrick.
24   Q.    He was your boss?
25   A.    Yes.
                                        Page 94

1  supposed to do when he went to Mr. Meaux,
2  going to his mentor?
3    A.    I don't know if that was what he
4  was supposed to do. He was doing something
5  that was okay.
6    Q.    Doing something that was
7  perfectly acceptable?
8    A.    Yes.
9    Q.    So it wouldn't be right to
10 criticize him for that, would it?
11   A.    Mr. Meaux was the chancellor. I
12 wasn't criticizing him. Mr. Meaux was the
13 chancellor and he was the one reorganizing the
14 district.
15   Q.    So it would be unfair to
16 criticize him for going to Mr. Meaux?
17   A.    In this situation. If he was
18 going to him in a mentoring situation.
19   Q.    That would be unfair to criticize
20 him for that, wouldn't it?
21   A.    I wouldn't criticize him for
22 mentoring, no.
23   Q.    How do you make the distinction?
24 You seem to want to make a distinction.
25   A.    There were times when he should
                                        Page 96

24  (Pages 93 to 96)

| | |
|---|---|
| 1   A.   I don't know. | 1   nothing about the hour change? |
| 2   Q.   Was it longer than six months? | 2        A.   I believe someone may have said |
| 3   A.   But I don't think it was because | 3   something in a document, either Buffy or |
| 4   they were used to it.  I think it was because | 4   Candice. |
| 5   it worked. | 5        Q.   Did you hold that against Mr. |
| 6   Q.   How long had they had been on the | 6   Carpenter? |
| 7   schedule, ma'am, the one they had before, if | 7        A.   Did I hold it against him? |
| 8   you know? | 8        Q.   Yes. |
| 9   A.   I don't know. | 9        A.   No.  He was the new manager and |
| 10   Q.   Was it more than a year? | 10   he was, you know. |
| 11   A.   Yes. | 11        Q.   Did you give this binder to Ms. |
| 12   Q.   Probably the whole time they had | 12   Webb when you were deciding to terminate Mr. |
| 13   been there, right? | 13   Carpenter? |
| 14   A.   Maybe. | 14        A.   No.  Actually, we terminated him |
| 15   Q.   So people don't like it when you | 15   and then we found out he filed the EEOC suit. |
| 16   change their work hours, do they? | 16   That's when I was asked to put the binder |
| 17   A.   Not when you lengthen them | 17   together. |
| 18   unnecessarily, no, people don't like that. | 18        Q.   Ma'am, maybe I got this wrong.  I |
| 19   Q.   Did you call Mr. Meaux and say, | 19   thought you told me you started working on the |
| 20   Mr. Meaux -- | 20   binder in September of 2005. |
| 21   A.   Mr. Meaux and I discussed it.  We | 21        A.   He was terminated before that. |
| 22   had an employee quit because of it.  But Mr. | 22   And they asked that we put him back in the |
| 23   Allowed it. | 23   position. |
| 24   Q.   Why? | 24        Q.   I'm talking about when he was |
| 25   A.   Because she had to put her child | 25   really terminated.  He wasn't terminated, was |
| Page 125 | Page 127 |

| | |
|---|---|
| 1   on the bus in the morning. | 1   he? |
| 2   Q.   Why did Mr. Meaux allow this | 2        A.   He was terminated, but the |
| 3   change of hours? | 3   chancellor asked us to put him back in the |
| 4   A.   I don't know.  Maybe you should | 4   position while this was pending. |
| 5   ask him that. | 5        Q.   Ma'am, was he ever taken off the |
| 6   Q.   Do you think he was wrong? | 6   payroll? |
| 7   A.   I think it caused problems. | 7        A.   In 2007. |
| 8   Q.   Do you think he was wrong to | 8        Q.   In 2005? |
| 9   allow the hour change, Mr. Meaux? | 9        A.   No. |
| 10   A.   I think it caused problems. | 10        Q.   So he was not terminated? |
| 11   Q.   You need to answer yes or no, | 11        BY MR. VINCENT: |
| 12   then you can explain it.  Do you think he was | 12        I object to the form of the |
| 13   wrong to allow the hour change, Mr. Meaux? | 13   question.  It's argumentative. |
| 14   A.   Yes. | 14        MR. ARRUEBARRENA CONTINUES EXAMINATION: |
| 15   Q.   Did you tell him that, Mr. Meaux? | 15        Q.   Ma'am, was he taken off the |
| 16   A.   We discussed it, yes. | 16   payroll? |
| 17   Q.   Did you criticize Mr. Carpenter? | 17        A.   No. |
| 18   Have you ever criticized Mr. Carpenter for | 18        Q.   You wanted to terminate him, |
| 19   that change in any document or even verbally? | 19   right? |
| 20   A.   Maybe to Mr. Meaux verbally, not | 20        A.   I wrote the letter recommending |
| 21   in writing. | 21   it. |
| 22   Q.   So you're saying if we look | 22        Q.   Right, you recommended his |
| 23   through these two hundred twenty pages of | 23   termination, but that wasn't accepted, was it, |
| 24   everything that could be involved with Mr. | 24   ma'am? |
| 25   Carpenter's deficiency or misconduct there's | 25        A.   Mr. Meaux did accept it.  But |
| Page 126 | Page 128 |

                                   32  (Pages 125 to 128)

PATRICK CARPENTER          DEPOSITION OF: DR. KAY MCDANIEL                     REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

1   Margaret Richard asked us to put him back in
2   his position.
3       Q.   Why?
4       A.   Because he filed this EEOC.  And
5   she told us to put him back in the position
6   until it was settled.
7       Q.   Did you provide this Patrick
8   Carpenter binder -- can we call it the EEOC
9   binder?
10      A.   If you'd like.
11      Q.   That wouldn't be an inappropriate
12  term, would it, ma'am?
13      BY MR. VINCENT:
14          Why don't we call it what it's
15  called, counselor.
16      MR. ARRUEBARRENA CONTINUES EXAMINATION:
17      Q.   Would that be an appropriate
18  name?  The binder prepared in response to the
19  EEOC charge, would that be appropriate?
20      A.   That's what we were asked to do
21  it.
22      Q.   You said when you completed the
23  binder, you couldn't remember, you didn't
24  think it took more than a year --
25      A.   Well, the date on it is September
                                    Page 129

1   29, 2005.
2       Q.   Can we rely on the fact that that
3   was when it was completed?
4       A.   I think so.
5       Q.   So you recommended that Patrick
6   be terminated in January of 2007, right?
7       A.   Yes.
8       Q.   Did you provide this binder to
9   HR?  You had already provided it in September
10  of '05, right?
11      A.   Right.
12      Q.   Was there anything else provided?
13      A.   Was there anything else provided?
14      Q.   Yes, before he was terminated in
15  January of 2007.
16      A.   I'm not sure I understand the
17  question.
18      Q.   Did you provide anything else to
19  HR?  Don't you have a policy and procedure to
20  review a termination with HR before you do it?
21      A.   In January of 2005 I did discuss
22  this with Jim Henderson.  I provided him a
23  letter recommending --
24      Q.   Who is Jim Henderson?
25      A.   He is senior vice president.
                                    Page 130

1       Q.   Of what?
2       A.   Of work force and education at
3   LCTCS.
4       Q.   Who does he report to?
5       A.   The president.
6       Q.   And at that time you were the
7   region -- sort of equivalent to the old
8   chancellor?
9       A.   I was regional director.
10      Q.   And Mr. Meaux had been retired?
11      A.   Yes.
12      Q.   So you reported to Jim Henderson?
13      A.   Yes.
14      Q.   Did you check with HR before you
15  fired Mr. Carpenter the day he really lost his
16  job --
17      BY MR. VINCENT:
18          I object to the form of the
19  question.
20      BY MR. ARRUEBARRENA:
21          Let me finish my question.
22      MR. ARRUEBARRENA CONTINUES:
23          -- in January of 2007?  Did you
24  check with HR?
25      A.   I'm not sure what you mean by
                                    Page 131

1   check.
2       Q.   Did you call them up, send them a
3   document or anything saying I would like to
4   fire Patrick Carpenter?  Don't you have a
5   procedure where you check with HR before you
6   fire an employee, especially one with a
7   pending EEOC charge?
8       A.   I don't remember if I checked
9   with HR or not.
10      Q.   Okay, I'm asking you what your
11  procedure is.  Do you check with HR before you
12  fire people in general?
13      A.   Yes.
14      Q.   So is there any reason you
15  wouldn't do that with Mr. Carpenter?
16      A.   I discussed it with Mr.
17  Henderson.
18      Q.   What did you tell him?  When was
19  this conversation?
20      A.   Before Christmas.
21      Q.   What was it that you said to him?
22      A.   I just explained his work history
23  with LTC.
24      Q.   Did you give him the binder that
25  we've been talking about?
                                    Page 132

                              33  (Pages 129 to 132)

PATRICK CARPENTER          DEPOSITION OF: DR. KAY MCDANIEL          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007          LILLIE R. BURCH, CCR

| | |
|---|---|
| 1   A.   We looked at it.  He didn't take<br>2  a copy of it.<br>3   Q.   You had it with you, the binder?<br>4   A.   Yes.<br>5   Q.   Did you have anything else?<br>6   A.   I don't think so.<br>7   Q.   Just the binder?<br>8   A.   I think so.<br>9   Q.   We've already figured out that<br>10  the binder has everything in it, right,<br>11  involving Mr. Carpenter?  Correct?<br>12   A.   Yes.<br>13   Q.   Everything that might be negative<br>14  about Mr. Carpenter, right?  All about<br>15  counseling, discipline, conduct, performance,<br>16  correct?<br>17   A.   Yes.<br>18   Q.   Did he thumb through all two<br>19  hundred twenty something pages?<br>20   A.   He thumbed through it, yes.<br>21   Q.   Do you know if that was the first<br>22  time he had seen the binder?<br>23   A.   I have no knowledge of that.<br>24   Q.   Was that the first time you had<br>25  shown it to him?<br>Page 133 | 1   A.   Yes, somebody told me that.<br>2   Q.   Let me show you this, which is<br>3  plaintiff's Bates Number 756.  It says:<br>4  Dismissal notice of suit rights.  It's dated<br>5  April 5, 2006.  Does that help refresh your<br>6  memory, ma'am?<br>7   A.   I have never seen this.<br>8   Q.   That was a period in time when<br>9  the EEOC had dismissed the charge.<br>10   A.   Somebody may have told me about<br>11  this.<br>12   Q.   So what I'm asking you is, do you<br>13  think that's when you heard it was resolved?<br>14   A.   Someone may have told me about<br>15  this.  Maybe I was just told about it.<br>16   Q.   Did you hear anything else about<br>17  the EEOC charge after April of '06?<br>18   A.   I don't think so.<br>19   Q.   As far as you know, the EEOC<br>20  charge had been resolved, it was dismissed,<br>21  right?<br>22   A.   I was told that, yeah.<br>23   Q.   Did somebody tell you he has so<br>24  much time to file suit and if he doesn't file<br>25  suit it's all over?<br>Page 135 |
| 1   A.   Yes.<br>2   Q.   Did he know there was an issue<br>3  with Mr. Carpenter, that he had filed a race<br>4  discrimination claim?<br>5   A.   I don't know.<br>6   Q.   Did you tell him:  This binder<br>7  started when Mr. Meaux told me that an EEOC<br>8  charge or lawsuit was filed?<br>9   A.   I may have.<br>10   Q.   Well, there is no reason why you<br>11  would withhold that from your boss, is there?<br>12   A.   No.<br>13   Q.   Did you feel at that time that<br>14  the EEOC charge had been resolved?<br>15   A.   Like I said, I was never told<br>16  anything in writing.  I was told at one point<br>17  that it had been resolved.<br>18   Q.   When was that, ma'am?<br>19   A.   I don't know the date.<br>20   Q.   Could it have been in April of<br>21  '06?<br>22   A.   I have no memory of the date.<br>23   Q.   Did somebody tell you that the<br>24  complaint was dismissed, that the EEOC<br>25  dismissed it?<br>Page 134 | 1   A.   No.<br>2   Q.   So when you went to see Mr.<br>3  Henderson you thought there was no more EEOC<br>4  problem, right?<br>5   A.   I had been told it was dismissed.<br>6  That was the last thing I was told.<br>7   Q.   So at that time you didn't think<br>8  there was any claim, you didn't know any<br>9  lawsuit or anything had been filed?<br>10   A.   No.<br>11   Q.   What did you tell him?<br>12   A.   I summarized the different<br>13  positions that Mr. Carpenter had been in.  And<br>14  that --<br>15   Q.   Did you show him the summary --<br>16   A.   No.  I summarized it to him<br>17  verbally.  I told him about the different<br>18  problems that existed in each position.<br>19   Q.   Did you tell him there was an<br>20  EEOC charge and it was dismissed?<br>21   A.   Possibly.<br>22   Q.   Anything else?<br>23   A.   I think that's it.<br>24   Q.   And he looked through the binder<br>25  that we have identified?<br>Page 136 |

34  (Pages 133 to 136)

321 North Vermont Street          VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999<br>Covington, Louisiana  70433          Board-Certified Court Reporters          Facsimile: (985) 893-6765

1    A.   He may have thumbed through it.
2  I don't have memory of him reading specifics.
3    Q.   Did you direct his attention to
4  any of the write-ups or anything in the binder
5  that you thought he should be interested in?
6    A.   No.
7    Q.   So you verbally told him about
8  what you understand the situation was with Mr.
9  Carpenter?
10    A.   Yes.
11    Q.   You showed him the documents in
12  the binder we've identified and you said: I
13  would like to recommend that he be fired?
14    A.   Yes.
15    Q.   And you asked him to write the
16  letter?
17    A.   Well, he's the point of
18  authority. So that's the procedure.
19    Q.   How long did that meeting last?
20    A.   Maybe thirty minutes.
21    Q.   Had you ever spoken to Mr.
22  Henderson about Mr. Carpenter good or bad
23  before that time?
24    A.   Possibly.
25    Q.   When did you become his direct

Page 137

1    Q.   And what problems did that cause?
2  Why was that a problem?
3    A.   She wanted to treat everything
4  like it was higher education. She wanted
5  everyone to go to a nine-month contract. What
6  we really do is twelve months. It's technical
7  education, it's hands on. It's very different
8  from community college.
9    Q.   So she wanted to change the way
10  the instructor contracts were done?
11    A.   Right.
12    Q.   She wanted to do it in a nine
13  month renewable contract, the way it's done in
14  other universities?
15    A.   Right.
16    Q.   That's probably the way it's done
17  at LSU, I'm guessing?
18    A.   Yes.
19    Q.   So she wanted to go to that as
20  opposed to a twelve-month and you didn't think
21  that was wise?
22    A.   It would be difficult to hire
23  people to work. We hire auto mechanics, we
24  hire welders. So it would be difficult to
25  hire them for nine months.

Page 139

1  report, about when?
2    A.   August of 2006.
3    Q.   Before that it was --
4    A.   When I became regional director
5  it was Toya Teemer Barnes for two months. She
6  was the interim.
7    Q.   That's who was in between Ms.
8  Richard?
9    A.   Yes.
10    Q.   Ms. Richard, do you feel she's
11  competent?
12    A.   As a chancellor?
13    Q.   Yes. Was she a competent
14  chancellor?
15    A.   I think she had issues. She
16  didn't understand the LTC.
17    Q.   So you didn't think she was
18  competent to be chancellor of LTC?
19    A.   Right.
20    Q.   What were the areas of
21  incompetency you feel she had?
22    A.   She came from a community college
23  background. And she didn't understand how
24  technical education is different from
25  community college education.

Page 138

1    Q.   They wouldn't get the whole thing
2  about the summers off, right, the way teachers
3  and professors do?
4    A.   Right.
5    Q.   What else?
6    A.   I just don't think she understood
7  our mission, what we did, that we needed to
8  train people quick. Our job is to train
9  people to work. And that's something we need
10  to do quickly often. And I don't think she
11  understood that.
12    Q.   So give me your top example of
13  what would demonstrate that she didn't
14  understand that.
15    A.   Well, when we offer a program, we
16  need to be able to respond quickly. And we
17  couldn't always do that.
18    Q.   Because of something she did or
19  didn't do?
20    A.   Yes, HR issues, things like that.
21    Q.   So she was moving too slow?
22    A.   Yes. If an employer comes to us
23  and says, "We need you to train a hundred
24  people," we need to do it right then, we don't
25  need to do it in six months.

Page 140

35 (Pages 137 to 140)

PATRICK CARPENTER          DEPOSITION OF: DR. KAY MCDANIEL                    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

1    from December of '02 until August of '03 Mr.
2    Meaux was the person training him?
3        A.    Not training, mentoring.
4        Q.    Well, a mentor is supposed to
5    provide guidance, right?
6        A.    Right.
7        Q.    So Mr. Meaux was providing him
8    guidance on how to perform his job as director
9    of student affairs?
10        A.    I'm not sure what was involved,
11    but I know he mentored him.  He wanted him to
12    be successful.
13        Q.    Do you know how often he met with
14    Mr. Meaux in this mentoring development
15    relationship?
16        A.    I do not know if it was a regular
17    thing.
18        Q.    You thought it was regular?
19        A.    No.  I don't know
20        Q.    Oh, you don't know?
21        A.    No.
22        Q.    Did Mr. Meaux ask you to help him
23    any?
24        A.    I did.
25        Q.    No, I asked if he asked you to

Page 161

1    about a statement Mr. Gassen made that he felt
2    was racially offensive or discriminatory?
3        A.    For the evaluation?
4        Q.    No.  I'm just asking.  Did he
5    ever complain to you about a statement Mr.
6    Gassen made to him that he thought was
7    racially discriminatory or racially offensive?
8        A.    I remember some conversation
9    about some speakers.  Their offices were next
10    door to each other.  And Mike had complained
11    that he was listening to music in his office.
12        Q.    So Mr. Carpenter conveyed to you
13    that he felt that whatever happened, the
14    interchange was racially discriminatory or
15    racially offensive?
16        A.    He just complained about the
17    music.  I don't recall it being racial.
18        Q.    Did Mr. Carpenter complain to you
19    about the music issue?
20        A.    He complained that Mr. Gassen had
21    complained about the music.
22        Q.    Did he feel it was unfair or
23    fair?
24        A.    He wanted to be able to listen to
25    music.  But the offices were very close

Page 163

1    help him.
2        A.    Yes.  I tried to do registration,
3    student grievances.  I tried to train him in
4    the areas that I was working.
5        Q.    Did you feel like he was refusing
6    it or just wasn't getting it?
7        A.    He did not refuse to help in
8    registration.  He wanted to make changes based
9    on what was done at Southern, which would not
10    work at LTC.  And he attempted to resolve
11    student grievances, but it did not work.
12        Q.    Now, the first evaluation I have
13    of Mr. Carpenter after him coming to LTC is
14    6-10-04.  Do you want to look in the book --
15        A.    No.  There's an earlier one.  We
16    evaluate in June.  The first evaluation period
17    he had not been there long enough to be
18    evaluated.
19        Q.    So that is the first evaluation?
20        A.    Yes.  It was done by two people.
21        Q.    Mr. Gassen and Ms. Alicia
22    Andrews?
23        A.    Mr. Gassen, yes.  And Ms.
24    Andrews.
25        Q.    Did Mr. Carpenter complain to you

Page 162

1    together.
2        Q.    So he understood Mr. Gassen
3    didn't want him to listen to a certain music?
4    BY MR. VINCENT:
5            I object to the form of the
6    question.
7    MR. ARRUEBARRENA CONTINUES EXAMINATION:
8        Q.    Is that what he understood?
9        A.    It's my memory he wanted to be
10    able to listen to music in his office.
11        Q.    Did he tell you that Mr. Gassen
12    listened to music?
13        A.    I don't remember that.
14        Q.    Is that why he felt it was
15    unfair, because Mr. Gassen got to listen to
16    music?
17        A.    I don't remember that.
18        Q.    So you're not saying he didn't
19    tell you that?
20        A.    I just don't remember it.
21        Q.    So he could have told you that,
22    you just don't remember it right now, right?
23        A.    Right.
24        Q.    So you would defer to his memory
25    on that, right?

Page 164

41 (Pages 161 to 164)

321 North Vermont Street                VENTURELLA & ASSOCIATES, L.L.C.            Telephone: (985) 893-1999
Covington, Louisiana  70433              Board-Certified Court Reporters           Facsimile: (985) 893-6765

1    A.    I don't remember.
2    Q.    But you're not saying
3  categorically he didn't tell you that?
4    A.    Right.
5    Q.    Do you remember he told you he
6  felt like Mr. Gassen was making this statement
7  to him about the music because of racial
8  discrimination or racial issues?
9    A.    I remember there was an issue
10  about the type of music.
11    Q.    Do you remember what type of
12  music it was?
13    A.    No, I don't.
14    Q.    Did you understand that Mr.
15  Carpenter felt that it was a racial issue?
16    A.    No, I didn't understand that.
17    Q.    Are you sure you didn't
18  understand that or is it just something you're
19  not remembering today?
20    A.    I did not understand that.
21    Q.    So you're sure he didn't mention
22  that to you?
23    A.    I remember that we talked about
24  the type of music.  That's all I remember.
25    Q.    Were you aware that the music was
                                              Page 165

1  that time.  That was a decision Mr. Meaux made
2  to move him under Mr. Wainwright.  Because he
3  was the dean over work force.  And Patrick was
4  working as director of continuing education.
5  It was a better fit to be under work force.
6    Q.    Didn't you say to him that wasn't
7  a proper thing for Mr. Gassen to say to
8  him when Mr. Carpenter complained to you about
9  the music issue?  Didn't you say that wasn't
10  right?
11    A.    I might have said that.
12    Q.    Did you tell Mr. Gassen Mr.
13  Carpenter has come to me with a complaint
14  about the issue of the music?
15    A.    I remember Mr. Gassen and I
16  talked about it.  Mr. Gassen said he liked all
17  types of music.  It was not because of the
18  type of music, it was because of the volume of
19  it.
20    Q.    So you conveyed to him that there
21  was an issue with the type of music, that Mr.
22  Carpenter thought he was making this request
23  because of the type of music?
24    A.    I conveyed to Mr. Gassen that
25  Patrick had spoken to me that he wanted to be
                                              Page 167

1  a jazz station that anyone likes to listen to
2  but African-American oriented?
3    A.    No, I'm not aware of that.
4    Q.    So if Mr. Carpenter said that he
5  mentioned that to you, would you defer to his
6  memory?
7    A.    Yes, I would.  I don't remember
8  that.
9    Q.    Did you understand the music was
10  not rap or anything, it was contemporary jazz?
11    A.    I just remember it being loud.
12  That's the issue I remember.
13    Q.    We've already established the
14  issue of whether Mr. Gassen could listen to
15  music versus Patrick, you'd defer to his
16  memory on that.
17    A.    I don't remember that being an
18  issue.
19    Q.    Didn't you move Mr. Carpenter
20  from being under Mr. Gassen because of that
21  issue?
22    A.    No, I did not.
23    Q.    So it's just a coincidence that
24  at that time you moved him to someone else?
25    A.    I don't remember that it was at
                                              Page 166

1  able to listen to music.
2    Q.    But Mr. Gassen understood it was
3  the type of music because Mr. Gassen defended
4  himself by saying it's not the type of music,
5  it's just music, right?  The issue was the
6  type of music, wasn't it?
7    A.    I wouldn't categorize it as
8  defending.  He said he liked all types of
9  music.  The issue was it was interrupting his
10  work.  He was playing his music too loud.
11    Q.    Was he ambivalent or aggravated
12  about it?
13    A.    Mr. Gassen?
14    Q.    Yes.
15    A.    I really don't remember emotion
16  being attached to it.  He just wanted to be
17  able to work in his office.  Their offices
18  were right next to each other.
19    Q.    Did you feel it was ridiculous
20  for him to come to you and complain about
21  that?
22    A.    No, I don't remember that.
23    Q.    Did you instruct Mr. Carpenter to
24  stop listening to music?
25    A.    I don't think I told him to stop
                                              Page 168

42  (Pages 165 to 168)

1  that would be other than a coincidence?
2      A.    No.
3      Q.    So it must be one of those
4  coincidences.  You got this in this format?
5      A.    Yes.
6      Q.    This alleges to convey that --
7  did you asked Ms. Berg for this?
8      A.    No.  I do not know Ms. Berg.  I
9  never met her.
10     Q.    How did she know to bring this to
11  you?
12     A.    I was the campus dean.  So the
13  complaint was turned in to me.
14     Q.    Do you know if she gave it to
15  somebody else who gave it to you, like Mr.
16  Williams or somebody else?
17     A.    I don't know.
18     Q.    Do you know if she gave it to
19  you?
20     A.    It may have been in my box.  It
21  wasn't handed to me.
22     Q.    Who was your boss?
23     A.    Mr. Meaux.
24     Q.    So you think it might have gone
25  to Mr. Meaux?

Page 205

1      A.    No, it did not go to Mr. Meaux.
2      Q.    Then who do you think it went to?
3  You don't know who?  You just know it didn't
4  go to you?
5      A.    It came to me eventually.  I
6  don't know who else touched it.
7      Q.    But not directly from the
8  student.
9      BY MR. VINCENT:
10         She testified it could have been
11  put in the box.
12     MR. ARRUEBARRENA CONTINUES EXAMINATION:
13     Q.    Your lawyer wants you to say
14  maybe it was put in the box.  Would you --
15     A.    I have already said that.
16     BY MR. VINCENT:
17         She's already testified to that.
18  If you don't remember the answer, Jim, I mean,
19  don't beat the witness up over that.
20     MR. ARRUEBARRENA CONTINUES EXAMINATION:
21     Q.    August 17.  So I guess you got
22  this sometime after August 17, 2005 and the
23  date of the binder, you figured out that was
24  the end of September 2005?
25     A.    Right.

Page 206

1      Q.    This is the same kind of thing, a
2  student alleging that she felt like Mr.
3  Carpenter gave her the runaround?
4      A.    Yes.  There was a complaint by
5  many students at that time.
6      Q.    That was sometime between August
7  17 and the end of September 2005, correct?
8      A.    It was sometime after August 17.
9      Q.    Yes, with deductive reasoning we
10  can figure that out.
11         I refer you to 713 -- Bates
12  number 713.  Amazingly enough, this particular
13  complaint is in the same font, the same style
14  as the other two complaints, this is W10.
15     A.    I can't speak to it.
16     Q.    You don't know why it would be in
17  the same style the same fonts?  No explanation
18  other than coincidence?
19     A.    I have no explanation, no.
20     Q.    Did you receive this or did
21  somebody put it in your "in" box or did
22  somebody hand it to you?
23     A.    I don't remember how it came to
24  me.
25     Q.    Did the student give it to you?

Page 207

1      A.    I don't remember that.
2      Q.    Did you talk to the student?
3      A.    I don't remember that.  We have
4  fourteen hundred students.
5      Q.    I just want to know if you
6  remember talking to the student.
7      A.    No.
8      Q.    This is included in the binder
9  that you were showing to Mr. Henderson when
10  you wanted to fire Mr. Carpenter, right?
11     A.    That's correct.
12     Q.    But you didn't talk to the
13  student?
14     A.    I don't remember talking to the
15  student.
16     Q.    And you don't remember talking to
17  Tony Berg, either, do you?
18     A.    I may have.  As I said, I had
19  many students.
20     Q.    Did you talk to Tony Berg?
21     A.    I don't recall.
22     Q.    Do you remember talking to Marion
23  Gautier?
24     A.    I talked to many students.  I
25  don't know their names.  There were many

Page 208

52  (Pages 205 to 208)

1  complaints at that time.
2      Q.    Are there more complaints than
3  this, did you just pick a couple of them?
4      A.    I picked the ones that were in
5  writing.  There were some that were verbal.
6      Q.    So you don't remember if you
7  talked to these students?
8      A.    I don't remember specifically.
9      Q.    This student alleges that the
10 name was withheld at the student's request.
11 So you don't even know who the student is?
12     A.    I do not.
13     Q.    So you have no way of knowing
14 whether this is accurate, correct?
15     A.    I believe it's accurate based on
16 what was going on at the time, the complaints
17 that we were getting.
18     Q.    But it could have been
19 inaccurate, correct?
20     A.    (No response.)
21     Q.    You could have shown Mr.
22 Carpenter this, couldn't you?  There was no
23 student's name on it?
24     A.    That's right, there was no
25 student's name.
                              Page 209

1      Q.    You never showed him this?
2      A.    I did not.
3      Q.    So he didn't get a chance to
4  respond to it, did he?
5      A.    There were times when I told him.
6      Q.    The question is W10, did he get a
7  chance to respond to it?
8      A.    No.
9      Q.    Did he get a chance to respond to
10 W9?
11     A.    No.
12     Q.    Did he get a chance to respond to
13 W8?
14     A.    No.
15     Q.    W11, Bates number 29 through 33,
16 just take a look at that.  Have you ever seen
17 it before?
18     A.    No, I have not.
19     Q.    Would you say Mr. Carpenter is
20 inaccurate when he said he put it in your
21 mailbox?
22     A.    I did not see it.
23     Q.    Could it have been in your
24 mailbox but you just didn't see it because you
25 are so busy?
                              Page 210

1      A.    No.
2      Q.    You read everything that comes in
3  your mailbox?
4      A.    Yes, I do.  I was never given a
5  copy of this letter.
6      Q.    What about Mr. Wainwright, did he
7  speak to you about getting the letter?
8      A.    No.
9      Q.    What about Mr. Meaux?
10     A.    No.
11     Q.    What about Margaret Eldon?
12     A.    No.  None of these people ever
13 told me they got this letter.
14     Q.    So you don't know if they got it
15 or not, right?  They might have gotten it but
16 just never talked to you about it?
17     A.    I think they would have told me.
18 No one ever told me they got this letter.
19     Q.    Would it be something you should
20 be advised of?
21     A.    Yes.
22     Q.    You agree with that, huh?
23     A.    Yes.  But I never got a copy of
24 this letter.
25     Q.    I'm really sorry, I don't know
                              Page 211

1  why I did this, but I made all the exhibits W.
2  There's no logic it.  We'll make this Exhibit
3  12, Bates Number 16 to 20.  It went to Ms.
4  Montgomery-Richard.  Do you see the address?
5      A.    Yes.
6      Q.    It's a complaint or grievance
7  involving a complaint based on race and color.
8  You see that in the first italicized sentence?
9      A.    Yes.
10     Q.    Do you see the last page, page
11 twenty?  Who is Leslie Hatfield; do you know
12 her?
13     A.    No.
14     Q.    Is 150 Third Street the address
15 where Chancellor Montgomery-Richard worked?
16     A.    Yes, it is.
17     Q.    So you wouldn't have any reason
18 to dispute that Leslie Hatfield might receive
19 mail for the chancellor at that time, huh?
20     A.    She may have.
21     Q.    Now, did Ms. Montgomery-Richard
22 tell you about this?
23     A.    No, I never knew about this.
24     Q.    You mentioned some things about
25 her that you thought were defective.  We
                              Page 212

53  (Pages 209 to 212)

```
 1   talked about it in some detail. You indicated
 2   she left involuntarily. Now, as far as you
 3   know, concerning LTC policies, if she received
 4   this she should have advised you of it, right?
 5       A.    She should have, yes.
 6       Q.    Let me point out to you some
 7   things in it. I believe your name is
 8   mentioned in it. The bottom partial paragraph
 9   on the first page, Bates Number 16, it says:
10   The grievance is clearly directed to the
11   following persons: Mr. Meaux, Dr. Kay
12   McDaniel, and Mr. William Wainwright. There's
13   a complaint in here -- by the way, did you
14   participate in the demotion of plaintiff when
15   he was sent to financial aid that his salary
16   would be demoted by over nine thousand dollar?
17       BY MR. VINCENT:
18          I object to the form of the
19   question.
20       MR. ARRUEBARRENA CONTINUES EXAMINATION:
21       Q.    Did you participate in that
22   decision?
23       A.    It was Mr. Meaux's decision.
24       Q.    I didn't ask you that. Did he
25   ask you for advice or consult you?
                                        Page 213
```

```
 1       A.    He did ask my advice.
 2       Q.    Did he ask you to give him input
 3   if he should do it or not?
 4       A.    Yes, he did.
 5       Q.    And can I assume your advice was
 6   to do it?
 7       A.    My advice was not to put him in
 8   the position.
 9       Q.    You wanted to fire him?
10       A.    I did not want him in that
11   position. He was given a choice at that time
12   to work in another position or come to
13   financial aid.
14       Q.    By the way, did you report to HR?
15   Does the LTC have an EEOC department, EEO
16   compliance department, or is it just a part of
17   HR?
18       A.    It's part of HR.
19       Q.    Did you report to HR the dispute
20   between Mr. Gassen and Mr. Carpenter that we
21   talked about earlier?
22       A.    No.
23       Q.    Why not?
24       A.    As I said, I thought it was a
25   loudness issue, it wasn't a discrimination
                                        Page 214
```

```
 1   issue.
 2       Q.    Do you have any idea -- you saw
 3   this before the deposition, didn't you?
 4       A.    No, I have never seen this.
 5       Q.    Do you have any idea why,
 6   assuming it's correct that Ms. Leslie Hatfield
 7   also works for Ms. Montgomery-Richard, why she
 8   wouldn't have advised you? Do you think that
 9   is something that indicates part of her
10   inadequacies?
11       A.    All I can tell you is I did not
12   see it.
13       Q.    Do you know why she wouldn't
14   advise you?
15       A.    I have no idea.
16       Q.    But she should have?
17       A.    She should have. But I have
18   never seen this.
19       Q.    If she had advised you of it what
20   would have been done, if you know?
21       A.    I have not read the whole thing,
22   I've just glanced through it, but we would
23   have answered it.
24       Q.    Well, assuming it was a racial
25   discrimination complaint, being demoted due to
                                        Page 215
```

```
 1   racial discrimination-retaliation, would HR
 2   have done some kind of response?
 3       A.    HR would have interviewed
 4   everybody involved.
 5       Q.    Why did you do the response to
 6   the EOC charge and not HR?
 7       A.    Dr. Montgomery asked Mr. Meaux to
 8   ask me to do it, so I did it. I didn't
 9   question it.
10       Q.    Dr. Montgomery could have asked
11   you to do the same thing concerning the
12   document we just looked at, W12, right?
13       A.    Yes.
14       Q.    And you would have done it?
15       A.    I would have done it. But I was
16   not asked.
17       Q.    Well, let's look at W13, Bates
18   number 60 through 65. Well, 65 is off, so I
19   will put 65 on there. So Bates number 60
20   through 65. This is an evaluation which is --
21   it's not in the same format as the other
22   evaluations we looked at. Do you know why?
23       A.    I know there was a mid year
24   evaluation. From my memory, Mr. Wainwright
25   asked Dr. Teemer what form to use. This is
                                        Page 216
```

54   (Pages 213 to 216)

PATRICK CARPENTER          DEPOSITION OF: DR. KAY MCDANIEL          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007          LILLIE R. BURCH, CCR

1   what was given to him.
2       Q.    Who is Dr. Teemer?
3       A.    She was formerly in the systems
4   office.
5       Q.    So this could have been the
6   format that you could have given him for
7   evaluation prior to him being sent to
8   Westside?
9       A.    Right.
10      Q.    And it is purported to be from
11  July 2004 to February 2005?
12      A.    Right.
13      Q.    Which is when he was demoted?
14  BY MR. VINCENT:
15          I object to the form of the
16  question.
17      MR. ARRUEBARRENA CONTINUES EXAMINATION:
18      Q.    Isn't that when he was demoted?
19      A.    I'm not sure of the date.
20      Q.    He went to financial aid, right?
21      A.    Yes.
22      Q.    This was a demotion, right?
23      A.    It was a different job that paid
24  less.
25      Q.    That paid nine thousand dollars

Page 217

1       Q.    And he reported to Mr. Meaux?
2       A.    Mr. Wainwright did.
3       Q.    So you don't know anything about
4   the validity or non-validity of this
5   particular evaluation?
6       A.    Well, as I mentioned before,
7   every supervisor, it's part of their job to
8   evaluate them.
9       Q.    I just want to know if you have
10  any reason to disagree with this evaluation.
11      A.    I have no reason to disagree.
12      Q.    Why if it was dated March 8 was
13  it not given to Mr. Carpenter until the 16th?
14      A.    I don't know that.
15  BY MR. ARRUEBARRENA:
16          Just for the record I want to
17  state that counsel is whispering to the
18  witness giving her advice.
19  BY MR. VINCENT:
20          I am not giving the witness
21  advice. There is no question on the table. I
22  was not giving advice.
23  BY MR. ARRUEBARRENA:
24          You were whispering about the LSU
25  game coming up?

Page 219

1   less?
2       A.    Correct.
3       Q.    You refuse to call that a
4   demotion?
5   BY MR. VINCENT:
6           I object to the form of the
7   question.
8       MR. ARRUEBARRENA CONTINUES EXAMINATION:
9       Q.    Was it a promotion?
10      A.    It was a different job. And he
11  actually made equal to what the other
12  financial aid officer made. So he was moved
13  to a position that paid a different amount.
14      Q.    So he was moved to a position
15  that paid nine thousand dollars less than
16  before?
17      A.    Yes.
18      Q.    If that happened to you would you
19  regard that as a demotion or promotion?
20      A.    I guess a demotion.
21      Q.    Okay, thank you.
22          Did you review this mid year
23  evaluation?
24      A.    No. I was not his supervisor.
25  Mr. Wainwright did it.

Page 218

1   BY MR. VINCENT:
2           More like that than giving her
3   advice, yes.
4       MR. ARRUEBARRENA CONTINUES EXAMINATION:
5       Q.    W14, Bates 21 through 22, and
6   then 05 is the last page. Have you ever seen
7   this exhibit?
8       A.    No.
9       Q.    Were you aware that on April 6
10  once again Ms. Hatfield received this document
11  by certified mail, Number 7004 1350 4274 8735?
12  Once again complaining that there hadn't been
13  any responses about race discrimination,
14  retaliation, demotions, stuff like that. Were
15  you aware of that?
16      A.    No. This is the first time I
17  have seen this letter.
18      Q.    Once again mentioning your name
19  that the grievance is being directed towards,
20  similar to the other grievance? Do you see
21  that?
22      A.    I see it.
23      Q.    Do you have any explanation as to
24  why you were not advised of this?
25      A.    I do not.

Page 220

55  (Pages 217 to 220)

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

1    Q.    That's just reasonable, right?
2    A.    Right.
3    Q.    Why did you criticize him for
4  this, for your approved vacation when you
5  evaluated him on August 15?
6    BY MR. VINCENT:
7        I object to the form of the
8  question.
9    MR. ARRUEBARRENA CONTINUES EXAMINATION:
10   Q.    Why did you criticize him for
11 that, ma'am?
12   A.    When he came back, he would not
13 work. He would not see students. During that
14 time I told him he must see students. He
15 insisted on appointments. That's not the way
16 we work. We see students when they come in.
17 I had denied vacation once before on May 30
18 that year because it's right before
19 registration. And when I denied his annual
20 leave he took sick leave, he called in sick.
21   Q.    So are you making that point
22 because you believe if you had denied the
23 vacation he would have called in sick for two
24 weeks.
25   A.    I'm just making the point.

Page 229

1    Q.    So there is no connection, is
2  there?
3    A.    I just want you to understand
4  that. I had denied leave once before. He
5  called in sick. It was a critical day before
6  registration. He asked for family vacation.
7  I did approve it. But yet students suffered
8  because he did not work hard before and after
9  his vacation.
10   Q.    Why did you criticize him for
11 taking vacation that you approved?
12   BY MR. VINCENT:
13       That's not her testimony.
14   MR. ARRUEBARRENA CONTINUES EXAMINATION:
15   Q.    Are you denying that you
16 criticized him for taking vacation?
17   A.    I criticized him for not serving
18 students.
19   Q.    Because he took vacation?
20   A.    He didn't serve them before and
21 after the vacation.
22   Q.    So you're saying you didn't
23 criticize him for taking vacation?
24   A.    I'm not saying that. I don't
25 know. Maybe it's on his evaluation.

Page 230

1    Q.    Well, it might be on the tape.
2    A.    Pardon me?
3    Q.    The tape recording where you give
4  him your evaluation?
5    A.    I don't understand. What tape
6  recording?
7    Q.    The one of you giving him the
8  evaluation. The one I'm going to show you.
9  And I remind you you are under oath, ma'am.
10 W17, Bates number 717 through 727. You gave
11 him this evaluation on August 15, correct?
12 It's on Bates number 726.
13   A.    August 15?
14   Q.    Yes, ma'am. Bates number 726 of
15 the exhibit.
16   A.    On this evaluation I did make the
17 point that he had called in sick.
18   Q.    In May?
19   A.    Yes.
20   Q.    So did you criticize him for
21 taking vacation right before the financial aid
22 deadline, verbally?
23   A.    I don't know verbally. It's not
24 on that document. Just the May 30 date is
25 criticized on this document that I see.

Page 231

1    Q.    When you gave him this you were
2  aware that an EEOC charge had been filed,
3  weren't you, ma'am?
4    A.    I was aware on August 5, yes.
5    Q.    Okay, so you were aware?
6    A.    Yes.
7    Q.    Prior to August 15?
8    A.    Yes.
9    Q.    So you gave him this after you
10 were aware that he filed an EEOC charge,
11 right, ma'am?
12   A.    Correct.
13   Q.    Ma'am, we had talked earlier
14 about the complaint investigation. Remember
15 we were looking at policy 6.011 at the
16 beginning of the deposition?
17   A.    Uh-huh (indicating
18 affirmatively).
19   Q.    On the back of that it says if
20 there is a complaint, the first thing is you
21 interview the complainant.
22   A.    Right.
23   Q.    Did anyone tell you not to
24 interview Mr. Carpenter about his EEOC
25 complaint?

Page 232

58  (Pages 229 to 232)

PATRICK CARPENTER              DEPOSITION OF:  DR. KAY MCDANIEL              REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM    DECEMBER 20, 2007                    LILLIE R. BURCH, CCR

| | |
|---|---|
| 1      BY MR. VINCENT:<br>2          I object to the form of the<br>3   question.<br>4      BY THE WITNESS:<br>5          I was given the directive to<br>6   document his work history.<br>7      MR. ARRUEBARRENA CONTINUES EXAMINATION:<br>8      Q.   So were you told not to talk to<br>9   him about it?<br>10     A.   No, I was not told not to talk<br>11  about it. I was just given the order to --<br>12     Q.   So you could have talked to him<br>13  about it?<br>14     A.   No one told me not to.<br>15     Q.   So you could have called any time<br>16  and said explain the details about what<br>17  exactly happened, when and where did the<br>18  incident occur, so forth?  You could have<br>19  asked him all these questions, right?<br>20     A.   I wasn't aware that I should do<br>21  that.<br>22     Q.   They didn't ask you to follow the<br>23  procedure of LTC and to interview him first?<br>24     A.   No.<br>25     Q.   They didn't tell you to do that?<br><br>Page 233 | 1      Q.   So because he didn't file the<br>2   EEOC charge with you you didn't follow the<br>3   investigative practices of LTC?<br>4      A.   I suppose.<br>5      Q.   Is that the best you can do right<br>6   now?<br>7      A.   That's it.<br>8      Q.   You could have done it, though,<br>9   right?<br>10     A.   I wasn't aware that it was my jot<br>11  to do that since it was filed with someone<br>12  else.<br>13     Q.   You were asked to look into it,<br>14  weren't you?<br>15     BY MR. VINCENT:<br>16         I object to the form of the<br>17  question.<br>18     MR. ARRUEBARRENA CONTINUES EXAMINATION:<br>19     Q.   Do you know if anyone else was<br>20  asked to look into it?<br>21     A.   I was not asked to look into it<br>22  and I do not know if anyone else was asked to<br>23  look into it.<br>24     Q.   You were asked to provide a<br>25  response?<br><br>Page 235 |
| 1      A.   Mr. Meaux said to document his<br>2   work history.<br>3      Q.   You didn't know you were supposed<br>4   to follow the procedures of your school?<br>5      A.   No.<br>6      BY MR. VINCENT:<br>7          I object to the form of the<br>8   question.<br>9      MR. ARRUEBARRENA CONTINUES EXAMINATION:<br>10     Q.   Is that what you're testimony is?<br>11     A.   No. I was told to produce a<br>12  document and that's what I did.<br>13     Q.   Why didn't you follow the written<br>14  procedures of the school, ma'am?<br>15     A.   He did not file the harassment<br>16  suit with me.<br>17     Q.   This is not a suit, ma'am, it's<br>18  an EEOC charge, it's a grievance.<br>19     A.   He doesn't file a grievance with<br>20  me.  Like I said, I didn't see these<br>21  documents.  So I didn't follow up with<br>22  something I couldn't.<br>23     Q.   But you knew the procedure was to<br>24  talk to the complainant first.<br>25     A.   He didn't file with me.<br><br>Page 234 | 1      A.   That's what I was asked to do.<br>2      Q.   Do you know if anyone else was<br>3   asked to respond?<br>4      A.   No, I do not.<br>5      Q.   When HR needed another copy, who<br>6   did they call?<br>7      A.   Me.<br>8      Q.   You.  So we've got that straight.<br>9          W18, Bates number 803.  This is<br>10  the charge.  It was filed on July 25, 2005.<br>11  Do you see that?<br>12     A.   (No response.)<br>13     Q.   Do you see that, ma'am?<br>14     A.   What date is that?<br>15     Q.   July 25, 2005.<br>16     A.   Yes.<br>17     Q.   As you already know, because you<br>18  have already confirmed it, the EEOC sends such<br>19  a charge out usually within a week.  So you<br>20  were told about it in early August.  You have<br>21  already testified to that, correct?<br>22     A.   I was told in August, yes.<br>23     Q.   Was the demotion because of<br>24  deficient performance?<br>25     A.   Yes.<br><br>Page 236 |

59  (Pages 233 to 236)

**Page 241**

1   that.
2     Q.   Building internal and external
3   relationships, does it show a lack of concern
4   for the relationships in the office to file
5   such a document?
6     A.   No.
7     Q.   Now, referring to the EEOC
8   charge, ma'am, exhibit W18, would you feel
9   that that shows an inappropriate level of
10  concern for communication with co-workers and
11  supervisors, filing that charge?
12     A.   I'm sorry, what was the question?
13     Q.   Do you think filing the charge,
14  exhibit W18, is supportive of a manager's or
15  employee's need to communicate with co-workers
16  or supervisors from an evaluation standpoint?
17     A.   I think it supports it.
18     Q.   What about professionalism?
19     A.   I suppose that's professional.
20     Q.   You said that the other complaint
21  to Ms. Montgomery-Richard lacked integrity in
22  its content.
23     A.   Well, he did say he was the only
24  black administrator in his former department.
25     Q.   Do you think this lacks integrity

**Page 242**

1   as did the other exhibit?
2     A.   I don't think it had merit.
3     Q.   So because of that do you think
4   it lacks integrity?
5     A.   Yes.
6     Q.   Do you think it lacks concern of
7   what the impact would have on others in the
8   organization?
9     A.   No.
10     Q.   You don't think it negatively
11  reflects on that?
12     A.   Negatively reflects on what?
13     Q.   On the concern he should have of
14  the impact of his actions on LTC and his
15  relationship with others?
16     A.   I don't understand.
17     Q.   Do you think that filing this
18  charge indicates a lack of concern on his part
19  from an evaluation standpoint for what his
20  concern should be for the impact of his
21  actions on others?
22     A.   I don't guess. I'm not real
23  sure.
24     Q.   You don't guess?
25     A.   I don't think that -- I'm not

**Page 243**

1   sure what you're even asking.
2     Q.   Do you think that filing this
3   charge shows a lack of concern for the impact
4   of his actions on staff and others at LTC?
5     A.   I think he's concerned about his
6   job and his salary.
7     Q.   So you think it was selfish?
8     A.   I think it was self-motivated,
9   yes.
10     Q.   So do you think it shows a lack
11  of concern about the impact of the action,
12  this charge, on LTC?
13  BY MR. VINCENT:
14       Do you understand the question,
15  ma'am?
16  BY THE WITNESS:
17       I've heard it many times, but I
18  don't understand what he's saying.
19   MR. ARRUEBARRENA CONTINUES EXAMINATION:
20     Q.   Do you think that filing this
21  charge indicates a lack of concern on his part
22  on the impact that it would have on LTC?
23     A.   Yes.
24     Q.   Do you think it shows a lack of
25  being a team player, building internal and

**Page 244**

1   external relationships, this charge?
2     A.   Say it again.
3     Q.   Do you think it shows a lack of
4   team building?
5     A.   Yes.
6     Q.   Now, Mr. Carpenter when he came
7   back from his vacation which you approved --
8   you did approve it, correct?
9     A.   Yes.
10     Q.   Were you aware that he had made
11  some appointments and that other people had
12  added appointments?
13     A.   There were times that he did
14  schedule them. We asked him not to when it
15  came closer to registration.
16     Q.   He had made some appointments?
17     A.   Yes.
18     Q.   And are you aware that probably
19  Ms. Guidry or someone added lots of
20  appointments to the book for him?
21     A.   Yes.
22     Q.   Are you aware that he saw as many
23  as humanly possible?
24     A.   No.
25     Q.   You believe he was lazy about

61  (Pages 241 to 244)

**Page 245**

1  that?
2      A.   I believe he didn't see as many
3  as he could have.
4      Q.   Were you there observing him?
5      A.   No, I was not there.  But I know
6  how many Mr. Williams was seeing each day.  He
7  was seeing fewer than Mr. Williams.
8      Q.   Mr. Williams had how many years
9  of experience in financial aid at that time?
10     A.   I guess two or three.
11     Q.   Mr. Carpenter had been there for
12  six months, right?
13     A.   Right.  But he had been trained
14  to do his job.
15     Q.   Ma'am, when you come into a new
16  job are you more experienced after two years
17  than six months?
18     A.   After two years.
19     Q.   Wouldn't you expect someone who
20  has been there for two years to be more
21  knowledgeable and more efficient?
22     A.   I expect him to do his job.  And
23  he was on vacation.  He knew there would be a
24  heavy load.
25     Q.   Because he didn't go fast enough

**Page 247**

1      A.   He had before.  That's why I gave
2  him --
3      Q.   When?
4      A.   When he was working with
5  students.  He would leave.  He would leave
6  people sitting in the office during
7  registration time.
8      Q.   Before he left on vacation?
9      A.   When he was working with
10  students.  He would leave them sitting in the
11  office during registration time.
12     Q.   Which days did he leave at the
13  normal time?
14     A.   I don't know.
15     Q.   So which day did he leave at the
16  normal leaving time?  You're not saying he
17  left early, he left at the normal time?
18     A.   Yes, the normal time.
19     Q.   Which date was that, August 10?
20     A.   It may have been the first day
21  back, I really don't know.
22     Q.   So you're saying he left at the
23  normal time and told the students I will be
24  back tomorrow?
25     A.   He did do that.

**Page 246**

1  with the ones he saw, is that it?
2      A.   I don't know if he didn't go fast
3  enough.  He didn't stay on task.  He would
4  leave his office, take personal phone calls.
5      Q.   You mean during these August 10,
6  11, and 12 -- are those the days we're talking
7  about?
8      A.   Yes.
9      Q.   You're saying he walked out of
10  the office, goofed off or something?
11     A.   Yes.  And he took long lunch
12  breaks, yes.
13     Q.   You personally observed that or
14  someone told you that?
15     A.   I was told that.
16     Q.   Who?
17     A.   Candice Guidry, Buffy Brinkley.
18     Q.   Anybody else?
19     A.   No.
20     Q.   Now, are you aware that he worked
21  late into the evening?
22     A.   I told him to.  I told him not to
23  leave.  We do that before registration.
24     Q.   Did he tell you he was going to
25  leave?

**Page 248**

1      Q.   On the 11th you told him you
2  would like him to stay longer?
3      A.   I told him he needed to stay and
4  serve students.
5      Q.   Which date was that?
6      A.   It was one of those dates, yes.
7      Q.   Now, did he stay?
8      A.   I think he did.
9      Q.   How do you know?
10     A.   Because I asked him, I think he
11  did.
12     Q.   Did you get more reports about it
13  or did you come look?
14     A.   I was at registration, I was
15  there, yes.
16     Q.   So you know he was there?
17     A.   Yes.
18     Q.   So you weren't there on the 10th?
19     A.   Yes, I was there.
20     Q.   When you left, did you tell him
21  he couldn't leave?
22     A.   He was in a different room.  He
23  was in a different office.
24     Q.   So it's your testimony he sort of
25  slipped out?

62  (Pages 245 to 248)

1      BY MR. VINCENT:
2        I object to the form of the
3 question.
4      BY THE WITNESS:
5        He didn't check with me before he
6 left. He just left.
7      MR. ARRUEBARRENA CONTINUES EXAMINATION:
8      Q.   How long did he stay the day you
9 asked him to stay longer?
10      A.   I don't know the time. Until the
11 last student was served.
12      Q.   Is there any reason to believe he
13 didn't do that on the 11th and the 12th?
14      A.   After that I think he did stay.
15 He did leave one day and left students.
16      Q.   Did he give you a reason why?
17      A.   No.
18      Q.   Did you ask him?
19      A.   No.
20      Q.   Don't you think getting back to
21 the fairness and the discipline policy, you
22 thought that lacked good judgment, didn't you?
23      A.   We expect people to work after
24 they come back from vacation. And he did not.
25      Q.   You felt that was negative on his

Page 249

1 part?
2      A.   Yes.
3      Q.   But you never asked him to
4 explain?
5      A.   There was no need for an
6 explanation.
7      Q.   So you didn't feel the need to
8 ask him for an explanation, ma'am?
9      A.   I did not.
10      Q.   Do you know if it was a medical
11 emergency or anything like that?
12      A.   He didn't tell me it was.
13      Q.   Because you didn't ask him,
14 right?
15      BY MR. VINCENT:
16        I object to the form of the
17 question.
18      MR. ARRUEBARRENA CONTINUES EXAMINATION:
19      Q.   You did not ask him, did you
20 ma'am?
21      A.   I did not ask him.
22      Q.   In fact, you never asked for
23 input from him about any criticisms you had of
24 him?
25      A.   He typically did not talk to me

Page 250

1 so it was no point.
2      Q.   The answer would be, no, you
3 didn't ask him?
4      A.   That's correct.
5      Q.   You didn't ask him about the
6 letter that supposedly came in from Mr. Chris
7 from the barbershop place?
8      A.   We actually had already discussed
9 that with him. This was part of the
10 apprenticeship problem.
11      Q.   Did you ask him about the letter
12 ever?
13      A.   No.
14      Q.   So the answer is you never asked
15 him to respond to this letter of September 13,
16 2005, from Mr. Chris, Bates number 666?
17      A.   I did not.
18      Q.   You didn't ask him to respond to
19 the letter from Mr. Bravel, Bates number 664,
20 which is against LTC policy, isn't that
21 correct, ma'am?
22      A.   I did not.
23      Q.   Which is against your company's
24 policy, correct?
25      A.   We already handled it in the

Page 251

1 reprimand I felt.
2      Q.   Do you want me to go over it with
3 you again, ma'am?
4      A.   No, I don't.
5      Q.   It is against your policy to have
6 written complaints and not give an employee
7 the opportunity to respond? Do you need me to
8 go over it with you, ma'am?
9      A.   No, I don't.
10      Q.   As to all these complaints in
11 your booklet, your binder, did you give him an
12 opportunity to respond to those written
13 complaints?
14      A.   Not the individual ones. Because
15 we were handling them as a group.
16      Q.   You never gave him an opportunity
17 to respond to any of it, did you, ma'am?
18      A.   Not to the written ones that came
19 in at the end, no.
20      Q.   You never gave him an opportunity
21 to respond to anything in the binder, did you?
22      BY MR. VINCENT:
23        Asked and answered. I object to
24 the form of the question.
25      BY THE WITNESS:

Page 252

63   (Pages 249 to 252)

1      I put together the binder as a
2  result of the EEOC claim.  So there was no
3  point in asking him.  I was just asked to pull
4  everything together for him.
5          MR. ARRUEBARRENA CONTINUES EXAMINATION:
6      Q.    And that was the binder that you
7  sat with Mr. Henderson and said look at my
8  justification for firing him?
9          BY MR. VINCENT:
10          I object to the form of the
11  question.
12          BY THE WITNESS:
13          Yes.
14          MR. ARRUEBARRENA CONTINUES EXAMINATION:
15      Q.    And you didn't feel it was
16  necessary, according to your policy, to ask
17  him for a response to anything that was in
18  that binder, right?
19      A.    Not the specific things.  We had
20  discussed many things in the binder as a
21  group.  He had been reprimanded for the
22  apprenticeship problem, and we had discussed
23  that.  There were two letters about that.  So
24  he had been told about that.
25      Q.    Ma'am, your policy says that if

Page 253

1  already testified to that, right, ma'am?
2          BY MR. VINCENT:
3          I object to the form of the
4  question.
5          MR. ARRUEBARRENA CONTINUES EXAMINATION:
6      Q.    Right, ma'am?
7      A.    Yes.
8      Q.    You weren't.
9          BY MR. VINCENT:
10          Are you testifying, Jim?
11          BY MR. ARRUEBARRENA:
12          No, just a fortuitous comment.
13          BY MR. VINCENT:
14          Then keep it to yourself,
15  counselor.
16          MR. ARRUEBARRENA CONTINUES EXAMINATION:
17      Q.    Now, you're sitting there
18  working.  You have done your booklet.  You say
19  you finished at the end of September.  Then
20  you claim there were some problems after that?
21  You claim that?
22      A.    Some problems with what?
23      Q.    Some kind of problem with his
24  performance before you fired him?
25      A.    Yes.

Page 255

1  someone needs improvement, you certainly are
2  aware that your policy says they are to be put
3  on a ninety-day performance improvement plan?
4      A.    We actually did one in one of the
5  evaluations.  He was put on an improvement
6  plan.
7      Q.    I'm assuming he accomplished it.
8      A.    I was told I couldn't fire him
9  because of the EEOC claim.
10      Q.    Who told you that?
11      A.    My supervisor.
12      Q.    Mr. Meaux?
13      A.    Dr. Montgomery.
14      Q.    Were they concerned about
15  retaliation?
16      A.    I'm not sure.
17      Q.    Was that packet sent to legal?
18      A.    What packet?
19      Q.    Your booklet.
20      A.    No.  I sent it to Margaret Webb.
21      Q.    Do you know if legal was
22  consulted about his termination?
23      A.    I do not know.
24      Q.    But you thought you were in the
25  clear on the EEOC in terminating him?  You

Page 254

1      Q.    Was it of the same degree as
2  before?
3      A.    There was a problem with him
4  serving students.
5      Q.    Did he improve any during 2006?
6      A.    No.
7      Q.    None?
8      A.    No.
9      Q.    So why didn't you fire him then?
10  You had your booklet.  Why didn't you fire him
11  then?
12      A.    I talked to Mr. Henderson in
13  December.  I was told I could fire him in the
14  new year.
15      Q.    You and Mr. Henderson decided
16  that?
17      A.    Well, I talked to Mr. Henderson,
18  but I don't know who he talked to.
19      Q.    Do you know if he spoke with
20  anybody?
21      A.    I do not know.
22      Q.    Were you aware that Mr. Meaux met
23  with the plaintiff after his EEOC charge in
24  September of 2008?
25      A.    (No response.)

Page 256

64  (Pages 253 to 256)

1  late September of 2005, the date you finished
2  preparing the binder, the Region 2 Patrick
3  Carpenter binder.
4      BY MR. VINCENT:
5          It's dated September 29.
6      BY MR. ARRUEBARRENA:
7          Anything after September 29,
8  2005. Take as long as you need, ma'am.
9          Let the record reflect the
10  witness is looking through defendant's Exhibit
11  G, Bates numbers 1 through 253.
12      BY THE WITNESS:
13          There is nothing in here.
14      BY MR. ARRUEBARRENA:
15      Q.  So there is nothing in his record
16  indicating deficient performance between
17  September 29 and the date you fired him?
18      BY MR. VINCENT:
19          I object to the form of the
20  question.
21      BY THE WITNESS:
22          That's correct.
23      MR. ARRUEBARRENA CONTINUES EXAMINATION:
24      Q.  Did anyone else participate in
25  the decision to fire him?

Page 265

1      A.  No.
2      Q.  So I will ask you once again.
3  Other than thinking the EEOC charge was over
4  with was there any other motivation for
5  terminating him on that day?
6      A.  He was continuing to not do his
7  job.
8      Q.  But you having nothing in his
9  record indicating that, correct?
10      A.  The evaluations. I'm not sure
11  there is one during that period.
12      Q.  Other than that, didn't you
13  attempt to give him an evaluation in June of
14  '06? You attempted to give him one, didn't
15  you, another bad evaluation?
16      A.  In June of '06 he was in what
17  position?
18      Q.  Financial aid. Didn't he stay in
19  financial aid from February 2005 through the
20  date of his termination?
21      A.  Yes.
22      Q.  Didn't you try to give him
23  another negative evaluation?
24      A.  I'm not sure about the word try.
25      Q.  Well, he didn't sign it. It was

Page 267

1      A.  I just made the recommendation.
2  It was a decision made by the point of
3  authority.
4      Q.  But he didn't have any personal
5  knowledge, all he knew is what you told him,
6  right?
7      A.  Right.
8      Q.  You could have just as easily
9  gotten a promotion for Mr. Carpenter if you
10  had praised him to Mr. Henderson, correct?
11      A.  I'm not so sure that I could have
12  done that.
13      Q.  Well, in any event, Mr. Henderson
14  had no personal knowledge other than what you
15  told him, right?
16      A.  That's correct.
17      Q.  Do you know if anyone else spoke
18  to him about it?
19      A.  I do not know that.
20      Q.  Did you consult with anyone else
21  on the decision to terminate Patrick Carpenter
22  other than Mr. Henderson?
23      A.  No.
24      Q.  Did anyone help you with that
25  decision in any way?

Page 266

1  not produced to me. It's not in his record.
2  So you didn't give it to him? Is this the
3  complete record, ma'am, that was given to me
4  by your company and represented as the
5  complete record?
6      A.  Yes.
7      Q.  So if it's not in here, it's not
8  important?
9      BY MR. VINCENT:
10          Object to the question. If it's
11  not in here it's not important?
12      BY MR. ARRUEBARRENA:
13          Answer the question, please,
14  ma'am.
15      BY THE WITNESS:
16          Let me check the date on this.
17      BY MR. ARRUEBARRENA:
18          Let the record reflect the
19  witness is examining the exhibit, or the Bates
20  numbers that I have identified.
21      BY THE WITNESS:
22          The last evaluation I see is
23  8-05.
24      MR. ARRUEBARRENA CONTINUES EXAMINATION:
25      Q.  So if it's not in the documents I

Page 268

67 (Pages 265 to 268)

321 North Vermont Street
Covington, Louisiana 70433

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters

Telephone: (985) 893-1999
Facsimile: (985) 893-6765

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK CARPENTER | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NUMBER 07- 0170-JJB-SCR |
| | * | |
| THE BOARD OF SUPERVISORS OF THE | * | JUDGE BRADY |
| LOUISIANA COMMUNITY AND | * | |
| TECHNICAL COLLEGE SYSTEM, ET AL | * | MAGISTRATE RIEDLINGER |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## DEFENDANTS' ANSWERS TO PLAINTIFF'S
## FIRST REQUEST FOR ADMISSIONS

**NOW INTO COURT,** through the undersigned, come defendants, who respectfully respond to answer plaintiff's Request for Admissions propounded upon them as follows:

## REQUEST FOR ADMISSION NO. 1:

Admit or deny that Plaintiff provided Mr. Wainwright a typed-written document dated February 4, 2005 which included the statement: "This letter will serve as a formal rejection of 'Corrective Action' and a formal complaint of Harassment as defined in the LCTCS Policy #11.3011 based on my race and my color."

## ANSWER TO REQUEST FOR ADMISSION NO. 1:

Denied

## REQUEST FOR ADMISSION NO. 2:

Admit or deny that Plaintiff provided Dr. Margaret Montgomery-Richard a typed-written document dated March 9, 2005 which included the statement: "Again, I have not

EXHIBIT
N
PENGAD 800-631-6989

1

received anything in writing regarding any of the moves and am convinced that I am being harassed based on my race."

**ANSWER TO REQUEST FOR ADMISSION NO. 2:**

Denied

**REQUEST FOR ADMISSION NO. 3:**

Admit or deny that the LTC provided a response to Plaintiff's EEOC Charge which included an Employment History Chronology with about 39 Attachments, which was sent to the EEOC on or about December 8, 2006.

**ANSWER TO REQUEST FOR ADMISSION NO. 3:**

Admitted

**REQUEST FOR ADMISSION NO. 4:**

Concerning the letter to Danny Crump from Keith W. Barvel dated September 14, 2005 and submitted to the EEOC by the LTC, please admit or deny that no one at the LTC (or on behalf of the LTC) either advised Plaintiff of the letter or sought any response form Plaintiff concerning the statements about said letter.

**ANSWER TO REQUEST FOR ADMISSION NO. 4:**

Admitted

**REQUEST FOR ADMISSION NO. 5:**

Concerning the letter to Danny Crump from Russell W. Christ dated September 13, 2005 and submitted to the EEOC by the LTC, please admit or deny that no one at the

LTC (or on behalf of the LTC) either advised Plaintiff of the letter or sought any response form Plaintiff concerning the statements about said letter.

**ANSWER TO REQUEST FOR ADMISSION NO. 5:**

Admitted

**REQUEST FOR ADMISSION NO. 6:**

Concerning the documents entitled "Report on Patrick Carpenter" by Buffy M. Brinkley dated September 14, 2005 and submitted to the EEOC by the LTC, please admit or deny that no one at the LTC (or on behalf of the LTC) either advised Plaintiff of the letter or sought any response form Plaintiff concerning the statements about said letter.

**ANSWER TO REQUEST FOR ADMISSION NO. 6:**

Admitted

**REQUEST FOR ADMISSION NO. 7:**

Concerning the document submitted by the LTC to the EEOC concerning Marion Gautier's dealings with Plaintiff, please admit or deny that no one at the LTC (or on behalf of the LTC) either advised Plaintiff of the document or sought any response form Plaintiff concerning the statements about said document.

**ANSWER TO REQUEST FOR ADMISSION NO. 7:**

Admitted

**REQUEST FOR ADMISSION NO. 8:**

Concerning the document submitted by the LTC to the EEOC concerning Toni Byrd's dealings with Plaintiff, please admit or deny that no one at the LTC (or on

3

behalf of the LTC) either advised Plaintiff of the document or sought any response form Plaintiff concerning the statements about said document.

## ANSWER TO REQUEST FOR ADMISSION NO. 8:

Admitted

## REQUEST FOR ADMISSION NO. 9:

Concerning the document submitted by the LTC to the EEOC concerning "Student in Business Department's dealings with Plaintiff a couple of weeks into the summer term 2005, please admit or deny that no one at the LTC (or on behalf of the LTC) either advised Plaintiff of the document or sought any response form Plaintiff concerning the statements about said document.

## ANSWER TO REQUEST FOR ADMISSION NO. 9:

Admitted

## REQUEST FOR ADMISSION NO. 10:

Concerning the document submitted by the LTC to the EEOC entitled "Report on Altercation with Mr. Patrick Carpenter" by Candice Guidry dated September 28, 2005, please admit or deny that no one at the LTC (or on behalf of the LTC) either advised Plaintiff of the document or sought any response form Plaintiff concerning the statements about said document.

## ANSWER TO REQUEST FOR ADMISSION NO. 10:

Admitted

**REQUEST FOR ADMISSION NO. 11:**

Admit or deny that the LTC utilize a progressive discipline policy and evaluation policy which includes step such as: (1) verbal warnings to identify problems; (2) written warnings, including a formal meeting with the employee, to establish clear performance expectations to correct the problems; (3) an opportunity for the employee to present his or her case; and (4) termination, if the problems remain unresolved after the above steps.

**ANSWER TO REQUEST FOR ADMISSION NO. 11:**

Admitted

Respectfully submitted,

**CHARLES C. FOTI, JR.
ATTORNEY GENERAL**

BY: _____

Scott G. Vincent
Bar Roll No. 14478
Stacey Johnson
Bar Roll No. 27331

Assistant Attorneys General
Louisiana Dept. of Justice
Litigation Division
1885 N. 3rd Street, 4th Floor
P.O. Box 94005
Baton Rouge, LA 70802
Telephone: (225) 326-6402
Facsimile: (225) 326-6495
Johnsonst@ag.state.la.us
Vincents@ag.state.la.us

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been forwarded to opposing counsel by mailing same in the United States Mail, properly addressed, with first-class postage affixed thereto, this 7th day of December, 2007

_____
SCOTT G. VINCENT




# Louisiana Technical College
# BR Tech Campus

3250 North Acadian Thruway East . Baton Rouge, Louisiana
70805
Phone:  (225) 359-9201  . Fax:  (225) 359-9296

August 15, 2005

Mr. W. Wayne Meaux
Vice Chancellor/Provost
Greater Capital Area District 2
3250 N. Acadian Thruway East
Baton Rouge, LA 70805

Dear Mr. Meaux:

This letter is to serve as a formal recommendation for removal of Mr. Patrick
Carpenter from employment at Louisiana Technical College – Baton Rouge
Campus as a Financial Aid Officer.

Mr. Carpenter has been placed on enforced annual leave effective August
15, 2005, based upon your approval.

Please contact me should you need additional information.

Sincerely,

*Kay McDaniel*

Kay McDaniel, Ph.D.
Campus Dean



EXHIBIT
O

Carpenter v. LTC
Bates No. 000729

# TRANSCRIPT OF THE DEPOSITION OF:

## DR. JOCELYN D. WEST
## 02/15/08

---

## PATRICK CARPENTER

## VERSUS

## LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



EXHIBIT
P

PATRICK CARPENTER            DEPOSITION OF: DR. JOCELYN D. WEST            REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL        FEBRUARY 15, 2008                LILLIE R. BURCH, CCR

| | |
|---|---|
| 1    Usual stipulations?<br>2   BY MR. ARRUEBARRENA:<br>3       Yes.<br>4   MR. ARRUEBARRENA CONTINUES EXAMINATION:<br>5       Q.   If I ask a question you don't<br>6   understand, please let me know and I will<br>7   rephrase it.  Okay?<br>8       A.   Okay.<br>9       Q.   If the LTC counsel objects,<br>10  unless he tells you not to answer the question<br>11  you're still required to answer.<br>12      A.   Okay.<br>13      Q.   Tell me your highest level of<br>14  education.<br>15      A.   I have a doctorate in adult<br>16  education and career guidance.<br>17      Q.   Where do you currently work?<br>18      A.   I'm self-employed.<br>19      Q.   What do you do?<br>20      A.   I'm a consultant.<br>21      Q.   In this area, in adult --<br>22      A.   No.  I do capacity building<br>23  training and grant writing for nonprofit and<br>24  faith based organizations.<br>25      Q.   When did you last work for the<br>                                              Page 5 | 1       Q.   And then the position just before<br>2   that?<br>3       A.   I was the dean of the Louisiana<br>4   Technical College Westside campus.<br>5       Q.   And can you remember anything<br>6   concerning when that job ended, month and<br>7   year?<br>8       A.   I worked those jobs concurrently<br>9   for awhile.  So it was when the new system was<br>10  developed where we went to the district model.<br>11  I can't remember exactly what the date was.<br>12      Q.   How long were you kind of doing<br>13  both of them, dean of LA Tech Westside and<br>14  district dean of student affairs?<br>15      A.   Maybe two years.<br>16      Q.   And then was there a period<br>17  before that where you were just a dean --<br>18      A.   Yes, there was.  I became the<br>19  dean of the Westside campus in 2000.<br>20      Q.   So somewhere between 2000 and<br>21  2006, somewhere in there, it looks like it<br>22  might have been around 2003, you were doing<br>23  both of them?<br>24      A.   Right.<br>25      Q.   And then at some point you<br>                                              Page 7 |
| 1   LTC?<br>2       A.   I retired August of 2006.<br>3       Q.   Was that a voluntary retirement<br>4   or did someone suggest that you retire?<br>5       A.   It was a voluntary retirement.<br>6       Q.   What position did you hold at<br>7   that time?<br>8       A.   I was district dean of student<br>9   affairs.<br>10      Q.   How long had you worked for LTC?<br>11      A.   Fourteen years.<br>12      Q.   Did you work with the state<br>13  before that?<br>14      A.   Pardon?<br>15      Q.   Were you a state employee before<br>16  that?<br>17      A.   No.  I had eight years at<br>18  Southern University.<br>19      Q.   You said district dean of student<br>20  affairs?<br>21      A.   Uh-huh (indicating<br>22  affirmatively).<br>23      Q.   How long had you held that<br>24  position before you retired?<br>25      A.   About three years.<br>                                              Page 6 | 1   evolved into finally district dean --<br>2       A.   Right, I had to give up the<br>3   campus position and just do the district<br>4   position.<br>5       Q.   About how many years or how much<br>6   time was it that you were no longer doing both<br>7   of them but just district development student<br>8   affairs?<br>9       A.   Probably no more than two, 2004<br>10  maybe.<br>11      Q.   2004, 2005, up until your<br>12  retirement?<br>13      A.   Yes.<br>14      Q.   As the dean of the Louisiana Tech<br>15  Westside campus does that involve all student<br>16  issues?  You know, student affairs, financial,<br>17  academic?<br>18      A.   Yes.<br>19      Q.   It's like you were head of the<br>20  campus?<br>21      A.   Head of that campus.<br>22      Q.   And district dean of student<br>23  affairs, what does that involve?<br>24      A.   I was in charge of all student<br>25  affairs issues for the entire district, which<br>                                              Page 8 |

2  (Pages 5 to 8)

1    Q.   Lamoyne Williams, who did he
2 report to?
3    A.   Lamoyne Williams reported to
4 whoever he wanted to report to.  He was
5 supposed to report to Marlon when he was in
6 financial aid.  He was later moved to a new
7 position of work force development, I think.
8    Q.   What did you mean when you said
9 Lamoyne Williams reports to anyone he wants to
10 report to?
11    A.   Lamoyne Williams was a golden
12 child at the Baton Rouge campus.  He was
13 allowed to do most anything he wanted to do as
14 far as Kay and Wayne were concerned.  So he
15 moved around a lot.
16    Q.   Is that a criticism of him?
17    A.   No.  It's just a fact.
18    Q.   When you say he was a golden
19 child, did they favor him in some way?
20    A.   Yes, they did.
21    Q.   Did you feel that whatever
22 motivations they had for favoring him were
23 fair?
24    A.   No.
25    Q.   Did you feel that their

Page 13

1 motivations for favoring him were unfair?
2    A.   Yes.
3    Q.   What was unfair about it?
4    A.   Well, he didn't have to follow
5 any rules.  When it came to what Lamoyne
6 wanted to do, regardless of whether or not you
7 gave a professional recommendation that it was
8 not the right thing to do, it didn't matter.
9    Q.   Because he had sponsorship from
10 Mr. Meaux and Dr. McDaniel?
11    A.   Yes.
12    Q.   Did that cause any kind of
13 disruption?
14    A.   Yes, it did.  Because Lamoyne
15 was -- Lamoyne was doing financial aid when we
16 all came to the Baton Rouge campus.  And he
17 didn't really want to do financial aid
18 anymore.  So they moved him to another
19 position, but he still was somewhat trying to
20 supervise Patrick.  So it created some tension
21 there.
22    Q.   Do you have personal knowledge of
23 who was responsible for any tension between
24 him and Patrick?  Would you say it was
25 Lamoyne's fault or Patrick's fault, as far as

Page 14

1 you know?
2    A.   I would have to say it was
3 Lamoyne's fault.
4    Q.   Why would you say that?
5    A.   Because if you are not someone's
6 supervisor you shouldn't be able to dabble in
7 their day-to-day operations.
8    Q.   Would it be fair to say that he
9 was overstepping his bounds with Patrick?
10    A.   Yes.
11    Q.   Do you know if he disliked
12 Patrick?
13    A.   I would have to say -- I wouldn't
14 know for sure.  But if I had to take a guess I
15 would say yes he did.
16    Q.   Why would you fall on that side
17 of it, that he disliked Patrick?
18    A.   Because Lamoyne was a follower,
19 not a leader.  And at some point in time the
20 leadership didn't like Patrick.
21    Q.   At what point in time did you
22 feel the leadership did not like Patrick?
23    A.   Well, Patrick got moved around a
24 lot.  I was initially on the interview of
25 Patrick.  When he came to work for the LTC he

Page 15

1 didn't come to work as a financial aid
2 officer.  And he eventually landed in student
3 affairs.  I just felt like at that point in
4 time there was some dislike for him
5 personally.
6    Q.   Had that been conveyed to you in
7 any way by either Dr. McDaniel or Vice
8 Chancellor Meaux?
9    A.   Kay McDaniel at one time said
10 Patrick's name was not allowed to be mentioned
11 in her home.  That's how much dislike she had
12 for him, his name could not be mentioned in
13 her house.
14    Q.   Did you hear any similar comments
15 from Mr. Meaux?
16    A.   I think at the end Mr. Meaux was
17 just feeling more frustrated than anything
18 else that he didn't know where to put Patrick.
19    Q.   Can you tell me anything about
20 the context of that comment made by Dr.
21 McDaniel that Patrick Carpenter's name was not
22 allowed in her house?
23    A.   There had been an incident at the
24 school that day.  I can remember it like it
25 was yesterday.  Because we were on the golf

Page 16

4  (Pages 13 to 16)

```
 1   course.  We were on a retreat with all of the
 2   deans.  And we were taking a break.  I can't
 3   remember the incident, but a phone call came
 4   and it involved Patrick.  I can't remember the
 5   details of what happened.  But of course
 6   Dr. McDaniel was frustrated about the incident
 7   reported to her.  And she made the statement
 8   that he caused so much tension in her life
 9   until his name was not allowed to be mentioned
10   in her house.
11        Q.    She said he caused tension in her
12   life?
13        A.    Yes.
14        Q.    Do you remember any other
15   statements that she made that indicated a
16   dislike for Patrick?
17        A.    Well, she sent me an e-mail once
18   where she wanted to reprimand Patrick for
19   something that he had done.  And I had to
20   express to her that I felt it was
21   inappropriate because Patrick had never
22   actually received proper training for the
23   thing she was holding him accountable for.
24        Q.    Can you remember anything about
25   the factual basis of that, the thing that she
                                           Page 17
```

```
 1   was holding him responsible for?
 2        A.    It had something to do with
 3   keeping appointments.  It had something to do
 4   with financial aid.  It may have had something
 5   to do with keeping appointments or something
 6   of that magnitude.  I can't remember the exact
 7   incident.
 8        Q.    Did it have anything to do with
 9   him being on vacation and coming back right
10   before a deadline for some financial aid?
11        A.    One time when Patrick was on
12   vacation, while he was gone, when he got back
13   he got -- Patrick brought this to me -- he got
14   a letter.  And the letter wasn't in the
15   mailbox the whole time he was gone because I
16   had the mail checked every day.  And the
17   letter appeared later and had a date on it
18   that would have been earlier.  And I think
19   that letter was about him not coming back to
20   work.  It had something to do with his
21   vacation while he was off.
22        Q.    So did it appear to you that
23   there was an attempt to postdate or predate a
24   letter?
25        A.    It appeared that way.
                                           Page 18
```

```
 1        Q.    Who was the letter from?
 2        A.    It was from Dr. McDaniel, if I'm
 3   not mistaken.
 4        Q.    And you're sure --
 5        A.    I had the mail checked every day.
 6   This letter did not appear until after Patrick
 7   came back to work.  But he was told it was in
 8   his box the entire time he was gone.  But I
 9   had the mail checked every day so I know that
10   it was not.
11        Q.    So that would have been an
12   untruth that it had been in his box?
13        A.    Oh, yes.
14        Q.    How would you have such specific
15   recollection of what is in somebody's mailbox?
16        A.    It was the mail for the student
17   services department.  And so the mail was
18   collected every day.
19        Q.    I'm going to come back to that.
20   I think I know the incident.  We can identify
21   the incident.  I have to find the letter.  I
22   think the incident that you refer to -- let me
23   ask you.  Did Ms. McDaniel ever convey to you
24   that she was working on or concerned about
25   Patrick complaining about racial
                                           Page 19
```

```
 1   discrimination, that she was involved with
 2   addressing that issue?
 3        A.    Not that I can recall.
 4        Q.    Did she ever convey to you that
 5   she was involved in addressing an EEOC
 6   complaint that he had filed?
 7        A.    No.
 8        Q.    Was it Dr. McDaniel's
 9   responsibility in 2005 to approve, say, if
10   Patrick wanted to take vacation?
11        A.    That was before I came to the
12   campus.  Yes, she would have been the person,
13   I would imagine.  Because she was the campus
14   administrator.
15        Q.    Would it be correct to say it was
16   her responsibility if someone asked for
17   vacation, especially if they hadn't been
18   through student registration before, to make a
19   decision whether or not that would be an
20   appropriate time to take vacation, the
21   manager?
22        A.    Yes, that was her call.
23        Q.    Would it be correct that if she
24   allowed vacation, she should have made
25   arrangements to back up the person on
                                           Page 20
```

PATRICK CARPENTER          DEPOSITION OF: DR. JOCELYN D. WEST                    REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL    FEBRUARY 15, 2008                    LILLIE R. BURCH, CCR

**Page 21**

1 vacation?
2      A.   Yes.
3      Q.   Would it be fair to criticize
4 Patrick because she gave him the vacation?
5 BY MR. VINCENT:
6           I object to the form of the
7 question.
8 BY MR. ARRUEBARRENA:
9           Would that be unfair?
10 BY THE WITNESS:
11           Yes, I think it would be unfair.
12 MR. ARRUEBARRENA CONTINUES EXAMINATION:
13      Q.   Let me refer you to Bates Number
14 372.  This is a vacation request approved by
15 Ms. McDaniel.  She approved him for vacation
16 August 9, 2005.  Do you remember anything
17 about the deadlines and when financial aid --
18 does that trigger any dates in your mind?
19      A.   That's coming up to the fall
20 registration.
21      Q.   I think the fall registration was
22 around the 15th.
23      A.   Uh-huh (indicating
24 affirmatively).
25      Q.   You're going to have to take my

**Page 22**

1 word for it and maybe when we take a break I
2 can find the testimony for you.  But Patrick
3 testified that while he was on vacation they
4 loaded up his schedule.  That there wasn't a
5 lot of backup.  And then when he got there he
6 couldn't see all the students and the students
7 complained.  That's what Ms. McDaniel was mad
8 at him about.  Does that sound like the
9 pattern --
10 BY MR. VINCENT:
11           I object to the form of the
12 question.
13 MR. ARRUEBARRENA CONTINUES EXAMINATION:
14      Q.   Go ahead.
15      A.   I'm not really certain that
16 during the time frame that you're referring to
17 I was actually at the campus.  Because I don't
18 remember the exact date that I transferred
19 over.  But Patrick was there prior to my
20 coming.
21           The way that they had the system,
22 as far as I can remember, was that other
23 people did the scheduling for you.  And so
24 they, you know, I know that Candice -- I can't
25 remember Candice's last name -- was one of the

**Page 23**

1 persons that took calls and did scheduling.
2 So the process they used to do scheduling
3 could have very well led to Patrick's load
4 being more than he could handle for seeing the
5 students.  And of course any time you are
6 dealing with students and their money, if they
7 are not pleased with you, they are not happy.
8      Q.   Do you know if Lamoyne Williams
9 was still involved in financial affairs at
10 that time?
11      A.   Lamoyne was involved for a while.
12 Because it seems like there was some division
13 by alphabet, if I remember correctly.
14      Q.   Would Lamoyne be the type of
15 person that if he didn't want to help Patrick
16 he would not be disciplined for not helping
17 Patrick?
18      A.   Say it again.
19      Q.   If he didn't want to help Patrick
20 when Patrick was on vacation, back him up, he
21 wouldn't be criticized for not helping Patrick
22 by Dr. McDaniel?
23      A.   Oh, no.
24      Q.   Because he was the golden boy,
25 correct?

**Page 24**

1      A.   That's correct.
2      Q.   I'm going to show you this
3 exhibit, Plaintiff's Bates Number 729.  This
4 is a recommendation of termination.  Were you
5 aware of that?  This is right around the time
6 we're talking about, August 15, 2005.
7      A.   I'm trying to remember if I knew
8 that they had done that.  I'm sure it must
9 have been mentioned to me, but I don't recall
10 exactly if it was ever discussed with me.  I
11 can't recall exactly.
12      Q.   You did recall I think when we
13 were talking about the time when Dr. McDaniel
14 mentioned something about Patrick's name
15 wouldn't be mentioned in her house, that he
16 had caused tension, that it was around this
17 time frame?
18      A.   That may be after that incident
19 when we were at the retreat.  But in the
20 times -- I'm trying to remember exactly.  I
21 don't remember the exact time frames, but I
22 think at one point in time when there was some
23 talk about Patrick I did share with Dr.
24 McDaniel and Wayne Meaux that Patrick may need
25 some additional training to be able to

6  (Pages 21 to 24)

PATRICK CARPENTER          DEPOSITION OF: DR. JOCELYN D. WEST          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL      FEBRUARY 15, 2008                                                    LILLIE R. BURCH, CCR

1  successfully do that job.
2      Q.    Did they convey to you that he
3  was not performing adequately?
4      A.    In their opinion, you know, some
5  of the things they may have felt like he
6  wasn't performing.  But if you didn't have the
7  right training and you had more of a load than
8  you could actually handle, then it would be
9  difficult to be held up to those standards.
10     Q.    Would it be correct that what
11 happened to Patrick in that situation in
12 essence is he was set up to fail?
13     A.    Yes, he was.
14     Q.    Who set him up?
15     A.    Lamoyne Williams and Kay
16 McDaniel.
17     Q.    How do you know Kay McDaniel set
18 him up to fail?
19     A.    At that time she was his
20 immediate supervisor.  And she could have
21 helped him better than she did.
22     Q.    How do you know that she didn't
23 help him and she could have?  How do you know
24 that?
25     A.    Well, after I got there, the

Page 25

1      I agreed that he needed help.
2  But I would not have chosen Candice.  So that
3  was of no help to Patrick with an overload.
4  And Baton Rouge campus was one of the largest
5  campuses in our district.
6      Q.    What do you think they were
7  preparing her for?
8      A.    Candice was being prepared to
9  take Patrick's job.
10     Q.    How do you know that?
11     A.    That's what she's doing now.
12     Q.    What race is Candice?
13     A.    She's white.
14     Q.    Did Patrick ever convey to you
15 that he had complained about race
16 discrimination?
17     A.    Yes.
18     Q.    Did you ever confer with
19 Chancellor Margaret Montgomery about that?
20     A.    I spoke to Dr. Montgomery
21 regarding the racial tension at Baton Rouge
22 campus period, not just related to Patrick.
23     Q.    During the time Patrick worked
24 there?
25     A.    Yes.

Page 27

1  recommendations that were made, they just did
2  not adhere to him as far as things that could
3  have been done.
4      Q.    You recommended ways to help
5  Patrick in situations and they wouldn't do it,
6  is that what you're saying?
7      A.    Yes.
8      Q.    What kinds of things?
9      A.    Well, at one point Candice was
10 made to assist Patrick.  Candice couldn't help
11 Patrick, she was a receptionist with a high
12 school diploma.  So that wasn't any help, you
13 know.  That would be like you assigning me to
14 be your assistant.  I'm not a lawyer.  So if I
15 don't have the knowledge to do the job, I'm
16 going to be more of a hindrance to you than a
17 help.
18     Q.    How do you know she assigned
19 Candice to do that, she told you?
20     A.    Oh, Candice was assigned to go to
21 financial aid boot camp.  Because they were
22 preparing Candice without my knowledge.  And
23 then when I was made aware of it, you know, I
24 sent in information saying that she didn't
25 have the credentials to have the position.

Page 26

1      Q.    Do you know April Magee?  Did she
2  work for Chancellor Montgomery?
3      A.    I don't recall April Magee.
4  There was a Beryl Magee.
5      Q.    Were you aware of any incident
6  with Mr. Gassen?
7      A.    I don't know him.
8      Q.    Do you know Margaret Webb?
9      A.    Yes.
10     Q.    Is she a competent HR person?
11     A.    She has her moments where she
12 doesn't do what she's supposed to.  She
13 drops the ball quite a bit.
14     Q.    What is your personal knowledge
15 about that?
16     A.    Oh, Margaret, she was one of
17 those types of people whenever she was working
18 on something you had to do your own follow-up
19 to make sure it happened or it wouldn't
20 happen.  With my own paperwork with Margaret,
21 I took care of it myself.  I wouldn't just
22 drop something off to her, not as it related
23 to my own personal needs.
24     Q.    Were you aware of Patrick being
25 demoted?

Page 28

7  (Pages 25 to 28)

321 North Vermont Street                VENTURELLA & ASSOCIATES, L.L.C.          Telephone: (985) 893-1999
Covington, Louisiana 70433              Board-Certified Court Reporters            Facsimile: (985) 893-6765

EEOC Form 161 (3/98)

U.S. E        AL EMPLOYMENT OPPORTUNITY COMMIS        N

## DISMISSAL AND NOTICE OF RIGHTS

To: Patrick W. Carpenter
9621 East Graham Avenue
Baton Rouge, LA 70814

From: U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
New Orleans Field Office
1555 Poydras Street, Suite 1900
New Orleans, LA 70112

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 270-2005-00410 | Uma Kandan, Supervisor | (504) 595-2856 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Keith T. Hill, Acting Field Director

4.5.06

Enclosure(s)

(Date Mailed)

cc:    Louisiana Technical College

EXHIBIT
Q

PENGAD 800-631-6989

Carpenter v. LTC
Bates No. 000756

Enclosure with EEOC
Form 161 (3/98)

INFORMATION RELATED TO FILING SUIT
UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should keep a record of this date.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – *not* 12/1/02 – in order to recover unpaid wages due for July 2000.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION -- **Title VII and the ADA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Carpenter v. LTC
Bates No. 000757



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
New Orleans Field Office

1555 Poydras Street, Suite 1900
New Orleans, LA 70112
(504) 589-2825
TTY (504) 589-2958
FAX (504) 589-6861
Website: www.eeoc.gov

EEOC Charge No. 270 -2005 -00410

Patrick W. Carpenter                            Charging Party
9621 East Graham Avenue
Baton Rouge, LA 70814

and

Louisiana Technical College                     Respondent
3250 North Acadian Thruway East
Baton Rouge, LA 70805

## NOTICE OF REVOCATION

Pursuant to the authority vested in me by the Commission and Title 29 of the Code of
Federal Regulations, this is notice that the DISMISSAL AND NOTICE OF RIGHTS
previously issued in the above styled matter, is hereby revoked.

The investigation of this matter will continue.

6/19/06
Date

Keith Hill, Acting Director

EXHIBIT
R

Carpenter v. LTC
Bates No. 000755



# LOUISIANA COMMUNITY & TECHNICAL COLLEGE SYSTEM

*Changing Lives,*
*Creating Futures*

Walter G. Bumphus, Ph.D.
*System President*

Officers:

Brett J. Mellington
*Chair*

Stephen C. Smith
*First Vice Chair*

Sean E. Reilly
*Second Vice Chair*

Members:

E. Edwards Barham
Helen Bridges Carter
Ava Dejoie
John E. DeLaney
Carl H. Franklin
Kathy Sellers Johnson
Ann H. Knapp
Dan Packer
Vincent J. St. Blanc, III
F. Mike Stone

Student Members:

Joan McHenry
Cleo Norris

Louisiana
Community
& Technical
College System

265 South Foster Drive
Baton Rouge, LA 70806

Phone: 225-922-2800
Fax: 225-922-1185

*www.lctcs.net*

January 2, 2007

Mr. Patrick Carpenter
9621 E. Graham Ave.
Baton Rouge, LA 70814

Dear Mr. Carpenter:

It has been determined to be in the best interest of the Louisiana Community and Technical College System that your unclassified, at-will, employment as Financial Aid Officer, Baton Rouge Campus, Region 2 of the Louisiana Technical College terminate effective close of business Tuesday, January 2, 2007.

This action is based on the recommendation of Dr. Kay McDaniel, Regional Director of Region 2.

Sincerely,

Jim Henderson
Senior Vice President of Workforce Training and Development

c:    Dr. Walter Bumphus
      Dr. Kay McDaniel
      Ms. Lura Kamiya

EXHIBIT
S
PENGAD 800-631-6989

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


PATRICK CARPENTER                    CIVIL ACTION
                                     NO. 07-0170

VERSUS
                                     JUDGE BRADY

THE BOARD OF SUPERVISORS OF
THE LOUISIANA COMMUNITY AND          MAGISTRATE
TECHNICAL COLLEGE SYSTEM,            RIEDLINGER
LOUISIANA BOARD OF REGENTS AND
LOUISIANA TECHNICAL COLLEGE


* * * * * * * * * * * * * * * * * * * * * * * *


        Deposition of WAYNE MEAUX, 1721
Sherwood Forest Boulevard, Baton Rouge,
Louisiana, taken at The Louisiana Department
of Justice, 1885 North Third Street, 4th
Floor, Baton Rouge, Louisiana, on December 21,
2007, at or about 9:48 a.m.


APPEARANCES:


        JAMES L. ARRUEBARRENA, L.L.C.
        By:  James L. Arruebarrena, Esq.
        1010 Common Street, Suite 3000
        New Orleans, Louisiana  70112
        (Attorney for Plaintiff)

        ASSISTANT ATTORNEY GENERAL
        LOUISIANA DEPARTMENT OF JUSTICE
        By:  Scott G. Vincent, Esq.
        By:  Stacey Wright-Johnson, Esq.
        1885 North Third Street, 4th Floor
        Baton Rouge, Louisiana  70802
        (Attorney for Defendant)

ALSO PRESENT:

        PATRICK CARPENTER

REPORTED BY:

        Marsha M. Donnelly, CSR



EXHIBIT
T

PATRICK CARPENTER          WAYNE MEAUX                          Reported By:
THE BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, LOUISIANA BOARD OF REGENTS (LOUISIANA TECH)          MARSHA M. DONNELLY, CSR

**Page 105**

```
 1   felt she was not performing adequately?
 2       A.    Right.
 3       Q.    But there was --
 4       A.    Whatever that means.  Because
 5   they didn't really know what she should be
 6   doing.
 7       Q.    Okay.  They just felt whatever it
 8   is, she's not doing it?
 9       A.    (Nods head indicating affirmative
10   response).
11       Q.    Okay.  I guess she was in her own
12   den of lions, right?  We like that saying
13   today.
14       A.    She was a lion once herself.
15       Q.    So who -- did Ms. McDaniel raise
16   any objections to Ms. Watts good or bad?
17       A.    When I talked -- when I spoke to
18   Kay about the direction we needed to go in, I
19   told her, I said, She can't get us there.  And
20   she did not -- I mean, I think they may have
21   talked together.
22       Q.    So then you had the talk?  You
23   all decided --
24       A.    Yeah.
25       Q.    -- this new direction just --
```

**Page 106**

```
 1   we're not going to make it with this lady?
 2       A.    Either, you know, she goes back
 3   into the classroom and teaches again, but we
 4   got to do something different.
 5       Q.    And when you gave her that
 6   choice, she wasn't interested in going back in
 7   the classroom?
 8       A.    No.
 9       Q.    Anybody else other than Patrick
10   that you had a similar kind of talk with?
11       A.    Oh, some of the deans that
12   retired that didn't realize just what
13   direction we were going in.  I had a very
14   seasoned group of old votech directors and
15   they weren't going to change.  And I could see
16   the -- I could see the tsunami coming, you
17   know, and --
18       Q.    So similar kind of talk?
19       A.    Yeah.  Similar talks.  They
20   decided to retire.
21       Q.    They had many years?
22       A.    37, 40 years.  Just -- you know,
23   just hanging around.  No place to go.
24       Q.    Really not able to adjust to the
25   new?
```

**Page 107**

```
 1       A.    They would have never lasted.
 2       Q.    Anybody else from a performance
 3   standpoint?  Have you ever had to talk with
 4   somebody with a recommendation from their
 5   immediate supervisor of termination in front
 6   of you?
 7       A.    No.
 8       Q.    Now, I'm not trying to trick you
 9   but --
10       A.    Not during that time, no.
11       Q.    But didn't you have a
12   recommendation from Ms. McDaniel to -- Dr.
13   McDaniel to terminate Patrick Carpenter when
14   you had a talk with him?
15       A.    But he wasn't in our presence.
16   She came to me.
17       Q.    No, that's not what I'm asking.
18   Let me make sure I ask the question correctly.
19       A.    Okay.
20       Q.    I'm asking if you ever had the
21   talk other than with Patrick with anyone who
22   outside of the employee's presence the
23   supervisor or someone else in authority had
24   already recommended to you they be terminated
25   but you had the talk suggesting perhaps a
```

**Page 108**

```
 1   retirement, maybe perhaps go to another job,
 2   perhaps maybe you should quit, just quit,
 3   other than Patrick?
 4       A.    I mean, over the years, Jim, I've
 5   had a lot of those conversations.  I mean --
 6       Q.    I guess what I'm asking is
 7   point -- the point I'm trying to make is a
 8   recommendation for termination --
 9       A.    No.
10       Q.    -- had been made.  But a
11   recommendation for termination had been made
12   for Patrick, correct?
13       A.    Yes.
14       Q.    Do you remember what the date of
15   that was?
16       A.    No, I don't.
17       Q.    But it was something you knew
18   about when you talked to Patrick?
19       A.    Right.
20       Q.    We'll get to that.
21       A.    I -- yeah.
22       Q.    You want to say something?
23       A.    No.  We'll get to it.
24       Q.    Okay.  Do you know if prior to
25   that recommendation for termination if this
```

27 (Pages 105 to 108)

1   policy of progressive discipline had been done
2   with Pat?
3        A.    I don't know that.
4        Q.    Should it have been done?
5        A.    Yes.
6        Q.    Should he have been given an
7   opportunity to address whatever was driving
8   the dean to recommend his termination?
9        A.    All policies approved by the
10  board should be followed to the letter of the
11  law.
12       Q.    So when you received -- you
13  received one letter during your tenure from
14  Dean McDaniel seeking to terminate Patrick,
15  correct?
16       A.    Uh-huh (indicating affirmative
17  response).
18       Q.    Did you just assume she had
19  already met with Patrick and sometime before
20  that -- according to this policy that we just
21  went over, the progressive discipline -- had
22  advised him that, you know, this was something
23  that she was going to do and given him a
24  chance to give her -- you know, address her
25  concerns? Did you just assume she had done

Page 109

1   that?
2        A.    I don't know that I assumed it
3   because even though she wanted to terminate, I
4   had -- I was determined that there was a spot
5   somewhere in the organization for Patrick.
6        Q.    You thought she was wrong to --
7        A.    I didn't say that. But you
8   don't -- sometimes we presume something about
9   people, and I presumed that Student Services
10  was his strength because he came from Southern
11  University. But the new organization was
12  different; and even though he got up there and
13  really did things well in terms of organizing
14  physically, there was a lot of the skill sets
15  that someone that had run a Student Services
16  organization could only have. So that's when
17  I began to realize we got a problem.
18       Q.    So let me ask --
19       A.    So the point I want to make is
20  that if that didn't work, the organization was
21  new. There were lots of opportunities. So I
22  was determined to find an opportunity.
23       Q.    Do you have any idea what
24  motivated the timing of the request? I'm not
25  asking you to remember right now the timing;

Page 110

1   but you remember when you got the letter
2   right?
3        A.    Yeah.
4        Q.    Do you have any idea what
5   motivated the timing?
6        A.    There was a lot of complaints
7   from students about Financial Aid issues.
8   And, I mean, her office was next to mine. I
9   saw them marching in. I think that was the
10  straw. And, of course, we were short handed
11  in Financial Aid and --
12       Q.    You mean complaints like about
13  maybe a deadline in August?
14       A.    Pell checks, misinformation, you
15  know, those things.
16       Q.    Let me ask you this, sir.
17  Looking at the policy, a student comes in,
18  complains about somebody, and that -- you seem
19  to think that was some part of a motivation to
20  recommend -- as far as you know Ms. McDaniel's
21  motivation to recommend Patrick's termination?
22       A.    (Nods head indicating affirmative
23  response).
24       Q.    According to the policy we just
25  went over, the progressive discipline policy,

Page 111

1   even if you didn't want to state the name of
2   the student, shouldn't the person that's being
3   considered for termination at least be allowed
4   to give -- be given a general description of
5   the alleged misinformation or the alleged --
6   whatever it is that's being alleged that's a
7   problem so that they could explain or try to
8   at least enlighten, give their side of the
9   story, correct? Wouldn't you agree with that?
10       A.    Yes.
11       Q.    Do you know if that was done?
12       A.    Don't know.
13       Q.    Would you say that was deficient
14  performance on the part of Ms. McDaniel if she
15  didn't do that?
16       A.    Well, I don't know if there were
17  other issues prior to this letter.
18       Q.    Well, right now we're talking
19  about you mentioned student complaints.
20       A.    Yeah.
21       Q.    So should student complaints if
22  they came in, should have -- even if the
23  student's name was going to be withheld for
24  whatever reason, student's choice or other
25  reasons, shouldn't that -- generally shouldn't

Page 112

28 (Pages 109 to 112)

1   never reviewed it himself so.
2   BY MR. ARRUEBARRENA:
3       Listen, I have a right to ask
4   him what he knows and it's your
5   policy.
6   BY MS. JOHNSON:
7       I understand that.
8   BY MR. ARRUEBARRENA:
9       Right now I'm just trying to
10  figure out what he knows.
11  BY MS. JOHNSON:
12      Okay.
13      Q.   And, sir, are you aware or do you
14  know if it's the policy of the LTC that if
15  someone's rated less than meets expectations
16  that a PIP should be given?
17      A.   That's correct.
18      Q.   And what is a PIP?
19      A.   Personal Improvement Plan.
20      Q.   Should that -- is a PIP always
21  ending in termination?
22      A.   No.
23      Q.   Or could just be we just want you
24  to improve in these areas?
25      A.   Right.

Page 121

1       Q.   It could suggest termination --
2       A.   Could.
3       Q.   -- right?  Make this M3.
4           (Meaux Deposition Exhibit No. M3
5           was marked by the attorney.)
6       Q.   Sir, this is Bates No. 136
7   through 147.  Sir, when I say Bates numbers,
8   I'm looking at the bottom, those little
9   numbers.  Yeah.
10      A.   Got you.
11      Q.   That's how we identify documents.
12  Plaintiff's Bates.  This is Title:  Policy
13  #II.3.010.  Would you agree, sir, this is the
14  Policy Regarding Performance Evaluation and
15  Salary Increases?
16      A.   Yes.
17      Q.   And I would ask you, sir, to turn
18  to the Bates No. 138 if you look at that
19  little number at the bottom.  And if you'd
20  look at the -- under No. 2, Needs Improvement,
21  that the second -- you know, Unsatisfactory
22  would be the worst you can get, right?
23      A.   Uh-huh (indicating affirmative
24  response).
25      Q.   And the next worst is Needs

Page 122

1   Improvement?
2       A.   (Nods head indicating affirmative
3   response).
4       Q.   And then the next one is Meets
5   Expectations?
6       A.   (Nods head indicating affirmative
7   response).
8       Q.   Let me ask you something about
9   that.  And I have to tell you a little story
10  about when I was a manager at AT&T and Bell
11  South.  My boss expected me if I had eight
12  people or ten people to have at least two of
13  them below expectations, at least -- no more
14  than two outstanding, and the rest, you know,
15  in that bell curve --
16      A.   Bell curve.
17      Q.   -- that just meets.  Is that the
18  way -- is there anything like that at the LTC?
19      A.   (Shakes head indicating negative
20  response).
21      Q.   So if a supervisor feels that
22  everybody's outstanding, they would not be
23  criticized for that?
24      A.   That's a fact.  Yes.
25      Q.   I'm assuming, though, if someone

Page 123

1   had 25 people working for them and they came
2   to you with everyone at 5, wouldn't you
3   question that supervisor's judgment?
4       A.   You would.
5       Q.   So you would expect, wouldn't
6   it -- has it been your practice, sir, that
7   even though it's not the policy -- the bell
8   curve I've just described where the majority
9   of the people just come and meets expectations
10  with a small amount at the bottom and a small
11  amount at the top -- isn't that the way it
12  usually works out in your experience?
13      A.   Not me.
14      Q.   Not you?
15      A.   Not me personally.
16      Q.   Okay.  I didn't mean you --
17  your -- you mean the way you evaluate a
18  person?
19      A.   Right.  I always set the bar and
20  then I expect them to reach it.  And I'll do
21  everything I can for them to reach it.  So you
22  can -- pull the evals that I've done, you
23  won't see a bell curve.
24      Q.   Okay.  So if you met the
25  expectation, you'd give them an exceeds or an

Page 124

31  (Pages 121 to 124)

1  outstanding?
2      A.    Well, expect -- no.  If you made
3  the expectations, you were there.
4      Q.    That's outstanding?
5      A.    But if you work above and beyond
6  the expectations.
7      Q.    Oh, I've got you.  Just meeting
8  it would be meets expectations?
9      A.    Right.  I got a problem with just
10  meeting them.
11      Q.    I'm with you.
12      A.    Because you can't change and
13  improve if you're just meeting.
14      Q.    Well, if you're just meeting, you
15  can get better, can't you?  Can't you exceed?
16      A.    But we work to exceed and we work
17  for outstanding.  And I basically looked at my
18  deans, the work they did in the region, and I
19  looked at the other deans around the State of
20  Louisiana in terms how they were producing and
21  that's kind of how I went with my evals.
22      Q.    Do you recall where Dean McDaniel
23  during the years year we've talking about,
24  2001 to 2006, when you've done an evaluation
25  of her, has she -- can you recall where has

Page 125

1  she fell?
2      A.    Outstanding.
3      Q.    Five all the way across?
4      A.    Well, I don't know that it was
5  all fives.
6      Q.    Well, I'm talking about the
7  overall.
8      A.    At the end of the day --
9      Q.    Yeah.
10      A.    -- she was Outstanding and
11  Exceeds.  Probably some Meets in there.  But
12  when you look at her overall --
13      Q.    I'm talking about the overall.
14      A.    Probably Outstanding.
15      Q.    So, I mean, that's perfect?
16  That's a five in every category, right?
17      A.    No.
18      Q.    Oh, I'm sorry.  Wait.
19  Outstanding is --
20      A.    You can have a 4 here --
21      Q.    That's 4.5 to 5?
22      A.    That's correct.
23      Q.    All right.  So you can have --
24      A.    A little bit less, yeah.
25      Q.    Yeah.  Statistically, according

Page 126

1  to mathematics, you can't have too many -- you
2  got to have a lot of fives?
3      A.    That's right.
4      Q.    Okay.  And if you don't mind
5  conveying to me, where did she fall if you had
6  to rank her with -- let's say when you had,
7  let's say, six of them or whatever you had --
8      A.    Yeah.
9      Q.    -- where did she fall?
10      A.    She was in the top.
11      Q.    Top 10 percent?
12      A.    Yeah.
13      A.    All right.  Now, looking at this
14  on Needs Improvement, you see where it says,
15  "An overall rating of Needs Improvement
16  requires that a Performance Improvement Plan
17  be established for the employee with a
18  follow-up performance evaluation required
19  90 days from the date of the Needs Improvement
20  performance rating"?  So that -- does that
21  refresh your memory as to the policy of the
22  LTC?
23      A.    Yes.
24      Q.    It doesn't give you an option,
25  does it?  It says it's required?

Page 127

1      A.    Yes.
2      Q.    So a follow-up evaluation is
3  required in 90 days, right?
4      A.    Yes.
5      Q.    If that's not done, would it be a
6  deficient performance?
7      A.    Yes.
8      Q.    Okay.  Thank you, sir.  Now, let
9  me refer you to -- I'll make this M4.
10          (DISCUSSION HELD OFF THE RECORD.)
11          (Meaux Deposition Exhibit No. M4
12          was marked by the attorney.)
13      Q.    I'm going to identify this as a
14  document dated October 11, 2002.  It's one
15  page.  And it appears to be a letter stating
16  to the Acting Chancellor, who was Jimmy
17  Clarke, at the Baton Rouge Campus of the
18  appointment of Mr. Patrick Carpenter the job
19  of Student Services Officer III which I think
20  was also known as or sometimes called Director
21  of Student Affairs, correct, sir?
22      A.    Uh-huh.
23      Q.    Okay.  I think we figured out
24  that Student Services Officer III is sort of
25  a -- like a payroll designation for something?

Page 128

32  (Pages 125 to 128)

PATRICK CARPENTER          WAYNE MEAUX                    Reported By:
THE BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, LOUISIANA BOARD OF EDUCATION EX000000 LOUISIANA TECH    MARSHA M. DONNELLY, CSR

**Page 129**

1      A.    You want the explanation?
2      Q.    Yeah.
3      A.    It comes out of NACUBO which is
4   national accounting practice for higher ed.
5   Yeah.  We never heard of it either.  But they
6   wanted to begin putting square pegs in square
7   holes so that's --
8      Q.    So somebody in HR said even
9   though you're going to be telling him --
10     A.    Yes.
11     Q.    -- and he's going to be called
12  the Director of Student Affairs, in our books,
13  in our system, our accounting system, it's
14  going to -- he's going to be Student Services
15  Officer III?
16     A.    That's correct.
17     Q.    Now, who was in the interview to
18  interview Patrick?
19     A.    You know, I don't remember, to
20  tell you the truth.  There was a committee
21  made up of people on the campus, and I guess
22  the Dean of Students certainly was.  Joycelyn
23  Brunswick.  But I can't recall.
24     Q.    Did you have any meetings with
25  Patrick on your own?

**Page 130**

1      A.    I did.
2      Q.    Okay.  Was that before or after
3   the group meeting?
4      A.    Both.
5      Q.    How many interviews were there?
6      A.    How many people applied?
7      Q.    No.  How many interviews with
8   Patrick were there?  Yeah.  How many times did
9   he have to interview for the job about?
10     A.    He just went through the one
11  process --
12     Q.    Okay.
13     A.    -- with the committee.
14  BY MS. JOHNSON:
15        I'm going to object to the form
16     of the question.  Are you asking what
17     interviews he sat in on or total --
18     Q.    I just want to know, if you
19  know -- you know, for instance, sometimes you
20  got to go -- you know, like you might start
21  at, you know, somebody who's screening people.
22  Then you might go to who might be your
23  immediate supervisor, then you might go to
24  that person's boss, then you might have a
25  group.  I was just wondering how many, if you

**Page 131**

1   know, interviews --
2      A.    Here's the process.  He and I
3   spoke, told him the position was open.
4      Q.    Right.
5      A.    Then somewhere down the line,
6   there would be advertising.
7      Q.    Right.
8      A.    Taking applications.  And there
9   would be a committee.  A committee of
10  diversity from the campus and off campus, and
11  he'd have to go through that process.
12     Q.    How did you come to speak to him
13  that first meeting?
14     A.    His wife worked for us.  She was
15  in the nursing department; and I think we were
16  at a graduation, and she told me that he
17  wasn't happy in his present position and he
18  was looking.  And I told him, I said, Well,
19  that's -- you know, she told me about his
20  background.  I said, Well, we may have
21  something.  I said, Have him come see me.
22     Q.    If you can recall, what did she
23  tell you about his background?
24     A.    Just that he was in Student
25  Services at Southern.

**Page 132**

1      Q.    Did you -- once you started
2   talking to Patrick, did you learn more about
3   exactly what he did at Student Services at
4   Southern?
5      A.    We talked about the registrar
6   piece, you know.  He was, you know, handling
7   grades and working with the faculty, you know,
8   and grades and that sort of thing.
9      Q.    So you understood that his
10  function at Southern was registrar?  In the
11  registrar piece?
12     A.    It was in the -- in that arena,
13  yeah.
14     Q.    So when you had this listing on
15  this -- in this Exhibit M4, you understood
16  that he hadn't actually worked on some of
17  these things --
18     A.    That's correct.
19     Q.    -- at Southern?  You knew that
20  already, right?  That was obvious, right?
21     A.    Well, you know, when you work in
22  Student Services, even though it's through
23  osmosis, you are exposed to a lot of this.
24  You may not do it personally.
25     Q.    Sure.

                                33  (Pages 129 to 132)

1    But anyway, I guess if we'd add
2 it up, it would have been 2. You're looking
3 at Bates No. 724. And so when you combine
4 that with the 1.92 given to him by Dr.
5 McDaniel, it came to 1.96. You see that?
6    A.    Uh-huh (indicating affirmative
7 response).
8    Q.    So that's pretty -- wouldn't you
9 call that toward the lower end of Needs
10 Improvement? Pretty close to Unsatisfactory.
11    A.    Uh-huh (indicating affirmative
12 response).
13    Q.    Have you ever seen somebody at
14 Unsatisfactory survive very long? I mean,
15 aren't -- shouldn't you be just about ready to
16 be walked out the door if you can't make -- if
17 you can't get above 1.49? Would you agree?
18    A.    Yes.
19    Q.    What about -- it's been your
20 experience if you can't get above 2.49, you're
21 basically -- you might not -- are you walking
22 out the door? Are you -- you're kind of being
23 pointed that way? You should at least be
24 pointed that way, huh?
25    A.    You're given an opportunity to
Page 281

1 improve.
2    Q.    So that's --
3    A.    But if you drop back in that
4 category, then you are pointed towards the
5 door.
6    Q.    Right. Okay. Now, at -- during
7 this evaluation, she criticized him -- do you
8 remember the incident where he took vacation
9 and he came back and it was the day -- one or
10 two days before the deadline for registration
11 in Financial Aid? Do you remember his
12 complaining about that?
13    A.    No.
14    Q.    Well, she did complain a lot
15 about it in a conversation she had which she
16 admitted to yesterday. She approved his
17 vacation. He had gone to her in June. I can
18 show you the documents but it's just the
19 testimony. Do you think it's fair to approve
20 vacation then criticize somebody for taking
21 it? Is that fair?
22    A.    No.
23    Q.    She admitted that she -- it's her
24 job to go over vacation requests; and if she
25 approves one, to provide for backup if it's
Page 282

1 around either a busy or non-busy time. But
2 she couldn't remember providing any backup for
3 Mr. Carpenter. Is that a proper way to handle
4 a situation like that?
5    A.    No.
6    Q.    And so when he came back, he was
7 just flooded with people. No one had really
8 backed him up. Mr. Williams which we already
9 know is kind of aggravated because he's
10 training a guy who gets paid 10,000 more than
11 him -- right? -- wasn't really interested in
12 helping him with his part of the alphabet.
13 Okay?
14    And so he -- he handled as many
15 as he could, but you can imagine it was a
16 fiasco because there was no backup while he
17 was on vacation. And he was criticized for
18 that and given this evaluation.
19    Now, sir, she told him, I want --
20 you may not come back here, turn yourself
21 around, get on your horse, go get your saddle
22 and you're -- basically. He asked if he could
23 go get his saddle. He asked if he can go up
24 to his desk. Leave and never come back.
25    She says, I'm putting you on two
Page 283

1 days' leave. And then she said, You never
2 come back here to this department and you wait
3 for Mr. Meaux -- she admitted this under oath,
4 her final instruction to him -- to call you.
5 Not you call him but to call you. It was
6 taped. And at first, she didn't admit it; but
7 then after we played the tape, she admitted,
8 yeah, she did say, Wait for Mr. Meaux to call.
9    Of course, we know the hurricane
10 hit a couple days later, and there was a lot
11 of confusion. So anyway. Now, she put him --
12 looking at 727 -- remember the policy that if
13 you rate somebody at Needs Improvement? You
14 look at Bates No. 727. She did sort of fill
15 out a PIP, a Performance Improvement Plan, 727
16 Bates. If you turn the page. One more.
17 Yeah.
18    This is -- this -- remember I
19 showed you that policy? This is when you put
20 somebody under, you know, below Meets
21 Expectations, this is what you're supposed to
22 do, right? It's not that policy.
23    A.    I got you.
24    Q.    It was the evaluation policy.
25 Although that's related.
Page 284

71 (Pages 281 to 284)

1       And one thing, too, sir, she came
2   to you with Exhibit 29 and she had not told
3   him -- before bringing it to you. She told
4   him that day she gave him this evaluation that
5   she wanted him fired. She had not done the
6   progressive discipline. She did not -- she
7   hadn't given him a letter or anything a month
8   before saying, If you don't improve, here's a
9   couple things you need to do, I'm going to be
10  recommending your term -- nothing. Okay. Is
11  that against the policy we looked at up here?
12      A.   Yes.
13      Q.   And talking about the progressive
14  discipline policy. You said yes?
15      A.   Yes.
16      Q.   So, and then she didn't, sir --
17  because the record shows this -- come back in
18  90 days and reevaluate this below expectation,
19  whatever it is, doesn't meet -- Needs
20  Improvement. This Needs Improvement
21  evaluation. She never came -- she never
22  reevaluated him. Never gave him anymore
23  feedback. That's against the policy, isn't
24  it, sir?
25      A.   According to the policy, you're

1   correct.
2       Q.   Can you explain why that is, why
3   she didn't do that?
4       A.   No, I cannot.
5       Q.   Now, sir, you came -- finally
6   things settled down after the hurricane
7   probably around -- pretty much know, it's
8   September 8th. You had a conversation,
9   that -- "the" conversation. You remember we
10  talked about "the" conversation? That was,
11  quote, the conversation we talked about
12  before.
13      A.   Right.
14      Q.   During that conversation, you
15  gave him three options. And I just need to
16  know if you can agree with this. One, you
17  told him, You could resign, correct?
18      A.   Yeah.
19      Q.   Two, you told him he could be
20  fired?
21      A.   Yeah.
22      Q.   Three, you told him he could go
23  to Jackson, 50 miles away?
24      A.   I told him he could work with
25  Corrections.

1       Q.   Which would have been --
2       A.   Which is housed in Jackson.
3       Q.   Right.
4       A.   That doesn't mean he would have
5   been domiciled there.
6       Q.   Okay. But in any event, those
7   were the three options. In the beginning of
8   that conversation, you were pretty -- you
9   first said, It looked to me like you abandoned
10  your job. And he had to explain to you --
11  because you had gotten the memo from Ms.
12  McDaniel. I'm going to show you this. I'm
13  assuming this is why you said that. And if we
14  can get your agreement on all this, we won't
15  have to waste time listening to the tape.
16      BY MR. ARRUEBARRENA:
17          M30.
18          (Meaux Deposition Exhibit No. M30
19      was marked by the attorney.)
20  BY MS. JOHNSON:
21          And I'm going to note for the
22      record, the tape is -- Patrick taped
23      your conversation on September 8th
24      without your consent.
25      Q.   Sir, you're aware that Louisiana

1   law provides for the lawful taping of any
2   conversation you're involved in, right? Don't
3   you know that?
4       A.   Yeah, Counsel, I have nothing to
5   hide.
6       Q.   Okay. And I just want -- I just
7   didn't -- I wanted to know if you knew it
8   was -- it's provided for by Louisiana law.
9       A.   Yeah, I didn't know that but --
10      Q.   Okay. It is.
11  BY MS. JOHNSON:
12          You're referring to the law, but
13      I don't -- you still haven't --
14  BY MR. ARRUEBARRENA:
15          I can show you the statute
16      later, Counsel.
17  BY MS. JOHNSON:
18          What is it?
19  BY MR. ARRUEBARRENA:
20          It's a Revised Statute. One
21      party consents. Says any tape
22      recording can be made as long as one
23      party consents.
24      Q.   M30.
25  BY THE WITNESS:

1     Q.    Okay.  So really we're coming to
2  the end of what you know --
3     A.    Yeah.
4     Q.    -- when we get to April of '06?
5     A.    Yeah.
6     Q.    Okay.  Now, just so you'll
7  know -- did you hear just through the
8  grapevine -- you know, sometimes when you
9  retire, people still stay in touch with people
10 and all.  Did you hear that Mr. Carpenter --
11 that the EEOC had dismissed his charge saying
12 it couldn't find a violation of the statute
13 without getting anything from the LTC?
14 Nothing?
15    A.    (Shakes head indicating negative
16 response).
17    Q.    Okay.  So naturally, Mr.
18 Carpenter was annoyed and he wrote Senator
19 Landrieu and she agreed.  She wrote a letter
20 to Keith Hill who was the director of the
21 EEOC.  It's in the record.  We'll show the
22 jury later.  And they reopened the charge in
23 and around June of 06.  'Do you remember
24 hearing anything about that?
25    A.    (Shakes head indicating negative

                                    Page 297

1  response).
2     Q.    You're gone by then?
3     A.    Yeah.
4     Q.    So -- but Ms. -- apparently Dr.
5  McDaniel didn't hear about that part.  She
6  only heard about the dismissal.  That was her
7  testimony under oath yesterday.
8          And she -- I showed her Mr.
9  Carpenter's personnel file which is
10 represented to be on Defendant's Bates --
11 Exhibit G, page one, from Margaret Elgin, a
12 certified true complete copy of all documents
13 from all -- from files which relate in any way
14 to Patrick Carpenter's employment at Louisiana
15 Technical College Capitol Area Region II.
16         And there's nothing in here that
17 would be -- could be considered -- well, there
18 are some things that could be considered
19 critical of Patrick after these discussions we
20 just talked about.  The one she had, then the
21 one with you about wanting him terminated,
22 then the one you had, and then -- we just
23 talked about, you know, in September and then
24 he came back.  But nothing in here that had
25 been reviewed with Mr. Carpenter according to

                                    Page 298

1  the progressive discipline policy.
2          And just let me show you a couple
3  of those areas.  There were many exhibits.  We
4  went over all kinds of stuff.  For instance --
5  and this is actually something that happened
6  before.  Something called a BR Tech Impact
7  Report that she wrote in January -- in
8  February of '05.  That was when you -- you
9  moved him to -- reduced his salary, moved him
10 to that other position.  You explained that
11 already.
12       BY MS. JOHNSON:
13         I'm going to object to the form
14 of the question.  And I don't know if
15 Van heard it, but he had -- he
16 doesn't know the facts of the case.
17 Patrick's salary was reduced in April
18 of 2005.  He was transferred in
19 February.
20       BY MR. ARRUEBARRENA:
21         Okay.  Well, you know --
22       BY MS. JOHNSON:
23         I object to the form of the
24 question.
25       BY MR. ARRUEBARRENA:

                                    Page 299

1          Yeah.  So you're coaching the
2  witness but go ahead.  Please don't
3  make me call the magistrate and --
4  BY MS. JOHNSON:
5          You do what you have to do.
6  Okay?
7  BY MR. ARRUEBARRENA:
8          Yeah, well, I will because
9  obviously --
10 BY MS. JOHNSON:
11         No problem.  We can --
12 BY MR. ARRUEBARRENA:
13         -- making speaking objections --
14 BY MS. JOHNSON:
15         You do what you have to do.
16 BY MR. ARRUEBARRENA:
17         -- are not proper.  If you want
18 to put employees in here that don't
19 know the case, that's your problem.
20    Q.    All right.  Now, in any event, he
21 was moved to the job then.  So that's just how
22 long it took them to get the pay reduction.
23 And that's in the documents.  I'll prove it at
24 the trial.  All right.  So the BR Tech Impact
25 Report --

                                    Page 300

                        75  (Pages 297 to 300)

**Page 301**

1  BY MR. HEARD:
2      What's the question that you're
3  asking?
4      Q.   Sir, she didn't give it to him.
5  There's a place for his signature. Can you
6  explain that? Is that within the policy of
7  the progressive discipline policy?
8      A.   I don't know what you're talking
9  about, the Impact.
10     Q.   This is -- you can read it. I'll
11 get you a copy or you can just take a look at
12 it and give it back to me. Bates No. 654.
13 Most of it's on there. Let me know when
14 you're finished. You see it's a criticism of
15 him, isn't it?
16     A.   Yeah.
17     Q.   And isn't the policy to review
18 such criticisms in writing with the employee
19 and give them a chance to respond?
20     A.   Yes.
21     Q.   She didn't do that. Is that a
22 deficient performance on her part? According
23 to your policy.
24     A.   According to policy, yes.
25     Q.   Then supposedly this complaint

**Page 302**

1  came in from someone named Mr. Bravel from the
2  electrical apprenticeship program which is a
3  letter critical of Mr. Carpenter, and this was
4  never discussed with him either as a general
5  content or as existed. Is that within the --
6  is that proper according to your policy, the
7  progressive discipline policy?
8      A.   Was this out of the packet?
9      Q.   This is in the packet, yeah. Her
10 packet.
11     A.   Was the packet discussed with Mr.
12 Carpenter?
13     Q.   That's not the question I'm
14 asking you. This is something she said she
15 received in September of '05. Mr. Carpenter
16 worked there in September '05, didn't he?
17     A.   Yes.
18     Q.   Doesn't the policy say that if a
19 criticism like this comes up and you're going
20 to use it against an employee, you should talk
21 to them about it?
22     A.   Yes.
23     Q.   She didn't do that so that was a
24 deficient performance on her part, correct?
25 According to policy.

**Page 303**

1      A.   According to policy.
2      Q.   Then this letter just by some
3  amazing coincidence around the same time,
4  September of '05 -- remember, that's when
5  she's doing the binder. Patrick Carpenter
6  binder, which, by the way, she admitted he's
7  never seen, all right -- from someone named
8  Mr. Christ which is a criticism of him. And
9  once again, did not tell him about it or about
10 anything that would indicate the criticisms
11 or -- that's not in accordance with the LTC's
12 progressive discipline policy, is it, sir?
13     A.   That's correct.
14     Q.   So once again that's a deficient
15 performance according to the policy?
16     A.   That's correct.
17     Q.   Then it goes on and on. It won't
18 take us long to get to the end. This is
19 something actually by some amazing coincidence
20 received on September 28, 2005. Do you
21 recognize Buffy Brinkley?
22     A.   Yes.
23     Q.   That's one of the people working
24 in Student Services?
25     A.   Right.

**Page 304**

1      Q.   This is like a one, two -- it's
2  Bates No. 678 through 689.
3  BY MS. JOHNSON:
4      And once again, I'm going to --
5      Q.   That's 11 pages.
6  BY MS. JOHNSON:
7      -- object to the form of the
8      question. Van has not been here for
9      these past three days. Ms. --
10 BY MR. ARRUEBARRENA:
11     Counsel, I ask that you object
12     to the form --
13 BY MS. JOHNSON:
14     -- McDaniel has testified --
15 BY MR. ARRUEBARRENA:
16     Counsel, I ask that you object
17     to the form of the question.
18 BY MS. JOHNSON:
19     -- that she --
20 BY MR. ARRUEBARRENA:
21     I ask that you --
22 BY MS. JOHNSON:
23     -- formulated that packet
24     pursuant to the EEOC complaint.
25 BY MR. ARRUEBARRENA:

76 (Pages 301 to 304)

| | |
|---|---|
| 1        I ask that you object --<br>2 BY MS. JOHNSON:<br>3        So the packet --<br>4 BY MR. ARRUEBARRENA:<br>5        Object to the form of the<br>6        question only, Counsel, once again.<br>7 BY MS. JOHNSON:<br>8        Go ahead.<br>9 BY MR. ARRUEBARRENA:<br>10        Okay?<br>11 BY MS. JOHNSON:<br>12        Thank you.<br>13        Q.    Sir, this is 11 pages from Ms.<br>14 Brinkley. You can just pick any paragraph.<br>15 It's just -- Patrick's terrible here, he did<br>16 this wrong, worst person that ever lived. You<br>17 name it, it's in there.<br>18 BY MR. HEARD:<br>19        I'm going to object to your<br>20        testimony here rather than asking<br>21        questions.<br>22        Q.    Right. Let me ask you a<br>23 question, sir.<br>24 BY MR. HEARD:<br>25        If you want the deponent to<br>                   Page 305 | 1     709. None of this -- none of the factual<br>2 bases of this, any of it, was ever discussed<br>3 with Patrick. Is that in accordance with the<br>4 progressive discipline policy?<br>5        A.    No.<br>6        Q.    Is that a deficient performance<br>7 according to the policy?<br>8        A.    Yes.<br>9        Q.    Same thing for Bates No. 711,<br>10 criticisms by student Toni Byrd. None of this<br>11 was discussed with Mr. Carpenter. Is that in<br>12 accordance with the progressive discipline<br>13 policy?<br>14 BY MR. HEARD:<br>15        Are these documents documents<br>16        that have been supplied?<br>17 BY MR. ARRUEBARRENA:<br>18        Yes.<br>19 BY MR. HEARD:<br>20        To the deponent?<br>21 BY MR. ARRUEBARRENA:<br>22        Yes.<br>23 BY MR. HEARD:<br>24        And are they speaking to him<br>25        or are they about something else?<br>                   Page 307 |
| 1     respond, you must ask a question.<br>2        Q.    This packet -- this thing, this<br>3 11-page diatribe, this thing criticizes Mr.<br>4 Carpenter's performance. But it was not --<br>5 none of the issues were presented to him. He<br>6 was not made aware in any way of the issues --<br>7 BY MR. HEARD:<br>8        Would you ask a question,<br>9        please.<br>10        Q.    -- existing. Does that properly<br>11 conform with the progressive discipline policy<br>12 of your -- of the LTC?<br>13        A.    No.<br>14        Q.    And is it a deficient performance<br>15 according to the policy?<br>16        A.    According to the policy, correct.<br>17        Q.    She worked hard on this. This is<br>18 a complaint alleged to be from a student,<br>19 Marion Gautier.<br>20 BY MR. HEARD:<br>21        Can you identify the document<br>22        that you're --<br>23        Q.    It's Bates No. 790 (sic) in the<br>24 binder. The Patrick Carpenter binder which we<br>25 talked about in other depositions. Bates No.<br>                   Page 306 | 1        Q.    Would you please answer the<br>2 question, sir. Does this Bates No. 711 not<br>3 being discussed with him, is that in<br>4 accordance with the progressive discipline<br>5 policy?<br>6        A.    No.<br>7        Q.    And is it a deficient performance<br>8 according to the policy?<br>9        A.    Yes.<br>10        Q.    I show you again, sir, Bates No.<br>11 713, another letter which this time is alleged<br>12 to be from an anonymous student once again<br>13 criticizing Mr. Carpenter. None of these<br>14 criticisms in any way were related to him. Is<br>15 that in accordance with the progressive<br>16 discipline policy?<br>17        A.    Counsellor, how do I know this<br>18 was not the discussed with Mr. Carpenter?<br>19        Q.    She admitted it. All right.<br>20 Assuming she didn't discuss it with him, is it<br>21 in accordance with the policy?<br>22        A.    No.<br>23        Q.    And assuming she didn't discuss<br>24 it with him, is that a deficient performance<br>25 on her part according to the policy?<br>                   Page 308 |

PATRICK CARPENTER                    WAYNE MEAUX                              Reported By:
THE BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, LOUISIANA BOARD OF REGENTS SOUTHEASTERN LOUISIANA TECH          MARSHA M. DONNELLY, CSR

| | |
|---|---|
| 1     A.   Yes. | 1    wasn't here; but isn't there an |
| 2     Q.   Candace Guidry, Bates No. 731 to | 2    evaluation dated June 1st, 2006, in |
| 3   736. So that's a five-page document critical | 3    the -- |
| 4   of Mr. Carpenter's performance. If it's true | 4   BY MR. ARRUEBARRENA: |
| 5   that Dr. McDaniel didn't discuss it with him, | 5     It's not in his file. |
| 6   does it violate the progressive discipline | 6   BY MS. JOHNSON: |
| 7   policy of the LTC? | 7     -- personnel file? |
| 8    BY MR. HEARD: | 8   BY MR. ARRUEBARRENA: |
| 9      And that is assuming that what | 9     It's not in his personnel file. |
| 10     you're saying is correct in that | 10   BY MS. JOHNSON: |
| 11     document? | 11     Where is it? |
| 12    BY MR. ARRUEBARRENA: | 12   BY MR. ARRUEBARRENA: |
| 13     Yes. | 13     It's not in his personnel file. |
| 14     A.   Yes. | 14    The one certified by Margaret Webb as |
| 15     Q.   And assuming that she didn't | 15    being a true complete copy of it. |
| 16   discuss what I just identified with Mr. | 16    And she didn't remember it. |
| 17   Carpenter, is that a deficient performance | 17   BY MS. JOHNSON: |
| 18   according to the policy? | 18     Who? Oh. |
| 19     A.   According to the policy, yes. | 19   BY MR. ARRUEBARRENA: |
| 20     Q.   Now, sir, Dr. McDaniel testified | 20    Your witness. |
| 21   that she had no documents really after this | 21   BY MS. JOHNSON: |
| 22   date on Bates 519, September 29th, from his | 22     Dr. McDaniel -- |
| 23   personnel file which was Defendant's Exhibit | 23   BY MR. ARRUEBARRENA: |
| 24   G, Bates No. 1 through 253 -- you're welcome | 24     Yeah. Dr. McDaniel. |
| 25   to look at it if you'd like to -- that | 25   BY MS. JOHNSON: |
| <div align="right">Page 309</div> | <div align="right">Page 311</div> |
| 1   represented any kind of deficient performance | 1     -- or Margaret Webb? I don't |
| 2   after September 29, 2005. | 2    know who you're talking about. |
| 3     A.   This is -- | 3   BY MR. ARRUEBARRENA: |
| 4     Q.   This is his personnel file given | 4     Dr. McDaniel. I gave her a |
| 5   to me by the LTC. And you're welcome to look | 5    chance to talk about it. "I don't |
| 6   through it if you'd like. | 6    remember it." |
| 7    BY MR. ARRUEBARRENA: | 7     Q.   Okay. So you would agree with me |
| 8     You can let the record reflect | 8   there's no documents in there after |
| 9     the witness is carefully looking | 9   September 29, 2005 -- |
| 10     through the packet I've identified. | 10     A.   I didn't see any. |
| 11     Q.   Tell me if there's any documents | 11     Q.   -- criticizing him, correct? |
| 12   after September 28th, 2005, that criticize Mr. | 12     A.   I didn't see any. |
| 13   Carpenter's performance. | 13     Q.   Thank you, sir. And you agree |
| 14     A.   After what date, sir? | 14   that the first page says that this is complete |
| 15     Q.   September 28th -- September 29th, | 15   copy of his personnel file -- |
| 16   2005. | 16     A.   That's correct. |
| 17     A.   All right. So I'm still in '01. | 17     Q.   -- by the HR department? |
| 18     Q.   Yeah. I mean, you know -- | 18     A.   (Nods head indicating affirmative |
| 19     A.   I understand. | 19   response). |
| 20     Q.   I will tell you -- and your | 20     Q.   You agree? That's a yes? |
| 21   lawyer might disagree -- she agreed that there | 21     A.   Yes. |
| 22   was no document criticizing him after that. | 22     Q.   Okay. Now -- we're getting to |
| 23   You can look through it if you want. | 23   the end of the story. This -- Mr. Henderson, |
| 24    BY MS. JOHNSON: | 24   where did he come from? |
| 25     And, once again, Mr. Heard | 25     A.   He is -- the short answer, he |
| <div align="right">Page 310</div> | <div align="right">Page 312</div> |

<div align="right">78 (Pages 309 to 312)</div>

1  replaced Margaret Richard.
2      Q.    Okay. And his title? If you
3  know.
4      A.    Vice president of Career and
5  Technical Education.
6      Q.    And do you know where he was
7  before? Was he with the LTC or did he come
8  from the outside?
9      A.    He came from Labor. Department
10  of Labor.
11     Q.    Labor department. So this is the
12  first time in the LTC?
13     A.    Yes.
14     Q.    So he wouldn't have an agenda or
15  any knowledge of --
16     A.    No.
17     Q.    Now, Dr. McDaniel testified that
18  he didn't know anything. I mean, all he --
19  like you. All you knew about Patrick in terms
20  of day to day accusations is what she told
21  you, right?
22     A.    (Nods head indicating affirmative
23  response).
24     Q.    You got to say yes.
25     A.    Yes.
                        Page 313

1  to fire Mr. Carpenter. So once again, she
2  brought a termination recommendation and
3  admitted she never gave Mr. Carpenter any
4  warning, any way to respond to any of the
5  reasons for the termination. Does that comply
6  with the progressive discipline policy of the
7  LTC? If that's true. If it's true, does it
8  comply?
9      A.    No, it does not.
10     Q.    And if that's true, is it a
11  deficient performance according to the policy?
12     A.    Correct.
13     BY MR. ARRUEBARRENA:
14         Take a break.
15         (A RECESS WAS TAKEN.)
16     Q.    Final questions. Sir, did you
17  observe Dr. McDaniel after she had asked you
18  for permission to fire, then you had to go
19  back and say, No, we can't fire him, there's
20  an EEOC charge, or something like that, right?
21     A.    What I did is I wanted to sit
22  down with the Chancellor Richard and discuss
23  possibilities. One of them, of course, was
24  transfer. The Corrections piece. Now, I gave
25  Patrick three options; but that was what I was
                        Page 315

1      Q.    Just like you, Dr. Henderson --
2  is he a Mr. or Dr.?
3      A.    Mr.
4      Q.    Okay. Mr. Henderson. I think
5  it's in the last letter. Somewhere in here.
6  Here it is. Bates No. 253. That's the
7  termination letter, right, from Mr. Henderson?
8      A.    That's after --
9      Q.    Jim Henderson.
10     A.    That's after my time.
11     Q.    Yeah, I know. But it is a
12  termination letter?
13     A.    Yes.
14     Q.    Dr. McDaniel testified that she
15  brought the binder -- sir, this binder.
16     A.    Yes, sir.
17     Q.    Bates No. 518 to 745. By the
18  way, this was submitted to the EEOC in
19  December 11, 2006. That's an uncontested
20  fact. Same as these admissions. Okay?
21     A.    All right.
22     Q.    So I guess about a month, three
23  weeks later, she testified she went to Jim
24  Henderson, gave him this packet, pointed out
25  some things in it to him and said she wanted
                        Page 314

1  looking at.
2      Q.    So you had already talked to the
3  chancellor about it?
4      A.    She told me right off the bat. I
5  told her that the dean wants him terminated.
6  I said, I've got some options. She said, He's
7  involved in an EEOC suit; and he'll, for the
8  time being, remain in the position he's in.
9      Q.    Did she say "suit"? I mean,
10  there was no lawsuit at that time.
11     A.    EEOC grievance or whatever, yeah.
12     Q.    Right. And was that frustrating
13  to you that you -- your sort of hands were
14  tied because of an EEOC charge?
15     A.    Not really. I mean, it's --
16     Q.    Do you know if it was frustrating
17  to Dr. McDaniel?
18     A.    I don't know that.
19     Q.    She did testify she admitted it
20  was frustrating.
21     A.    Yeah.
22     Q.    She testified, too, sir -- and I
23  want to know if you agree -- that the
24  allegations made in the EEOC charge showed a
25  lack of integrity, a lack of concern for the
                        Page 316

79 (Pages 313 to 316)

PATRICK CARPENTER                    WAYNE MEAUX                    Reported By:
THE BOARD OF SUPERVISORS OF THE LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, LOUISIANA BOARD OF REGENTS AND LOUISIANA TECH     MARSHA M. DONNELLY, CSR

| | |
|---|---|
| 1  impact his actions would have on the LTC. Do | 1        REPORTER'S CERTIFICATE |
| 2  you agree with that? | 2 |
| 3        A.    I never read the suit. | 3        I, Marsha M. Donnelly, Certified |
| 4        Q.    The charge? | 4  Court Reporter in and for the State of |
| 5        A.    The charge. | 5  Louisiana, Certificate No. 95012, which is |
| 6        Q.    The one I showed you.  Remember? | 6  current and in good standing, as the Officer |
| 7  You quibbled with me on one of the points. | 7  before whom this testimony was taken, do |
| 8        A.    Oh, I got you. | 8  hereby certify that the above-named witness, |
| 9        Q.    Yeah, that charge. | 9  after having been first duly sworn by me upon |
| 10        A.    What about it?  What's your | 10  authority of R.S. 37:2554, did testify as |
| 11  question? | 11  hereinabove set forth; that this testimony was |
| 12        Q.    She said she thought it showed a | 12  reported by me in the stenotype reported |
| 13  lack of integrity and a lack of concern for | 13  method, was prepared and transcribed by me or |
| 14  the impact his actions would have on the LTC. | 14  under my personal direction and supervision, |
| 15  I just want to know if you agree with that. | 15  and is a true and correct transcript to the |
| 16        A.    Again, Mr. Carpenter has the | 16  best of my ability and understanding; that I |
| 17  right to do and say what he pleases. | 17  am not related to counsel or to the parties |
| 18        Q.    Do you think it's proper for her | 18  herein, nor am I otherwise interested in the |
| 19  to have that attitude about someone asserting | 19  outcome of this matter. |
| 20  their rights? | 20 |
| 21        A.    I certainly can't control her | 21 |
| 22  thoughts or what she says. | 22        _____ |
| 23        Q.    You would -- I'm assuming you | |
| 24  might act more professionally than that, | 23 |
| 25  correct? | Marsha M. Donnelly |
| | Certified Shorthand Reporter |
| | 23 |
| | 24 |
| | 25 |
| Page 317 | Page 319 |

| |
|---|
| 1        A.    I don't know what I'd do in that |
| 2  situation. |
| 3        Q.    Do you have anything you want to |
| 4  clarify before we close the deposition? |
| 5        A.    It's just unfortunate we got to |
| 6  this point.  That's all I'm going to say. |
| 7        BY MR. ARRUEBARRENA: |
| 8            Well, sir, I thank you for your |
| 9            time.  I thank you for your agreement |
| 10            to come without the subpoena. |
| 11            (AT THIS TIME TESTIMONY WAS |
| 12            CONCLUDED AND THE RECORD WAS CLOSED.) |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
| Page 318 |

80  (Pages 317 to 319)

# TRANSCRIPT OF THE DEPOSITION OF:

## DR. ALECIA CYPRIAN
## 02/18/08

---

## PATRICK CARPENTER

## VERSUS

## LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM, ET AL

---

Transcript and Concordance:
Prepared By:   Lillie R. Burch, C.C.R.

VENTURELLA & ASSOCIATES, L.L.C.
Board-Certified Court Reporters
321 North Vermont Street
Covington, Louisiana   70433

Telephone  (985) 893-1999
Facsimile: (985) 893-6765

Toll Free:  877-890-1999



1   to say, well, we'll let that be and we'll find
2   someone else.  And Patrick is a very humble
3   person, though he was outspoken and really
4   trying to bring his prior experiences from
5   Southern to the table at the LTC, nobody
6   wanted to hear that.  Because this is the way
7   that we've done it, so this is the way we will
8   continue to do it.  You either get on-board or
9   you get out.
10          And that was, when I became a
11  member of the LTC, the mentality of the LTC.
12  Even though in April of last year I left
13  willingly, I left knowing that an opportunity
14  for growth and the LTC's ability to get me to
15  where I needed to be professionally was not
16  going to happen.  Because I was more of a
17  liability than an asset to them.
18      Q.    I'm reading a letter which is
19  Patrick Carpenter's hiring letter.  It's from
20  Mr. Meaux.  One of the sentences says:  Mr.
21  Carpenter will be directing, developing, and
22  reorganizing the BR tech student services
23  department.
24          Did Mr. Carpenter ever tell you
25  that his charge from Mr. Meaux was to make

Page 17

1   from Greensburg and of course fifty or so
2   miles from Baton Rouge.  And I asked to
3   transfer probably February of 2006 to the
4   Florida Parishes campus.  And I knew someone
5   who worked with the budget to let me know that
6   Florida Parishes could accommodate my salary.
7   But I was told by both Sharon Hornsby and
8   Wayne Meaux that they didn't know if the
9   Florida Parishes campus could support my
10  budget.  And I had to meet with them at least
11  three or four times regarding a transfer when
12  white individuals who were at the LTC, like
13  Delano Klein, Mark Zean, were transferred
14  without incident.
15      Q.    So you felt like on issues at
16  least in terms of your employment transfers,
17  from your personal experiences, white
18  employees similarly situated were treated
19  better than you were?
20      A.    Similarly or less than were
21  treated better than I was.
22      Q.    Is there anything that you know
23  about of any kind of similar nature with
24  Patrick Carpenter that you feel he was treated
25  less favorably than any white employees?

Page 19

1   changes?
2       A.    Yes.
3       Q.    Do you feel that Mr. Meaux
4   supported him in that?
5       A.    Initially.
6       Q.    At what point do you feel he
7   didn't support him in that?
8       A.    When Kay didn't agree.
9       Q.    And do you know when that was?
10      A.    Probably right before he got to
11  the Westside campus.
12      Q.    You said you felt Patrick had to
13  work in a hostile environment.  And then you
14  sort of talked about the general environment
15  of coming from your background and the
16  background came from and going into the
17  environment of the LTC.  Do you feel that
18  there was any kind of hostile environment
19  against Patrick because of his race, African
20  American?
21      A.    Well, I mean, I just have to say
22  that I'm African American as well.  And I
23  would have to say yes.  And I say that and
24  preface that with my transfer, for instance.
25  I am from Independence, which is thirty miles

Page 18

1       A.    Part of me can speak to you about
2   that and part of me can't.  I guess my
3   recommendation is that a review of the
4   personnel records -- I mean, even between the
5   time that I was at the LTC Baton Rouge campus
6   and when I left, people of color, particularly
7   African Americans, were being either forced to
8   resign or were going to be fired.  Because
9   nobody felt like they needed to do unethical
10  things.  Nobody felt like they were going to
11  go against their professional ethics in
12  general, you know, based on numbers and
13  getting students financial aid.  Of course,
14  that was not everybody.  But just to look at
15  those individuals, all you need to do honestly
16  is look at the makeup of people, especially in
17  a professional setting, at the LTC overall,
18  and just the Baton Rouge campus, as to who
19  holds professional positions.
20          There are plenty of qualified
21  individuals at the master's level and doctoral
22  level who have applied for positions at the
23  LTC and have not been granted an opportunity
24  to have those positions.  And not because they
25  weren't qualified to have them.  It's just

Page 20

5  (Pages 17 to 20)

1  good ole' boy politics in the state of
2  Louisiana.
3      Q.    Do you feel that Mr. Meaux has
4  made decisions against African Americans that
5  were racially motivated?
6      A.    Absolutely.  He's one of the good
7  ole' boys who has been there forever.  Or was
8  there forever.  He along with Dr. Richard both
9  left at the same time.  And I don't know how
10  much politics played into that.  But it's very
11  political.
12      Q.    What about Kay McDaniel, do you
13  feel she has done anything adverse to African
14  Americans that was racially motivated?
15      A.    Yes.  To be honest with you,
16  Kay's interaction, how she talks to you,
17  addresses you.  When I got to the Baton Rouge
18  campus I was then still district director of
19  admissions.  And particularly on one incident
20  Eric Verbois, who was responsible and the
21  brains behind the Eric system, which was a
22  separate system from the SCEAS system, when
23  the entire LTC went to SCEAS Eric was still
24  wanting to use his database to get things
25  done.  And we had an issue regarding

Page 21

1  cumulative grade point averages for students.
2  So Eric sent me an e-mail.  Nonetheless, then
3  Kay sent me an e-mail.  And, you know,
4  thinking that Kay, being the campus dean,
5  would have to have clarity on how Eric was
6  actually computing cumulative grade point
7  averages, she sent me an e-mail and I sent one
8  back to her just asking for clarity on, you
9  know, what Eric used to calculate grade point
10  averages.  And didn't get a response from Kay.
11  And the communication from Kay ceased
12  regarding anything that had to do with the
13  Baton Rouge campus as far as admissions and
14  records were concerned.  And I don't think it
15  was because I was questioning Kay as a
16  professional, I think it was an African
17  American professional questioning Kay and how
18  dare I question Eric about the way in which
19  something was done.
20      So the bottom line was you either
21  fell in line or you were put on that list.
22  And when you get to Kay's list that's not a
23  good list.  Because Wayne valued Kay because
24  Kay was the type of leader that whatever Wayne
25  told Kay to do that he thought was in the best

Page 22

1  interest of the Baton Rouge campus, then
2  that's what happened.
3      Q.    You said something about her
4  demeanor.  Are you trying to say she had a
5  condescending demeanor towards you?
6      BY MR. VINCENT:
7          I object to the form of the
8  question.  Go ahead and answer it, ma'am.
9      BY THE WITNESS:
10          Yes, she did.
11  MR. ARRUEBARRENA CONTINUES EXAMINATION:
12      Q.    Were you able to observe her
13  demeanor with white employees to make a
14  distinction between the demeanor she was
15  projecting towards you?
16      A.    Absolutely.  I spent many days in
17  meetings with Kay.  Yes.
18      Q.    So you felt like in general,
19  then, including yourself, she had a
20  condescending demeanor against African
21  Americans in comparison to her demeanor
22  towards white workers?
23      A.    Yes.  An example, I specifically
24  remember the last graduation at the Baton
25  Rouge campus.  I actually represented the

Page 23

1  Westside campus.  Because we had a joint
2  nursing graduation.  And I sat on stage.  And
3  I was the only person of color on stage.  She
4  acknowledged everyone but me on the stage.
5      Q.    So it was all of these little --
6      A.    The little nuances.
7      Q.    The cumulative effect of all of
8  that, huh?
9      A.    Right.
10      Q.    In other words, it couldn't be a
11  coincidence?
12      A.    No, not in my professional
13  opinion of having worked in higher ed for the
14  past fifteen years.
15      Q.    Did you find Mr. Meaux to be
16  someone who would have a retaliatory attitude
17  about you if you challenged him or complained
18  about him?
19      A.    Yes.
20      Q.    How do you know that?
21      A.    Case in point.  I think right
22  before or during my conversation when he asked
23  me to come and visit him so I could bring
24  Patrick to the Westside campus, I talked
25  extensively to him about my opportunity to

Page 24

6  (Pages 21 to 24)

1  become a campus dean at the Hammond area
2  campus.  Because Sharon Hornsby was both the
3  campus dean for the Florida Parishes campus
4  and the Hammond area campus.  And when Will
5  Wainwright got a district position and moved
6  to the Baton Rouge campus he assured me that
7  within a year I would get that position.  And
8  part of that was taking Patrick and training
9  Patrick and getting Patrick acclimated as best
10 I could, though I was new to the environment
11 as well.  And somewhere along the way all of
12 that changed.
13     Q.    What about that makes you
14 conclude that it was some type of retaliation
15 for challenging him or disagreeing with him?
16     A.    You really just said it.  It was
17 challenging him.  Because I would always have
18 questions about the way in which we were doing
19 business, the way we were registering
20 students, how we would go about admitting
21 students, the way we went about processing
22 financial aid.  Just things in general that I
23 would ask him directly.  Because my supervisor
24 was out on leave for one period of time when
25 we did the reorganization from the campus

Page 25

1  level model to the district model to actually
2  do that whole model for us.  And I would make
3  recommendations.  And he would go -- not
4  assuming whether or not he met with the entire
5  group -- would come back and say we can't do
6  that.  And then when we did start having the
7  district model, when they originally had the
8  district model, Jocelyn Brunswick was the only
9  African American who was a campus dean.  So
10 they would all meet.  Well, when we changed,
11 when we took on a district approach where we
12 had the district directors oversee the
13 campuses in the district, we had one meeting.
14 And that's because, in my professional
15 opinion, of the five district directors, and
16 Tammy Brown will tell you, she was one, she
17 will tell you that she doesn't identify with
18 the race.  But for the most part, three of us,
19 or four, I include Tammy, were of color and
20 two were not.  And the people who were of
21 color were coming in and were asking questions
22 and were bringing documentation to support our
23 questions.  We had one meeting and they
24 stopped.  No more.  Per Wayne Meaux.
25     Q.    Were you challenging professional

Page 26

1  disagreements or was it unethical policies?
2      A.    Unethical practices that we were
3  utilizing in reporting numbers to the Board of
4  Regents.
5      Q.    Is that one way of saying he was
6  faking the numbers?
7      A.    Somewhat.  In the way they
8  reported.
9      Q.    And these are numbers that
10 generate the revenue that the college gets?
11     A.    From the state, yes.  And there
12 is no check and balance.  There is no way
13 anybody can check and balance.  Because SCEAS
14 is an access database.  You can make it do
15 what you want it to do when you want it to do
16 it.
17     Q.    So it was your professional
18 opinion that the way it was being managed
19 inaccurate information was given to the state
20 which the state would using to make financial
21 decisions about the LTC system?
22     A.    In some part.  And I think part
23 of that truly was part of Patrick's issue.  I
24 know as a professional it was part of my
25 issue.  And I can't speak for Patrick, but for

Page 27

1  me, being a consummate professional you kind
2  of go in hoping that somehow some way you can
3  change the scope of the environment and the
4  way in which people do things.  If you show
5  them the proper way, and the legal way, an
6  ethical way to do them, that that would
7  change.  I sent e-mails to that effect and
8  would get no response.
9      Q.    Do you know Lamoyne Williams?
10     A.    Yes.
11     Q.    Do you have any idea why of all
12 the people I have talked to he would make
13 negative comments about Patrick, if there was
14 any personal reasons -- well, let me ask you
15 this.  Do you know if he just didn't like
16 Patrick?
17     A.    I don't know if Lamoyne disliked
18 Patrick.  Lamoyne was there when Patrick --
19 Lamoyne worked as some kind of teacher before
20 he got into student affairs.  So he probably
21 knew of Patrick and knew what Patrick's role
22 there was.
23         Part of Mr. Meaux's rationale for
24 hiring Patrick was because he had no people of
25 color, none, in professional positions at the

Page 28

7  (Pages 25 to 28)

**Page 29**

1  Baton Rouge campus. And that's what he
2  needed. And that's what he did.
3      Q.   Why do you think he thought he
4  needed African American people in the position
5  like the one he gave Patrick? Why do you
6  think he felt that was necessary?
7      A.   Because the LTC had not long ago
8  done a study. Before I went to the technical
9  college I worked at Baton Rouge Community
10 College. And the Board of Regents was doing a
11 study. Because I think there was some issue
12 regarding people of color, particularly
13 African Americans, in leadership positions in
14 technical and community college systems. And
15 I'm sure if you did some research you could
16 see that national study in either the
17 Chronicle or in some of the community college
18 digests.
19     Q.   Do you think he did it with a
20 full heart, a sincere attempt to rectify that
21 problem, or did he do it be begrudgingly?
22     A.   I think he did it because he had
23 to do it. And it was between Patrick and
24 myself. After I got hired it was told to me
25 by several individuals that I didn't get the

**Page 30**

1  job because I was working on my doctorate and
2  he felt that soon after I got it I would
3  leave. And he didn't feel that way about
4  Patrick.
5      Q.   Do you know of any instances,
6  just from your personal knowledge from any
7  source, of Patrick complaining about race
8  discrimination during his employment with LTC?
9      A.   To whom?
10     Q.   Either to Mr. Wainwright, or
11 Chancellor Montgomery-Richard, or Mr. Meaux,
12 anyone like that?
13     A.   Patrick did tell me -- and I
14 think this was right at the time I got to the
15 Baton Rouge campus -- right before I got there
16 he had been put on administrative leave. They
17 told him he couldn't do that. Then he came
18 back. That's when he began the process of
19 filing a formal grievance. He did let me read
20 the letter. In that letter he informed
21 Dr. Richard that he wanted to have Mr. Meaux
22 and Kay McDaniel investigated based on
23 retaliation. Part of that was due to his
24 race.
25     Q.   Can you tell me, did the

**Page 31**

1  atmosphere change for Patrick after he made
2  the complaints about Mr. Meaux and Ms.
3  McDaniel?
4      A.   I think for all of us the
5  atmosphere was hostile, particularly at the
6  Baton Rouge campus.
7      Q.   What I'm asking for, though, is
8  whether or not you noticed any particular
9  greater degree of hostility towards Mr.
10 Carpenter after he made those complaints.
11     A.   Probably so in the form of
12 e-mails. Not so much face-to-face. But he
13 would share e-mail communication with me to
14 seek my advice on how to respond.
15     Q.   Did you have occasion during that
16 period to observe his work or how he was being
17 treated at work or were you separated from
18 him?
19     A.   When I was in the Baton Rouge
20 campus we worked in the same area. He was
21 pretty much stressed all the time and making
22 sure he, you know, saved e-mails, sent his
23 e-mail to his personal account. Because at
24 that point when he filed a formal grievance he
25 felt that he would be retaliated against.

**Page 32**

1      Q.   In your position did you actually
2  observe anything that you could call
3  retaliation against him as far as you could
4  tell?
5      A.   Like I said, in written form, not
6  face-to-face. But, yes, in written form.
7      Q.   What kind of written form?
8      A.   Case in point, a person who he
9  didn't even report to or had no jurisdiction
10 over him, Pat Walton, would constantly e-mail
11 him about verification of students. They
12 wanted specific procedures on how he was doing
13 things. Whereas they didn't ask that of
14 Marlon who was also doing financial aid at the
15 Baton Rouge campus.
16     Q.   So that appeared to be to you an
17 example of him being treated differently after
18 his complaints of discrimination?
19     A.   Yes. Well, not so much
20 discrimination. But just the fact that he
21 filed a grievance and discrimination was part
22 of it.
23     Q.   Is there anything else that you
24 might observe might attribute to him being
25 treated more harshly after he filed the

8 (Pages 29 to 32)

PATRICK CARPENTER          DEPOSITION OF: DR. ALECIA CYPRIAN          REPORTED BY:
LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM     FEBRUARY 18, 2008          LILLIE R. BURCH, CCR

| | |
|---|---|
| 1   grievance, the discrimination complaint? | 1                REPORTER'S CERTIFICATE |
| 2        A.    No. | 2 |
| 3        BY MR. ARRUEBARRENA: | 3 |
| 4            That's all I have for now.  I | 4        I, Lillie R. Burch, Certified Court |
| 5   offer Mr. Vincent to ask you a couple of | 5   Reporter in and for the State of Louisiana, |
| 6   questions.  Then I may ask a couple of | 6   Certification No. 87177, which is current and |
| 7   follow-ups. | 7   in good standing, as the officer before whom |
| 8        EXAMINATION BY MR. VINCENT: | 8   this testimony was taken, do hereby certify |
| 9        Q.    Good afternoon, ma'am.  Scott | 9   that DR. ALECIA CYRIAN, after having been duly |
| 10   Vincent.  Did you ever get that transfer to | 10   sworn by me upon authority of R.S. 37:2554, |
| 11   Tri-Parish? | 11   did testify as hereinbefore set forth in the |
| 12        A.    Yes, I did. | 12   foregoing pages; that this testimony was |
| 13        Q.    Was it Tri-Parish or Florida | 13   reported by me in the stenotype reporting |
| 14   Parishes? | 14   method, was prepared and transcribed by me or |
| 15        A.    Florida Parishes. | 15   under my personal direction and supervision, |
| 16        Q.    How long did it take for you to | 16   and is a true and correct transcript to the |
| 17   get that transfer? | 17   best of my ability and understanding; that I |
| 18        A.    Two months. | 18   am not related to counsel or to the parties |
| 19        BY MR. VINCENT: | 19   herein, nor am I otherwise interested in the |
| 20            That's all the questions I have, | 20   outcome of this matter. |
| 21   Dr. Cyprian.  Thank you. | 21 |
| 22        BY MR. ARRUEBARRENA: | 22 |
| 23            I thank you so much, Dr. Cyprian, | 23 |
| 24   for taking the time out of your busy schedule | 24        _____ |
| 25   to give your testimony.  We really appreciate | 25        Lillie R. Burch, CCR |
|                                  Page 33 |        Certification No. 87177 |
| | |
| | |                                  Page 35 |

| |
|---|
| 1   it. |
| 2 |
| 3            (AT THIS TIME, TESTIMONY WAS |
| 4        CONCLUDED AND THE RECORD WAS CLOSED.) |
| 5 |
| 6 |
| 7 |
| 8 |
| 9 |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |
|                                  Page 34 |

9  (Pages 33 to 35)

*751 a.m.*



# Louisiana Technical College
## BR Tech Campus

3250 North Acadian Thruway East
Baton Rouge, Louisiana 70805
Phone: (225) 359-9201  Fax: (225) 359-9296



August 15, 2005

Mr. Patrick Carpenter
LTC – BR Tech
3250 N. Acadian Thruway East
Baton Rouge, LA 70805

Dear Mr. Carpenter:

As we discussed in our meeting this morning, you have been placed on annual leave for two days (Monday, August 15th and Tuesday, August 16th, 2005) or until you can arrange an appointment with Mr. Wayne Meaux, Vice Chancellor/Provost.  You were placed on annual leave because of your unacceptable conduct.

Mr. Meaux is scheduled to return to campus on Tuesday, August 16, 2005.

Sincerely,

*Kay McDaniel*

Kay McDaniel, Ph.D.
Campus Dean
LTC – Baton Rouge Campus

C: W. Wayne Meaux
Vice Chancellor/Provost

*Received in Student Services on October 13, 2005 Campus mail 7:51 a.m.*



EXHIBIT

Carpenter v. LTC

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Ms Margaret Montgomery-Richard<br>Chancellor<br>LOUISIANA TECHNICAL COLLE<br>150 Third Street<br>Baton Rouge, LA 70801 | Patrick W. Carpenter |
| | THIS PERSON (check one or both)<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>270-2005-00410 |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **10-SEP-05** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by _____ to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **25-AUG-05**
to    **Byron Sylve, ADR Coordinator, at (504) 589-4296**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| George Simpson,<br>Investigator | New Orleans District Office<br>701 Loyola Ave<br>Suite 600<br>New Orleans, LA 70113 |
|---|---|
| *EEOC Representative* | |
| *Telephone:* **(504) 589-2277** | |

Enclosure(s): [X] Copy of Charge

### CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

See enclosed copy of charge of discrimination.

EXHIBIT
W
FENGAD 800-631-6989

Carpenter v. LTC
Bates No. 000793

| Date<br>Aug 10, 2005 | Name / Title of Authorized Official<br>Keith Hill,<br>Acting Director | Signature |
|---|---|---|

CASE LOG

(Continue on Reverse)

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 220 2005-00410 | Louisiana Tech College | Patrick W. Carpenter |

| Date | Action | Entered | Reviewed/ |
|---|---|---|---|
| 09/13/05 | OCP contacted by telephone and reviewed charge drafted BCP concluded on EEOC process at guidedreor. | [initials] | |
| 8/10/05 | Signed Change | [initials] | |
| 2-10-06 | Called CP - left message on VM | [initials] | |
| 3-2-06 | Called CP - Conducted PI | [initials] | |
| 4-5-06 | M3 to UK | [initials] | |
| 4/5/06 | Dismissal approved | [initials] | |
| 2/15/07 | Signed RTS & DI | [initials] | |

Carpenter v. LTC
Bates No. 000748

EEOC Form 159 (10/94)

# LOUISIANA COMMUNITY AND TECHNICAL COLLEGE SYSTEM
## PROFESSIONAL/ADMINISTRATIVE EVALUATION AND PLANNING FORM
### FOR UNCLASSIFIED EMPLOYEES

Name _Patrick Carpenter_____    Position _FAO___  Period Covered from 02/28 to _6/30/05

Department _Student Services_____    Full Time __X___  Part Time ____ (% FTE)

Reason for Rating: [ X ]  Annual    [   ]  Other _____  Hire Date _12/04/02_____

## INSTRUCTIONS:

**% of effort** - For each Section indicate the % of the employee's overall effort that is assigned for all applicable criterion covered by the section. Note that the total % of effort for all sections combined should equal 100%.

**Criterion Comments** - In the space provided for criterion comments, please provide a brief narrative summary of the employee's activities during the period covered. These comments should justify the criterion rating as indicated. Utilize any goals and objectives that may have been set for this criterion in the previous evaluation period.

**Criterion and Section Summary Rating** - Rate the employee on each applicable criterion in each section. A  the criterion rating numbers together and divide by the total number of criteria in each section to obtain the Section Summary Rating.

**Overall Evaluation Rating** - In the overall evaluation summary, provide a narrative statement that supports the overall evaluation rating for the employee for the period evaluated, as supported by the ratings for each Section and their respected % of effort assigned.

Transfer the corresponding Section Summary Rating into the Overall Evaluation Rating Calculator then multiply by the % of effort assigned to the Section to determine the Weighted Rating. Total the Weighted Rating for all sections to determine the Overall Evaluation Rating.

**Planning Form** - Utilize the Planning Form to set goals and objectives for each section for the next evaluation period.

**Performance Improvement Plan** – A Performance Improvement Plan is required for all employees with overall evaluation ratings of Needs Improvement or Unsatisfactory. This is not required for other overall evaluation ratings.

**Individual Rating** – The intent of this evaluation process is to rate the individual on his/her own performance based on objectives, goals, expectations and actual performance. It is not intended to be a ranking of one employee against another.

Return pages 3 through 8, Planning Form and Performance Improvement Plan, if applicable, to human resources.

**EXHIBIT**

X

PENGAD 800-631-6989

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000717

## Rating Categories and Definitions:

**5 – Outstanding – Performance is consistently well above the expected levels of competence in all requirements for the review criterion.** Performs work above expected levels for the position and may make suggestions for work improvement.  Employee anticipates and responds quickly to changing situations, continually expanding knowledge and skills to address new challenges.  Employee requires essentially no supervision of duties appropriate for the position, regularly going beyond what is expected for the review criterion.

A rating of Outstanding for the overall evaluation is used if the employee consistently performs well above all requirements of the position.

**4 – Exceeds Expectations – Performance is occasionally above the expected levels of competence for the review criterion.**  Expectations are met in all areas, and in some areas are exceeded, but not on a consistent basis.

A rating of Exceeds Expectations for the overall evaluation is used if the employee has met all requirements of the job and has exceeded some, but not all, requirements of the position.

**3 – Meets Expectations – Performance consistently meets the expected level of competence for the review criterion.**  Work of a satisfactory nature is performed on a consistent basis with normal supervision, meeting all job expectations of the review criterion.

A rating of Meets Expectations for the overall evaluation is used if the employee has consistently met all requirements of the position.

**2 – Needs Improvement – Performance does not consistently meet all requirements of the review criterion.**  Overall performance is less than satisfactory for the review criterion.  Where performance in some areas is satisfactory, improvement is needed in others.

A rating of Needs Improvement for the overall evaluation is used if the employee has met some requirements but there are areas where he/she needs improvement to meet requirements of the position, or where performance fluctuates between satisfactory and unsatisfactory.  An overall rating of Needs Improvement requires that a Performance Improvement Plan be established for the employee with a follow-up performance evaluation required 90 days from the date of the Needs Improvement performance rating.

**1 – Unsatisfactory – Performance is consistently poor or inadequate in meeting most or all requirements of the review criterion.**  Requires frequent, close supervision and/or the redoing of work.  Few or no goals and objectives are met.  Signifies need for immediate improvement.

A rating of Unsatisfactory for the overall evaluation indicates that the employee's performance does not meet the minimum requirements of the position.  Overall performance must improve in order to retain the employee in his/her present position.  A Performance Improvement Plan is required to be established for the employee with a follow-up performance evaluation required 90 days from the date of the Unsatisfactory performance rating.  Human Resources must be consulted regarding the employee's future status with the institution.

Carpenter v. LTC
Bates No. 000718

LCTCS Professional/Administrative Evaluation

A. Communication:  _25___% of overall effort assigned to this Section
Rate employee for all applicable criteria  for this section.

| Criteria for Evaluation and Comments | Criterion Rating | | | | | |
|---|---|---|---|---|---|---|
| | N/A | 1 | 2 | 3 | 4 | 5 |
| 1.   Written and Oral Communication – Has effective writing and speaking skills.  Writes in an understandable manner, free of grammatical, spelling or sentence structure errors.  Gives clear directions.  If required to conduct meetings: prepares agenda, defines purpose of meeting, encourages participation, considers and follows up on suggestions, and adjourns on time.<br>Comments: Delay with ID policy<br>Writes with grammatical errors | | | 2<br>X | | | |
| 2.  Communication with Co-workers and Supervisor – Uses appropriate communication channels.  Consults with supervisor about actual or potentially sensitive issues.  Assumes responsibility for communicating relevant information to co-workers and supervisor on a timely basis.<br>Comments:  January 5, 2005 Situation with Auditor who was conducting a grade audit.  The grade audit had nothing to do with Continuing Ed.  Patrick spoke to auditor and went to both Dean Hitchcock and Dean Wainwright to told them about the conversation.  He was advised by Dean Hitchcock and Dean Wainwright to speak to me and he did not.  Finally on January 21, Patrick came to see me about the situation.  I had already handled it with the auditors.  Patrick does not communicate with me and tries to work around me | | | 2<br>X | | 4 | 5 |
| 3.  Effective Listening – Listens to and considers the views of others.  Considers the advantages, disadvantages, usefulness, potential results and other relevant factors of alternatives.<br><br>Comments:  Does not listen to College Dean, Senior FAO, or Dean of Workforce. | | 1<br>X | 2 | 3 | 4 | 5 |
| ...tion A Summary Rating - Add the criterion rating numbers together and divide by the total number of | | | | | | 1 .67 |

Carpenter v. LTC
Bates No. 000719

LCTCS Professional/Administrative Evaluation

applicable criteria in each section.  Show Section Summary Rating in box at right (round to 2 decimal places).

Carpenter v. LTC
Bates No. 000720

CTCS Professional/Administrative Evaluation

Page 4

B. Work Habits: _25____% of overall effort assigned to this Section
..ate employee for all applicable criteria for this section.

| Criteria for Evaluation and Comments | Criterion Rating |
| --- | --- |

| Criteria for Evaluation and Comments | N/A | 1 | 2 | 3 | 4 | 5 |
| --- | --- | --- | --- | --- | --- | --- |
| 1.  Workload Management/Commitment to Work – Demonstrates competence in performance of duties associated with the functional area.  Prioritizes work and submits completed work on a timely basis in an orderly and efficient manner.  Self-motivated, commits time as necessary to fulfill responsibilities of position. Note:  You will want to outline functional duties and may want to address these on a separate supporting attachment.  **Comments: Patrick was required to attend the FAO boot camps.  He did not attend all sessions and left early.  He was given manuals to read which he admitted on April 27 in a meeting with Dr. Joycelyn Brunswick and me.  He was given computer tutorials to work through.  He admitted that he did not work through them.   Does not wait on students in a timely manner.** | N/A | 1 | 2 X | 3 | 4 | 5 |
| 2.  Attendance/Use of Time –Maintains appropriate office hours. Keeps appointments on time.  Makes effective use of time.  Responds to business communications in a timely manner, i.e. telephone calls, faxes, emails.  Employee is dependable and has a minimum of unplanned absences. Comments:  When annual leave was denied on May 30 because of the upcoming registration on June 1-3, Patrick called in sick.  We had explained that May 30 was a crucial day for financial aid before summer registration. | N/A | 1 X | 2 | 3 | 4 | 5 |
| 3.  Professionalism – Performs job duties in accordance with policies, procedures and generally accepted standards/ guidelines for the profession/area of work.  Complies with relevant laws and regulations. Comments: | N/A | 1. | 2 | 3 X | 4 | 5 |

| Section B Summary Rating - Add the criterion rating numbers together and divide by the total number of applicable criteria in each section.  Show Section Summary Rating in box at right (round to 2 decimal places). | 2 .00 |
| --- | --- |

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000721

Adaptability: ___25___% of overall effort assigned to this Section.
...te employee for all applicable criteria for this section.

| Criteria for Evaluation and Comments | | | Criterion Rating | | | | |
|---|---|---|---|---|---|---|---|
| | N/A | 1 | 2 | 3 | 4 | 5 |
| 1.  Flexibility – Adjusts behavior to fit the situation or person as appropriate.  Modifies operational procedures, plans and goals to meet changing institutional demands and opportunities.<br>Comments:<br><br>Has difficulty adjusting schedule to fits other's needs.  Students must come first in Student Services; his schedule may have to be adjusted to meet their needs. | N/A | 1 | 2<br>X | 3 | 4 | 5 |
| 2.  Action Oriented – Demonstrates a capacity to quickly adapt to change, shortening the response time of all processes and systems.  Delegates authority and assumes responsibility, as appropriate.  Eliminates bureaucratic practices to accelerate all aspects of work.<br>Comments: | N/A | 1 | 2<br>X | 3 | 4 | 5 |
| 3.  Future Oriented – Anticipates internal and external forces that will impact the future effectiveness and efficiency of the unit and responds with needed changes.  Thinks dynamically and fosters creative approaches or imaginative solutions.<br>Comments: | N/A | 1 | 2<br>X | 3 | 4 | 5. |

| Section C Summary Rating - Add the criterion rating numbers together and divide by the total number of applicable criteria in each section.  Show Section Summary Rating in box at right (round to 2 decimal places). | 2.00 |
|---|---|

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000722

Case 3:07-cv-00170-JJB-SCR    Document 73-1    05/08/08    Page 134 of 138

⌐. Adding Value/Team Building: ___25___ % of overall effort assigned to this Section
..ate employee for all applicable criteria for this section.

| Criteria for Evaluation and Comments | N/A | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| 1.  Integrity-- Reaches decisions based on the highest ethical standards.  Fosters a culture of trust and respect for others.  Behaves in a fair and ethical manner.<br>Comments: |  |  |  | 3<br>X |  |  |
| 2.  Concern with Impact --Understands the LCTCS mission and goals.  Concentrates on outcomes, works across departmental boundaries and assumes ownership of problems.  Resolves problems with minimum impact on students, staff and public.  Demonstrates an understanding of the "big picture" and how actions impact the entire System.<br>Comments:<br>Needs to plan work schedule around peak periods in Student services. His absence from work could cause huge problems in the ..glstration/financial aid process. |  |  |  | 3<br>X |  |  |
| 3.  Value-Added Orientation -- Capitalizes on opportunities to reduce costs, improve customer service/satisfaction and increase productivity. -- Pursues and encourages opportunities that foster learning, growth and development.<br>Comments: |  | 1<br>X |  |  |  |  |
| 4.  Team Relations-- Treats others with dignity and respect. Contributes to an environment where differences are valued and encouraged. Seeks to build internal and external partnerships to better accomplish goals.<br>Comments:  Patrick has caused many issues with those he works with because he has failed to carry his workload. The student Services department works as a team with the exception of Patrick. |  | 1<br>X |  |  |  |  |

| S⌐⌐ion D Summary Rating - Add the criterion rating numbers together and divide by the total number of a⌐. able criteria in each section.  Show Section Summary Rating in box at right (round to 2 decimal places). | 2.00 |
|---|---|

Carpenter v. LTC
Bates No. 000723

LCTCS Professional/Administrative Evaluation

## OVERALL EVALUATION SUMMARY NARRATIVE:

**OVERALL EVALUATION RATING CALCULATOR:** Transfer the corresponding Section Summary Rating into the Overall Evaluation Rating Calculator then multiply by the % of effort assigned to the Section to determine the Weighted Rating.  Total the Weighted Rating for all sections to determine the Overall Evaluation Rating.

| Section | %Effort Assigned to Section | | Section Summary Rating | | Weighted Rating |
|---|---|---|---|---|---|
| A  COMMUNICATION | .25 | x | 1.67 | = | .42 |
| B  WORK HABITS | .25 | x | 2.00 | = | .5 |
| C  ADAPTABILITY | .25 | x | 2.00 | = | .5 |
| D  ADDING VALUE/TEAM BLDG | .25 | x | 2.00 | = | .5 |
| E  MANAGEMENT ACTIVITIES | | x | | = | |
| Overall Evaluation Rating | 100% | | | | 1.92 |

Dean Will Wainwright's eval will count ½ of total score.  2.00 + 1.92 / 2 =  1.96

Overall Rating Scale =  Overall Rating Category

| | |
|---|---|
| 4.50 – 5.00 | Outstanding |
| 3.50 – 4.49 | Exceeds Expectations |
| 2.50 – 3.49 | Meets Expectations |
| 1.50 – 2.49 | Needs Improvement * |
| 1.00 – 1.49 | Unsatisfactory * |

*Requires Performance Improvement Plan

**EMPLOYEE COMMENTS** (add a separate page if necessary):

This appraisal has been discussed by the undersigned and a copy given to the employee.

_Kay M Manuel_
Rating Supervisor's Signature          Print Supervisor Name          Date

_Patrick Carpenter_          _Patrick Carpenter_          _8/15/05_
Employee's Signature*          Print Employee Name          Date

*This signature does not indicate agreement or disagreement but simply that the evaluation has been discussed.

Name _____ Position _____ Period Covered from _____ to _____

Department _____ Full Time _____ Part Time _____ (% FTE)

Reason for Rating: ☐ Annual    ☐ Other    Hire Date _____

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000724

## PLANNING FORM – PROFESSIONAL/ADMINISTRATIVE
(For use with Professional/Administrative Evaluation)  Page 1 of 2

For the period covered from _____ to _____

**Instructions:**

*The purpose of the Planning Form is to describe the developmental goals and objectives intended for the employee to pursue during the coming year.  It is recommended that the description be specific so that at the end of the year there will be as little ambiguity as possible in judging whether each goal was achieved.  It is recognized that some plans will be changed during the year and that not all goals will be achieved for a variety of reasons.*

*Set at least one objective for each employee per Section that will aid the employee's performance development.  Be sure that it is specific, measurable, attainable, reasonable and that a time is set for expected completion.*

### Section A - Communication

Goals and Objectives Set (set begin date and completion date for each)

|  | Begin Date | Completion Date |
|---|---|---|
| ➤  __Follow Communications Channels | 8/1/05 | |
| ➤  __Improve Written Communications by receiving feedback and help proofreading | __8/1/05_ | |

Status of Goals and Objectives at Review Date:

### Section B - Work Habits

Goals and Objectives Set (set begin date and completion date for each)

|  | Begin Date | Completion Date |
|---|---|---|
| ➤  Recognize peak times in FA and do not take leave during those periods | 8/1/05_ | |
| ➤  Keep appointments with students.  Wait on drop Ins in a timely manner. | | |
| ➤  Do not send students away. | 8/1/05__ | |

Status of Goals and Objectives at Review Date:

### Section C - Adaptability

Goals and Objectives Set (set begin date and completion date for each)

Begin        Completion

Date        Date

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000725

➢ __As a servant of students, be flexible with your schedule in order to meet their needs.

_____    __8/1/05_____    _____

> Status of Goals and Objectives at Review Date:

## PLANNING FORM – PROFESSIONAL/ADMINISTRATIVE
(For use with Professional/Administrative Evaluation)  Page 2 of 2

### Section D - Adding Value/Team Building

Goals and Objectives Set (set begin date and completion date for each)

|  | Begin Date | Completion Date |
|---|---|---|

➢ ___Work as a team with others in Student
Services_____    _8/1/05__    _____

➢ _____    _____    _____

> Status of Goals and Objectives at Review Date:

### Section E - Management Activities

Goals and Objectives Set (set begin date and completion date for each)

|  | Begin Date | Completion Date |
|---|---|---|

➢ _____    _____    _____

➢ _____    _____    _____

> Status of Goals and Objectives at Review Date:

The goals and objectives listed for the performance criterion have been discussed and are understood.

*Kay McDaniel*    _____        *Patrick Carpenter*    *8/15/05*
Supervisor's Signature    Begin Date        Employee's Signature    Begin Date

_____    _____        _____    _____
Supervisor's Signature    Review Date        Employee's Signature    Review

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000726

## PERFORMANCE IMPROVEMENT PLAN
*(Required for Overall Performance Ratings of Needs Improvement and Unsatisfactory)*

E  'oyee: (Print) _Patrick Carpenter_ ___ Position/Rank _FAO_

Evaluator: _Dr. Kay McDaniel_ ___ Title: _Campus Dean_

*This following Performance Improvement Plan has been established for this employee due to receipt of an overall performance evaluation rating of*

/ ✓/ Needs Improvement  for the period covered from _7-1-04_ to _8-30-05_

/ / Unsatisfactory for the period covered from _____ to _____

Identify the area(s) where performance improvement is needed.  For each area identified establish goals and objectives that are required to be met.  Be sure to assign a beginning date for each planned activity, a deadline for expected outcome completion date and a review date for area for performance improvement.

Area for Performance Improvement:
_Communications & Work habits_

Planned activity and expected outcome:

_Follow communication channel(s)_
_Keep appointments_
_Wait on students_

Begin Date: _7-1-05_ ___ Outcome Completion Date: _____ Review Date _____

Status of Planned Activity and Expected Outcome at Review Date:

*Use as many pages as necessary for the Performance Improvement Plan.*
*Indicate # of pages utilized _____.*

The undersigned understand that it is necessary at this time to focus on the indicated area(s) for performance improvement.  It is noted that disciplinary action(s) may be taken at any point if performance does not indicate significant improvement.

_Kay McDaniel_ ___ _Patrick Carpenter_ _Patrick Carpenter_ _8/15/05_
Evaluator Signature    Begin Date    Employee Signature  Print Name    Review Date

_____    _____    _____    _____    _____
Evaluator Signature    Review Date    Employee Signature    Print Name    Review Date

BrdApprv6/13/01

Carpenter v. LTC
Bates No. 000727