UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PATRICK CARPENTER** | * | **CIVIL ACTION NO. 07-0170** |
| | * | |
| **VERSUS** | * | **JUDGE BRADY** |
| | * | |
| **THE BOARD OF SUPERVISORS OF THE** | * | **MAGISTRATE RIEDLINGER** |
| **LOUISIANA COMMUNITY AND** | * | |
| **TECHNICAL COLLEGE SYSTEM,** | * | |
| **LOUISIANA BOARD OF REGENTS** | * | |
| **AND LOUISIANA TECHNICAL COLLEGE** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**SHORT AND CONCISE STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED**

COMES NOW, Plaintiff Patrick Carpenter ("Carpenter"), and pursuant to the local rules of this Court (LR 56.2) submits a short and concise statement of facts as to which there exists a genuine issue to be tried, as follows: (The first 64 material facts at issue are numbered to correspond to the Defendant's alleged statements of uncontested material facts). There are material facts as to which there exists a genuine issue to be tried in the denials of the Defendant's alleged uncontested material facts.

1. Patrick Carpenter (hereinafter referred to as "Carpenter" and "plaintiff") was hired as the Director of Student Affairs at Louisiana Technical Colleges Baton Rouge Campus on December 2, 2002 to replace Virgina Watts, a Caucasian female.

**Response:     Denied for lack of knowledge to justify a belief herein.**

2. Carpenter was recommended for employment by Vice Chancellor/Provost Wayne Meaux. The initial, interviewing committee, of which Kay McDaniel ("McDaniel") was a member, narrowed the candidates down to three, Carpenter, William Hughes, and Dr. Alecia Cyprian. McDaniel gave Carpenter a very high rating. The second, hiring committee selected Carpenter for the position. Dr. West, who was a member of the second committee, voted against Carpenter in favor of Dr. Cyprian.

    **Response:     Denied for lack of knowledge to justify a belief herein.**

5. Historically, all standardized tests have been administered by the staff in the Office of Student Affairs primarily because they are trained in proper test administration standards and have the facilities to administer such tests.

    **Response:     Denied for lack of knowledge to justify a belief herein.**

6. The previous Practical Nursing Department Head, Mrs. Sybil Turnbull, implemented the PAX-PN exam for applicants to the Practical Nursing Program in 1989. The PAX-PN Test included science which was a better indicator of success in the medical field than was the general admissions test given to all applicants known as the Test of Adult Basic Education ("TABE"). The process ws to place all PN applicants who made successful scores on th TABE on a list to take the PAX-N as a secondary screening process. The Office of Student Affairs maintained the list and would perform a mail-merge of the names and addresses to these students and would mail letters regarding the date and time the PAX-PN would be administered to those on the list. Staff of the Office of Student Affairs would then

administer the test for the Practical Nursing Department and would forward the tests to the National League for Nursing ("NLN") to be scored. The results of the test would be sent by the NLN directly to the Office of Student Affairs.

**Response:    Denied for lack of knowledge to justify a belief herein.**

8.  Plaintiff made the decision without consulting the administration at BR Tech. When Beverly Pacas, the current department head for Health Services, found out about Carpenter's decision regarding testing, she wrote him a memorandum requesting that he allow his staff to administer the PAX-PN Test in May 2003 because her department was not set up to administer same.

**Response:    Denied for lack of knowledge to justify a belief herein.**

11. McDaniel responded to Carpenter's letter regarding the PAX-PN exam on April 16, 2003, by asking him to ensure someone from his department assist the nursing department in administering the PAX-PN exam in May 2003.

**Response:    Denied for lack of knowledge to justify a belief herein.**

12. On June 4, 2003, Beverly Pacas advised McDaniel that Carpenter never responded to an email she sent him on March 30, 2003. When McDaniel asked him why he failed to respond to Mrs. Pacas' email, Carpenter stated "it wasn't signed and he couldn't be sure it was from her."

**Response:    Denied as written.**

13. On June 18, 2003, McDaniel received an email from Jennifer Passman, Coordinator of the District II E-Learning advising McDaniel that she had made arrangements for students to

complete an e-learning survey through Carpenter, but plaintiff failed to have students complete the survey. Ms. Passman had students complete the surveys during registration instead. Carpenter's failure to do his job significantly disrupted the flow of registration.

**Response:    Denied for lack of knowledge to justify a belief herein.**

14. As Director of Student Affairs, one of Carpenter's duties was to handle student discipline. McDaniel began working with Carpenter by having him sit in on student issues so he could observe how to handle student problems. McDaniel subsequently asked Carpenter to handle a student problem in the cosmetology department at the Frazier Campus. Ms. Sanders, the Cosmetology Instructor, advised McDaniel that plaintiff made sexual remarks to her, but she refused to file a grievance.

**Response:    Denied.**

15. While at the Frazier Campus for the purpose of handling student discipline, Carpenter got a manicure in the Cosmetology Department.

**Response:    Denied as written.**

16. Carpenter evaluated and submitted performance scores for Tammy Brown and Enola Miller for the entire year even though he had only supervised them for six months. McDaniel had to follow-up and ask Carpenter for copies of Mrs. Brown's and Mrs. Miller's evaluations because he failed to provide them in a timely manner.

**Response:    Denied for lack of knowledge to justify a belief herein.**

17. In July 2003, Carpenter conducted a lecture with Dr. Alecia-Cyprian-Andrews, Director of Admissions, but plaintiff did not meet with Dr. Andrews to plan the presentation and he used

up all of the allotted time during his presentation. During his presentation, plaintiff spoke with tremendous authority on Student Affairs issues, but he gave out erroneous information. For instance, the information in Carpenter's PowerPoint presentation was in direct conflict with the BR Tech Student Catalog. Plaintiff also set deadlines for admissions without discussing it with McDaniel even after McDaniel advised him McDaniel was opposed to deadlines for the Technical College Students.

**Response:    Denied as written.**

18. Carpenter's inability to communicate clearly and to provide direction and leadership escalated until he became ineffective. After much discussion regarding Carpenter's job performance, it was determined that he lacked the proper skill sets to be successful in the Office of Student Affairs.

**Response:    Denied for lack of knowledge to justify a belief herein.**

19. He was therefore, detailed to LTC-Westside Campus to be mentored by the District Dean of Student Affairs, Dr. Joycelyn Brunswick, and other District Student Affairs staff members.

**Response:    Denied as written.**

20. Effective August 11, 2003, Carpenter participated in an internship program. The objective was to expand services in the District. It was Vice Chancellor/Provost Wayne Meaux's decision to find an area of responsibility in which Carpenter could be successful.

**Response:    Denied for lack of knowledge to justify a belief herein.**

21. After completing a semester of mentoring, Dr. Brunswick advised Wayne Meaux ("Meaux") "it was not working out," and asked that Carpenter be transferred back to the BR Tech

Campus.

**Response:    Denied for lack of knowledge to justify a belief herein.**

22. In an attempt to find a position in which Carpenter could find success, Meaux recommended that Carpenter be placed in the position of Coordinator of Corporate and Continuing Education and Safety under the direction of Michael Gassen, Assistant Dean, and William Wainwright, Dean of Workforce Development. The objective was for Carpenter to become independent and assume full responsibility for directing Continuing and Corporate Education at BR Tech Campus.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

23. Carpenter was assigned the position of Coordinator of Corporate and Continuing Education and Safety in January of 2004. In this position, he was responsible for payroll. However, he failed to timely pay apprentice trainers during the 2004 Christmas holidays. Carpenter blamed this flagrant oversight on lack of training and the fact he was unaware trainers were working over the holidays.

    **Response:    Denied as written.**

24. As Safety Coordinator, Carpenter was assigned to write an ID policy for the BR Tech Campus. A committee was formed and began meeting in March 2004.

    **Response:    Denied as written.**

25. The process of trying to get Carpenter to produce this policy was very frustrating for the administration.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

26. McDaniel presented a draft of the policy produced by Carpenter's committee to the faculty on September 28, 2004. Since Carpenter was not present to address faculty and staff questions regarding the policy, McDaniel emailed questions to him on that same date. Receiving no response from Carpenter, McDaniel requested a status report on the new ID policy from Carpenter on October 20, 2004. On October 25, 2004, Carpenter submitted a new ID policy to McDaniel without addressing the questions she sent him on September 28th. Additionally, Carpenter added a refund fee for temporary ID's that the administration had overruled as early as April 2004. The ID policy was never completed.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

27. It was agreed that Carpenter would report both to McDaniel and William Wainwright starting in July 2004.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

28. McDaniel sent Carpenter emails requesting further clarification of the campus ID policy in November 2004.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

30. LTC received two letters from apprenticeship leaders detailing the difficulties they had with Carpenter.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

31. Under Carpenter's leadership, *the enrollment in continuing education dwindled to one class of 20 students.*

    **Response:    Denied as written.**

32. In an effort to find a single-focused position of responsibility in which Carpenter could find success and to fill a staff need, Meaux, once again, re-assigned Carpenter to serve as a Financial Aid Officer in the Office of Student Affairs at the BR Tech Campus.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

33. By assigning Carpenter to the Financial Aid Office, the administration's intention was to give LaMoyne Williams assistance by dividing the alphabet and giving each of them a share of the total number of students on financial aid.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

34. Carpenter would only be responsible for learning the Pell Grant regulations and processing students for the 2005 – 2006 Pell Year.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

35. Carpenter was sent to training classes at the LASFA Conference in Lafayette, Louisiana, told how to access the on-line training provided free of charge by the U.S. Department of Education and given the Federal Pell Grant regulations.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

36. On April 27, 2005, LaMoyne Williams requested a meeting with Dr. Joycelyn Brunswick, Carpenter and McDaniel to discuss several issues, primarily a verbal exchange that occurred between Mr. Williams and Carpenter on that date.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

39. Several employees at BR Tech overheard Carpenter give out false information to students regarding the awarding of Pell Funds.

> **Response:** **Denied for lack of knowledge to justify a belief herein.**

40. Carpenter refused to ask anyone for help or clarification, including Mr. Williams, who was more than willing to assist him.

    **Response:** **Denied as written.**

41. On May 27, 2005, McDaniel sent Carpenter an email denying his request for annual leave on May 30, 2005 because of the workload of the Financial Aid Office.

    **Response:** **Denied for lack of knowledge to justify a belief herein.**

43. On August 10, 2005, McDaniel received a call from Ms. Enola Miller, Office Manager for the Student Affairs Department. Ms. Miller was very concerned because Carpenter had just returned from his two-week vacation and was angry that students came to see him without appointments.

    **Response:** **Denied for lack of knowledge to justify a belief herein.**

44. The reason students came in without appointments is because they only had until August 12, 2005 to complete financial aid paperwork in order to be guaranteed a fall tuition deferment.

    **Response:** **Denied for lack of knowledge to justify a belief herein.**

45. Carpenter was aware of this deadline before he went on vacation.

    **Response:** **Denied as written.**

46. Students whose last names begin with A-N were assigned to Carpenter and these students had to wait two weeks to see Carpenter while he was on vacation.

    **Response:** **Denied as written.**

47. McDaniel telephoned Carpenter and advised him that he had to see all of the students who

came to see him and that under no circumstances was he to turn any students away.

**Response:    Denied for lack of knowledge to justify a belief herein.**

48. LaMoyne Williams called McDaniel at approximately 6:00 p.m. on August 11, 2005 and advised her that Carpenter was turning students away.

**Response:    Denied for lack of knowledge to justify a belief herein.**

49. Carpenter's actions constituted insubordination.

**Response:    Denied as written.**

50. On August 12, 2005, McDaniel received calls from Laura Crook in Accounting, Margaret Elgin, HR Analyst and LaMoyne Williams. Angry students had been to Ms. Crook and Mrs. Elgin to complain about Carpenter. McDaniel was advised that Carpenter was not waiting on students and not serving them in a timely manner. *Carpenter also told students he would not defer any Pell Grants after Monday, August 15, 2005* despite the fact that Mr. Williams had sent Carpenter an email advising him that BR Tech defers Pell throughout registration if the paperwork is in order.

**Response:    Denied for lack of knowledge to justify a belief herein.**

51. Carpenter's incompetence caused many students to have to return to his office multiple times simply because he refused to follow the work-flow pattern shown to him by Mr. Williams and did not produce documents and Pell Award Letters in a timely fashion.

**Response:    Denied.**

52. As a result of the events that transpired during the week of August 10, 2005, McDaniel met with Carpenter on Monday, August 15, 2005, discussed the issues with him, placed him on

forced leave for 15 hours (from 9:00 a.m. on Monday, August 15 through 4:30 p.m. on Tuesday, August 16, 2005), and completed his evaluation.

**Response:   Denied for lack of knowledge to justify a belief herein.**

53. Since Meaux was off campus for those two days, McDaniel instructed Carpenter to call Meaux and set up an appointment with him.

**Response:   Denied.**

54. Carpenter did not call Meaux or return to the BR Tech Campus as he was instructed to do.

**Response:   Denied.**

55. On Thursday, August 25, 2005, Mrs. Lillie Pryer, BR Tech Payroll Administrator, advised McDaniel that she did not have a signed time sheet nor approved annual leave forms for Carpenter from August 17 – August 25, 2005. As a result, McDaniel asked Mrs. Pryer to contact Carpenter to notify him of his status with the campus and to ask him if he had any plans to meet with Meaux.

**Response:   Denied for lack of knowledge to justify a belief herein.**

57. Given the fiasco created by Carpenter during Fall Registration, Carpenter and Meaux met on September 8, 2005 to discuss issues and options relating to his employment at the LTC. During their discourse, Meaux offered the option of transitioning Carpenter to work with corrections programs managed by the Folkes Campus in Jackson, Louisiana. When their discussion ended, Meaux asked Carpenter to contact him in a couple of days, after he had an opportunity to think about the offer. On September 12, 2005, plaintiff declined Affiant's offer to transition to the Folkes Campus.

          **Response:**    **Denied as written.**

58.    Given the fact Carpenter declined Meaux's offer to transfer to the Folkes Campus, McDaniel asked Margaret Webb to contact Carpenter and instruct him to report to McDaniel when he returned to work on Tuesday, September 13, 2005. Carpenter reported to Student Services. McDaniel had to call him to her office at 8:40 a.m.

          **Response:**    **Denied for lack of knowledge to justify a belief herein.**

59.    Carpenter repeatedly failed to follow orders, ask for assistance from his supervisors, and work with other staff members in ways that would enable him to be successful and productive.

          **Response:**    **Denied.**

60.    Although plaintiff was never disciplined for deficient performance, he was re-assigned to positions during his tenure at LTC due to his unsatisfactory work performance and LTC's desire to find a position for him in which he could be successful.

          **Response:**    **Denied.**

61.    In addition to providing him with the support he needed to learn each job assignment he was given, the staff at LTC worked very hard to provide Carpenter with many opportunities to be successful. Nonetheless, Carpenter worked in isolation and repeatedly failed to consult with his supervisors before he instituted major changes in the policy at LTC.

          **Response:**    **Denied.**

62.    Carpenter was not terminated in retaliation for complaining about racial discrimination or harassment or on account of his race.

**Response:    Denied.**

63. Carpenter was separated because he created dissension among the staff, disrupted the flow of work, hampered enrollment and created a burden on his supervisors who had to spend an inordinate amount of time reminding him of his duties and deadlines and frequently had to do his work for him.

    **Response:    Denied.**

64. At the time of his "demotion" in September of 2005, Carpenter was reassigned from the position of Director of Corporate and Continuing Education. LaMoyne Williams, a black male, filled the position on an interim basis until he was made permanent Director of Workforce. There was a corporate reorganization, and the position of Director of Corporate and Continuing Education was eliminated and the duties of the position were absorbed by the Director of Workforce, LaMoyne Williams. When Carpenter was ultimately terminated on January 2, 2007, his position as Financial Aid Officer was filled by Latreva Walker, a black female.

    **Response:    Denied for lack of knowledge to justify a belief herein.**

65. Was race a determinative factor in Carpenter's termination?

66. Was there a causal connection between Carpenter filing his race discrimination grievance with the E.E.O.C. and his termination?

67. When did LTC receive Carpenter's E.E.O.C. Charge of Discrimination?

68. When did Dr. McDaniel learn of Carpenter's E.E.O.C. Charge?

69. When did Meaux learn of Carpenter's E.E.O.C. Charge?

70. Why did LTC revoke their decision to terminate Carpenter on August 15, 2005?

71. Was the delay in terminating Carpenter's employment due to LTC's plan to "paper" Carpenter's employee file with negative evaluations and negative criticisms of his job performance?

Respectfully submitted,

/s/ Victor Farrugia
VICTOR FARRUGIA (#19324)
1010 Common Street, Suite 3000
New Orleans, LA 70112
Telephone: (504) 525-0250
Facsimile: (504) 581-7083

and

JAMES L. ARRUEBARRENA,
   Attorney at Law, L.L.C.
1010 Common Street, Suite 3000
New Orleans, LA 70112
Telephone: (504) 525-2520
Facsimile (504) 581-7083

**Attorneys for Patrick Carpenter**

**C E R T I F I C A T E**

I hereby certify that a copy of the above and foregoing has been served upon all parties herein by using the CM/ECF system and by depositing same in the United States Mail, properly addressed, and postage prepaid, on this 5th day of May, 2008 to any non-CM/ECF participants.

                                        /s/ Victor Farrugia
                                        VICTOR FARRUGIA